## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**THOMAS O'NEAL,**          Case No. 8:20-cv-936-KKM-AAS
        *Judgment Creditor*

**Vs.**

**BRANDON M. CARNES, et al.,**
        *Judgment Debtors*

_____/

**THOMAS O'NEAL,**
        *Judgment Creditor/Plaintiff*

**Vs.**

**CBD AMERICAN SHAMAN, LLC, et al.,**
        *Impleaded Defendants*

_____/

### JUDGMENT CREDITOR'S/PLAINTIFF'S OPPOSED MOTION TO DETERMINE APPLICABILITY OF CRIME-FRAUD EXCEPTION TO DEFENDANTS' ATTORNEY-CLIENT AND ATTORNEY WORK-PRODUCT PRIVILEGES WITH SUPPORTING MEMORANDUM

COMES NOW Judgment Creditor/Plaintiff/Counterclaim Defendant, Thomas J. O'Neal ("O'Neal"), by and through his undersigned attorney, and moves the Court for an order finding that the crime-fraud exception applies to Judgment Debtor, Brandon Carnes' ("Carnes") and Defendants' attorney-client and attorney work-product privileges, as the same are recognized by Rules 501 and 502, Fed.R.Evid., and Section 90.502, *Florida Statutes*, and declare that Carnes and

Defendants are not entitled to the benefit of the privileges to conceal their fraudulent and criminal conspiracy.

## MEMORANDUM IN SUPPORT

### I. Introduction.

As detailed below, O'Neal presents far more than a mere *prima facie* showing that Carnes and Defendants engaged in a civil and criminal conspiracy to transfer Carnes' non-exempt assets to Defendants in violation of state fraudulent transfer laws, Florida's fraudulent transfer laws, Florida's civil theft statute, Florida's criminal theft statute, Section 812.14, *Florida Statutes*, federal criminal laws relating to the subornation of perjury, and by the flagrant abuse of process as herein described. O'Neal's proof of Carnes' and Defendants' fraud and criminal conduct not only meets the *prima facie* evidentiary standard—it is overwhelming.

### II. Criminal and Fraudulent Conduct.

O'Neal's *prima facie* showing relies upon the Declaration of Leigh Geither ("Geither Declaration) [Doc. 152-1] attached as Exhibit "1"; Declaration of Kathi Miley [Doc. 119-1] attached as Exhibit "2"; Declaration of David R. Mitchell ("Mitchell Declaration") attached as Exhibit "3"; and the Declaration of David L. Luck ("Luck Declaration") [Doc. 188-3] attached as Exhibit "4." O'Neal also relies upon Shaman Franchising's franchisee disclosure document (FDD) issued April 30, 2021 ("2021FDD") attached as Exhibit "5," together with attorney emails and attached documents.

O'Neal was awarded a final judgment against Carnes on July 30, 2021, in the amount of $608,400.00.  [Doc. 78]  Immediately prior to October 15, 2020, Carnes was the sole owner of five (5) single-member limited liability companies ("Carnes' LLCs") that owned and operated twenty-six (26) "CBD American Shaman" franchised stores located in five (5) states, including in the State of Florida.  *See* Transfer Agreement [Doc. 152-1] attached as Exhibit "6" at p. 1/14.  On October 15, 2020, Carnes, individually, and as the owner of the Carnes' LLCs, conveyed twenty-two (22) franchised stores to Defendants and conveyed one (1) franchised store to Kalaiwaa without satisfying O'Neal's claim.  *Id*.

Pursuant 16 C.F.R. § 436.5, propounded by the Federal Trade Commission (FTC) and commonly referred to as the "Franchise Rule," franchisors must publicly issue a franchisee disclosure document ("FDD") on an annual basis and must promptly amend FDDs in the event of any material changes in the operation of the franchise system, including the termination of a franchisee owning a material number of franchises.  Franchisor must cease selling franchises if they fail to publicly issue and file an updated FDD within one hundred and twenty (120) days after the close of the franchisor's fiscal year.  Pursuant to Item 20 (Exhibit M-2) of the Franchise Rule a franchisor must specifically disclose in its FDD all franchisees who have been "terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under a franchise agreement" during the most recently completed fiscal year and must disclose the franchised locations, together with the name and telephone number of the terminated franchisee.

The Franchise Rule's requirement that a franchisor disclose if any of its franchised locations have "ceased to do business under a franchise agreement" can be deceptively circumvented by the artifice of a "management agreement," whereby the franchise agreement is not technically "terminated" in that the franchisee continues to retain legal title to the franchised stores, but all possessory rights and control, including all profits, are assigned to the franchisor. Deceptive use of "management agreements" are known to be a way for franchisors to obfuscate the true status of its franchise system.

Shaman Franchising was selling franchises throughout the United States, including in in the States of Maryland, Minnesota, and New York, and engaged Matthew L. Hood, Esquire and the Hood Law Group to prepare and file its FDDs. *See* cover sheet to Uniform Franchise Registration Application attached hereto as Exhibit "7" at pp. 1-2/15. The States of Maryland, Minnesota, and New York require franchisors selling franchises within their jurisdiction to file copies of their FDDs with specified state agencies before making any sales and further require that franchisors promptly file amendments to its FDD in the event of any "material change," expressly including the termination of five percent (5%) or more of a franchisor's franchised outlets nationwide within any three (3) month period, or immediately discontinue marketing franchises in the State (Maryland), the termination of ten percent (10%) of all franchised locations within any three (3) month period, or immediately discontinue marketing franchises in the State (Minnesota), and terminating ten (10) franchise locations or ten percent (10%) of the franchise locations during a three (3) month

period and/or the franchisor purchasing more than five percent (5%) of its franchises in a six (6) month period, or immediately discontinue marketing franchises in the State (New York).[1]

Carnes and Defendants knew that prospective franchisees, lenders, property owners, and creditors rely upon the truthfulness of the disclosures made in Shaman Franchising's publicly issued FDDs in their commercial dealing with Defendants and Shaman Franchising's franchisees.  Carnes and Defendants also knew that O'Neal had been employed by Shaman Franchising, CBD American, and Shaman Botanicals to open and operate company-own stores in the State of Florida (*See* Complaint [Doc. 1] in underlying litigation).  Moreover, Carnes and Defendants were aware that O'Neal was knowledgeable about the contents of Shaman Franchising's publicly issued FDDs and that O'Neal relied upon the truthfulness of the disclosures made in the FDDs in his dealings with Carnes and Defendants, as evidenced by the Declaration of Thomas J. O'Neal in Support of Motion for Default Judgment [Doc. 58-1] filed March 21, 2021, and O'Neal's explicit reference to Shaman Franchising's 2020 FDD.  A copy of the O'Neal Declaration referring to Shaman Franchising's 2020 FDD is attached as Exhibit "8."

In the third calendar quarter of 2020, Carnes made the decision to defraud O'Neal by engaging in a classic retail "bust-out," whereby Carnes caused the Carnes'

---

[1] *See* Business Regulation Art.33, §§ 14–201 *et seq.* (Maryland); M.S.A. 80C.01, *et. seq.* (Minnesota); and  General Business Law § 681. *et. seq.* (New York).

LLCs to purchase product, sell the products at full retail prices to customers, but fail to make lease payments to the property owners of the Transferred Stores or payments to other unsecured vendors and creditors, then fraudulently convey the Transferred Stores to Defendants in violation of state fraudulent transfer laws; loot the Carnes' LLCs; and abscond with the proceeds. *See* letter from Attorney Porto to Carnes ("Porto Letter") dated December 23, 2020, included in Geither Declaration attached as Exhibit "1" at pp. QQ/QQ, itemizing the unpaid amounts owed by the Carnes' LLCs to property owners, vendors, and other creditors.

Carnes and Defendants knew that the Transferred Stores could not be conveyed to a third party without the fraudulent participation of Shaman Franchising, and the combined commitment of Carnes' and Defendants' to fraudulently conceal the transfers from O'Neal. The co-conspirators knew that Carnes had evaded service of the summons and complaint in the underlying litigation for eight (8) months, but that Carnes had authorized Attorney Pickett as his lawyer to accept service of the summons and complaint in the underlying litigation on September 7, 2020 [Doc. 39-1] and knew that the service upon Attorney Pickett constituted valid personal service upon Carnes. A copy of the Carnes Return of Service and Pickett Return of Service are attached as Exhibit "9" and "10," respectively.

Carnes and Defendants fully recognized that Carnes' failure to respond to the summons and complaint in the underlying litigation would result in O'Neal obtaining a substantial default judgment taken against Carnes, and that O'Neal would be entitled to engage in post-judgement collection and discovery proceedings against Carnes. The

Defendants further knew that Carnes had engaged in a retail "bust-out."  *See* Porto Letter attached to Geither Declaration (Exhibit "1") at pp. 58-64/64.  Lastly, Carnes and Defendants also knew that the Transferred Stores could not be conveyed to a third party without Shaman Franchising' fraudulent assistance, and knew that the Transferred Stores could not be conveyed to themselves, or to any of their affiliated entities, without Defendants and Carnes joining in a civil conspiracy to conceal the fraudulent transfers from O'Neal.

Defendants retained Attorney Porto and Attorney Pickett to draft documents and otherwise represent Defendants in furthering their civil and criminal conspiracy. Attorney Porto and Attorney Pickett instructed Carnes to contact David J. Mitchell, Esquire to review and comment upon the documents prepared by Attorney Porto and Attorney Pickett so as to give the false appearance that Carnes' and the Carnes' LLCs were represented by "independent" counsel and were not co-conspirators with Defendants.  Carnes engaged Attorney Mitchell to review the documents prepared by Attorney Porto and Attorney Pickett.  *See* September 23, 2020 email from Attorney Porto to Attorney Mitchell attached to Mitchell Declaration (Exhibit "3") at pp. 11/64.

Attorney Porto emailed to Attorney Mitchell a management agreement ("Management Agreement") to be executed by Carnes, the Carnes LLCs, and Shaman Botanicals.  *See* September 24, 2020 email from Attorney Porto to Carnes and Attorney Mitchell and Management Agreement attached to Mitchell Declaration (Exhibit "3") at pp. 11-15/64.  Pursuant to the Management Agreement, Carnes granted Shaman

Botanicals the "exclusive right ... of administering, managing and operating  the business operations at the [Transferred Stores], including but not limited to, operating a CBD American Shaman location at such Property"; and that "neither Carnes, nor the [Carnes LLCs], shall have any right to operate at such [Transferred Stores] and each agree that [Shaman Botanicals] shall have the exclusive right to occupy such [Transferred Stores]." *Id.* at p. 13/64.

Carnes and Defendants abandoned their plan to use the artifice of the Management Agreement to document their fraudulent transaction, and on October 2, 2020, Attorney Porto emailed the Transfer Agreement to Attorney Mitchell for his review. *See* October 2, 2020 email from Attorney Porto to Carnes and Attorney Mitchell attached to Mitchell Declaration (Exhibit "3") at pp. 22-32/64. 26Pursuant to the Transfer Agreement, Carnes agreed to "assign any leases to the ...[Transferred Assets], along with any assets associated with such ...[Transferred Stores], to...[Defendants, exclusive of Kalaiwaa]; agreed to execute an assignment of the lease ...[along with any associated assets for the Transferred Store located] at 1005 Middlebrook Drive, Suite C, Mission, Kansas to Kalaiwaa" ("Mission Store"); agreed that "neither Carnes, nor ...[the Carnes LLCs] shall have any right to operate at ...[the Transferred Stores]"; that the Transferred Stores were "assigned to ... [Defendants] free from any liabilities";  and that Shaman Franchising "release[ed] Carnes from that Franchise Agreement entered into ... [by Shaman Franchise and Carnes] on April 18, 2018." *Id.* at pp. 24-25, 26/54 (brackets added).

The co-conspirators were acutely aware that in order for their civil and criminal conspiracy to succeed, Carnes must not be located by O'Neal and served with a subpoena *duces tecum* or otherwise be compelled to give testimony regarding the fraudulent conveyance of the Transferred Stores.   On April 24, 2021, Shaman Franchising, CBD American, and Shaman Botanicals answered under oath the following interrogatory ("Interrogatory") propounded by O'Neal:

> Interrogatory 8: **Please identify** (by full name, **current or last known address, telephone number**, and title or position) all persons whom Defendant believes have or may have knowledge concerning the subject matter of this action ….

> Answer:  ***Brandon Carnes, a Defendant in this lawsuit who is not affiliated with the Shaman Companies and who was mentioned in the allegation of Plaintiff's … Complaint:   615-761-6501   or   913-633-3808; brandon.carnes1@gmail.com or brandoncarnes1@yahoo.com.

Interrogatory No. 8.

Pursuant to the terms of the Transfer Agreement, Defendants made payments to Carnes on or before each of the following dates:  November 14, 2020, December 14, 2020, January 14, 2021, February 14, 2021, March 14, 2021, and April 14, 2021; and distributed "affiliated income" to Carnes "in accordance with Shaman's usual practices monthly from October 15, 2020, until and including June 14, 2021.  *See* Transfer Agreement attached as Exhibit "6" at p. 7/14.  On December 23, 2020—just 120 days <u>before</u> Defendants responded to the Interrogatory—Attorney Porto sent the Porto Letter to Carnes at Carnes' then current residence located at 23611 W. 51st Terrace, Shawnee, KS 66226, and sent a copy of the Porto Letter to Carnes' counsel,

Attorney Mitchell.  *See* Porto Letter attached to Geither Declaration (Exhibit "1") at pp. 58-64/64.

Shaman Franchising's, CBD American's, and Shaman Botanicals' response to the Interrogatory was deceptive and misleading, omitted material facts necessary to make the response, in light of circumstances under which the response was made, not false and misleading to O'Neal, and the deception was done in furtherance of Carnes' and Defendants' continuing civil and criminal conspiracy to conceal the whereabouts of Carnes and to hinder, delay, disrupt, and/or defeat O'Neal's right to pre-judgment injunction remedies.

The key component of Carnes' and Defendants scheme was to successfully induce O'Neal into agreeing to release Defendants from liability for their deceitful and fraudulent conduct under the duplicitous pretext of settling a Fair Labor Standards Act (FLSA) claim.  Defendants caused Shaman Franchising to violate the Franchise Rule and state franchisor disclosure laws by not amending Shaman Franchising's publicly issued 2020 FDD and publicly issuing Shaman Franchising's 2021 FDD without truthfully disclosing that Shaman Franchising "terminated, cancelled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under a franchise agreement" on October, 15, 2020, resulting in twenty-three (23) franchised "outlets" owned by Carnes being terminated by Shaman Franchising—not three (3) as fraudulently represented.  *See* "Item 20, Table No. 5 (Exhibit M-2) of Shaman Franchising's 2021 FDD issued April 30, 2021, attached as Exhibit "5" at p. 264/271

Carnes and Defendants knew that O'Neal would rely on Shaman Franchising amending its publicly filed 2020 FDD and making truthful disclosures in Shaman Franchising's 2021 FDD publicly issued April 30, 2021, when evaluating any "release of claims" proposals received from Defendants. Shaman Franchising's disclosures in its 2021 FDD were false and deceptive, known by Defendants to be false and deceptive, and wrongly induced O'Neal to justifiably believe that Carnes continued to own and operate twenty-three (23) "outlet[s]" as of January 1, 2020, and more specifically, that the twenty-three "outlet[s]" had not been fraudulently transferred by Carnes to Defendants on October 15, 2020. O'Neal would not have signed a settlement agreement that included  a "release of claims" provision purporting to release Defendants from liability for their deceitful and fraudulent conduct if O'Neal knew the true facts.

Carnes and Defendants knew that the Middle District of Florida required all agreements resolving Fair Labor Standard Act (FLSA) claims to be filed with the court and approved for "fairness" in order for the settlement of the FLSA claims to be enforceable.  Carnes and Defendants also knew that if Shaman Franchising, CBD American, and Shaman Botanicals submitted a settlement agreement that included a release intended to bar O'Neal's from suing Defendants for their fraudulent and deceitful conduct, the Court would make inquiry and the fraudulent conveyance of the Transferred Stores would be revealed to O'Neal.

As part of their continuing conspiracy, CBD American, and Shaman Botanicals resolved to evade court review of the to-be-drafted settlement documents and on April

21, 2021, the parties filed a joint notice pursuant to M.D. Fla. Local Rule 3.09 ("Resolution Notice"). [Doc. 65]   The Resolution Notice stated that O'Neal's FLSA claims had been settled and informed the Court that the lawyers for Shaman Franchising, CBD American, and Shaman Botanicals "are in the process of drafting a confidential agreement to memorialize that resolution" that would not be subject to the review of the Court for "fairness," and the parties would be filing a notice of dismissal of the underlying litigation pursuant to Fed.R.Civ.P. 41(a)(1)(A)(ii). [Doc. 65]

O'Neal signed the Settlement Agreement on May 14, 2021, and Defendants executed the document on May 24, 2021.  A copy of the Settlement Agreement is attached as Exhibit "11."  O'Neal would not have agreed to a "release of claims" that barred him from suing Defendants for their fraudulent and deceitful conduct as herein described if he were aware of the true facts.  O'Neal continued to be ignorant of Carnes' conveyance of the Transferred Stores to Defendants until Defendants' disclosed their fraud in their memorandum in opposition to O'Neal's motion to compel production of documents filed in the Western District of Missouri on November 20, 2021 as herein described.

On July 30, 2021, O'Neal was awarded a default judgment [Doc. 78] against Carnes, and others, in the amount of Six Hundred and Eight Thousand Four Hundred Dollars ($608,400.00), together with plus post-judgment interest, and began collection efforts in this Court and in the United States District Court for the Western District of Missouri.  On August 20, 2021, the Court entered an Order ("August 20, 2021 Order")

[Doc. 88] instructing O'Neal to serve Carnes with the August 20, 2021 Order ordering Carnes to complete Form 1.977, Fla.R.Civ.P., including interrogatories directed at discovering any transfers of Carnes' assets to third parties, and for Carnes to deliver the same to O'Neal's attorney within forty-five days of service.

O'Neal relied upon the truthfulness of Shaman Franchising's representation in its 2021 FDD that Carnes owned and operated the Mission Store and Carnes was subject to being properly served with court papers at the Mission Store pursuant to Rule 7(b)(2)(B)(i), Fed.R.Civ.P., ("A paper is served under this rule by …leaving it … at the person's office with a clerk or other person in charge….") and Kansas law, K.S.A. 60- 205(B)(2)(b)(i) (substantively the same as Rule 7(b)(2), Fed.R.Civ.P.)

Carnes and Defendants knew that O'Neal would be relying upon the truthfulness of Shaman Franchising's 2021 FDD that Carnes owned and operated the Mission Store when O'Neal caused a process server to serve Carnes with the August 21, 2021 Order [Doc. 88] at the Mission Store.  Carnes and Defendants were acutely mindful that in order for their fraudulent and criminal conspiracy to succeed, Carnes must not be located and served with the August 20, 2021 Order. [Doc. 88]  Shaman Franchising, CBD American, and Shaman Botanicals received a copy of the August 20, 2021 Order pursuant to the CM/ECF on August 20, 2021, but Defendants disposed of the August 20, 2021 Order and related service papers addressed to Carnes that had been delivered to the "person in charge" of the Mission Store.  Carnes and Defendants concealed from O'Neal that the information in Shaman Franchising's 2021 FDD upon which relied upon to serve Carnes was outright false.

O'Neal filed Case No. 4:21-09039-SRB in the United States District Court for the Western District of Missouri ("Missouri Federal Court") and sought to serve Carnes at the Mission Store with discovery relating to the Transferred Stores. In furtherance of Carnes' and Defendants' civil conspiracy and to further delay O'Neal's discovery of Carnes' conveyance of the Transferred Stores to Defendants, Defendants conspicuously failed to inform O'Neal that that Kalaiwaa, not Carnes, owned and operated the Mission Store, that the disclosure in Shaman Franchising's 2021 FDD was false; and that O'Neal's service of court papers on Carnes by serving the "person in charge" of the Mission Store was a worthless and futile exercise and was done to conceal the whereabouts of Carnes and to further hinder, delay, disrupt, and/or defeat O'Neal's rights as a judgment creditor of Carnes.

O'Neal served requests for production of documents upon Defendants pursuant to Rules 34 and 68, Fed.R.Civ.P. and a motion to compel in the Missouri Federal Court seeking "records in the ... [Defendants'] possession relating to the disposition" of certain CBD American Shaman stores previously franchised by judgment debtor Brandon Carnes." [MO. Doc. #18 at p. 2 (brackets added)]  Defendants filed a Suggestions in Opposition to Plaintiff Thomas O'Neal Motion to Compel [MO. Doc. #18 at p. 2] in the Missouri Federal Court stating: "O'Neal and his attorneys are on a fishing expedition in the wrong pond using the wrong gear"; and "the discovery O'Neal seeks in aid of execution is not relevant to the identification of any assets from which the judgment against Carnes can be satisfied." *Id*.

Defendants represented to the Missouri Federal Court that: "(t)here is also no basis to permit discovery on a theory of fraudulent transfer of the stores that the Shaman Companies reacquired under the agreement with Carnes…[entered into] in October of 2021"; recited that "(f)ranchisee reacquisition is a common occurrence permitted under applicable regulations." Defendants further falsely stated that Carnes' conveyance of the Transferred Stores to Defendants was "disclosed in the normal course of business in the franchisor's annual Franchise Disclosure Document ("FDD") (brackets added)."

Defendants made the statements to the Missouri Federal Court with the intention of creating the false appearance that the disclosures in Shaman Franchising's 2021 FDD were truthful and complete, when Defendants knew that the Shaman Franchising's 2021 FDD omitted material facts necessary in order to make the statement made, in light of circumstances under which they are made, not false and misleading. Defendants also knew that to disclose in a pubic court filing that Shaman Franchising's 2021 FDD was false and deceptive would result in Shaman Franchising's franchisees  being informed of Shaman Franchising's violations of the Franchise Rule and applicable state franchisor disclosure laws, and every franchisee who relied on the 2020 FDD (after October 15, 2020) and the 2021 FDD would have the right to rescind their franchise agreements thereby subjecting Defendants to adverse federal and state regulatory actions and financial losses.

Upon being confronted about the false disclosures in Shaman Franchising's 2021 FDD, Defendants filed the Miley Declaration. [Doc. 119-5]  A copy of the Miley

Declaration is attached as Exhibit "2."  The Miley Declaration is based on "personal knowledge" and states that the false statement in Shaman Franchising's 2021 FDD that Carnes owned and operated the Mission Store was "a mistaken entry" and that the Mission Store "was reacquired by ... [Defendants] as part of" the Transfer Agreement.  The Miley Declaration further states, with the intent to obfuscate and create the false appearance that the disclosures were completely truthful, that "Carnes closed three stores in Bradenton, Florida, Kissimmee, Florida, and Sarasota, Florida in 2020 which are reflected in the List of Former or inactive Franchisees ... attached as Exhibit M-2" to Shaman Franchising's 2021 FDD."  Defendants knew that Shaman Franchising's 2021 FDD was required to disclose all twenty-three (23) of Carnes' franchised "outlets" that Shaman Franchising "terminated, cancelled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under a franchise agreement" in accordance the Franchise Rule.  Defendants solicited and filed with the Court the false and misleading Miley Declaration and filed the same as part of Defendants flagrant abuse of process.

On November 3, 2021—twenty-six (26) days before Defendants' disclosed in the Missouri Federal Court that Carnes had conveyed the Transferred Stores to Defendants—O'Neal's attorney sent Attorney Porto an email stating that the conveyances of the Transferred Stores "appears [to have]... occurred sometime during the twelve month period ending 12/31/20, [and] I am very concerned about the relatively short limitation periods that are running as to any innocent transferees.  I need to at least start the clock running regarding getting a court order..."  *See*

November 3-4, 2021 email exchange Between Kevin H. Graham and Attorney Porto attached as Exhibit "12."

Attorney Porto responded, stating that "(o)n Wednesday, November 3, you sent me a letter to clarify the scope of your discovery requests and my clients' position with a stated response deadline of end of business today on November 4"; stating that "I have forwarded your letters onto my client and its franchise counsel" [and have been] informed me they are reviewing their files"; and stating that "I believe  that we are working in good faith to address your concerns... However, I do not guarantee that we will produce additional documents or even locate additional documents to produce." *Id.*

As a final part of Carnes and Defendants civil and criminal conspiracy, Defendants solicited and filed the false Luck Declaration. [Doc. 188-5]  A copy of the Luck Declaration is attached as Exhibit "4."  The Luck Declaration [Doc. 188-3] was executed on January 9, 2022, and filed with the Court on February 28, 2022.  *Id*.  At the time Defendants solicited Attorney Luck to provide false testimony and filed the Luck Declaration, Defendants knew that when O'Neal signed the Settlement Agreement on May 14, 2021, O'Neal, nor O'Neal's attorney, Kevin H. Graham, had knowledge that Carnes had secretly conveyed the Transferred Stores to Defendants.

Upon being confronted by about the false disclosures in Shaman Franchising's 2021 FDD, Defendants, on or about September 3, 2022, caused Shaman Franchising to discontinue selling franchises on its website, https://cbdamericanshaman.com.

### III.  Applicable Legal Standards and Analysis.

As the court succinctly stated in *Diamond Resorts U.S. Collection Dev., LLC v. US Consumer Attorneys, P.A.*, 519 F.Supp.3d 1184, *reconsideration denied*, 2021 WL 4482837 (S.D. Fla. 2021):

> The attorney-client privilege exists to protect confidential communications between client and lawyer made for the purpose of securing legal advice. Thus, in order to claim attorney-client privilege, the proponent of the privilege must prove that what is sought to be protected is (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client. Privileged persons' include the client, the attorneys, and any of their agents that help facilitate attorney-client communications or the legal representation. In addition to demonstrating the elements required to initially establish the privilege, the asserting party must prove that it has not waived the privilege.

519 F.Supp.3d at 1197 (internal citations and quotation marks omitted).

The attorney-client privilege attaches to all communications made in confidence by a client to an attorney for the purposes of securing legal advice or assistance. The attorney-client privilege "does not protect communications made in furtherance of a crime or fraud" and the Eleventh Circuit has a two-part test for applying the crime-fraud exception:

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice. Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

*In re Grand Jury Subpoena*, 2 F. 4th (11th Cir. 2021) *citing* and *quoting In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987). (internal citations and quotation marks omitted).

Both requirements for the application of the crime-fraud exception are plainly met in this case and all of Carnes' and Defendants' communications with and among Attorneys Pickett, Porto, Hood, Moore, and Luck are subject to the crime-fraud exception to the attorney-client privilege. *See e.g., In re ATIF, Inc.*, 2019 WL 10733623, *1 (M.D.Bank. 2019) ("Plaintiff had shown a prima facie case of the Defendants' fraudulent conduct in connection with the fraudulent transfers.").

O'Neal has also made a *prima facie* showing that the crime-fraud exception applies to Carnes' and Defendants' attorney work-product privilege. In *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1337–38 (11th Cir. 2018), the Eleventh Circuit held:

> that the district court properly concluded that the crime-fraud exception may be applied because illegal or fraudulent conduct by an attorney alone may suffice to overcome attorney work product protection  We have previously recognized that in cases of attorney misconduct there is no protection for the attorney's work product. *** [A]n attorney may not exploit work product protection when she engages in illegal conduct or a fraud upon the court even if her client is innocent. Of course, for the crime-fraud exception to apply, a court must find that the specific document or testimony that the court is ordering to be produced reflects work of the attorney that was performed in furtherance of the criminal or fraudulent activity or that was closely related to it.

885 F.3d at 1324, 1337–38 (11th Cir. 2018) (brackets added; footnotes omitted).

And as explained in *Gutter v. E.I. Dupont De Nemours*, 124 F.Supp.2d 1291, 1307 (S.D.Fla.2000):

> the party opposing the privilege on the crime/fraud exception has the initial burden of producing evidence which, if unexplained, would be *prima facie* proof of the existence of the exception. The burden of persuasion then shifts to the party asserting the privilege to give a reasonable explanation of its conduct.[7] If the court accepts the explanation as sufficient to rebut the evidence presented by the party opposing the privilege, then the privilege remains. If the court does

not find the evidence is sufficient to rebut the *prima facie* case, then the *prima facie* case still exists and the privilege is lost.  In order to carry its burden of persuasion, the party seeking to invoke the privilege has to show by a preponderance of the evidence that the *prima facie* showing that the crime/fraud exception applies should not be accepted.

124 F.Supp.2d at 1307.

O'Neal has made a *prima facie* showing that the crime-fraud exception applies to the work-product generated by Attorneys Pickett, Porto, Hood, Moore and Carnes' and Defendants are not entitled to protect their attorneys' work-product from discovery.

### IV.   Conclusion.

"A privilege surviv[es] until the relation is abused and vanish[es] when the abuse is shown to the satisfaction of the judge...." *Clark v. United States,* 289 U.S. at 1, 16; 53 S.Ct. 464, 470; 77 L.Ed. 933 (1933).  This is a proper case for the Court to determine that Carnes and Defendants are not entitled to the benefit of the attorney-client or attorney work-product privileges to further conceal their fraudulent and criminal conspiracy.

/s/ Kevin H. Graham
Florida Bar No. 615986
3159 Lake Ellen Dr., Suite 100
Tampa, FL  33618
Telephone: (813) 240-0107
khgraham@outlook.com
Attorney for Judgment
Creditor/Plaintiff

**Certificate of Service**

I hereby certify that I served a copy of the foregoing to Defendants' counsel using the CM/ECF system.

/s/ Kevin H. Graham

**Certificate of Compliance**

I hereby certify that in accordance with Local Rule 3.01(g), I conferred with counsel for Defendants, S.J. Moore, Esquire, and Defendants oppose the granting of the *instant* Motion.

/s/ Kevin H. Graham