**FRANCHISE DISCLOSURE DOCUMENT**

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
A Nevada Limited Liability Company

**2300 Main, Suite 165**
**Kansas City, MO 64108**
**855-427-7386**
**franchisedevelopment@cbdamericanshaman.com**
**AmericanShamanFranchise.com**



The franchise offered by AMERICAN SHAMAN FRANCHISE SYSTEM, LLC, is for the establishment and operation of a business that will conduct a retail establishment that offers certain "Industrial Hemp Derived" based products to the public under the name "CBD AMERICAN SHAMAN".

The total investment necessary to begin operation of your AMERICAN SHAMAN FRANCHISE SYSTEM, LLC, franchised business is from $34,625.00 to $131,825.00. This includes $25,000.00 that must be paid to us or our affiliates.  If you sign a Multi-Unit Development Agreement, you will pay us $10,000 more for each additional (excluding your first SHAMAN store) SHAMAN store that you secure the right to develop; provided, however, for every four SHAMAN stores you commit to develop and open within 12 months of signing your Multi Unit Development Agreement, we grant you the right to open one additional SHAMAN store and we waive the franchise fee for such additional SHAMAN store. We only grant development rights in blocks of five SHAMAN stores so you will be required to pay a multiple franchise fee equal to $10,000 per SHAMAN store for a minimum of four SHAMAN stores upon signing the Multi Unit Development Agreement.

This disclosure document summarizes certain provisions of the Franchise Agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least fourteen (14) calendar days before you sign a binding agreement with, or make any payment to, the Franchisor or an affiliate in connection with the proposed franchise sale. **Note, however, that no government agency has verified the information contained in this document.**

You may wish to receive your disclosure document in another format that is more convenient for you. To discuss the availability of disclosures in different formats, contact:

Kathi Miley
(855) 427-2233 ext. 109
kathi@cbdamericanshaman.com

i

The terms of your contract will govern your franchise relationship. Don't rely on the disclosure document alone to understand your contract.  Read your entire contract carefully.  Show your contract and this disclosure document to an advisor, like a lawyer or an accountant.

Buying a franchise is a complex investment. The information in this disclosure document can help you make up your mind. More information on franchising, such as "A Consumer's Guide to Buying a Franchise," can help you understand how to use this disclosure document, is available from the Federal Trade Commission. You can contact the FTC at 1-877-FTC-HELP or by writing to the FTC at 600 Pennsylvania Avenue, NW, Washington, D.C. 20580. You can also visit the FTC's home page at http://www.ftc.gov for additional information. Call your state agency or visit your public library for other sources of information on franchising.

There may also be laws on franchising in your state.[1]  Ask your state agencies about them.

Issuance Date:  April 30th, 2021

---

[1] For example, the Indiana Franchise Act requires the following language to be listed on the FDD Cover Page: "Indiana Registered Agent: Indiana Secretary of State, 201 State House, Indianapolis, Indiana 46204."

**ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF MICHIGAN**

In recognition of the requirements of the Michigan Franchise Investment Law, Chapter 445, §§ 445.1501 through 445.1546 and the regulations promulgated thereunder, the Franchise Disclosure Document of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Michigan shall be amended as follows:

1.  The following is added on the State Cover Page, immediately before the Effective Date:

**THE STATE OF MICHIGAN PROHIBITS CERTAIN UNFAIR PROVISIONS THAT ARE SOMETIMES IN FRANCHISE DOCUMENTS.  IF ANY OF THE FOLLOWING PROVISIONS ARE IN THESE FRANCHISE DOCUMENTS, THE PROVISIONS ARE VOID AND CANNOT BE ENFORCED AGAINST YOU.**

a.  A prohibition on the right of the franchisee to join an association of franchisees.

b.  A requirement that a franchisee assent to a release, assignment, novation, waiver or estoppel which deprives a franchisee of rights and protections provided in this act. This shall not preclude a franchisee, after entering into a franchise agreement, from settling any and all claims.

c.  A provision that permits a franchisor to terminate a franchisee prior to the expiration of its term except for good cause.  Good cause shall include the failure of the franchisee to comply with any lawful provision of the franchise agreement and to cure such failure after being given written notice thereof and a reasonable opportunity, which in no event need be more than thirty (30) days, to cure such failure.

d.  A provision that permits a franchisor to refuse to renew a franchise without fairly compensating the franchisee by repurchase or other means for the fair market value at the time of expiration of the franchisee's inventory, supplies, equipment, fixtures, and furnishings.  Personalized materials which have no value to the franchisor and inventory, supplies, equipment, fixtures and furnishings not reasonably required in the conduct of the franchise business are not subject to compensation.  This subsection applies only if: (i) the term of the franchise is less than five (5) years; and (ii) the franchisee is prohibited by the franchise or other agreement from continuing to conduct substantially the same business under another trademark, service mark, trade name, logo type, advertising, or other commercial symbol in the same area subsequent to the expiration of the franchise or the franchisee does not receive at least six (6) months advance notice of franchisor's intent not to renew the franchise.

e.  A provision that permits the franchisor to refuse to renew a franchise on terms generally available to other franchisees of the same class or type under similar circumstances.  This section does not require a renewal provision.

f.  A provision requiring that arbitration or litigation be conducted outside this state.  This shall not preclude the franchisee from entering into an agreement, at the time of arbitration, to conduct arbitration at a location outside this state.

g.  A provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise, except for good cause.  This subdivision does not prevent a franchisor from

exercising the right of first refusal to purchase the franchise.  Good cause shall include, but not be limited to:

    i. the failure of a proposed transferee to meet the franchisor's then current reasonable qualifications or standards;

    ii. the fact that the proposed transferee is a competitor of the franchisor or sub franchisor;

    iii. the unwillingness of the proposed transferee to agree in writing to comply with all lawful obligations; and

    iv. the failure of the franchisee or proposed transferee to pay any sums owing to the franchisor or to cure any default in the franchise agreement existing at the time of the proposed transfer.

h. A provision that requires the franchisee to resell to the franchisor items that are not uniquely identified with the franchisor.  This subdivision does not prohibit a provision that grants to a franchisor a right of first refusal to purchase the assets of the franchisee on the same terms and conditions as a bona fide third party willing and able to purchase those assets, nor does this subdivision prohibit a provision that grants the franchisor the right to acquire the assets of a franchise for the market or appraised value of such assets if the franchisee has breached the lawful provisions of the franchise agreement and has failed to cure the breach in a manner provided in subdivision (c).

i. A provision which permits the franchisor to directly or indirectly convey, assign or otherwise transfer its obligations to fulfill contractual obligations to the franchisee unless provision has been made for providing the required contractual services.

**THE FACT THAT THERE IS A NOTICE OF THIS OFFERING ON FILE WITH THE ATTORNEY GENERAL DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION, OR ENDORSEMENT BY THE ATTORNEY GENERAL.**

2. Item 3, under the heading entitled "LITIGATION," shall be amended by deleting the paragraph in its entirety and substituting the following in lieu thereof:

"Neither Franchisor, nor any person identified in Item 3 of the Franchise Disclosure Document, has been convicted of a felony or pleaded nolo contendere to a felony charge or has been enjoined in a civil action by final judgment if the felony or civil action involved violation of a franchise, antifraud or securities law, fraud, embezzlement, fraudulent conversion or misappropriation of property, or unfair or deceptive practices or comparable allegations.

Neither Franchisor, nor any person identified in Item 3 of the Franchise Disclosure Document, is subject to any currently effective order of the United States Securities and Exchange Commission or the securities administrator of any state denying registration of, or barring or suspending the registration or license of, the person as a securities broker, dealer, securities agent, or registered representative or investment advisor or is subject to a currently effective order of a national securities association or national securities exchange, as defined in the securities exchange act of 1934, suspending or expelling the person from membership in the association or exchange.

Neither Franchisor, nor any person identified in Item 3 of the Franchise Disclosure Document, is subject to a currently effective order or ruling of the federal trade commission.

Neither Franchisor, nor any person identified in Item 3 of the Franchise Disclosure Document, is subject to a currently effective injunctive or restrictive order relating to business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or salesperson."

3.  Additional Item 17 Disclosures.  The following statements are added to Item 17:

    a.  Michigan law may impose certain restrictions on our ability to assign the Franchise Agreement or Multi Unit Development Agreement.

    b.  You must execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor, its affiliates and their respective shareholders, officers, directors, agents, and employees, excluding only such claims as you may have under the Michigan Franchise Investment Law.

    c.  The choice of forum provision(s) should not be considered a waiver of any right conferred upon any party by the Michigan Franchise Investment Law.

    d.  The choice of law provision(s) should not be considered a waiver of any right conferred upon either you or upon us by the Michigan Franchise Investment Law.

4.  Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Michigan Franchise Investment Law and any rules and regulations promulgated thereunder are met independently without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF MICHIGAN LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC.  READ THIS ADDENDUM CAREFULLY.**

If the franchisee has any questions regarding this notice, those questions should be directed to the Michigan Department of Attorney General, Consumer Protection Division, Attn: Franchise, 670 Law Building, Lansing, Michigan 48913, telephone: (517) 373-7117.

## How to Use This Franchise Disclosure Document

Here are some questions you may be asking about buying a franchise and tips on how to find more information:

| QUESTION | WHERE TO FIND INFORMATION |
|---|---|
| **How much can I earn?** | Item 19 may give you information about outlet sales, costs, profits or losses. You should also try to obtain this information from others, like current and former franchisees. You can find their names and contact information in Item 20 or Exhibits M-1 and M-2 |
| **How much will I need to invest?** | Items 5 and 6 list fees you will be paying to the franchisor or at the franchisor's direction. Item 7 lists the initial investment to open. Item 8 describes the suppliers you must use. |
| **Does the franchisor have the financial ability to provide support to my business?** | Item 21 or Exhibit B includes financial statements. Review these statements carefully. |
| **Is the franchise system stable, growing, or shrinking?** | Item 20 summarizes the recent history of the number of company-owned and franchised outlets. |
| **Will my business be the only CBD AMERICAN SHAMAN business in my area?** | Item 12 and the "territory" provisions in the franchise agreement describe whether the franchisor and other franchisees can compete with you. |
| **Does the franchisor have a troubled legal history?** | Items 3 and 4 tell you whether the franchisor or its management have been involved in material litigation or bankruptcy proceedings. |
| **What's it like to be a CBD AMERICAN SHAMAN franchisee?** | Item 20 or Exhibits M-1 and M-2 lists current and former franchisees. You can contact them to ask about their experiences. |
| **What else should I know?** | These questions are only a few things you should look for. Review all 23 Items and all Exhibits in this disclosure document to better understand this franchise opportunity. See the table of contents. |

**What You Need To Know About Franchising *Generally***

**Continuing responsibility to pay fees**. You may have to pay royalties and other fees even if you are losing money.

**Business model can change**. The franchise agreement may allow the franchisor to change its manuals and business model without your consent. These changes may require you to make additional investments in your franchise business or may harm your franchise business.

**Supplier restrictions**. You may have to buy or lease items from the franchisor or a limited group of suppliers the franchisor designates. These items may be more expensive than similar items you could buy on your own.

**Operating restrictions**. The franchise agreement may prohibit you from operating a similar business during the term of the franchise. There are usually other restrictions. Some examples may include controlling your location, your access to customers, what you sell, how you market, and your hours of operation.

**Competition from franchisor**. Even if the franchise agreement grants you a territory, the franchisor may have the right to compete with you in your territory.

**Renewal**. Your franchise agreement may not permit you to renew. Even if it does, you may have to sign a new agreement with different terms and conditions in order to continue to operate your franchise business.

**When your franchise ends.** The franchise agreement may prohibit you from operating a similar business after your franchise ends even if you still have obligations to your landlord or other creditors.

**Some States Require Registration**

Your state may have a franchise law, or other law, that requires franchisors to register before offering or selling franchises in the state. Registration does not mean that the state recommends the franchise or has verified the information in this document. To find out if your state has a registration requirement, or to contact your state, use the agency information in Exhibit A-2.

Your state also may have laws that require special disclosures or amendments be made to your franchise agreement. If so, you should check the State Specific Addenda. See the Table of Contents for the location of the State Specific Addenda.

## Special Risks to Consider About *This* Franchise

Certain states require that the following risk(s) be highlighted:

1. **<u>Out-of-State Dispute Resolution</u>.** The franchise agreement requires you to resolve disputes with the franchisor by mediation, arbitration and/or litigation only in Kansas City, Missouri and/or litigation only in Jackson County, Missouri. Out-of-state mediation, arbitration, or litigation may force you to accept a less favorable settlement for disputes. It may also cost more to mediate, arbitrate, or litigate with the franchisor in Missouri than in your own state.

2. <u>The franchisor is at an early stage of development and has a limited operating history. This franchise is likely to be a riskier investment than a franchise in a system with a longer operating history.</u>

3. <u>If seeking a franchise in the state of Maryland, your spouse must sign a document that makes your spouse liable for all financial obligations under the franchise agreement even though your spouse has no ownership interest in the franchise. This guarantee will place both your and your spouse's marital and personal assets, perhaps including your house, at risk if your franchise fails.</u>

4. <u>You must make minimum royalty or advertising fund payments, regardless of your sales levels. Your inability to make the payments may result in termination of your franchise and loss of your investment.</u>

5. <u>You must purchase all or nearly all of the inventory or supplies that are necessary to operate your business from the franchisor, its affiliates, or suppliers that the franchisor designates, at prices the franchisor or they set. These prices may be higher than prices you could obtain elsewhere for the same or similar goods. This may reduce the anticipated profit of your franchise business.</u>

6. <u>There might be other risks concerning this franchise.</u>

Certain states may require other risks to be highlighted. Check the "State Specific Addenda" (if any) to see whether your state requires other risks to be highlighted.

### Option to Enter into a Multi-Unit Development Agreement

AMERICAN SHAMAN FRANCHISE SYSTEM, LLC offers an opportunity to enter into a Multi-Unit Development Agreement with additional benefits to individuals and entities who desire to develop and open a certain number of said SHAMAN Stores in accordance with the terms and upon the conditions contained in the Multi-Unit Development Agreement as set forth in further detail in Exhibit F.

# TABLE OF CONTENTS
## DISCLOSURE DOCUMENT

<u>ITEM</u>                                                                                                                     PAGE

Item 1     THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND
           AFFILIATES ..................................................................................................1

Item 2     BUSINESS EXPERIENCE .............................................................................3

Item 3     LITIGATION...................................................................................................4

Item 4     BANKRUPTCY ..............................................................................................4

Item 5     INITIAL FEES.................................................................................................5

Item 6     OTHER FEES ..................................................................................................6

Item 7     ESTIMATED INITIAL INVESTMENT........................................................10

Item 8     RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES .....................12

Item 9     FRANCHISEE'S OBLIGATIONS ...............................................................15

Item 10    FINANCING...................................................................................................16

Item 11    OUR ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND
           TRAINING .....................................................................................................16

Item 12    TERRITORY ..................................................................................................24

Item 13    TRADEMARKS ............................................................................................25

Item 14    PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION.....................27

Item 15    OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE
           FRANCHISED BUSINESS.............................................................................28

Item 16    RESTRICTIONS ON WHAT YOU MAY SELL .....................................................29

Item 17    RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION........29

Item 18    PUBLIC FIGURES.........................................................................................35

Item 19    FINANCIAL PERFORMANCE REPRESENTATIONS ...........................................35

Item 20    OUTLETS AND FRANCHISEE INFORMATION ...................................................36

Item 21    FINANCIAL STATEMENTS ........................................................................49

Item 22    CONTRACTS..................................................................................................49

Item 23    RECEIPTS ......................................................................................................51

**<u>EXHIBITS</u>**

| | |
|---|---|
| Exhibit A-1 | Agent for Service of Process |
| Exhibit A-2 | List of State Agencies |
| Exhibit B | Financial Statements |
| Exhibit C | Franchise Agreement |
| Exhibit D | Non-Compete and Non-Disclosure Agreement |
| Exhibit E | Lease Rider |
| Exhibit F | Multi Unit Development Agreement |
| Exhibit G | Employee Confidentiality Agreement |
| Exhibit H | Operations Resources |
| Exhibit I | Release |
| Exhibit J | State-Specific Addenda |
| Exhibit K | Assignment of Telephone Numbers, Telephone Listings, and Internet Addresses |
| Exhibit L | Authorization for Electronic Funds Transfer |
| Exhibit M-1 | List of Active Franchisees in System |
| Exhibit M-2 | List of Former or Inactive Franchisees That Have Left System |
| Exhibit N-1 | Receipt |
| Exhibit N-2 | Receipt |

**THE FRANCHISE DISCLOSURE DOCUMENT**

**Item 1**
**THE FRANCHISOR AND ANY PARENTS, PREDECESSORS, AND AFFILIATES**

The FRANCHISOR is "AMERICAN SHAMAN FRANCHISE SYSTEM, LLC." For ease of reference, we will be referred to as "SHAMAN," "we," or "us" in this Disclosure Document. The person or entity who buys the franchise will be referred to as "you" and "your" throughout this Disclosure Document. If you are a corporation or limited liability company, your owners and their respective spouses (if any) must sign our "Guaranty and Assumption of Obligations," which means that all of our Franchise Agreement's provisions also will apply to your owners and their spouses (if any). (See Item 15)

We were incorporated in the State of Nevada on March 2, 2017. Our principal business address is 2300 Main, Suite 165, Kansas City, MO  64108.

We operate under our corporate name and the marks described in Item 13 (the "Marks"). We do not do business under any other names, although we may do so in the future.

We have no predecessor. Our parent company is SVS Enterprises, LLC, a Kansas limited liability company, whose principal business address is 2300 Main Street, Suite 165, Kansas City, Missouri 64108.

We have two (2) affiliates:

Shaman Botanicals, Inc. is a Missouri corporation with a principal business address of 2405 Southwest Boulevard, Kansas City, MO 64108 that processes and distributes products derived from "Industrial Hemp" and other plants. Shaman Botanicals, Inc. has never conducted the type of business you will operate and has never offered franchises.

CBD American Shaman, LLC is a Missouri limited liability company with a principal business address of 2405 Southwest Boulevard, Kansas City, MO 64108 that operates a website used to purchase products from Shaman Botanicals, Inc.  Since December 2018, CBD American Shaman, LLC has owned and operated SHAMAN stores that conduct the type of business you will operate.  CBD American Shaman, LLC has never offered franchises.

Our agent for service of process in the State of Nevada is Registered Agents Inc. with an office address: 401 Ryland Street, Suite 200-A Reno, NV 89502.  If we have an agent in your state for service of process, we disclose that agent in Exhibit "A-1".

We grant franchises for stores operating under the "CBD AMERICAN SHAMAN" name and other Marks. (For reference purposes in this Disclosure Document, we call the stores in our System "SHAMAN stores"; we call the SHAMAN store that you will operate the "Store.") SHAMAN stores offer for retail sale certain "Industrial Hemp" and other plant-based products which are prepared or manufactured according to specified processes and procedures using high-quality ingredients, including specifically formulated and specially produced proprietary lines of Cannabidiol (CBD) and other "Industrial Hemp" products. Throughout the United States, "Industrial Hemp" is defined as the plant Cannabis Sativa L. and any part of the plant, whether growing or not, with a delta-9 tetrahydracannabidiol concentration of not more than 0.3% on a dry weight basis, and extractions from its isomers and other biomass. If you acquire a franchise, you must operate your Store according to our business formats, methods, procedures, designs, layouts, standards, and specifications.

Your Store will offer products and services to the general public throughout the year and compete with other retail stores and chains that sell, and online sales of, similar Industrial Hemp based products. The market for Industrial Hemp-based products is aggressively developing and the public's familiarity with CBD and other products derived from Industrial Hemp is growing at a rapid rate. You may face competition from other SHAMAN stores that we or our affiliates franchise or own and operate at traditional sites, and you will have to compete with other local and national retail businesses offering Industrial Hemp based products and services. You may also face competition from the sale of Industrial Hemp based products through other channels of distribution by us or our affiliates or competitive brands that we may or may not control.

We began offering franchises for SHAMAN stores in March of 2018. As of the date of this FDD, we own and operate 44 SHAMAN stores.

We have no other business activities and have not offered franchises in other lines of business.

In addition to a franchise, we offer a multi-unit development agreement to interested franchisees. See Exhibit F, Multi-Unit Development Agreement. Upon establishing each additional outlet under the Development Schedule an Area Developer may be required to sign a then-current Franchise Agreement, which may differ from the current Franchise Agreement included with this Franchise Disclosure Document.

Industry Regulations:

The U.S. Food and Drug Administration, and other federal and state agencies and departments, administer and enforce laws, rules and regulations governing agricultural products, cosmetic products, foods and dietary supplements, and the ingredients which may be utilized in foods and dietary supplements.    The Agriculture Improvement Act of 2018, (known as the "2018 Farm Bill"), established a new category of cannabis, classified as "hemp," and removed it as a controlled substance under Federal Law.  You are offered the opportunity to sell to the retail public, products which contain cannabidiol derived from "hemp."  The U.S. Food and Drug Administration and certain states currently take the position that cannabidiol is prohibited from use as an ingredient in food and dietary supplements; however, the FDA is not currently enforcing this position pending their public comments and final ruling.  Our CBD and Industrial Hemp-based product line is distinguishable from marijuana products as none of our products contain a delta-9 tetrahydracannabidiol concentration of more than 0.3% on a dry weight basis, or in any extractions from its isomers and other biomass. As such, our product line complies with federal industry regulations allowing for the sale of such products, the federal Agricultural Improvement Act of 2018, Pub. L. 115-334 ("2018 Farm Act") and complies with other similar state CBD and Industrial Hemp regulations regulating the production, manufacturing and distribution of CBD and Industrial Hemp-based products[2]. Our product line consists of topical body products such as lotions, balms, salves, oils, tinctures, water-soluble gummies, candies, baked-goods and other ingestibles, infused beverages, bath bombs, and pet and

---

[2] California regulations that apply to the regulation of Industrial Hemp-based products include Division 24 of the California Food and Agricultural Code, Section 4900 in Title 3 of the California Code of Regulations pertaining to Industrial Hemp Cultivation Registration Fees, Sections 4920 and 4921 pertaining to the list of approved cultivars, Sections 4901 and 4902 pertaining to Industrial Hemp registration application and eligibility requirements and Sections 4930, 4935, 4940, 4941, 4942, 4943, 4944, 4945, 4946, 4950 and 4950.1  pertaining to Industrial Hemp planting, sampling and testing for THC concentration, harvest, and destruction. In addition, cannabis is defined in Section 26001(f) of the California Business and Professions Code ("BPC"), which specifically states that cannabis does not include Industrial Hemp.

animal products. There are ongoing efforts at the Federal and state levels to change current restrictions on hemp and cannabidiol, and you should investigate these laws, rules and regulations on a continual basis.

It is very important that you investigate the most recent Federal, and your particular state and local laws, rules and regulations regarding the transportation, possession, sale, and use of hemp and cannabidiol, and the use of cannabidiol as an ingredient in foods and dietary supplements. There is no federal license or certification required to sell CBD or other Industrial Hemp-based products at our stores; however, you may have local, county or state general business licenses that apply in your area which you may be required to obtain and comply with for your retail store. Generally, this may include a city or other local business license, but you need to investigate what other licenses in your area you may be required to obtain to open and operate your franchise.

## Item 2
## BUSINESS EXPERIENCE

**Stephen Vincent Sanders, Chief Executive Officer and Director**:

March 2017 to Present - Director of American Shaman Franchise System, LLC, in Kansas City, Missouri.
April 2018 to Present - Chief Executive Officer of American Shaman Franchise System, LLC, in Kansas City, Missouri.
March 2017 to April 2018 - President of American Shaman Franchise System, LLC, in Kansas City, Missouri.
March 2015 to Present – Owner and operator of CBD American Shaman, LLC in Kansas City, Missouri.
January 2017 to Present – Owner, President and Director of Shaman Botanicals, Inc. located in Kansas City, Missouri.
January 2012 to March 2015 – Owner and operator of Evolution Distributors, LLC in Kansas City, Missouri.

**Marc Sayler, Vice President:**

July 2018 to Present – Vice President of American Shaman Franchise System, LLC, in Kansas City, Missouri.
January 2017 to July 2018 - Manager of Education and Development at The Kirby Company in Cleveland, Ohio.
January 2001 to December 2016 - Independent Small Business Consultant in Fairfield, California.

**Jim McNair, Secretary/Treasurer**:

January 2019 to Present – Controller, Secretary and Treasurer of American Shaman Franchise System, LLC, in Kansas City, Missouri.
January 2016 to December 2018 – retired.
December 2012 to December 2015 – International Controller and Managing Director for Western Europe at Great Plains Manufacturing in Sleaford, England.

**Kathi Miley, Director of Franchise Development:**

October 2018 to Present – Director of Franchise Development at American Shaman Franchise System, LLC, in Kansas City, Missouri.
July 2018 to October 2018 – Director of Contracts and Administration at American Shaman Franchise System, LLC, in Kansas City, Missouri.
December 2017 to July 2018 - Inside Sales Manager at United Consumer Financial Services in Cleveland, Ohio.
January 2012 to December 2017 - Credit Team Manager at United Consumer Financial Services in Cleveland, Ohio.

**Item 3**
**LITIGATION**

**Pending Actions**

CBD American Shaman, LLC, et al. v. Matthew Boyd, et al, (Jackson County, MO Cir. Ct., filed August 10, 2020, removed to federal court - Western District of Missouri, Case No. 21-cv-00051 on January 27, 2021).
Claim against previous franchisee we allege acted outside of his franchise agreement by selling products after his termination for cause per the franchise agreement. CBD American Shaman LLC brought suit to protect the brand. No trial setting presently.

**Government Actions**

In the Matter of American Shaman Franchise System, LLC, DFI Case No. S-242323 (FX), Wisconsin Department of Financial Institutions (To be issued May 5, 2021).
Consent Cease and Desist Order in which Franchisor, affiliates, agents, servants, officers, etc. shall cease and desist from making or causing to be made to any person or entity in Wisconsin any further offers or sales of franchises unless and until such franchises are registered or are exempted from registration. This matter involved the sale of a franchise during a few days when Franchisor's Wisconsin registration had expired and not been timely renewed. Upon successful registration with Wisconsin in 2021 this Consent Cease and Desist Order shall be lifted.

No other litigation information is required to be disclosed at this time.

**Item 4**
**BANKRUPTCY**

On April 20, 2012, Franchisor's Director of Franchise Development, Kathi Miley, filed a bankruptcy petition under Chapter 13 of the U.S. Bankruptcy Code. In re Kathi L. Miley, Case No. 12-12979 (N.D. Ohio 2012). On October 7, 2015, the bankruptcy court entered a discharge. No other bankruptcy information is required to be disclosed in this Item.

**Item 5**
**INITIAL FEES**

You will pay us a franchise fee, the amount of which shall be determined as follows:

Unless you sign a Multi-Unit Development Agreement or are an employee of ours or one of our affiliates, you will pay us a franchise fee of $10,000 when you sign the Franchise Agreement.  If you enter into a Multi-Unit Development Agreement, you will have the right to purchase a predetermined number of franchises to develop and operate in a specified period of time. In such case, you will pay us the $10,000 initial franchise fee for each SHAMAN store that you obtain the right to develop at the time you sign the Multi Unit Development Agreement and such amount will be applied toward the then current initial franchise fee to be paid for each SHAMAN store that you develop at the time you sign the Franchise Agreement for such SHAMAN store.  For every four SHAMAN stores you commit to develop and open within 12 months of signing your Multi Unit Development Agreement, we grant you the right to open one additional SHAMAN store and we waive the franchise fee for such additional SHAMAN store.  If you do not develop and open your SHAMAN stores in accordance with the terms of your Multi Unit Development Agreement within 12 months of signing your Multi Unit Development Agreement, you will lose any right to open the additional SHAMAN store for which we waived the initial franchise fee, regardless of any approved extension we may grant you with regard to the term of your Multi Unit Development Agreement. We only grant development rights in blocks of five SHAMAN stores.  You will be required to pay a multiple franchise fee equal to $10,000 per SHAMAN store for the first four out of every five SHAMAN stores that you secure the right to develop upon signing the Multi Unit Development Agreement.  The Multi Unit Development Agreement is attached and marked as Exhibit F.  If you are employed by us or one of our affiliates, we will negotiate your franchise fee, but it will not be more than $10,000.

You will be required to purchase from us or our affiliates inventory and store supplies costing approximately $15,000.00.  These fees are not refundable.

If you fail to locate a suitable site location within 90 days of the date that you sign the Franchise Agreement we may terminate the Franchise Agreement without refund of franchisee fee of $10,000.

If you fail to successfully complete the initial training program within 90 days of the date that you sign the Franchise Agreement, the Franchise Agreement will be terminated, and you will not receive a return of any of the initial franchise fee that you paid.

The initial franchise fee is nonrefundable and the initial fees and payments in this Item 5 are uniformly calculated as contribution and payment for training, education, programming, and processing.

**Escrow Arrangement or Other Financial Assurance.**

**In those states that require an escrow account or other financial assurance condition for collection of initial fees, we shall establish an escrow account to hold initial fees which shall remain in escrow until the franchise has been opened, or comply with state specific financial assurance conditions before any initial fees are collected directly for the benefit of the Franchise.**

[Remainder of page intentionally left blank.]

**Item 6**
**OTHER FEES**

| Type of Fee | Amount | Due Date | Remarks | Uniformly Collected (Y/N) |
|---|---|---|---|---|
| Royalty fee | 0% | N/A | We do not assess a royalty fee at this time. We reserve the right to impose a royalty fee of up to 6% of "gross sales" as defined herein upon 90 days notice to you. The fee is non-refundable.<br><br>"Gross sales" as used in this Disclosure Document means the total revenues received by you in and from your Store operations whether for cash, check, automatic electronic withdrawal, credit or otherwise, less rebates or refunds to customers or the amount of any sales tax or other similar taxes that you may be required to and do collect from customers to be paid to any federal, state or local taxing authority. Gross sales include non-refundable deposits in the month received regardless of when such products are provided, or services are rendered. | N/A |
| Marketing Fee | $800.00 | Prorated across the first 4 Tuesdays of each month. | Payable to , on a prorated basis on the first 4 Tuesdays of each month provided we will not collect a marketing fee with regard to the Store's first 30 days of operation.  We will ACH your bank account. We reserve the right to impose an increase in the marketing fee of up to 3½% of "gross sales" as defined herein (subject to a minimum monthly | Yes |

|  |  |  | marketing fee of $800). We will provide at least ninety (90) days advanced notice of the change of the marketing fee. The fee is non-refundable. |  |
|---|---|---|---|---|
| Local Individual Store Marketing Fee | $750.00 / month | As incurred | Payable by you to other vendors of your choice | N/A |
| Technology Fee | $200.00 / month | Prorated across the first 4 Tuesdays of each month. | Payable to us, on a prorated basis on the first 4 Tuesdays of each month We will ACH your bank account. This fee is to pay for certain aspects of your computer system, software, or other technological platforms.  We reserve the right to increase this fee from time to time upon 90 days notice to you. The fee is non-refundable. | Yes |
| Audit fee | Cost of audit | Within 10 days of the date of our statement for amount due | If we charge any type of fee based on a percentage of gross sales, you will pay us the costs of an audit to be performed if you fail to provide monthly financial statements or if a random audit shows an understatement of gross sales in excess of two percent (2%). This fee is non-refundable. | Yes |
| Late fee | Ten percent (10%) of the amount due | Within 10 days of the date of our statement for amount due | You will pay us a late fee in the amount of ten percent (10%) if you fail to pay any Fee within ten (10) days of the due date. This fee is non-refundable. | Yes |
| Interest on late payments | The lesser of one and One-half percent (1 ½%) per month or the maximum rate | Within 10 days of the date of our statement for amount due | If payment is late, you will pay us interest on any fee due us, at the lesser of one and one-half percent (1½%) per month or the maximum rate permitted by law, until full payment is | No |

| | permitted by law | | received. This fee is non-refundable. | |
|---|---|---|---|---|
| Insufficient Funds Fee | $250 per occurrence. | Within 10 days of the date of our statement for amount due | If funds in your bank account are insufficient to cover amounts due to us on the date such funds are due, in addition to the overdue amount and interest, we have the right to a fee of $250 per occurrence, or a lesser amount as limited by your state's applicable law This fee is non-refundable. This fee may not be uniformly imposed, depending upon circumstances at the sole discretion of Franchisor. | No |
| Additional training and Annual Meeting fee | To be determined by us, but not to exceed $500.00 per person beyond the owner and operating manager. Annual Meeting fee not to exceed $350 per person. | Prior to commencement of the training program | You will pay us a non-refundable fee if you ask for special assistance, additional training beyond the owner and operating manager,or we determine that additional training is warranted after your initial training period. Annual Meeting Fee, if paid in advance of the Annual Meeting and the Franchisee is unable to attend, the fee is refundable. | Yes, as incurred |
| Franchisee Ad Co-Op / or Association fee | To be determined by the Franchisee Ad Co-Op/ Association | To be determined by the Franchisee Ad Co-Op/ Association | You must participate in the Ad Co-Op/ Association,, with the minimum Membership Fee, which is currently $200 per month. The monies paid go to the Ad Co-Op/ Association. The fees are non-refundable. As currently operating, on account of the impact of COVID-19, a portion of this is funded by the Marketing Fee, temporarily, until the Co-Op is self-sufficient. SHAMAN Company | Yes |

| | | | stores have one vote per store. The fee is determined by a vote of the Co-Op Association Board each quarter. | |
|---|---|---|---|---|
| Alternative supplier evaluation fees | Various amounts to be determined by the amount of time and money necessary to evaluate the alternative supplier and/or the alternative | As incurred | If you seek approval of a new supplier or product, we may charge you a fee for conducting the evaluation or you may have to pay some third party to evaluate your item or proposal. The fee is non-refundable. | Yes, as incurred |
| Renewal fee | 20% of the then-initial franchise fee | 6 months before the signing of the renewal Franchise Agreement | Payable to us, if you wish to renew your Franchise Agreement. The fee is non-refundable. | Yes |
| Alternative dispute fee | To be determined by the CPR Legal Program Resolution | At commencement of dispute resolution | Fee for participating in CPR Legal Program. Payable to the CPR Legal Program administrators. This fee is non-refundable. | Yes, as incurred |
| Transfer fee | Fifty percent (50%) of the amount of the then-initial Franchise Fee | Due at time transferee signs Franchise Agreement | Either you or transferee must pay us 50% of the current initial fee for the franchise. This fee is non-refundable.<br><br>If you assign the franchise to a business entity in which you own all of the ownership interests, the transfer fee is limited to reimbursing us for any legal expenses we incur to prepare or review documentation related to the transfer. | Yes, as incurred |
| Costs and attorneys' fees | Will vary under circumstances | As incurred | Payable to us to reimburse us for fees incurred by us in obtaining injunctive or legal relief for the enforcement of any item of the Franchise | As incurred, if applicable |

| | | | Agreement or for costs incurred for Arbitration proceedings. These fees are non-refundable. | |
|---|---|---|---|---|
| Indemnification | Will vary under circum stances | As incurred | You must reimburse us if we are held liable for any claims arising from your business. This fee is non-refundable. | As incurred, if applicable |

**Item 7**
**ESTIMATED INITIAL INVESTMENT**

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment Is to be Made |
|---|---|---|---|---|
| Initial Franchise Fee (1) | $10,000³ | Lump sum payment by certified funds | At time of signing of Franchise Agreement | Us |
| Travel and living expenses while training (2) | $1,000–$2,500 | Check, cash, or credit card | As incurred | Various third-party vendors |
| Real estate/rent and deposit (3) | $1,000–$5,000 | As agreed to | As incurred | Landlord |
| Construction or remodeling of an in-line facility or pad site (4) | $5,000 - $35,000 | As agreed to | As incurred | Various third parties (construction co. architect, etc.) |
| Leasehold improvements (5) | $5,000-$15,000 | As agreed to | As incurred | Various third-party vendors |
| Furniture, fixtures, and equipment (6) | $2,500-$10,000 | As agreed to | As incurred | Various third-party vendors |
| Signage (7) | $3,500 – $10,000 | As agreed to | As incurred | Various third-party vendors |
| Opening inventory (8) | $15,000 | As agreed to | As incurred | Us or our affiliates |
| Grand Opening (9) | $1,000 – $2,500 | As agreed to | As incurred | Various third-party vendors |
| Utility deposits, security deposits, business licenses, insurance, etc. (10) | $500–$1,500 | As agreed to | As incurred | Various government entities, utility companies |

³ An employee of ours or our affiliates may have a negotiated lower initial fee. If you sign a Multi-Unit Development Agreement you will pay a multiple franchise fee that will be calculated based on the number of SHAMAN stores you commit to develop in a certain time period.

| Type of Expenditure | Amount | Method of Payment | When Due | To Whom Payment Is to be Made |
|---|---|---|---|---|
| Additional funds—3 months (11) | $10,000 – $25,000 | As agreed to | As incurred | Us or our affiliates and various third-party vendors |
| Uniform – Shaman-branded polo shirts (12) | $25 each | As agreed to | As incurred | Us or our affiliates |
| **Total** | **$34,625 – $131,8025** | | | |

Explanatory Notes:

1.      The initial franchise fee is $10,000.00 for an individual franchise.   If you sign a Multi-Unit Development Agreement you will pay the $10,000 initial franchise fee multiplied by each SHAMAN store you commit to develop at the time you sign the Multi Unit Development Agreement and the balance of the then current initial franchise fee for a SHAMAN store at the time you sign the Franchise Agreement for such SHAMAN store.  For every four SHAMAN stores you commit to develop and open within 12 months of signing your Multi Unit Development Agreement, we grant you the right to open one additional SHAMAN store and we waive the franchise fee for such additional SHAMAN store. We only grant development rights in blocks of five SHAMAN stores so you will be required to pay a multiple franchise fee equal to $10,000 per SHAMAN store for a minimum of four SHAMAN stores upon signing the Multi Unit Development Agreement. We will negotiate your franchise fee if you are an employee of ours or our affiliates, but it will not exceed $10,000.

2.      Expenses that you will incur for travel, food, and lodging during your training period away from your home. These amounts are not refundable.

3.      A SHAMAN store occupies about 1,000 to 1,500 square feet of space. Rent depends on geographic location, size, local rental rates, businesses in the area, site profile, and other factors. It could be considerably higher in large metropolitan areas than in more suburban or small-town areas. SHAMAN stores can be located in strip shopping centers, shopping malls, free-standing units, and other venues in downtown commercial areas and in residential areas. We anticipate that you will rent the Store's premises. It is possible, however, that you will choose to buy, rather than rent, real estate on which a building suitable for the store already is constructed or could be constructed. Real estate costs depend on location, size, visibility, economic conditions, accessibility, competitive market conditions, and the type of ownership interest you are buying. The rental security deposit will be refundable on the terms stated in your lease.

4.      The amount ranges from the cost to remodel an inline facility to the purchase and/or construction of a pad site. You may wish to operate your SHAMAN business from a free-standing building, which will cost additional monies for purchasing the land and constructing a building. These monies may be refundable depending on the terms negotiated.

5.      Building out an existing improvement according to our specifications, including floor covering, wall treatment, counters, ceilings, painting, window coverings, electrical, carpentry, and similar work, and architect's and contractor's fees depend on the site's condition, location, and size; the demand for the site among prospective lessees; the site's previous use; the build-out required to conform the site for your Store; and any construction or other allowances the landlord grants. The lower figure assumes that you

remodel an existing building; the higher figure assumes the construction of a new building on a pad site. These monies are not refundable after they have been expended.

6.      These items include furniture, fixtures, and other items, such as office equipment, telephone system, and POS computer system and software. These amounts are not refundable, but the machines may be sold.

7.      This includes inside and outside signage. The monies are not refundable.

8.      This includes opening inventory of Hemp products, promotional material and other supplies. Monies spent on these items may be refundable upon return of the product if the store closes within ninety (90) days.

9.      Monies to be included in initial marketing for the first three (3) months of operation. This includes funds to be used for "Grand Opening." These monies are not refundable.

10.     You must obtain business licenses as dictated by local regulations. You will need to provide monies for deposits for utilities and insurance. Insurance costs depend on policy limits, types of policies, nature and value of physical assets, gross revenue, number of employees, square footage, location, business contents, and other factors bearing on risk exposure. The estimate contemplates insurance costs for 3 months. These monies are not refundable.

11.     This item estimates your expenses during the initial period (first three (3) months) of operation of your Store (other than the items identified separately in the table). These expenses include payroll costs. These figures are estimates, and you may have additional expenses starting the business. Your costs depend on how much you follow our methods and procedures; your management skill, experience, and business acumen; local economic conditions; the local market for your products and services; the prevailing wage rate; the competition; and the sales level reached during the initial period of operation of your Store. We base these figures upon our review of the various elements which we have determined to be necessary to establish a retail operation based on our experience in the industry and our affiliate's experience with opening and operating SHAMAN stores. These amounts are not refundable.

12.     You may choose to purchase uniforms consisting of polo-style shirts featuring the CBD American Shaman logo, but we do not require you to do so.

You should review these figures carefully with a business advisor before deciding to acquire the franchise. We do not offer financing directly or indirectly for any part of the initial investment. The availability and terms of outside financing depend on many factors, including the availability of financing, generally; your creditworthiness and collateral; and the lending policies of financial institutions from which you request a loan.

## Item 8
## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

You must operate the Store according to our current and future SHAMAN System Standards as set forth in our Proprietary Operations Manual ("Manual" or "OM") and other directives which we may provide

you from time to time or update and/or change from time to time. SHAMAN System Standards will regulate, among other things: the types, models, and brands of fixtures, furniture, equipment, furnishings, and signs (collectively, "Operating Assets"); the products and supplies you must use in operating the Store; unauthorized and prohibited products and services; inventory requirements; and the designated and approved suppliers of Operating Assets, proprietary products, and other items.

For Operating Assets, inventory and proprietary products of our CBD and Industrial Hemp-based products (topical body products such as lotions, balms, salves, oils, tinctures, water-soluble gummies, candies, baked-goods and other ingestibles, infused beverages, bath bombs, and pet and animal products), your suppliers will be limited to us, our affiliates, including Shaman Botanicals, Inc., or other specified exclusive sources, and you must buy some products during the franchise term only from us, our affiliates, or the other specified designated sources at the prices we or they decide to charge. The currently approved suppliers include us, and our affiliates, including Shaman Botanicals, Inc. We restrict your sources of proprietary products to protect our trade secrets, ensure quality, ensure a reliable supply of products that meet our standards, achieve better terms of purchase and delivery service, control use of the Marks by third parties, and monitor the manufacturing, packaging, processing, and sale of these items.  You may not use or sell a product or service in your Store unless it has been approved by us.  Additionally, you must have our approval to maintain an inventory of non-American Shaman brand products in excess of 10% of your total product inventory.

You must purchase and maintain during the term of your Franchise Agreement the type and no less than the amount of insurance coverages we require.  Currently, the minimum insurance requirements include (a) comprehensive general liability insurance, with a combined single limit of $1,000,000 per occurrence, (b) motor vehicle liability coverage, with a combined single limit of $1,000,000 on each non-owned or hired vehicle used in connection with the operation of your Store, (c) workers' compensation coverage with minimum coverage as required by law, and (d) other insurance that may be required by the statutes or other laws of the state and/or any local governmental entities in which your Store is located and operated.   All insurance policies required shall be written by an insurance company satisfactory to us with an A.M. Best rating of BBB or higher and must name us as an additional insured. We may modify our insurance requirements and any modifications will be communicated to you in our Manual or otherwise in writing.

We have developed a proprietary electronic point of sale software platform that you must use in operating your Store.  At this time, the American Shaman point of sale software is made available to you at no additional cost but we reserve the right to impose fees relating to the license, use or support of the point of sale software in the future.  A dedicated device is required to operate the software platform.  You must purchase a computer that is compatible with such software platform.

Stephen Vincent Sanders, our Chairman/CEO, is the owner of Shaman Botanicals, Inc. and CBD American Shaman, LLC, which are required approved vendors for you.

Vendor approval will depend on product quality, delivery frequency and reliability, service standards, financial capability, customer relations, concentration of purchases with suppliers to obtain better prices and service, and/or a supplier's willingness to pay us or our affiliates for the right to do business with our System.

The criteria used for approving suppliers is not available to you.

You may contract with alternative suppliers who meet our criteria. In order to determine if they meet our criteria, you first must send us sufficient information, specifications, and samples so that we can determine whether the item or service complies with SHAMAN System Standards or the supplier meets approved supplier criteria.

We may charge you or the supplier a reasonable fee for the evaluation (see Item 6).

We will decide within a reasonable time (generally no more than 30 days) whether to accept or reject your alternative product or supplier.

We may revoke a product's or supplier's previous approval if it or they fail to maintain its quality and standards, or we decide to replace it with a different product or revoke a supplier's previous approval (if it fails to properly conduct its transactions with us or other franchisees). We may inspect a supplier's facilities after the approval process to make sure that the supplier maintains our standards. If it does not, we may revoke our approval by notifying the supplier and you in writing.

We issue specifications and standards to franchisees. Our standards and specifications may impose minimum requirements for production, performance, reputation, prices, quality, design, and appearance. Our OM or other written communications will identify our standards and specifications. We will notify you, and when appropriate, the suppliers, of changes in standards and specifications. There might be situations in which you can obtain items from any supplier who can satisfy our requirements, and therefore, who is, in effect, an approved supplier.

We currently receive revenue in the form of a 10% commission from our affiliate and required approved vendor Shaman Botanicals, Inc. for the sales of products sold by it to American Shaman franchisees. The amount of, or method for determining, any payment that we receive from Shaman Botanicals, Inc. based on the sales of products by it to American Shaman franchisees may change. Shaman Botanicals, Inc. will also derive revenue from the sales of products to American Shaman franchisees.

Any purchases from us or our affiliates, whether required or voluntary, may be at prices exceeding our costs up to 30% - 35% across the product lines and therefore we or our affiliates may derive a profit.

We may receive revenues from the sale or lease of required products or services by us to our franchises, but we received no revenues from the sale or lease of required products or services by us to our franchisees in fiscal year 2020.  The percentage of our total revenue in fiscal year 2020 from the sale or lease of required products or services by us to our franchisees to that of required purchases by franchisees was 0%.

Our affiliates' revenue from the sale or lease of required products and services to our franchisees in fiscal year 2018 was $18,337,019.19  We derived this information from reports of sales made to our franchisees that we obtained through Shaman Botanicals, Inc.'s point of sale system.

Collectively, the purchases and leases described above are about 40% of your overall purchases and leases in establishing the Store and 65% of your overall purchases and leases in operating the Store.

There currently are no purchasing or distribution cooperatives.

We may negotiate purchase arrangements with suppliers (including price terms) for the benefit of the franchise system.

We do not provide material benefits to you (for example, renewing or granting additional franchises) based on your purchase of particular products or services or use of particular suppliers.

**Item 9**
**FRANCHISEE'S OBLIGATIONS**

**This Table lists your principal obligations under the Franchise Agreement and Other Agreements. It will help you find more detailed information about your obligations in these agreements and in other items of this disclosure document.**

| Obligation | In Franchise Agreement and/or Multi Unit Development Agreement | Disclosure Document |
|---|---|---|
| (a) Site selection and acquisition/lease | Article 10A of Franchise Agreement; Section 6 of Multi Unit Development Agreement | Item 11 and Exhibit E |
| (b) Pre-opening purchases/leases | Articles 12 and 13 of Franchise Agreement | Items 7 and 11 |
| (c) Site development and other pre-opening requirements | Article 11 of Franchise Agreement | Items 5, 7, and 11 |
| (d) Initial and ongoing training | Article 14A, 14C, and 14D of Franchise Agreement | Item 11 |
| (e) Opening | Article 14F of Franchise Agreement | Item 11 |
| (f) Fees | Articles 7, 14, 15, 16, 18, 25 of Franchise Agreement; Section 4 of Multi Unit Development Agreement | Items 5, 6, and 7 |
| (g) Compliance with standards and policies/ operating manual | Article 9A of Franchise Agreement | Items 8 & 11 |
| (h) Trademarks and proprietary information | Article 20 of Franchise Agreement | Items 13 and 14 |
| (i) Restrictions on products/ services offered | Article 13 of Franchise Agreement | Items 8, 11 and 16 |
| (j) Warranty and customer service requirements | None | None |
| (k) Territorial development and sales quotas | Section 5 of Multi Unit Development Agreement | Item 12 |
| (l) Ongoing product/services, purchases | Article 13 of Franchise Agreement | Items 8 and 16 |
| (m) Maintenance appearance and remodeling requirements | Article 11 of Franchise Agreement | Items 7 & 11 |
| (n) Insurance | Article 19 of Franchise Agreement | Item 8 |
| (o) Advertising | Article 18 of Franchise Agreement | Item 11 |
| (p) Indemnification | Article 28 of Franchise Agreement | Item 6 |
| (q) Owner's participation/ management/staffing | Article 14 of Franchise Agreement | Item 15 |
| (r) Records and reports | Article 17 of Franchise Agreement | Item 11 |

| | | |
|---|---|---|
| (s) Inspections/audits | Articles 16 & 17 of Franchise Agreement | Items 6 & 11 |
| (t) Transfer | Article 25 of Franchise Agreement; Sections 3B, 3C and 7 of Multi Unit Development Agreement | Items 6 and 17 |
| (u) Renewal | Article 6 of Franchise Agreement | Items 6 and17 |
| (v) Post-termination obligations | Article 23 of Franchise Agreement | Item 17 |
| (w) Non-competition covenants | Articles 24 and Exhibit "D" of Franchise Agreement | Item 17 and Exhibit "D" |
| (x) Dispute resolution | Article 28 of Franchise Agreement; Section 8F of Multi Unit Development Agreement | Item 17 |
| (y) Other | None | None |

## Item 10
## FINANCING

We do not offer direct or indirect financing. We do not guarantee your note, lease, or any obligation.

## Item 11
## OUR ASSISTANCE, ADVERTISING, COMPUTER SYSTEMS, AND TRAINING

**Except as listed below, we are not required to provide you with any assistance.** We do not install equipment, signs, fixtures, opening inventory or supplies. We do deliver opening inventory. We do supply written specifications for equipment, signs, fixtures and supplies.

**Before you open the Store, we will:**

1.      Give you our site selection criteria for the Store. The site must meet our criteria for demographic characteristics; traffic patterns; parking; character of neighborhood; competition from, proximity to, and nature of other businesses; size; appearance; and other physical and commercial characteristics. We will approve or disapprove a location you propose within 30 business days after receiving your description of, and evidence confirming your favorable prospects for obtaining, the proposed site. We will use reasonable efforts to help analyze your market area, to help determine site feasibility, and to assist in designating the location, although we will not conduct site selection activities for you. We generally do not own your site and lease it to you. (Franchise Agreement—Article 10A)

2.      Approve your Store's lease. You must sign a lease for the premises of your Store within 90 days after the effective date of the Franchise Agreement or we may terminate the Franchise Agreement. We provide you a Lease Rider containing provisions we require to be attached to every SHAMAN store's lease.  We may review the final draft of your Store's lease to determine whether it contains any terms of which we do not approve, but we have no responsibility for evaluating or advising you with respect to your lease. (Franchise Agreement—Article 10A)

3.      Give you mandatory and suggested specifications and layouts for a SHAMAN store, including requirements for dimensions, design, image, interior layout, decor, fixtures, equipment, signs, furnishings, and color scheme. (Franchise Agreement—Article 11)

4.      As discussed in Item 8, identify the Operating Assets, proprietary products, other products, and supplies that you must use to develop and operate the Store, the minimum standards and specifications that you must satisfy, and the designated and approved suppliers from whom you must or may buy or lease these items (which may be limited to or include us, our affiliates, or other specified exclusive sources). (Franchise Agreement—Articles 12 and 13)

5.      Provide you online access to the Manual, the current table of contents of which is in Exhibit "H". (Franchise Agreement—Article 9A)

6.      Train you (or your Operating Partner) and one manager-level employee. (Franchise Agreement—Article 14A) We describe this training later in this Item.

7.      We do not provide assistance with conforming the premises to local ordinances, building codes, or obtaining any required permits, and/or constructing, remodeling, or decorating the premises. Additionally, you are responsible for hiring and training your employees. (Franchise Agreement--Articles 11E and 14A)

**Time of Opening**

We estimate that it will be 30 to 90 days after you sign the Franchise Agreement before you open the Store, but this assumes that you already have a site for the Store or find one shortly after signing the Franchise Agreement. You must sign a lease for an acceptable site within 90 days after the Franchise Agreement's effective date, and we may terminate the Franchise Agreement if you fail to sign a lease within the 90-day period. The specific timetable for opening depends on the site's condition; the Store's construction schedule; the extent to which you must upgrade or remodel an existing location; the delivery schedule for equipment and supplies; the completion of training; and your compliance with local laws and regulations. You may not open the Store until (1) we notify you in writing that the Store meets our standards and specifications; (2) you complete pre-opening training to our satisfaction; (3) you have paid the initial franchise fee and other amounts then due to us; and (4) you give us certificates for all required insurance policies and present copies of required licenses.

**During your operation of the Store, we will:**

1.      Advise you regarding the Store's operation based on your reports or our inspections. We also will guide you on standards, specifications, and operating procedures and methods that SHAMAN stores use; purchasing required and authorized Operating Assets, proprietary products, and other items and arranging for their distribution to you; advertising and marketing materials and programs; employee training; and administrative, bookkeeping, accounting, and inventory control procedures. We will guide you in our Manual, bulletins, and other written materials; by electronic media; by telephone consultation; and/or at our office or the Store. (Franchise Agreement—Article 14D)

2.      Give you, at our suggestion or at your request (and our option), additional or special guidance, assistance, and training. (Franchise Agreement—Article 14C & D) (See Items 6 &11)

3.      Continue to provide you access to the current online Operating Manual, which could include audiotapes, videotapes, compact disks, computer software, other electronic media, and/or written materials. The OM contains mandatory and suggested specifications, standards, operating procedures, and rules ("System Standards") that we require. We may modify the Operating Manual periodically to reflect changes in System Standards. (Franchise Agreement—Article 9A)

4.      Issue and modify System Standards for SHAMAN stores. We periodically may modify System Standards, which may accommodate regional or local variations, and these modifications may require you to invest additional capital in the Store or incur higher operating costs. (See Item 11) (Franchise Agreement—Articles 9A, 12C, and 21)

5.      Inspect the Store and observe your operation to help you comply with the Franchise Agreement and all System Standards. (Franchise Agreement—Article 11D)

6.      We will develop and conduct marketing, advertising, public relations, and promotional campaigns which you must participate in for the benefit of the SHAMAN System as we deem necessary. (Franchise Agreement—Article 18A)

7.      We will maintain and administer the National Advertising Fund. Our costs and expenses incurred in connection with such administration may be paid out of the National Advertising Fund. (Franchise Agreement—Article 18E)

8.      Let you use our confidential information. (Franchise Agreement—Articles 2 and 24)

9.      Let you use our Marks. (Franchise Agreement—Articles 2, 3 and 20)

10.     Periodically offer refresher training courses. (Franchise Agreement-Article 14C) (See Item 11)

**<u>Advertising</u>**

1.      We shall develop and conduct marketing, advertising, public relations, and promotional campaigns which you must participate in for the benefit of the SHAMAN System as we deem necessary in our sole discretion, through any media that we choose. Media coverage may be on a local-to-international basis, and we reserve the exclusive right to develop and conduct such advertising, sales, or marketing activities. (Franchise Agreement -- Article 18A)

        (a)     The source of the advertising material that we may provide will be in-house or through an advertising agency. (Franchise Agreement -- Article 18A)

        (b)     We are not required to spend any funds on advertising in any particular area. (Franchise Agreement—Article 18A)

        (c)     You are required to conduct marketing and advertising to promote the products and systems offered by us to potential operators and to spend up to a $750.00 amount per month on advertising and marketing your business, exclusive of the marketing fee you must pay us monthly. (Franchise Agreement—Article 18B)

(d)     You may use any advertising media that will be effective. (Franchise Agreement -- Article 18B)

(e)     The media coverage shall be local. (Franchise Agreement—Article 18B - 18C)

(f)     You may use your own advertising and marketing material in promoting your franchise business if you receive our prior written approval, which will be determined by us within twenty (20) business days from the date on which we received your request. (Franchise Agreement—Article 18C)

2.      The National Marketing Fund

You must pay us a marketing fee equal to $800 per month, provided we will not collect such marketing fee with respect to the Store's first 30 days of operation.  Such fees will be placed into the National Marketing Fund.  The National Marketing Fund monies will be placed in a separate bank account, commercial account, or savings account. The National Marketing Fund will be administered by us, at our discretion. The National Marketing Fund proceeds may be used for researching, preparing, maintaining, administering, and directing marketing and promotional materials and public relations programs, including production of commercial print, radio, television, magazine, newspaper, Internet marketing, direct response literature, direct mailings, brochures, national and international franchise sales, collateral materials marketing, surveys of marketing effectiveness, and other marketing or public relations expenditures. We may reimburse ourselves from the National Marketing Fund for administrative costs, including the salaries of public relations personnel or persons administering the marketing services, independent audits, reasonable accounting, bookkeeping, reporting and legal expenses, taxes, repayment of loans, and all other reasonable direct or indirect expenses that we or our authorized representatives incur with the programs funded by the National Marketing Fund.  We may also reimburse SHAMAN franchisees using monies from the National Marketing Fund for up to $250 of out-of-pocket expenses incurred by the franchisee to modify or discontinue the use of any Mark or to use an additional or substitute mark. (Franchise Agreement – Articles 18E and 20C)

(a)     The National Marketing Fund is not audited.  We will make available to franchisees, no later than 120 days after the end of each calendar year, an annual unaudited financial statement for the National Marketing Fund that shows how the National Marketing Fund proceeds have been spent in the prior year. (Franchise Agreement – Article 18E)

(b)     All SHAMAN stores owned by us or our affiliates will be required to pay an equal amount or on an equal percentage basis, as applicable, into the National Marketing Fund. (Franchise Agreement – Article 18E)

(c)     Marketing Expenditures from the National Marketing Fund will be up to the sole discretion of Franchisor in how to allocate amongst geographic areas where American Shaman facility sites are located. (Franchise Agreement – Article 18E)

(d)     The National Marketing Fund is not used to solicit new franchise sales. (Franchise Agreement – Article 18E)

(e)     National Marketing Fund monies not spent in any fiscal year will be carried forward for use in the ensuing fiscal years.  In addition, we reserve the right to loan money to the National Marketing

Fund on a periodic basis and charge a market interest rate in connection with such loan.  Monies in the National Marketing Fund may be used to repay such loans in future years as we determine.  You are not entitled to receive a periodic accounting for how National Marketing Fund monies are spent.(Franchise Agreement – Article 18E)

(f)      Through 2020 covid economic crisis we did not collect the entire National Marketing Fees each month.  In 2019 the entire National Marketing fee was required by each franchisee to pay monthly into the National Marketing Fund. In our 2018 fiscal year there were no funds spent from the National Marketing Fund in our 2018 fiscal year.


3.      Advertising Co-op/Association

In 2020 we established the American Shaman Franchise Association as a non-profit entity to serve as an advertising council or advertising cooperative (the "Association").  We reserve the right to create Advertising Co-Ops, each of which is an association of all franchisees whose SHAMAN stores are located within an Area of Dominant Influence ("ADI") (An ADI is a geographic market designation that defines a broadcast media market consisting of the cities, counties, or other defined area in which the home market stations receive a preponderance of viewing.). One function of any Advertising Co-Op is to establish a local advertising pool, of which the funds must be used for advertising of the SHAMAN store operations located in the ADI and for the mutual benefit of each Advertising Co-Op member. If an Advertising Co-Op is established in your ADI, you are required to join and participate in it and contribute to the pool in accordance with the rules and regulations of the Advertising Co-Op, as determined by its members. The members of the Advertising Co-Op will be responsible for administering the Advertising Co-Op. The Co-Op should operate from written governing documents, the rules of which are available for all members to review. Annual reports must be prepared by the Advertising Co-Op. which will be available for your review. (Franchise Agreement – Article 18D)

SHAMAN stores owned by us or our affiliates may participate, but are not be required, to pay an equal amount or on an equal percentage basis, as applicable, into the American Shaman Franchise Association. (Franchise Agreement – Article 18D)

The American Shaman Franchise Association is required to be participated in by each franchise at least to the minimum fee owed for each member franchise.  Other than the National Marketing Fund and the American Shaman Franchise Association, there currently is no other advertising funds in which you must participate according to the Franchise Agreement at this time, but we reserve the right to create ones, which you must participate in.

The Association Fund monies are not used to solicit new franchise sales.

**Computer Hardware and Software**

We have the right to specify or require certain brands, types, makes, and/or models of communications, computer systems, and hardware to be used by you in operating your Store (Franchise Agreement– Article 12C).  We have developed a proprietary electronic point of sale software platform that you must use in operating your Store.  At this time, the American Shaman point of sale software is made available to you at no additional cost, but we reserve the right to impose fees relating to the license, use or support of the point of sale ("POS") software in the future.  A dedicated device is required to operate the software platform.  You must purchase a computer that is compatible with such software platform.

Neither we nor any affiliate or third party has any obligation to provide ongoing maintenance, repairs, upgrades, or updates to the American Shaman point of sale software. Our POS software includes a franchise online operating manual, consisting of a series of tabs. As the operating manual is online and tabular, there is no page number applicable to the operating manual. The tabs may be considered a Table of Contents and consist of the following content sections, which are also set forth in Exhibit H: US Hemp Laws, Pre-opening Marketing, Online Presence, Social Media, Advertising and Marketing, Compliance, Operations, Point of Sale Instruction. CBD Information, Products Information, Selling Products, and Miscellaneous.

You must have a functioning email address so that we can send you notices and otherwise communicate with you by this method.

We reserve the right to change the Computer System at any time. There are no contractual limitations on the frequency and cost of this obligation.  We need not reimburse you for any of these costs.

There is a monthly $200 technology fee to pay for the Computer System, software or other technological platforms. There are no other required fees for maintenance, updating, upgrading or support contracts for the point of sale or computer systems.

We will have the ability to access all information and financial data recorded by the Computer System for any purpose, including audit, sales verification and System development purposes.  There are no contractual limitations on our right to access the information and data.  Sales, inventory, employee, and other proprietary information will be maintained on the Computer System upon implementation of the American Shaman point of sales system.

We have the right to modify our policies regarding both our and your use of internet websites as we deem necessary or appropriate for the best interests of the System. (Franchise Agreement, Article 12C). You acknowledge that we and/or our affiliates are the lawful, rightful and sole owner of the internet domain name www.cbdamericanshaman.com as well as any other internet domain names registered by us, and you unconditionally disclaim any ownership interest in such domain names and any similar Internet domain names. You may not register any Internet domain name in any class or category that contains words used in, or similar to any brand name, owned by us or our affiliates, or any abbreviation, acronym, phonetic variation or visual variation of those words. (Franchise Agreement, Article 12C)

## Computer Network, Intranet or Extranet Participation

You are required to participate in our System-wide intranet system which, among other things, allows you to: (i) complete certain on-line training; (ii) access the OM; and (iii) communicate with us and other System franchisees. You agree to use the facilities of any computer network, intranet system or extranet system in strict compliance with the standards, protocols, and restrictions that we include in the OM, including those related to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory, or defamatory statements.  You are required to participate in any other System-wide computer network, intranet system or extranet system that we implement.  (Franchise Agreement—Article 12C)

**Training**

Before the facility opens, we will train you (or your managing owner) and one of your manager-level employees to operate a SHAMAN store. We will provide up to four (4) days of training (although the specific number of days depends on our opinion of your experience and needs) at our training facilities in the Kansas City Metro Area, or another location we designate and/or at an operating SHAMAN store. If you (or your managing owner) and one of your manager-level employees cannot complete initial training to our satisfaction, we may terminate the Franchise Agreement. (Franchise Agreement—Article 14A)

You must pay for all travel and living expenses that you and your employees incur and for your employees' wages and workers' compensation insurance while they train at operating SHAMAN stores.

Training will occur after you sign the Franchise Agreement and while you are developing the Store. Your attendees must complete training before you may open your Store. We plan to be flexible in scheduling training to accommodate our personnel, you, and your personnel. As of the date of this Disclosure Document, we provide the following training:

**Training Program:**

| Subject | Classroom Training Hrs. | Hours of On-The-Job Training | Location |
|---|---|---|---|
| Company overview | 1 hour | | Franchisor corporate office |
| Factory Tour | 2 hours | | Franchisor corporate office |
| Hemp Laws | 0.5 hour | | Franchisor corporate office |
| Pre-opening Marketing | 0.75 hour | | Franchisor corporate office |
| Establishing an Online Presence | 1 hour | | Franchisor corporate office |
| Leveraging Social Media | 1 hour | | Franchisor corporate office |
| Advertising & Marketing Techniques | 1 hour | | Franchisor corporate office |
| Compliance | 1 hour | | Franchisor corporate office |
| Key Performance Indicators | 0.5 hour | | Franchisor corporate office |
| POS Training | 1 hour | | Franchisor corporate office |
| Daily Operations | 0.5 hour | | Franchisor corporate office |
| CBD Basics | 0.5 hour | | Franchisor corporate office |
| CBD Advanced | 2.0 hour | | Franchisor corporate office |
| Product Information | 1 hour | | Franchisor corporate office |
| Shaman Customer Experience | 1 hour | | Franchisor corporate office |
| Retail Sales Basics | 2.25 hours | | Franchisor corporate office |

| CBD Certification Course | 8 hours | | Online |
|---|---|---|---|
| In Store Training | | 8 hours | Designated training store |
| TOTAL 33 hours | 25 hours | 8 hours | |

Marc Sayler oversees all training.  Mr. Sayler has 18 years of general training experience and has been employed with us since July 2018.  The OM, a Training Manual, and Videos will be used as the principal instructional material.

We conduct our initial training program at our corporate offices and at SHAMAN stores located in the Kansas City metropolitan area.  We currently hold training classes on an as needed basis.

When your Store is ready to open, we may, at our cost, send one of our representatives to your Store for up to 2 days to work on the final aspect of the training and to assist with the opening. You also must successfully complete this phase of training if it is required by us.

You (or your managing owner) and/or other previously trained and experienced employees must attend and satisfactorily complete various training courses that we periodically provide at the times and locations we designate. Besides attending these courses, you must attend an annual meeting of all franchisees at a location we designate. We will not require attendance at the annual meeting for more than four (4) days during any calendar year. (See Item 6) There are no fees for training for you as the owner or the operating manager at any training provided by us, with the exception of an annual meeting fee of up to $350 per attendee. In addition, should you request for additional training attendees beyond the allotted two at any training session provided, there may be a fee of $500 per person assessed. You are responsible for all related travel and living expenses, and wages at any such events.  The additional training will be available on an "as needed" basis depending on new product and services introduction. The location, duration, frequency, and content of the training program will vary depending on the availability of location, and purpose of the additional training.

We may require Store managers to satisfactorily complete initial and ongoing training programs. (Franchise Agreement—Article 14A)

We may charge you a fee for training additional managers. (See Item 6) You are responsible for all related travel and living expenses and wages. (Franchise Agreement—Article 14C)

**<u>Operations Resources</u>**

The "refer to online resource center", is stated in Exhibit "H."

**Item 12**
**TERRITORY**

You will operate the Store at a specific location that we must first approve. There is no minimum territory granted to you. You may operate the Store only at the approved premises and may not relocate the premises without our approval. Conditions for our approval of relocation of your Store include property destruction beyond your control, acts of god, changes in municipal or state zoning or permitting requirements, personal or family tragedy. There is no right to move your location once you have selected an established location during the Franchise Agreement Term. We will allow relocation if circumstances dictate that it is in your and our best interests. You may establish additional franchised outlets if you are in compliance with all of the terms and conditions of the Franchise Agreement and the Manual and if we have determined that you are ready to establish additional franchised outlets.

You will not receive an exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control.

We and our affiliates retain all rights with respect to SHAMAN stores, the Marks, the sale of similar or dissimilar products and services, and any other activities we deem appropriate whenever and wherever we desire, including, but not limited to:

(a)     the right to provide, offer, and sell and to grant others the right to provide, offer, and sell goods and services that are identical or similar to and/or competitive with those provided at SHAMAN stores, whether identified by the Marks or other trademarks or service marks, through dissimilar channels of distribution (including retail stores and the Internet, technological innovations or market developments, or similar electronic media) on any terms and conditions we deem appropriate;

(b)     the right to establish and operate, and to grant others the right to establish and operate, businesses offering dissimilar products and services, under the Marks and on any terms and conditions we deem appropriate;

(c)     the right to operate and grant others the right to operate SHAMAN stores at "non-traditional sites" on any terms and conditions we deem appropriate. "Non-traditional sites" are sites that generate customer traffic flow and that are independent of the general customer traffic flow of the surrounding area, including military bases, shopping malls, airports, stadiums, major industrial or office complexes, hotels, school campuses, train stations, travel plazas, toll roads, casinos, hospitals, and sports or entertainment venues;

(d)     the right to acquire the assets or ownership interests of one or more businesses providing products and services like those provided at SHAMAN stores, and franchising, licensing, or creating similar arrangements with respect to these businesses once acquired, wherever these businesses (or the franchisees or licensees of these businesses) are located or operating; and

(e)     the right to be acquired (whether through acquisition of assets, ownership interests, or otherwise, regardless of the form of transaction), by a business providing products and services similar to those provided at SHAMAN stores, or by another business, even if such business operates, franchises, and/or licenses competitive businesses.

We are not required to pay you if we exercise any of the rights specified above inside your territory. In addition, you are advised that we currently exercise such rights through our competing distribution channels, which include online sales of similar products, white-label and wholesale products, as well as our business-owned retail stores.

You have no options, rights of first refusal, or similar rights to acquire additional franchises.

Although we and our affiliates have the right to do so (as described above), we and our affiliates have not operated or franchised, and have no plans at this time to operate or franchise, other businesses selling or leasing similar products or services under different trademarks.

Continuation of your franchise rights does not depend on your achieving a certain sales volume, market penetration, or other contingency.

We do not restrict you from soliciting or accepting orders from outside your Store, but you do not have the right to use other channels of distribution to make sales outside your Store.

## Item 13
## TRADEMARKS

Under the Franchise Agreement, we grant you the non-exclusive right to use the Marks in connection with the operation of your Store.

Under a license agreement with Stephen Vincent Sanders, our Chairman and CEO, we are licensed to use the Marks described below and to sublicense such Marks to our franchisees to use in operating SHAMAN stores. The license agreement is for a 30-year term and can be terminated if we breach the agreement. If the license agreement is terminated, you may be required to stop using the Marks described below.

No other agreement limits our right to use or license the Marks.

The word and design marks for CBD AMERICAN SHAMAN are registered upon the principal register of the United States Patent and Trademark Office as follows:

| Mark | Registration No. | Application # | Date of Registration |
|---|---|---|---|
| CBD AMERICAN SHAMAN | 4944269 | 86/566,263 | April 26, 2016 |
|  4 | 4944414 | 86/589,338 | April 26, 2016 |

---

[4] Also applied for in the Russian Federation (Application No. A0101052), United Kingdom (Application No. WO0000001565635), European Union (Application No. A0101052), and through the United States "Madrid Protocol" (Application No. A0101052), the last of which has been registered.

| | | | |
|---|---|---|---|
|  | 5519343 | 87/723,541 | July 17, 2018 |
| AMERICAN SHAMAN | Pending | 90/243,095 | N/A |
|  | Pending | 90/364,524 | N/A |
| CBNIGHT | Pending | 90/232,886 | N/A |
| CBGO | Pending | 90/243,069 | N/A |

You must follow our rules when you use the Marks, including giving proper notices of trademark and service mark registration and obtaining fictitious or assumed name registrations required by law. You may not use any Mark in your corporate or legal business name; with modifying words, terms, designs, or symbols (except for those we license to you); in selling any unauthorized services or products; or as part of any domain name, homepage, electronic address, or otherwise in connection with a website without our written permission.

There are no material determinations of the U.S. Patent and Trademark Office, the Trademark Trial and Appeal Board, or any state trademark administrator or court; or any pending infringement, opposition, or cancellation proceedings involving the principal Marks. There is no pending material federal or state court litigation regarding our use or ownership rights in any Mark.

There are currently no effective agreements that significantly limit our rights to use or license the use of the Marks.

We will protect your right to use the Marks against claims of infringement or unfair competition arising out of your proper use of the Marks. You must notify us of the use of, or claim of rights to, a trademark identical or confusingly similar to our Marks.  We have the right to determine whether or not we will take affirmative action when notified of these uses or claims and the right to exclusively control any litigation or proceedings.  You are required to assist us in the prosecution of such litigation or proceedings.

We will reimburse you for all actual damages (other than loss of income) and out-of-pocket expenses incurred by you in connection with any claim by any third party for infringement or unfair competition arising out of your use of the Marks; however, our obligations to reimburse you will exist only if you have used the name or mark that is the subject of the controversy in strict accordance with the provisions of your Franchise Agreement and our rules, regulations, procedures, requirements, and instructions, and have notified us of the challenge as stated above and have otherwise fully cooperated with us in the defense of any action.

We may modify or discontinue the use of any one or more of the Marks at our discretion and at any time, and we may add additional or substitute marks.  You must immediately comply with our instructions in that regard. Our only obligation is to reimburse you for your out-of-pocket expenses actually incurred, including, but not limited to, letterhead, in an amount not to exceed more than Two Hundred Fifty Dollars ($250.00).

We know of no superior prior rights or infringing uses that could materially affect your use of the Marks in the state where your Store will be located.

All required affidavits have been filed.

We are the lawful and sole owner of the domain name(s) www.cbdamericanshaman.com. You may not register any of the Marks or other proprietary marks owned by us or any abbreviation, acronym or variation of the Marks, or any other name that could be deemed confusingly similar, as Internet domain names. We retain the sole right to advertise the SHAMAN system on the Internet and to create, operate, maintain and modify, or discontinue using a website using the Marks. You may access our website. Except as we may authorize in writing in advance, however, you cannot: (i) link or frame our website; (ii) conduct any business or offer to sell or advertise any products or services on the worldwide web; and (iii) create or register any Internet domain name in connection with your franchise.

You may use only the Marks that we designate and may use them only in the manner we authorize and permit. Any goodwill associated with Marks, including any goodwill that might be deemed to have arisen through your activities, inures directly and exclusively to our benefit. You may use the Marks only for the operation of the Store and only at the location we approve or in advertising for the Store. You will use all Marks without prefix or suffix and in conjunction with the symbols "TM," or "®," as applicable.  You may not use the Marks in connection with the offer or sale of any services or products that we have not authorized for use in connection with the System. You may not use the Marks as part of your corporate or other legal name. We must approve your corporate name and all fictitious names under which you propose to do business in writing before use.  You must use your corporate or limited liability company name either alone or followed by the initials "D/B/A" and the business name "CBD American Shaman." You must properly register at the office of the county in which your Store is located, or such other public office as provided for by the laws of the state in which your Store is located, as doing business under the assumed business name.

## Item 14
## PATENTS, COPYRIGHTS, AND PROPRIETARY INFORMATION

There are no patent applications pending that are material to the franchise. We claim copyright protection for our OM and other publications and promotional materials, although we have not registered any of the materials with the U.S. Copyright Office. These materials are considered proprietary and confidential and are considered our property and may be used by you only as provided in the Franchise Agreement, OM, and other communications that we provide to you. We reserve the right to register any of our copyrighted materials at any time we deem appropriate.

There currently are no effective determinations of the Copyright Office or any court regarding any of our copyrighted materials.

There are no agreements in effect that significantly limit our right to use or license the copyrighted materials. We are not required by any agreement to protect or defend any patent, trademark, or copyright.

We know of no superior prior rights or infringing uses that could materially affect your use of the copyrights in the state where your franchise business will be located.

Our OM and other materials contain our confidential information (some of which constitutes trade secrets under applicable law). This information includes site selection criteria; training and operations materials; methods, formats, specifications, standards, systems, procedures, techniques, sales and marketing techniques, knowledge, and experience used in developing and operating SHAMAN stores; marketing and advertising programs for SHAMAN stores; any computer software or similar technology that is proprietary to us or the System; knowledge of specifications for and suppliers of Operating Assets, and other products and supplies; knowledge of the operating results and financial performance of SHAMAN stores other than your Store; and graphic designs and related intellectual property.

All ideas, concepts, techniques, or materials concerning a SHAMAN store, whether or not protectable intellectual property and whether created by or for you or your owners or employees, must be promptly disclosed to us and will be deemed to be our sole and exclusive property, part of the SHAMAN system, and works made-for-hire for us. If any item does not qualify as a "work made-for-hire" for us, you assign ownership of that item, and all related rights to that item, to us and must take whatever action (including signing assignment or other documents) we request to show our ownership or to help us obtain intellectual property rights in the item.

You may not use our confidential information in an unauthorized manner. You must take reasonable steps to prevent improper disclosure to others and use non-disclosure and non-competition agreements with those having access. You must also promptly tell us when you learn about the unauthorized use of this proprietary information. We are not obligated to take any action, but we will respond to your notification of unauthorized use as we think appropriate. We will indemnify you for any loss you sustain as a result of any action brought by a third party concerning your use of this proprietary information. We may regulate the form of agreement that you use and will be a third-party beneficiary of that agreement with independent enforcement rights.

### Item 15
### OBLIGATION TO PARTICIPATE IN THE ACTUAL
### OPERATION OF THE FRANCHISED BUSINESS

The day-to-day operations of your SHAMAN business must be managed at all times by you (or your Operating Partner as defined below) or a "General Manager" who has satisfactorily completed our training program. Your General Manager need not have an equity interest in the business but must agree in writing not to compete against us and to preserve confidential information to which he or she has access and not to compete with you, us, and other franchisees. We may regulate the form of agreement that you use and be a third-party beneficiary of that agreement with independent enforcement rights. Certain other employees may also be required to enter into an agreement not to compete against us in similar businesses of other systems while employed by you, and for 12 months thereafter, and an agreement not to reveal confidential information obtained during the course of their employment with you. (See Exhibit "G").

You are required to inform us immediately of a change of the Operating Partner or General Manager of your business operation.

If you are, or at any time during the term become, a business corporation, partnership, limited liability company, or other legal entity, you must designate an "Operating Partner." Your Operating Partner must be an individual who (a) owns and controls not less than 5% of the equity and voting rights; (b) has completed our training program to our satisfaction; and (c) has the power and authority to bind you in all dealings with us. If you are a corporation, limited liability company, or partnership, your owners and their respective spouses (if any) must personally guarantee your obligations under the Franchise Agreement and agree to be bound personally by every contractual provision, whether containing monetary or non-monetary obligations, including the covenant not to compete. This "Guaranty and Assumption of Obligations" is included on Page 39 of the Franchise Agreement.

## Item 16
## RESTRICTIONS ON WHAT YOU MAY SELL

You must offer and sell all Items and perform all services that we periodically require for SHAMAN stores. You may not offer or sell any products or perform any services that we have not authorized or approved. (See Item 8) Our System Standards may regulate required and/or authorized items and proprietary products; unauthorized and prohibited products, and services; purchase, storage, preparation, handling, and packaging procedures and techniques for items and proprietary products; and inventory requirements for proprietary products and other products and supplies so that your Store operates at full capacity. We periodically may change required and/or authorized items and proprietary products. There are no limits on our right to do so. (See Item 8)

We do not impose any restrictions or conditions that limit your access to customers.

## Item 17
## RENEWAL, TERMINATION, TRANSFER, AND DISPUTE RESOLUTION

### THE FRANCHISE RELATIONSHIP

These tables list certain important provisions of the Franchise Agreement and related agreements. You should read these provisions in the agreements attached to this Disclosure Document.

**FRANCHISE AGREEMENT:**

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| a. Length of the franchise term | Article 6A | 5 years |
| b. Renewal or extension | Article 6B | Unlimited 5-year renewals if you meet certain requirements |
| c. Requirements for you to renew or extend | Article 6B | To renew the Franchise Agreement, you must provide written notice of the request to renew and you and your affiliates must be in full compliance with the Franchise Agreement and all other agreements with us or our affiliates. You must sign the then-current form of Franchise Agreement, which may contain materially different terms and conditions from the original Franchise Agreement that you |

| | | |
|---|---|---|
| | | signed, secure an approved location, sign a release, if applicable, and pay the required renewal fee |
| d. Termination by you with cause | Article 22A | If we have materially failed to comply with terms of the Franchise Agreement after 30 days' notice |
| e. Termination by us without cause | Not applicable | Not applicable |
| f. Termination by us with cause | Article 22B | We can terminate immediately or within 30 days if you breach a material provision of the Franchise Agreement |
| g. "Cause" defined – curable defaults | Articles 22B | Failure to pay the full amount of the Marketing, or any other fee or amount due; failure to furnish required reports; misuses or failure to follow guidelines regarding the Marks, failure to operate in compliance with the Franchise Agreement, Manual, and other guidelines; failure to properly set up your Store |
| h. "Cause", defined—non-curable | Article 22C | Failure to successfully complete training; fail to locate a satisfactory site for your Store within 90 days of signing the Franchise Agreement; assignment for the benefit of creditors, an affirmative act of bankruptcy or insolvency (the provision in the Franchise Agreement which provides for termination upon the filing of bankruptcy may not be enforceable under Federal Bankruptcy Law, 11 U.S.C. Section 101 et seq.); fail or refuse three or more times in any 12-month period to submit reports or pay monies when due; operate your Store in violation of applicable law; failure to comply with a notice of compliance by a governmental authority; transfer in violation of this agreement; divulge the OM or SHAMAN's trade secrets or confidential information to a third party; fail three or more times in a 12-month period to substantially comply with the Manual; conviction of a felony |

| | | |
|---|---|---|
| | | or plead nolo contendere to a felony; abandonment of business, surrender of control; material misrepresentation or omission in the application; engage in an activity that has a material adverse effect on the System or Marks or engage in a business separate from the Store; lose the right to occupy the Store premises due to breach of lease; you or any officer, director, member, manager or partner of yours becomes subject to United States Executive Order 13224 or the Patriot Act |
| i.Your obligations on termination or non-renewal<br><br>Termination for cause creates a $50,000.00 fine and termination fee | Article 23 | Cease operating franchised business; cease use of confidential information and Marks; deliver property containing the Marks; cancel assumed or similar name registrations; pay outstanding amounts and, if applicable, damages; return manuals; assign telephone numbers and domain names; de-identify your Store; comply with covenants Termination for cause results in a $50,000.00 termination fee. |
| j. Assignment of contract by us | Article 25A | No restriction on our right to assign |
| k. "Transfer" by you—definition | Article 25B | Includes transfer of the Franchise Agreement or business assets by you and transfers of your ownership interests if the franchisee is an entity |
| l. Our approval of transfer by you | Article 25B | We have the right to approve all transfers by you |
| m. Conditions of our approval of transfer | Article 25B and 25C | Full compliance; transferee qualifies; all outstanding amounts due are paid in full; completion of training by transferee; transfer fee paid; transferee agrees to be bound by all terms of the current Franchise Agreement; you execute and deliver other required documents, including a release |
| n. Our right of first refusal to acquire your business | Article 25C | We have the right to match any offers |

| o. Our option to purchase your business on termination or non-renewal | Article 23G | We have the right to purchase your business |
|---|---|---|
| p. Your death or disability | Article 25D | Franchise must be assigned to an approved operator within 60 days, provided, in the event of your death, if we do not approve your heirs or beneficiaries of the Store, your estate has an additional 60 days to assign to an approved assignee |
| q. Non-competition covenants during the term of the Franchise | Article 24B | No diverting business to competitors or doing any other act injurious or prejudicial to the SHAMAN System |
| r. Non-competition covenants after the franchise is terminated (but not on expiration) | Article 24B | For 2 years, no diverting business to competitors or doing any other act injurious or prejudicial to the SHAMAN System or setting up a similar business within 50 miles of previous location or another SHAMAN location. Retail store customers come from various distances for our products up to and including 50 miles or more away. In addition, retail sales of CBD products do not require a professional license or state certification which may arguably require a smaller radius for a non-compete. This noncompete provision would not forbid a terminated franchisee from opening up another non CBD-product retail store and is not overly burdensome. |
| s. Modification of the agreement | Article 32G | No modification except by agreement of the parties. But OM directives are subject to change by us |
| t. Integration/ merger clause | Article 32D | Only terms of Franchise Agreement are binding (subject to state law), provided nothing in the Franchise Agreement or in any related agreement is intended to disclaim the representations made in this disclosure document. |
| u. Dispute resolution by arbitration | Article 28B | Arbitration and mediation in Kansas City, Missouri (subject to state law) |

| v. Choice of forum | Article 28A and 28B | Litigation in Jackson County, Missouri (subject to state law) |
| w. Choice of law | Article 28C | Except for Federal trademark law, Missouri laws apply (subject to state law) |

**MULTI UNIT DEVELOPMENT AGREEMENT:**

| Provision | Section in franchise or other agreement | Summary |
|---|---|---|
| a. Length of the Multi-Unit Development Agreement term | Section 5.A | Varies based on the agreed upon development schedule |
| b. Renewal or extension<br><br>(i) Extension of the term in its entirety<br><br>(ii) Extension of the term with respect to only one specific SHAMAN store to be developed | Section 5.B | (i) You may request only one 45-day extension of the term of the Multi Unit Development Agreement if you experience delays beyond your control in developing and opening the franchise location(s).<br><br>(ii) You may request only one 45-day extension of the term with respect to one specific SHAMAN store if you experience delays beyond your control in developing and opening the location. |
| c. Requirements for you to renew or extend | Section 5.B | You must request the extension in writing at least 15 days before the expiration of the term. We will grant the extension if we determine that you have made a good faith effort to comply with your obligations to open your SHAMAN store location(s) but have experienced delays beyond your control. |
| d. Termination by you with cause | Not applicable | Not applicable |
| e. Termination by us without cause | Not applicable | Not applicable |
| f. Termination by us with cause | Section 5.C | We can terminate if you fail to open the number of SHAMAN stores that you have secured the right to open within the time period(s) specified in your Multi Unit Development Agreement (allowing for any approved extensions), if you are in material breach of a Franchise Agreement with us |

| | | beyond any applicable cure period, or upon your transfer or assignment or attempted transfer or assignment in violation of the Multi Unit Development Agreement |
|---|---|---|
| g. "Cause" defined – curable defaults | Not applicable | Not applicable |
| h. "Cause", defined—non-curable | Section 5.C | You fail to meet your development schedule (allowing for any approved extensions); you are in material breach of a Franchise Agreement with us beyond any applicable cure period; or you transfer or assign or attempt to transfer or assign in violation of the Multi Unit Development Agreement |
| i. Your obligations on termination or non-renewal | Section 5.C | We keep the Multiple Franchise Fee and any other fees paid by you under the Multi Unit Development Agreement prior to termination |
| j. Assignment of contract by us | Section 7A | No restriction on our right to assign |
| k. "Transfer" by you—definition | Section 7B | Includes any assignment or transfer, voluntarily or involuntarily, in whole or in any part, by operation of law or otherwise |
| l. Our approval of transfer by you | Section 7B | You may not transfer without our approval |
| m. Conditions of our approval of transfer | Section 7B | Approval will be granted, withheld or conditioned in our sole discretion |
| n. Our right of first refusal to acquire your business | Not applicable | Not applicable |
| o. Our option to purchase your business on termination or non-renewal | Not applicable | Not applicable |
| p. Your death or disability | Section 7B | Transfer must be approved by us, but we will not unreasonably withhold our approval of a transferee approved as a Successor Operator under a Franchise Agreement between you and us |
| q. Non-competition covenants during the term of the Franchise | Not applicable | Not applicable |
| r. Non-competition covenants after the franchise is | Not applicable | Not applicable |

| terminated (but not on expiration) | | |
|---|---|---|
| s. Modification of the agreement | Section 8G | No modification except by agreement of the parties. |
| t. Integration/ merger clause | Section 8G | Only terms of Multi Unit Development Agreement are binding |
| u. Dispute resolution by arbitration | Not applicable | Not applicable |
| v. Choice of forum | Section 8F | Litigation in Jackson County, Missouri (subject to state law) |
| w. Choice of law | Section 8F | Missouri laws apply (subject to state law) |

## Item 18
## PUBLIC FIGURES

We currently do use public figures to promote our products sold at the franchises.  We reserve all rights to make determinations of which public figures to engage with such promotion and all activities.

## Item 19
## FINANCIAL PERFORMANCE REPRESENTATIONS

The FTC's Franchise Rule permits a franchisor to provide information about the actual or potential financial performance of its franchised and franchisor-owned outlets, if there is a reasonable basis for the information and if the information is included in the Disclosure Document. Financial performance information that differs from that included in Item 19 may be given only if (1) a franchisor provides the actual records of an existing outlet you are considering buying or (2) a franchisor supplements the information provided in this Item 19, for example, by providing information about possible performance at a particular location or under particular circumstances.

We do not make any representations about a franchisee's future financial performance or the past financial performance of company-owned or franchised outlets. We also do not authorize our employees or representatives to make such representations either orally or in writing. If you are purchasing an existing outlet, however, we may provide you with the actual records of that outlet. If you receive any other financial performance information or projections of your future income, you should report it to our management by contacting Kathi Miley at (855) 427-2233 ext. 109, or the Federal Trade Commission, and any appropriate state regulatory agencies.

[Remainder of page intentionally left blank.]

**Item 20**
**OUTLETS AND FRANCHISEE INFORMATION**

There are no trademark-specific franchisee organizations associated with the franchise system at this time.

**Table No. 1**
**Systemwide Outlet Summary**
**For Years 2016–2020**

|  |  |  |  |  |
|--|--|--|--|--|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| Outlet Type | Year | Outlets at the Start of the Year | Outlets at the End of the Year | Net Change |
|--|--|--|--|--|
| Franchised | 2016 | 0 | 0 | 0 |
|  | 2017 | 0 | 0 | 0 |
|  | 2018 | 0 | 127 | 127 |

|  | 2019 | 127 | 353 | 226 |
|---|---|---|---|---|
|  | 2020 | 353 | 300 | (53) |
| **Company-Owned** | 2016 | 0 | 0 | 0 |
|  | 2017 | 0 | 0 | 0 |
|  | 2018 | 0 | 2 | 2 |
|  | 2019 | 2 | 17 | 15 |
|  | 2020 | 17 | 43 | 26 |
| **Total Outlets** | 2016 | 0 | 0 | 0 |
|  | 2017 | 0 | 0 | 0 |
|  | 2018 | 0 | 129 | 129 |
|  | 2019 | 129 | 370 | 241 |
|  | 2020 | 370 | 343 | (27) |

**Table No. 2**
**Transfers of Outlets from Franchisee to New Owners (Other than the Franchisor)**
**For Years 2016–2020**

| State | Year | Number of Transfers |
|---|---|---|
| Arkansas | 2016 | 0 |
|  | 2017 | 0 |
|  | 2018 | 0 |
|  | 2019 | 0 |
|  | 2020 | 0 |
| Colorado | 2016 | 0 |
|  | 2017 | 0 |
|  | 2018 | 0 |
|  | 2019 | 0 |
|  | 2020 | 3 |

| State | Year | Value |
|---|---|---|
| Connecticut | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 1 |
| Florida | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 2 |
| | 2020 | 3 |
| Georgia | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 1 |
| Indiana | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 0 |
| Iowa | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 0 |
| Kansas | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 2 |
| | 2019 | 2 |
| | 2020 | 0 |
| Kentucky | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 0 |
| Maryland | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 0 |
| Missouri | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 1 |

| | | |
|---|---|---|
| Montana | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 1 |
| Nebraska | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 0 |
| Nevada | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 1 |
| New Mexico | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 0 |
| North Carolina | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 0 |
| Ohio | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 0 |
| Oklahoma | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 2 |
| | 2020 | 0 |
| Oregon | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |
| | 2020 | 0 |
| Pennsylvania | 2016 | 0 |
| | 2017 | 0 |
| | 2018 | 0 |
| | 2019 | 0 |

|  | 2020 | 1 |
|---|---|---|
| Rhode Island | 2016 | 0 |
|  | 2017 | 0 |
|  | 2018 | 0 |
|  | 2019 | 0 |
|  | 2020 | 0 |
| South Carolina | 2016 | 0 |
|  | 2017 | 0 |
|  | 2018 | 0 |
|  | 2019 | 0 |
|  | 2020 | 0 |
| Tennessee | 2016 | 0 |
|  | 2017 | 0 |
|  | 2018 | 0 |
|  | 2019 | 0 |
|  | 2020 | 0 |
| Texas | 2016 | 0 |
|  | 2017 | 0 |
|  | 2018 | 0 |
|  | 2019 | 2 |
|  | 2020 | 12 |
| Utah | 2016 | 0 |
|  | 2017 | 0 |
|  | 2018 | 0 |
|  | 2019 | 0 |
|  | 2020 | 3 |
| Wisconsin | 2016 | 0 |
|  | 2017 | 0 |
|  | 2018 | 0 |
|  | 2019 | 1 |
|  | 2020 | 1 |
| **TOTAL** | 2016 | 0 |
|  | 2017 | 0 |
|  | 2018 | 2 |
|  | 2019 | 9 |
|  | 2020 | 28 |

**Table No. 3**
**Status of Franchised Outlets**
**For Years 2016- 2020**

| State | Year | Outlet at Start of Year | Outlets Opened | Terminations | Non-Renewals | Reacquired by Franchisor | Ceased Operations for Other Reasons | Outlets at the End of the Year |
|---|---|---|---|---|---|---|---|---|
| AL | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2020 | 2 | 1 | 0 | 0 | 0 | 0 | 3 |
| AZ | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| AR | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| | 2019 | 4 | 3 | 0 | 0 | 0 | 1 | 6 |
| | 2020 | 6 | 0 | 0 | 0 | 0 | 1 | 5 |
| CO | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 5 | 0 | 0 | 0 | 0 | 5 |
| | 2020 | 5 | 2 | 0 | 0 | 0 | 0 | 7 |
| CT | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2020 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| DE | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| FL | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 12 | 0 | 0 | 0 | 0 | 12 |
| | 2019 | 12 | 14 | 0 | 0 | 0 | 2 | 24 |
| | 2020 | 24 | 5 | 0 | 0 | 5 | 10 | 14 |
| GA | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| | 2019 | 4 | 9 | 0 | 0 | 0 | 0 | 13 |
| | 2020 | 13 | 5 | 0 | 0 | 0 | 3 | 15 |
| ID | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| IN | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | 2019 | 2 | 6 | 0 | 0 | 0 | 1 | 7 |
| | 2020 | 7 | 1 | 0 | 0 | 0 | 5 | 3 |
| IA | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| KS | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 26 | 0 | 0 | 0 | 0 | 26 |
| | 2019 | 26 | 9 | 1 | 0 | 0 | 3 | 31 |
| | 2020 | 31 | 0 | 0 | 0 | 8 | 9 | 14 |
| KY | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 6 | 0 | 0 | 0 | 0 | 7 |
| | 2020 | 7 | 0 | 0 | 0 | 2 | 4 | 1 |
| LA | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
|  | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2019 | 0 | 2 | 1 | 0 | 0 | 0 | 1 |
|  | 2020 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| ME | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
|  | 2020 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| MA | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2020 | 0 | 3 | 0 | 0 | 0 | 0 | 3 |
| MD | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2019 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MO | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2018 | 0 | 12 | 0 | 0 | 0 | 0 | 12 |
|  | 2019 | 12 | 18 | 3 | 0 | 1 | 0 | 25 |
|  | 2020 | 25 | 2 | 0 | 0 | 7 | 7 | 13 |
| MT | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
|  | 2019 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
|  | 2020 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| NE | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2018 | 0 | 5 | 0 | 0 | 0 | 0 | 5 |
|  | 2019 | 5 | 8 | 0 | 0 | 0 | 0 | 13 |
|  | 2020 | 13 | 0 | 0 | 0 | 0 | 2 | 11 |
| NV | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|  | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
|  | 2019 | 1 | 9 | 0 | 0 | 0 | 0 | 10 |

|    | Year | | | | | | | |
|----|------|---|---|---|---|---|---|---|
|    | 2020 | 10 | 4 | 0 | 0 | 0 | 2 | 12 |
| NH | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2019 | 0 | 7 | 0 | 0 | 0 | 0 | 7 |
|    | 2020 | 7 | 2 | 0 | 0 | 0 | 3 | 6 |
| NM | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
|    | 2019 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
|    | 2020 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| NC | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
|    | 2019 | 1 | 1 | 0 | 0 | 0 | 1 | 1 |
|    | 2020 | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| OH | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
|    | 2020 | 1 | 3 | 0 | 0 | 0 | 0 | 4 |
| OK | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2018 | 0 | 26 | 1 | 0 | 0 | 0 | 25 |
|    | 2019 | 25 | 10 | 4 | 0 | 1 | 15 | 15 |
|    | 2020 | 15 | 1 | 0 | 0 | 0 | 10 | 6 |
| OR | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
|    | 2019 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
|    | 2020 | 1 | 3 | 0 | 0 | 0 | 0 | 4 |
| PA | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
|    | 2018 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
|    | 2019 | 1 | 8 | 0 | 0 | 0 | 0 | 9 |
|    | 2020 | 9 | 4 | 0 | 0 | 0 | 3 | 10 |
| RI | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 1 | 0 | 0 | 0 | 2 | 0 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SC | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TN | 2018 | 0 | 5 | 0 | 0 | 0 | 0 | 5 |
| | 2019 | 5 | 12 | 0 | 0 | 0 | 0 | 17 |
| | 2020 | 17 | 4 | 0 | 0 | 0 | 10 | 11 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TX | 2018 | 0 | 19 | 0 | 0 | 0 | 0 | 19 |
| | 2019 | 19 | 97 | 0 | 0 | 0 | 3 | 113 |
| | 2020 | 113 | 46 | 1 | 0 | 0 | 36 | 122 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| UT | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 11 | 0 | 0 | 0 | 0 | 11 |
| | 2020 | 11 | 2 | 0 | 0 | 0 | 4 | 9 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| VT | 2018 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 | 0 |
| | 2016 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| WI | 2018 | 0 | 4 | 0 | 0 | 0 | 0 | 4 |
| | 2019 | 4 | 20 | 0 | 0 | 0 | 2 | 22 |
| | 2020 | 22 | 1 | 0 | 0 | 0 | 7 | 16 |
| TOTALS | **2016** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2017** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2018** | **0** | **128** | **1** | **0** | **0** | **0** | **127** |

| | 2019 | 127 | 268 | 10 | 0 | 3 | 29 | 353 |
| | 2020 | 353 | 93 | 1 | 0 | 23 | 122 | 300 |

**Table No. 4**
**Status of Company-Owned Outlets**
**For Years 2016–2020**

| State | Year | Outlets at Start of the Year | Outlets Opened | Outlets Reacquired from Franchisees | Outlets Closed | Outlets Sold to Franchisees | Outlets at End of the Year |
|---|---|---|---|---|---|---|---|
| Arizona | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 1 | 0 | 0 | 0 | 2 |
| California | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 |
| Florida | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 3 | 0 | 0 | 0 | 3 |
| | 2020 | 3 | 0 | 5 | 1 | 0 | 7 |
| Kansas | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 4 | 0 | 0 | 0 | 4 |
| | 2020 | 4 | 1 | 7 | 1 | 0 | 11 |
| Kentucky | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 0 | 2 | 0 | 0 | 2 |
| Massachusetts | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 1 | 0 | 0 | 0 | 1 |
| | 2019 | 1 | 0 | 0 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Missouri | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 3 | 0 | 0 | 3 |
| | 2020 | 3 | 2 | 7 | 1 | 0 | 11 |
| New Mexico | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 1 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 |
| North Carolina | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 2 | 0 | 0 | 0 | 2 |
| | 2020 | 2 | 0 | 1 | 1 | 0 | 2 |
| Ohio | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 2 | 0 | 0 | 0 | 2 |
| Oklahoma | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 1 | 0 | 0 | 1 |
| | 2020 | 1 | 0 | 0 | 0 | 0 | 1 |
| Tennessee | 2016 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2017 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2018 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2019 | 0 | 0 | 0 | 0 | 0 | 0 |
| | 2020 | 0 | 3 | 0 | 1 | 0 | 2 |
| **TOTALS** | **2016** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2017** | **0** | **0** | **0** | **0** | **0** | **0** |
| | **2018** | **0** | **2** | **0** | **0** | **0** | **2** |
| | **2019** | **2** | **10** | **5** | **0** | **0** | **17** |
| | **2020** | **17** | **9** | **22** | **5** | **0** | **43** |

**Table No. 5**
**Projected Openings as of December 31, 2021**

| State | Franchise Agreements Signed but Stores Not Opened | Projected Franchised New Stores in the Next Fiscal Year | Projected Company-Owned Openings in Next Fiscal Year |
|---|---|---|---|
| Alabama | 1 | 2 | 0 |
| Arizona | 1 | 2 | 2 |
| Arkansas | 1 | 0 | 0 |
| California | 0 | 0 | 0 |
| Colorado | 0 | 1 | 0 |
| Delaware | 1 | 1 | 0 |
| Florida | 2 | 3 | 0 |
| Georgia | 2 | 1 | 0 |
| Hawaii | 0 | 0 | 1 |
| Idaho | 0 | 0 | 0 |
| Illinois | 0 | 0 | 1 |
| Indiana | 0 | 1 | 0 |
| Iowa | 1 | 0 | 0 |
| Kansas | 0 | 1 | 1 |
| Kentucky | 1 | 1 | 0 |
| Louisiana | 0 | 0 | 0 |
| Maine | 0 | 1 | 0 |
| Maryland | 0 | 0 | 0 |
| Massachusetts | 1 | 1 | 0 |
| Missouri | 1 | 2 | 1 |
| Nebraska | 3 | 1 | 0 |
| Nevada | 1 | 2 | 0 |
| New Hampshire | 0 | 1 | 0 |
| New Jersey | 2 | 0 | 0 |
| New Mexico | 0 | 0 | 0 |
| New York | 0 | 0 | 0 |
| North Carolina | 0 | 0 | 0 |
| Ohio | 0 | 4 | 0 |
| Oklahoma | 1 | 1 | 0 |
| Oregon | 0 | 1 | 0 |
| Pennsylvania | 3 | 6 | 0 |
| Rhode Island | 1 | 0 | 0 |
| South Carolina | 1 | 0 | 0 |
| Tennessee | 4 | 2 | 0 |
| Texas | 13 | 10 | 1 |
| Utah | 3 | 1 | 0 |

| Vermont | 0 | 0 | 0 |
|---|---|---|---|
| Virginia | 0 | 0 | 0 |
| Washington | 0 | 0 | 0 |
| Wisconsin | 1 | 3 | 0 |
| **TOTALS** | **45** | **49** | **7** |

The names, addresses and telephone numbers of our franchisees and their outlets are indicated on Exhibit "M-1".

The name and last known home address and home telephone number or the current business telephone number, if known, of every franchisee that has had an outlet terminated, cancelled, not renewed or otherwise voluntarily or involuntarily ceased to do business under the franchise agreement during the most recently completed fiscal year or that has not communicated with us within ten weeks of the Issuance Date are also indicated on Exhibit "M-2".   If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

During the last three fiscal years, we have not signed any confidentiality clauses with current or former franchisees that would restrict them from speaking openly with you about their experience with us.

### Item 21
### FINANCIAL STATEMENTS

Attached to this Disclosure Document as Exhibit "B" are our audited financial statements as of December 31, 2020, our audited financial statements as of December 31, 2019, and our audited financial statements as of December 31, 2018.

### Item 22
### CONTRACTS

The following contractual documents are attached as exhibits to this Disclosure Document:

| | |
|---|---|
| Exhibit C | Franchise Agreement |
| Exhibit D | Non-Compete and Non-Disclosure Agreement |
| Exhibit E | Lease Rider |
| Exhibit F | Multi Unit Development Agreement |
| Exhibit G | Employee Confidentiality Agreement |
| Exhibit I | Release |
| Exhibit J | State-Specific Addenda |
| Exhibit K | Assignment of Telephone Numbers, Telephone Listings, and Internet Addresses |
| Exhibit L | Authorization for Electronic Funds Transfer |

**<u>State Effective Dates</u>**

The following states have franchise laws that require that the Franchise Disclosure Document be registered or filed with the state, or be exempt from registration: California, Hawaii, Illinois, Indiana, Maryland, Michigan, Minnesota, New York, North Dakota, Rhode Island, South Dakota, Virginia, Washington, and Wisconsin.

This document is effective and may be used in the following states, where the document is filed, registered or exempt from registration, as of the Effective Date stated below:

| State | Effective Date |
|---|---|
| California | Pending |
| Hawaii | Pending |
| Illinois | Pending |
| Indiana | 8/15/2020 |
| Maryland | Pending |
| Michigan | 4/29/2021 (awaiting confirmation) |
| Minnesota | Pending |
| New York | Pending |
| North Dakota | Pending |
| Rhode Island | 7/27/2020 |
| South Dakota | Pending |
| Virginia | Pending |
| Washington | Pending |
| Wisconsin | 8/26/2020* |

Other states may require registration, filing, or exemption of a franchise under other laws, such as those that regulate the offer and sale of business opportunities or seller-assisted marketing plans.

* As of May 5, 2021, will be subject to a Consent Order as set forth in Item 3

**Item 23**
**RECEIPTS**

The last two pages of this Disclosure Document (after the exhibits) are detachable documents that you will sign to acknowledge your receipt of this Disclosure Document. Please sign and date each receipt, return 1 copy to us and retain the other copy for your files.

EXHIBIT "A-1"
AGENTS FOR SERVICE OF PROCESS

| STATE | AGENT | ADDRESS |
|---|---|---|
| California | Commissioner of the Department of Business Oversight | 320 West 4th Street, Suite 750 Los Angeles, CA  90013-2344 |
| Hawaii | Commissioner of Securities | 335 Merchant Street, Room 203 Honolulu, HI  96813 |
| Illinois | Illinois Attorney General | 500 South Second Street Springfield, IL  62706 |
| Maryland | Maryland Securities Commissioner | 200 St. Paul Place Baltimore, MD  21202-2020 |
| Minnesota | Commissioner of Commerce | 85 7th Place East, Suite 280 St. Paul, MN  55101-2198 |
| New York | Secretary of State of the State of New York | 41 State Street Albany, NY  12231-0001 |
| North Dakota | Securities Commissioner | 600 East Boulevard, 5th Floor Bismarck, ND  58505 |
| South Dakota | Department of Labor and Regulation Division of Securities | 124 E. Euclid, Ste.104 Pierre, SD  57501 |
| Virginia | Clerk of the State Corporation Commission | 1300 East Main Street, 1st Floor Richmond, VA  23219 |
| Washington | Department of Financial Institutions | 210 11th Avenue General Administration Building, 3rd Floor Olympia, WA  98507-9033 |

**EXHIBIT "A-2"**
**LIST OF STATE AGENCIES**

| STATE | AGENT | ADDRESS |
|---|---|---|
| California | Commissioner of the Department of Business Oversight | 320 West 4th Street, Suite 750<br>Los Angeles, CA  90013-2344<br>Toll Free Telephone #: 1-866-275-2677 |
| Hawaii | Commissioner of Securities | 335 Merchant Street, Room 203<br>Honolulu, HI 96813 |
| Illinois | Office of the Attorney General | 500 South Second Street<br>Springfield, IL  62706 |
| Maryland | Office of the Attorney General<br>Securities Division | 200 St. Paul Place<br>Baltimore, MD  21202-2020 |
| Minnesota | Department of Commerce | 85  7th Place East, Suite 280<br>St. Paul, MN  55101-2198 |
| New York | New York State Department of Law<br>Bureau of Investor Protection and Securities | 120 Broadway, 23rd Floor<br>New York City, NY  10271 |
| North Dakota | North Dakota Securities Department | 600 East Boulevard Avenue<br>State Capitol, 5th Floor, Dept. 414<br>Bismarck, ND  58505-0510 |
| South Dakota | Department of Labor and Regulation<br>Division of Securities | 124 E. Euclid, Ste.104<br>Pierre, SD  57501 |
| Virginia | State Corporation Commission<br>Division of Securities and Retail Franchising | 1300 East Main Street,<br>9th Floor<br>Richmond, VA  23219 |
| Washington | Washington Department of Financial Institutions<br>Securities Division | 150 Israel Road SW<br>Tumwater, WA 98501 |

# EXHIBIT "B"

# FINANCIAL STATEMENTS

**Audited Financial Statements**
**As of December 31st, 2018**

**Audited Financial Statements**
**As of December 31st, 2019**

**Audited Financial Statements**
**As of December 31st, 2020**

**AMERICAN SHAMAN FRANCHISE SYSTEM, INC**

**FINANCIAL STATEMENTS**

**WITH INDEPENDENT AUDITORS' REPORT AND
SUPPLEMENTARY INFORMATION**

**December 31, 2018**

## TABLE OF CONTENTS

<u>Page</u>

INDEPENDENT AUDITORS' REPORT ................................................................................................ 1-2

FINANCIAL STATEMENTS:
    Balance Sheet ............................................................................................................................... 3
    Statement of Income .................................................................................................................... 4
    Statement of Shareholder's Equity ............................................................................................. 5
    Statement of Cash Flows ............................................................................................................. 6
    Notes to Financial Statements .................................................................................................. 7-11





**INDEPENDENT AUDITORS' REPORT**

Shareholder
American Shaman Franchise System, Inc.
Kansas City, Missouri

We have audited the accompanying financial statements of the American Shaman Franchise System, Inc.,
which comprise the balance sheet as of December 31, 2018, and the related statements of income, retained
earnings, and cash flows for the year ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**
Management is responsible for the preparation and fair presentation of these financial statements in
accordance with accounting principles generally accepted in the United States of America; this includes the
design, implementation, and maintenance of internal control relevant to the preparation and fair presentation
of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**
Our responsibility is to express an opinion on these financial statements based on our audits.  We
conducted our audit in accordance with auditing standards generally accepted in the United States of
America.   Those standards require that we plan and perform the audit to obtain reasonable assurance about
whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the
financial statements.   The procedures selected depend on the auditor's judgment, including the assessment
of the risks of material misstatement of the financial statements, whether due to fraud or error.   In making
those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair
presentation of the financial statements in order to design audit procedures that are appropriate in the
circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal
control.   Accordingly, we express no such opinion.   An audit also includes evaluating the appropriateness
of accounting policies used and the reasonableness of significant accounting estimates made by
management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our
audit opinion.

1401 East 104th Street, Suite 100, Kansas City, MO 64131-4507 • Voice (816) 363-8700 Fax (816) 363-7117 • www.marrandcompany.com

- 1 -

04/30/2021 ASFS FDD

<u>INDEPENDENT AUDITORS' REPORT (CONTINUED)</u>

Members
American Shaman Franchise System, Inc.


**Basis for Qualified Opinions**
As more fully discussed in Note 7 to the financial statements, the Company has not included the assets of Shaman Botanicals, Inc. and CBD American Shaman, LLC, both variable interest entities, that, in our opinion, should be consolidated with the financial statements of the Company to conform with accounting principles generally accepted in the United States of America. Management has elected to omit the financial effects of this departure on the financial statements.

**Qualified Opinions**
In our opinion, except for the effects of the matter discussed in the Basis for Qualified Opinions paragraph, the financial statements referred to in the first paragraph present fairly, in all material respects, the financial position of American Shaman Franchise System, Inc. as of December 31, 2018,  and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*Marr and Company*

Marr and Company, P.C.
Certified Public Accountants

Kansas City, Missouri
April 24, 2019

- 2 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, INC.**

BALANCE SHEET
As of December 31, 2018

### ASSETS

| | |
|---|---:|
| Current assets: | |
| Cash | $  22,357 |
| Accounts receivable | 100,123 |
| Other receivables | 52,808 |
| Total current assets | 175,288 |
| | |
| Property, plant and equipment, at cost | |
| Net of accumulated depreciation | 49,349 |
| Total assets | $ 224,637 |

### LIABILITIES AND SHAREHOLDER'S EQUITY

| | |
|---|---:|
| Current liabilities: | |
| Accounts payable | $  55,890 |
| Accrued interest | 300 |
| Deferred revenue | 1,000 |
| Income tax payable | 14,789 |
| Accrued payroll | 7,192 |
| Accrued expenses | 41,250 |
| Short-Term notes payable | 18,269 |
| Total current liabilities | 138,690 |
| | |
| Shareholder's equity | |
| Common stock | |
| ($1 par value, 251 issued and outstanding) | 251 |
| Retained earnings | 85,696 |
| Total Shareholder's equity | 85,947 |
| | |
| Total Liabilities and Shareholder's Equity | $ 224,637 |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 3 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, INC.**

STATEMENT OF INCOME
For the Year Ended December 31, 2018

| | | |
|---|---|---|
| Revenue: | | |
| Franchise fees | $ | 534,560 |
| Royalties | | 636,410 |
| Other franchise income | | 11,457 |
| Total Revenue | | 1,182,427 |
| | | |
| Less direct expenses | | (434,475) |
| Gross profit | | 747,952 |
| | | |
| General & administrative expenses | | 628,649 |
| | | |
| Net income from operations | | 119,303 |
| | | |
| Other income/(expense): | | |
| Interest income | | 2 |
| Interest expense | | (300) |
| Total other income/(expense) | | (298) |
| | | |
| Net income before income tax | | 119,005 |
| | | |
| Provision for income tax | | 14,789 |
| | | |
| Net income | $ | 104,216 |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 4 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, INC.**

STATEMENTS OF SHAREHOLDER'S EQUITY
For the Year Ended December 31, 2018

| | |
|---|---:|
| Balance at December 31, 2017 | $ (18,520) |
| Net income for 2018 | 104,216 |
| Balance at December 31, 2018 | $ 85,696 |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 5 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, INC.**

STATEMENT OF CASH FLOWS
For the Year Ended December 31, 2018

|  | 2018 |
|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: |  |
| Net Income/(Loss) | $ 104,216 |
| Adjustments to reconcile net income to net cash flows | |
| from operating activities: | |
| Increase/(decrease) in: | |
| Depreciation | 3,796 |
| Provision for income tax | 14,789 |
| Accounts receivable | (100,123) |
| Other receivables | (52,808) |
| Accounts payable | 50,190 |
| Accrued interest | 197 |
| Accrued payroll | 7,192 |
| Accrued expense | 41,250 |
| Deferred Revenue | 1,000 |
| Net Cash Flows from Operating Activities | 69,699 |
|  | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | |
| Purchase of equipment | (53,145) |
| Net Cash from Investing Activities | (53,145) |
|  | |
| CASH FLOWS FROM FINANCING ACTIVITIES: | |
| Principal payments on notes payable | (34,480) |
| Net proceeds from notes payable | 38,000 |
| Net Cash Flows from Financing Activates | 3,520 |
|  | |
| Net Change in Cash Balance | 20,074 |
|  | |
| Cash at beginning of year | 2,283 |
| Cash at end of year | $ 22,357 |
|  | |
| Supplemental disclosure of cash flow information: | |
| Cash paid for interest | $ 0 |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 6 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, INC.**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018

INDEX

NOTE 1:     COMPANY BACKGROUND

NOTE 2:     SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

      A.    Cash and Cash Equivalents
      B.    Concentration of Credit Risk
      C.    Receivables and Allowance for Bad Debt
      D.    Property and Equipment
      E.    Deferred Income Taxes
      F.    Use of Estimates
      G.    Subsequent Events

NOTE 3:     CREDIT RISK OF CASH BALANCES

NOTE 4:     SHORT-TERM DEBT

NOTE 5:     RELATED PARTY TRANSACTIONS

NOTE 6:     LEASE COMMITMENTS

NOTE 7:     VARIABLE INTEREST ENTITY

NOTE 8:     SUBSEQUENT EVENTS

AMERICAN SHAMAN FRANCHISE SYSTEM, INC.

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018

NOTE 1:    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

A.  Nature of Operations

American Shaman Franchise System, Inc. (the "Company"), a corporation was organized in Nevada on March 2, 2017. The Company is engaged in the sale of franchises for retail stores that sell CBD product to consumers all over the United States.

B.  Cash and Cash Equivalents

For cash flow purposes, the Company considers all short-term investments with an original maturity of three months or less to be cash equivalents.

C.  Concentration of Credit Risk

The FDIC insures bank deposits up to $250,000 on a per institution per depositor basis.   A concentration of credit risk did not exist as of December 31, 2018 as deposits were within the FDIC insured limits.

C.  Account Receivables and Allowance for Bad Debt

Receivables are stated net of any allowance for doubtful accounts.  Management performs regular analysis of customer accounts, taking into consideration the balance, time outstanding, and an assessment of the customer's ability to pay.   At the end of each year, the amount of provision and ending allowance account balance is evaluated.   Uncollectible accounts are expensed in the year such amounts are determined.   Management considered all accounts fully collectable at December 31, 2018.

D.  Property and Equipment

Property and equipment are carried at cost and include expenditures for improvements and betterments which substantially increase the useful lives of existing property and equipment. Maintenance, repairs and minor renewals are expensed as incurred. When properties are retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts and any profit or loss is credited or charged to income.

The Company provides for depreciation of property and equipment by methods and at rates designed to expense the cost of such equipment over their estimated useful lives. Depreciation is computed on the MARCS straight-line method, utilizing a mid-quarter convention.   The estimated useful lives for equipment and vehicles range from 5 to 7 years.   The estimated useful lives for building improvements are 20 years.

- 8 -

AMERICAN SHAMAN FRANCHISE SYSTEM, INC.

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018

NOTE 2:   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

E.  Deferred Income Taxes

For income tax reporting, the Company uses accounting methods that recognize depreciation sooner than for financial statement reporting.   As a result, the basis of property and equipment for financial reporting exceeds its tax basis by the cumulative amount that accelerated depreciation exceeds straight-line depreciation.   Deferred income taxes have been recorded for the excess, which will be taxable in future periods through reduced depreciation deductions for tax purposes.

For financial statement reporting, the company accrues interest payable as a result of various loans made by Shaman Botanicals to the company.   As a result, the interest expense is recognized when accrued for financial statement reporting but not until paid for income tax reporting.   Deferred income taxes have been recorded for the excess, which will be deductible in future periods through increased interest expense.

For financial statement reporting, the company has established an allowance for doubtful accounts receivable which recognizes the expense sooner than for income tax reporting.   Deferred taxes have been recorded for the excess, which will be deductible in future periods with direct write off.

F.  Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.   Actual results could differ from those estimates.

NOTE 3:   CREDIT RISK OF CASH BALANCES

The ending bank balance as of December 31, 2018 was as follows.

|  | Bank Balance | F.D.I.C. Coverage Limits | Exceeded Coverage Limit |
|---|---|---|---|
| December 31, 2018 | $53,297 | $250,000 | $0 |

- 9 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, INC.**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018

NOTE 4:     SHORT-TERM DEBT

On March 1, 2018, the Company signed a promissory note with Shaman Botanicals to loan them $15,000 to help cover some of the start-up costs in the Company's first full year of operations.   The note has an interest rate of 2% per annum, all of which is payable on January 1, 2019.   As of December 31, 2018, the Company had paid $14,731 on this note.

On April 1, 2018, the Company signed a promissory note with Shaman Botanicals to loan them $18,000 to help cover some of the start-up costs in the Company's first full year of operations.   The note has an interest rate of 2% per annum, all of which is payable on September 1, 2019.

Maturities for short-term debt are as follows:

Years Ending December 31,

| | |
|---|---|
| 2019 | $18,269 |
| | $18,269 |

NOTE 5:     RELATED PARTY TRANSACTION

Shaman Botanicals, Inc. lent the Company money (see Note 4) during the year ended December 31, 2018. During the year ended December 31, 2018, they received $0 of interest payments on the outstanding debt. Unpaid and accrued interest on these notes was $300 as of December 31, 2018 (see Note 4).

The Company received royalties and commissions for the products sold to its Franchisees. These rates are based of total sales net of any shipping cost, and are paid monthly by Shaman Botanical to the company. As of December 31, 2018, these rates were set at 10% for royalties and 6% for commissions, respectivly. For the eight months ended August 31, 2018, the total amount paid to the Company from Shaman Botanicals were $636,410 in royalties and $387,238 in commissions.

NOTE 6:     LEASE COMMITMENT

In May of 2018 management entered into a lease agreement for the rental of office space from May of 2018 through May of 2023, but was canceled in February 2019.   The agreement requires the Company to pay a monthly rental fee of $2,700.   During the year ended December 31, 2018, the Company paid $10,800 related to this agreement.

In February of 2019 management entered into a lease agreement for the rental of office space from March of 2019 through December of 2021.   The agreement requires the Company to pay a monthly rental fee of $3,735 for 2019, $3,828.38 for 2020, and $3,921.75 for 2021.   During the year ended December 31, 2018, the Company paid $0 related to this agreement.

- 10 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, INC.**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2018

NOTE 6:     LEASE COMMITMENT (continued)

Future minimum lease payments are as follows.

| Year Ending December 31, | Total |
|---|---|
| 2019 | $ 42,750 |
| 2020 | 45,941 |
| 2021 | 47,061 |
| | $ 135,752 |

NOTE 7: VARIABLE INTEREST ENTITY

American Shaman Franchise System, Inc. sells franchisees for Shaman Botanicals, Inc. The Company determined that the entity is a variable interest entity (VIE), and that the Company would absorb a majority of its expected losses, if any, as defined by the FASB Codification. However, the Company's management has elected to not include the assets of Shaman Botanicals, Inc. as of December 31, 2018, and the auditors' report has been modified accordingly. The financial effect of the variable interest entity on the financial statements of the Company has not been included.

American Shaman Franchise System, Inc. loaned money to CBD American Shaman, LLC, to open up corporate stores to sell products for Shaman Botanicals, Inc. The Company determined that the entity is a variable interest entity (VIE), and that the Company would absorb a majority of its expected losses, if any, as defined by the FASB Codification. However, the Company's management has elected to not include the assets of CBD American Shaman, LLC. as of December 31, 2018, and the auditors' report has been modified accordingly. The financial effect of the variable interest entity on the financial statements of the Company has not been included.

NOTE 8:     SUBSEQUENT EVENT

Management has evaluated events and transactions that have occurred since December 31, 2018 and reflected their effects, if any, in these financial statements through April 24, 2019 the date the financial statements were available for release.

- 11 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

**FINANCIAL STATEMENTS**

**WITH INDEPENDENT AUDITORS' REPORT**

**December 31, 2019**

## TABLE OF CONTENTS

Page

INDEPENDENT AUDITORS' REPORT ................................................................................. 1-2

FINANCIAL STATEMENTS:
    Balance Sheet ............................................................................................................... 3
    Statement of Income..................................................................................................... 4
    Statement of Retained Earnings .................................................................................. 5
    Statement of Cash Flows.............................................................................................. 6
    Notes to Financial Statements ................................................................................. 7-11





## INDEPENDENT AUDITORS' REPORT

Member
American Shaman Franchise System, LLC
Kansas City, Missouri

We have audited the accompanying financial statements of the American Shaman Franchise System, LLC, which comprise the balance sheet as of December 31, 2019, and the related statements of income, member's equity, and cash flows for the year then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**
Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**
Our responsibility is to express an opinion on these financial statements based on our audit.   We conducted our audit in accordance with auditing standards generally accepted in the United States of America.   Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements.   The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error.   In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control.   Accordingly, we express no such opinion.   An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

1401 East 104th Street, Suite 100, Kansas City, MO 64131-4507 ♦ Voice (816) 363-8700 Fax (816) 363-7117 ♦ www.marrandcompany.com

- 1 -

## INDEPENDENT AUDITORS' REPORT (CONTINUED)

Member
American Shaman Franchise System, LLC

**Basis for Qualified Opinions**

As more fully discussed in Note 5 to the financial statements, the Company has not included the assets of SVS Enterprises, LLC of which is a variable interest entity.  In our opinion the Company's financial statements should include the accounts of SVS Enterprises, LLC to conform with accounting principles generally accepted in the United States of America. Quantification of the effects of this departure from generally accepted accounting principles on the financial position, results of operations, and cash flows of the Company is not practicable.

**Qualified Opinions**

In our opinion, except for the effects of not including the accounts of SVS Enterprises, LLC in the accompanying financial statements as explained in the Basis for Qualified Opinion paragraph, the financial statements referred to in the first paragraph present fairly, in all material respects, the financial position of American Shaman Franchise System, LLC as of December 31, 2019, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Marr and Company*

Marr and Company, P.C.
Certified Public Accountants

Kansas City, Missouri
April 29, 2020

- 2 -

04/30/2021 ASFS FDD

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

BALANCE SHEET
As of December 31, 2019

**ASSETS**

| | | |
|---|---:|---:|
| Current assets: | | |
| Cash and cash equivalents | $ | 85,055 |
| Accounts receivable | | 56,473 |
| Prepaid | | 139,911 |
| Other receivables | | 81,224 |
| Total current assets | | 362,663 |
| | | |
| Property, plant and equipment, at cost | | |
| Net of accumulated depreciation | | 68,305 |
| Total Assets | $ | 430,968 |

**LIABILITIES AND MEMBER'S EQUITY**

| | | |
|---|---:|---:|
| Current liabilities: | | |
| Accounts payable | $ | 851,890 |
| Accrued interest | | 666 |
| Accrued payroll | | 23,017 |
| Accrued expenses | | 17,607 |
| Due to related party (Note 3) | | 1,679,189 |
| Short-term notes payable (Note 2) | | 18,269 |
| Total current liabilities | | 2,590,638 |
| | | |
| Member's equity | | |
| Accumulated deficit | | (2,159,670) |
| Total Member's equity | | (2,159,670) |
| | | |
| Total Liabilities and Member's Equity | $ | 430,968 |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 3 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

STATEMENT OF INCOME
For the Year Ended December 31, 2019

| | | |
|---|---|---:|
| Revenue: | | |
| Franchise fees | $ | 4,674,780 |
| Royalties | | 2,529,603 |
| Conferences | | 39,913 |
| Buildout | | 24,750 |
| Other franchise income | | 24,073 |
| Total Revenue | | 7,293,119 |
| | | |
| Direct expenses | | (103,682) |
| Gross profit | | 7,189,437 |
| | | |
| General & administrative expenses | | 9,434,775 |
| | | |
| Net Loss from Operations | | (2,245,338) |
| | | |
| Other income/(expense): | | |
| Interest income | | 86 |
| Interest expense | | (365) |
| Total Other Income/(expense) | | (279) |
| | | |
| Net Loss | | $ (2,245,617) |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 4 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

STATEMENT OF MEMBER'S EQUITY
For the Year Ended December 31, 2019

| | | |
|---|---|---|
| Balance at January 1, 2019 | $ | 85,947 |
| Net loss for 2019 | | (2,245,617) |
| Balance at December 31, 2019 | $ | (2,159,670) |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 5 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

STATEMENT OF CASH FLOWS
For the Year Ended December 31, 2019

| | 2019 |
|---|---:|
| CASH FLOWS FROM OPERATING ACTIVITIES: | |
| Net Loss | $ (2,245,617) |
| Adjustments to reconcile net income to net cash flows | |
| from operating activities: | |
| Depreciation | 10,753 |
| Decrease (increase) in Operating Assets: | |
| Accounts receivable | (57,473) |
| Other receivables | (28,415) |
| Prepaid expenses | (139,911) |
| Increase (decrease) in Operating Liabilities: | |
| Accounts payable | 795,999 |
| Accrued interest | 365 |
| Accrued payroll | 15,825 |
| Accrued expense | (23,643) |
| Due to Related Party | 1,764,524 |
| Net Cash Flows from Operating Activities | 92,407 |
| | |
| | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | |
| Purchase of equipment | (29,709) |
| Net Cash used by Investing Activities | (29,709) |
| | |
| | |
| Net Change in Cash Balance | 62,698 |
| | |
| Cash and cash equivalents, at beginning of year | 22,357 |
| Cash and cash equivalents, at end of year | $ 85,055 |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 6 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2019

INDEX

NOTE 1:   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

        A.   Nature of Operations
        B.   Cash and Cash Equivalents
        C.   Concentration of Credit Risk
        D.   Accounts Receivables and Allowance for Bad Debt
        E.   Property and Equipment
        F.   Income Tax Statues – Disregarded Entity
        G.   Use of Estimates

NOTE 2:   SHORT-TERM DEBT

NOTE 3:   RELATED PARTY TRANSACTIONS

NOTE 4:   LEASE COMMITMENTS

NOTE 5:   VARIABLE INTEREST ENTITY

NOTE 6:   COMITMENTS AND CONTENGENCIES

NOTE 7:   SUBSEQUENT EVENTS

- 7 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2019


NOTE 1:    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

A.  Nature of Operations

American Shaman Franchise System, LLC (the "Company"), is a single member limited liability company organized in Nevada on March 2, 2017. The Company is engaged in the sale of franchises for retail stores that sell CBD product to consumers all over the United States.

B.  Cash and Cash Equivalents

For cash flow purposes, the Company considers all short-term investments with an original maturity of three months or less to be cash equivalents.

C.  Concentration of Credit Risk

The FDIC insures bank deposits up to $250,000 on a per institution per depositor basis.   A concentration of credit risk did not exist as of December 31, 2019 as deposits were within the FDIC insured limits.

D.  Account Receivables and Allowance for Bad Debt

Receivables are stated net of any allowance for doubtful accounts. Management performs regular analysis of customer accounts, taking into consideration the balance, time outstanding, and an assessment of the customer's ability to pay.   At the end of each year, the amount of provision and ending allowance account balance is evaluated. Uncollectible accounts are expensed in the year such amounts are determined. The Company wrote-off $147,000 of uncollectable accounts during 2019. Management considered all remaining accounts fully collectable at December 31, 2019.

E.  Property and Equipment

Property and equipment are carried at cost and include expenditures for improvements and betterments which substantially increase the useful lives of existing property and equipment. Maintenance, repairs and minor renewals are expensed as incurred. When properties are retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts and any profit or loss is credited or charged to income.

The Company provides for depreciation of property and equipment by methods and at rates designed to expense the cost of such equipment over their estimated useful lives. Depreciation is computed on the MARCS straight-line method, utilizing a mid-quarter convention. The estimated useful lives for equipment and vehicles range from 5 to 7 years. The estimated useful lives for building improvements are 20 years.

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2019

NOTE 1:   <u>SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)</u>

F.   Income Taxes Statues – Disregarded Entity

During 2019, the Company changed its legal structure from a corporation to a limited liability company. The company has also made the election elected to be disregarded as a separate entity for income tax filing purposes for federal and state income tax purposes. Consequently, the variable interest entity discussed in note 5 is taxed on the Company's income or losses. Therefore, the financial statements do not reflect a provision for income taxes.

G.   Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.   Actual results could differ from those estimates.

NOTE 2:   <u>SHORT-TERM DEBT</u>

On March 1, 2018, the Company signed a promissory note with Shaman Botanicals, LLC to loan them $15,000 to help cover some of the start-up costs in the Company's first full year of operations.   The note has an interest rate of 2% per annum, all of which is payable on January 1, 2020.   The balance on the note was $269 at December 31, 2019.

On April 1, 2018, the Company signed a promissory note with Shaman Botanicals, LLC to loan them $18,000 to help cover some of the start-up costs in the Company's first full year of operations.   The note has an interest rate of 2% per annum, all of which is payable on September 1, 2020.

Maturities for short-term debt are as follows:

|  | Years Ending December 31, |
|---|---|
| 2020 | $18,269 |
|  | $18,269 |

Interest expense related to the above notes was $365 for the year ended December 31, 2019.

- 9 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2019

NOTE 3:     RELATED PARTY TRANSACTIONS

The Company and Shaman Botanicals, LLC are both fully owned by SVS Enterprises, LLC.   The Company borrowed from Shaman Botanicals, LLC (see Note 2) in 2018.   Unpaid and accrued interest on these notes was $666 as of December 31, 2019.

The Company received royalties and commissions for the products sold to its Franchisees. These rates are based of total sales net of any shipping cost, and are paid monthly by SVS Enterprises, LLC to the company. As of December 31, 2019, these rates were set at 10% for royalties, respectively.   During 2019 the Company recognized $2,529,603 in royalty revenue from SVS Enterprises, LLC.   The Company also had a balance due to SVS Enterprises, LLC at December 31, 2019 of $1,679,189 for operating expenses paid on behalf of the Company.

NOTE 4:     LEASE COMMITMENTS

In May of 2018 management entered into a lease agreement for the rental of office space from May of 2018 through May of 2023, but was canceled without penalty in February 2019. The agreement required the Company to pay a monthly rental fee of $2,700. For the year ended December 31, 2019, the Company paid $2,700 related to this agreement.

In February of 2019 management entered into a lease agreement for the rental of office space from March of 2019 through December of 2021. The agreement required the Company to pay a monthly rental fee of $3,735 for 2019, $3,828 for 2020, and $3,922 for 2021. However, in July of 2019 this lease agreement was amended to add additional space. The new agreement requires the Company to pay a monthly rental fee of $4,375 for 2019, $4,484 for 2020, and $4,594 for 2021 and 2020. For the year ended December 31, 2019, the Company paid $40,000 related to these agreements.

During 2019 management entered into two lease agreements for copy machines. The agreements require monthly rental payments of $279 and $1,094 through maturity in April and August 2022, respectively.   For the year ended December 31, 2019, the Company paid $7,446 related to these agreements.

Future minimum lease payments are as follows.

| Year Ending December 31, | Total |
|---|---|
| 2020 | $    71,678 |
| 2021 | 72,991 |
| 2022 | 24,023 |
| | $  168,692 |

- 10 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2019

NOTE 5:    <u>VARIABLE INTEREST ENTITY</u>

American Shaman Franchise System, LLC sells to franchisees for SVS Enterprises, LLC. The Company determined that the entity is a variable interest entity (VIE), and that the Company would absorb a majority of its expected losses, if any, as defined by the FASB Codification. However, the Company's management has elected to not include the assets of SVS Enterprises, LLC as of December 31, 2019, and the auditors' report has been modified accordingly. The financial effect of the variable interest entity on the financial statements of the Company has not been included.

NOTE 6:    <u>COMMITMENTS AND CONTINGENCIES</u>

The Company is currently defending itself from allegations of violating trade secrets of another company, after hiring its former employees. The Plaintiff is claiming damages in excess of $1 million and the case is currently in arbitration. This claim is not at a stage where the outcome can be predicted. The Company is vigorously contesting the claim. There has been no provision for possible loss included in these financial statements.

NOTE 7:    <u>SUBSEQUENT EVENT</u>

Management has evaluated events and transactions that have occurred since December 31, 2019 and reflected their effects, if any, in these financial statements through April 29, 2020 the date the financial statements were available for release.

- 11 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

**FINANCIAL STATEMENTS**

**WITH INDEPENDENT AUDITORS' REPORT**

**December 31, 2020**

**TABLE OF CONTENTS**

| | Page |
|---|---|
| INDEPENDENT AUDITORS' REPORT | 1-2 |

FINANCIAL STATEMENTS:

| | |
|---|---|
| Balance Sheet | 3 |
| Statement of Income | 4 |
| Statement of Retained Earnings | 5 |
| Statement of Cash Flows | 6 |
| Notes to Financial Statements | 7-11 |

04-30-21 ASFS FDD





### INDEPENDENT AUDITORS' REPORT

Member
American Shaman Franchise System, LLC
Kansas City, Missouri

We have audited the accompanying financial statements of the American Shaman Franchise System, LLC, which comprise the balance sheet as of December 31, 2020, and the related statements of income, member's equity, and cash flows for the year then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**
Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**
Our responsibility is to express an opinion on these financial statements based on our audit.   We conducted our audit in accordance with auditing standards generally accepted in the United States of America.   Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements.   The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error.   In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control.   Accordingly, we express no such opinion.   An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

1401 East 104th Street, Suite 100, Kansas City, MO 64131-4507 • Voice (816) 363-8700 Fax (816) 363-7117 • www.marrandcompany.com

- 1 -

04-30-21 ASFS FDD

INDEPENDENT AUDITORS' REPORT (CONTINUED)

Member
American Shaman Franchise System, LLC

**Basis for Qualified Opinions**

As more fully discussed in Note 4 to the financial statements, the Company has not included the assets of SVS Enterprises, LLC of which is a variable interest entity.   In our opinion the Company's financial statements should include the accounts of SVS Enterprises, LLC to conform with accounting principles generally accepted in the United States of America. Quantification of the effects of this departure from generally accepted accounting principles on the financial position, results of operations, and cash flows of the Company is not practicable.

**Qualified Opinions**

In our opinion, except for the effects of not including the accounts of SVS Enterprises, LLC in the accompanying financial statements as explained in the Basis for Qualified Opinion paragraph, the financial statements referred to in the first paragraph present fairly, in all material respects, the financial position of American Shaman Franchise System, LLC as of December 31, 2020, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Marr and Company*

Marr and Company, P.C.
Certified Public Accountants

Kansas City, Missouri
April 30, 2021

- 2 -

04-30-21 ASFS FDD

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

BALANCE SHEET
As of December 31, 2020

**ASSETS**

| | | |
|---|---|---:|
| Current assets: | | |
| Cash and cash equivalents | $ | 56,280 |
| Accounts receivable | | 144,929 |
| Total current assets | | 201,209 |
| | | |
| Property, plant and equipment, at cost | | |
| Net of accumulated depreciation | | 59,808 |
| Total Assets | $ | 261,017 |

**LIABILITIES AND MEMBER'S EQUITY**

| | | |
|---|---|---:|
| Current liabilities: | | |
| Accounts payable | $ | 813,498 |
| Accrued interest | | 666 |
| Accrued payroll | | 11,744 |
| Due to related party (Note 2) | | 3,852,426 |
| Total current liabilities | | 4,678,334 |
| | | |
| Member's equity | | |
| Accumulated deficit | | (4,417,317) |
| Total Member's equity | | (4,417,317) |
| | | |
| Total Liabilities and Member's Equity | $ | 261,017 |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 3 -

04-30-21 ASFS FDD

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

STATEMENT OF INCOME
For the Year Ended December 31, 2020

| | | |
|---|---|---:|
| Revenue: | | |
| Franchise fees | $ | 3,128,500 |
| Royalties | | 1,833,702 |
| Conferences | | 75,385 |
| Buildout | | 15,104 |
| Other franchise income | | 8,646 |
| Total Revenue | | 5,061,337 |
| | | |
| Direct expenses | | (305,322) |
| Gross profit | | 4,756,015 |
| | | |
| General & administrative expenses | | 7,213,706 |
| | | |
| Net Loss from Operations | | (2,457,691) |
| | | |
| Other income/(expense): | | |
| Interest income | | 44 |
| PPP Loan Forgiveness | | 200,000 |
| Total Other Income/(expense) | | 200,044 |
| | | |
| Net Loss | $ | (2,257,647) |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 4 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

STATEMENT OF MEMBER'S EQUITY
For the Year Ended December 31, 2020

| | |
|---|---|
| Balance at January 1, 2020 | $ (2,159,670) |
| Net loss for 2019 | (2,257,647) |
| Balance at December 31, 2020 | $ (4,417,317) |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 5 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

STATEMENT OF CASH FLOWS
For the Year Ended December 31, 2020

|  | 2020 |
|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES: | |
| Net Loss | $ (2,257,647) |
| Adjustments to reconcile net income to net cash flows from operating activities: | |
| Depreciation | 12,104 |
| Decrease (increase) in Operating Assets: | |
| Accounts receivable | (7,381) |
| Prepaid | 140,061 |
| Increase (decrease) in Operating Liabilities: | |
| Accounts payable | (38,392) |
| Accrued payroll | (11,273) |
| Accrued expense | (32,395) |
| Due to Related Party | 2,169,755 |
| Net Cash Flows from Operating Activities | (25,168) |
| | |
| CASH FLOWS FROM INVESTING ACTIVITIES: | |
| Purchase of equipment | (3,607) |
| Net Cash used by Investing Activities | (3,607) |
| | |
| Net Change in Cash Balance | (28,775) |
| | |
| Cash and cash equivalents, at beginning of year | 85,055 |
| Cash and cash equivalents, at end of year | $ 56,280 |

*See Accompanying Independent Auditors' Report and Notes to these financial statements.*

- 6 -

04-30-21 ASFS FDD

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2020

INDEX

NOTE 1:   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

      A.   Nature of Operations
      B.   Cash and Cash Equivalents
      C.   Concentration of Credit Risk
      D.   Accounts Receivables and Allowance for Bad Debt
      E.   Property and Equipment
      F.   Income Tax Statues – Disregarded Entity
      G.   Use of Estimates

NOTE 2:   RELATED PARTY TRANSACTIONS

NOTE 3:   LEASE COMMITMENTS

NOTE 4:   VARIABLE INTEREST ENTITY

NOTE 5:   COMITMENTS AND CONTENGENCIES

NOTE 6:   SUBSEQUENT EVENTS

NOTE 7:   PAYROLL PROTECTION PROGRAM LOAN

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2020

NOTE 1:    <u>SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES</u>

A.   Nature of Operations

American Shaman Franchise System, LLC (the "Company"), is a single member limited liability company organized in Nevada on March 2, 2017. The Company is engaged in the sale of franchises for retail stores that sell CBD product to consumers all over the United States.

B.   Cash and Cash Equivalents

For cash flow purposes, the Company considers all short-term investments with an original maturity of three months or less to be cash equivalents.

C.   Concentration of Credit Risk

The FDIC insures bank deposits up to $250,000 on a per institution per depositor basis.   A concentration of credit risk did not exist as of December 31, 2020 as deposits were within the FDIC insured limits.

D.   Account Receivables and Allowance for Bad Debt

Receivables are stated net of any allowance for doubtful accounts. Management performs regular analysis of customer accounts, taking into consideration the balance, time outstanding, and an assessment of the customer's ability to pay.   At the end of each year, the amount of provision and ending allowance account balance is evaluated. Uncollectible accounts are expensed in the year such amounts are determined. The Company wrote-off $392,569 of uncollectable accounts during 2020. Management considered all remaining accounts fully collectable at December 31, 2020.

E.   Property and Equipment

Property and equipment are carried at cost and include expenditures for improvements and betterments which substantially increase the useful lives of existing property and equipment. Maintenance, repairs and minor renewals are expensed as incurred. When properties are retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts and any profit or loss is credited or charged to income.

The Company provides for depreciation of property and equipment by methods and at rates designed to expense the cost of such equipment over their estimated useful lives. Depreciation is computed on the MARCS straight-line method, utilizing a mid-quarter convention. The estimated useful lives for equipment and vehicles range from 5 to 7 years. The estimated useful lives for building improvements are 20 years.

- 8 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2020

NOTE 1:   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

F.   Income Taxes Statues – Disregarded Entity

During 2019, the Company changed its legal structure from a corporation to a limited liability company. The company has also made the election to be disregarded as a separate entity for income tax filing purposes for federal and state income tax purposes. Consequently, the variable interest entity discussed in note 4 is taxed on the Company's income or losses. Therefore, the financial statements do not reflect a provision for income taxes.

G.   Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.   Actual results could differ from those estimates.

NOTE 2:   RELATED PARTY TRANSACTIONS

The Company received royalties and commissions for the products sold to its Franchisees. These rates are based of total sales net of any shipping cost, and are paid monthly by SVS Enterprises, LLC to the company. As of December 31, 2020, these rates were set at 10% for royalties.   During 2020 the Company recognized $1,833,702 in royalty revenue from SVS Enterprises, LLC.   The Company also had a balance due to SVS Enterprises, LLC at December 31, 2020 of $3,834,157 for operating expenses paid on behalf of the Company.

- 9 -

04-30-21 ASFS FDD

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2020

NOTE 3:        LEASE COMMITMENTS

In February of 2019 management entered into a lease agreement for the rental of office space from March of 2019 through December of 2021. The agreement required the Company to pay a monthly rental fee of $3,828 for 2020 and $3,922 for 2021. In July of 2019 this lease agreement was amended to add additional space. The new agreement requires the Company to pay a monthly rental fee of $4,484 for 2020, and $4,594 for 2021. For the year ended December 31, 2020, the Company paid $53,703 related to these agreements.

During 2020 management entered into two lease agreements for copy machines. The agreements require monthly rental payments of $279 and $1,094 through maturity in April and August 2022, respectively.   For the year ended December 31, 2020, the Company paid $18,947 related to these agreements.

Future minimum lease payments are as follows.

| Year Ending December 31, | | Total |
|---|---|---|
| 2021 | $ | 72,991 |
| 2022 | | 24,023 |
| | $ | 97,014 |

NOTE 4:   VARIABLE INTEREST ENTITY

American Shaman Franchise System, LLC sells to franchisees for SVS Enterprises, LLC. The Company determined that the entity is a variable interest entity (VIE), and that the Company would absorb a majority of its expected losses, if any, as defined by the FASB Codification. However, the Company's management has elected to not include the assets of SVS Enterprises, LLC as of December 31, 2020, and the auditors' report has been modified accordingly. The financial effect of the variable interest entity on the financial statements of the Company has not been included.

NOTE 5:   COMMITMENTS AND CONTINGENCIES

The Company is currently defending itself from allegations of violating trade secrets of another company, after hiring its former employees. The Plaintiff is claiming damages in excess of $1 million and the case is currently in arbitration. This claim is not at a stage where the outcome can be predicted. The Company is vigorously contesting the claim. There has been no provision for possible loss included in these financial statements.

- 10 -

**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

NOTES TO THE FINANCIAL STATEMENTS
December 31, 2020

NOTE 6:   <u>SUBSEQUENT EVENT</u>

Management has evaluated events and transactions that have occurred since December 31, 2020 and reflected their effects, if any, in these financial statements through April 30, 2021 the date the financial statements were available for release.

NOTE 7:   <u>PAYROLL PROTECTION PROGRAM LOAN</u>

On March 11, 2020, the World Health Organization declared the novel strain of coronavirus (COVID-19) a global pandemic and recommended containment and mitigation measures worldwide.  The Company signed a note payable with a local financial institution backed by the U.S. Small Business Administration ("SBA") on May 5, 2020 for $200,000 with a maturity date of May 5, 2022, the first payment deferred for six months, and annual interest rate of 1.0%.  This note was available through the Paycheck Protection Program (the "PPP") as a part of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") that offers cash-flow assistance to nonprofit and small business employers through guaranteed loans for certain expenses incurred between May 5, 2020, and October 19, 2020.  The Company opted to select the 8-week period beginning on the date the loan proceeds were disbursed for eligible expenses through October 19, 2020.  The PPP loan did not require collateral or personal guarantees and offered the ability to have a substantial portion of the principal amount forgiven when the Company used the proceeds on eligible costs.  The Company filed for loan forgiveness in January 2021 and received the official legal release and forgiveness from the SBA in February 2021.  The Company reported the forgiveness of the loan as Other Income in the accompanying financial statements.

- 11 -

04-30-21 ASFS FDD

**EXHIBIT "C"**

**FRANCHISE AGREEMENT**
**TABLE OF CONTENTS**

ARTICLES                                                                PAGE

RECITALS                                                                      1

Article 1   INCORPORATION OF RECITALS..........................................................................2

Article 2   DEFINITIONS...................................................................................................2

Article 3   GRANT OF FRANCHISE ................................................................................4

Article 4   RESERVATIONS OF RIGHTS .......................................................................4

Article 5   LEGAL ENTITY INFORMATION .................................................................5

Article 6   TERMS OF FRANCHISE ...............................................................................6

Article 7   FRANCHISE FEE ...........................................................................................7

Article 8   NO EXCLUSIVE TERRITORY......................................................................7

Article 9   OUR OBLIGATIONS .....................................................................................7

Article 10  LEASE OF STORE SITE.................................................................................8

Article 11  DEVELOPMENT OF STORE SITE ...............................................................9

Article 12  EQUIPMENT, FIXTURES, AND FURNITURE .........................................10

Article 13  PRODUCTS, SUPPLIES, AND MATERIALS ............................................13

Article 14  TRAINING AND ASSISTANCE BY US......................................................13

Article 15  FEES TO US...................................................................................................15

Article 16  PAYMENTS OF FEES AND REPORTING REQUIREMENTS.................17

Article 17  RECORD KEEPING AND ACCOUNTING ................................................17

Article 18  MARKETING AND ADVERTISING ...........................................................18

Article 19  INSURANCE OBLIGATIONS......................................................................21

Article 20  PROTECTION OF TRADEMARKS AND RELATED PROPRIETARY
            RIGHTS .........................................................................................................22

Article 21  MODIFICATION OF THE SYSTEM...........................................................23

Article 22  TERMINATION OF THE FRANCHISE.......................................................24

Article 23  YOUR OBLIGATIONS UPON EXPIRATION OR TERMINATION OF
            THIS AGREEMENT ................................................................................26
Article 24  COVENANTS AND CONFIDENTIAL INFORMATION .......................................27
Article 25  TRANSFERABILITY OF INTEREST .......................................................30
Article 26  RELATIONSHIPS OF THE PARTIES.........................................................34
Article 27  WAIVER.........................................................................................34
Article 28  ENFORCEMENT BY US; GOVERNING LAW ......................................................35
Article 29  INDEMNIFICATION...............................................................................36
Article 30  TAXES AND INDEBTEDNESS ...............................................................36
Article 31  NOTICES.........................................................................................37
Article 32  MISCELLANEOUS .........................................................................37
Article 33  SPECIAL REPRESENTATIONS ...............................................................40

## EXHIBIT "C"

## FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** (the "Agreement"), is made and entered into as of the date set forth on the signature page below, by and between AMERICAN SHAMAN FRANCHISE SYSTEM, LLC, a Nevada limited liability company, with its principal place of business located at 2300 Main, Suite 165, Kansas City, MO 64108, hereinafter referred to as "SHAMAN," "Franchisor," "we," "our," or "us," and _____ of _____ (hereinafter referred to as "Franchisee," "you," or "your"), as of the "Date of Execution" set forth on the final page of this Agreement.

## RECITALS

**I.     WHEREAS,** we have created and developed a system (the "Franchisor's System", "SHAMAN System" or "System") for the establishment and operation of an "Industrial Hemp Products Store" for retail sale of Industrial Hemp products to the public (operating under the name of "CBD AMERICAN SHAMAN"); and

**II.     WHEREAS**, THE SHAMAN System consists of a layout and design, equipment, interior and exterior decoration, sign specifications, various trade names and trademarks, trade secrets and other items used in advertising, trade practices, operating methods, various business forms, training materials, manuals, sales techniques, personnel management and control, bookkeeping, and accounting systems; and

**III.     WHEREAS,** we have the right to assign the use of the name and service mark "CBD AMERICAN SHAMAN" and certain designs, phrases, logos, trademarks, service marks, copyrights, and other items now or hereafter owned, used, or provided by us as are designated in writing and as may hereinafter be adopted by SHAMAN for use by you in connection with the operation of a retail SHAMAN store under the SHAMAN System; and

**IV.     WHEREAS,** you desire to acquire a franchise license to operate a SHAMAN store and agree that you will promote and conduct the business operation to the best of your ability and efforts; and

**V.     WHEREAS,** you recognize the importance to us, to our other franchisees, and to the public of maintaining the integrity, standards, qualities, and attributes of products and services associated with the Proprietary Marks, and you are willing to adhere to these certain uniform standards, procedures, and policies to maintain such integrity, standards, qualities, and attributes; and

**VI.     WHEREAS,** we desire to grant you a franchise license to operate a "CBD AMERICAN SHAMAN" retail store operation according to the terms and conditions set forth herein.

**NOW, THEREFORE,** in reliance upon and in consideration of the above facts and the terms and conditions set forth below, the parties agree as follows:

**Article 1**      <u>**INCORPORATION OF RECITALS**</u>

The recitals set forth in Paragraphs I through VI above are true and correct and are hereby incorporated by reference into the body of this Agreement.

**Article 2**      <u>**DEFINITIONS**</u>

A.      "<u>Agreement</u>" - means this agreement, attachments, and all instruments in amendment hereof.

B.      "<u>Affiliate</u>" - means any person or entity that controls, is controlled by, or is in common control with, Franchisor or Franchisee, as applicable.

C.      "<u>Area of Demographic Influence</u>" (ADI). An ADI is a geographic market designation that defines a broadcast media market consisting of the cities, counties, or other defined area in which the home market stations receive a preponderance of viewing.

D.      "<u>Asset Interests</u>" –  means any interest in or right under this Agreement and any interest in your Store or the assets of your Store, including the Store Site.

E.      "<u>CBD American Shaman Business</u>" – means the business operations conducted or to be conducted by Franchisee consisting of providing industrial hemp derived based products to the general public through membership-based programs, and the sale of related products and services using Franchisor's System and in association with the Marks.

F.      "<u>Confidential Information</u>" – means, subject to the exclusions in Article 24.A.5, all Trade Secrets, knowledge, know-how, standards, methods, techniques, formulae, formats, specifications, procedures, information, systems, sales and marketing techniques, and procedures, related to (a) the establishment and operation of the System, (b) design, manufacture, use or sale of products, or (c) the development, operation or franchising of SHAMAN stores and includes, without limitation, any and all information contained in the OM; all records pertaining to customers, suppliers, and other service providers of, and/or related in any way to, Franchisee's CBD American Shaman Business including, without limitation, all databases (whether in print, electronic or other form), all names, addresses, phone numbers, email addresses, customer purchase records, customer information, customer lists, manuals, promotional and marketing materials, marketing strategies; and any other data which Franchisor or its Affiliates designate as confidential.

G.      "<u>Franchise</u>" - shall mean the business operations conducted or to be conducted using Franchisor's System and, in association therewith, the Marks.

H.       "<u>Gross Sales</u>"  The term "Gross Sales" as used in this Agreement shall mean the total revenues received by FRANCHISEE in and from FRANCHISEE'S  CBD American Shaman Business operations whether for cash, check, automatic electronic withdrawal, credit or otherwise, less rebates or refunds to customers or the amount of any sales tax or other similar taxes that you may be required to and do collect from customers to be paid to any federal, state or local taxing authority.  Such amount of gross receipts shall include non-refundable deposits in the month received notwithstanding when such products are provided, or services are rendered.

I.      "Interests" – mean Ownership Interests and Asset Interests, collectively.

J.      "Lease" – means any agreement (whether oral or written), including without limitation any offer to lease, license or lease agreement, under which the right to occupy premises has been obtained and any amendment made thereto from time to time. Franchisee acknowledges and agrees that before any Lease will be accepted by Franchisor, the Lease must incorporate the "Lease Rider" (as defined in Article 10).

K.      "Marks" or "Proprietary Marks" – shall mean the trademarks "CBD AMERICAN SHAMAN" to the extent of Franchisor's rights to the same, together with such other trade names, trademarks, symbols, logos, distinctive names, service marks, certification marks, logo designs, insignia or otherwise which may be designated by Franchisor from time to time as part of the System for use by you, and not thereafter withdrawn.

L.      "Offer" – means a bona fide written offer for the purchase of (i) an Ownership Interest in you, whether direct or indirect, or (ii) your Asset Interests.

M.      "Owner" or "owner" – means, with respect to you, an owner of direct or indirect Ownership Interests in you.

N.      "Ownership Interests" – means (i) in relation to a corporation, the ownership of shares of stock in the corporation; (ii) in relation to a partnership, the ownership of a general or limited partnership interest; (iii) in relation to a trust, the ownership of the beneficial interest of such trust; (iv) in relation to a limited liability company, the ownership of a membership interest; and (v) in relation to any other business entity, the ownership of any equity interest therein.

O.      "Permanent Disability" means that we and you both agree that you will be unable, through mental or physical infirmity, to participate actively in the business for six (6) months or more throughout any consecutive twelve (12) month period.  If you and we do not both agree on this, it must be determined by suitably qualified medical practitioners; one appointed by you and another appointed by us.  If the two (2) medical practitioners fail to agree, then both practitioners will select a third medical practitioner whose determination shall be final and binding. The cost of any such medical consultation shall be borne equally by both you and us.

P.      "Products" – means all supplies, material, equipment, and ancillary items sold, leased, prepared or otherwise dealt with in connection with CBD American Shaman or associated with the Marks.

Q.      "Proprietary Operations Manual," "Manual," or "OM" - means, but is not limited to, collectively, all directives, books, pamphlets, bulletins, memoranda, order forms, packing slips, invoices, letters, email, Internet or intranet data, or other publications, documents, software programs, video tapes, transmittances or communications, in whatever form (including electronic form) prepared by or on behalf of Franchisor for use by franchisees generally or for Franchisee in particular, setting forth information, advice and standards, requirements, marketing information and procedures, operating procedures, instructions or policies relating to the operation of the CBD American Shaman  Business or the operation of Franchises, as the same may be added to, deleted or otherwise amended by Franchisor from time to time. The form and content of the Manual

maintained by Franchisor shall prevail in the event of any dispute regarding the form of or content of the Manual between Franchisor and Franchisee.

R.      "SHAMAN store" – means a retail store at which a CBD American Shaman Business is conducted.

S.      "Store Site" – means the retail store front, commercial building, or other approved location from which you sell Products and provide services in connection with your CBD American Shaman Business.

T.      "Trade Secret(s)"- shall mean information, including a formula, pattern, compilation, program, device, method, training technique or process related to the System that both derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

## Article 3      GRANT OF FRANCHISE

Subject to the terms and conditions set forth herein, we hereby grant to you during the term of this Agreement a license to use the SHAMAN System and the Marks associated therewith exclusively in connection with the operation of a SHAMAN store at a Store Site with an address to be determined ("your Store" or "your SHAMAN store"). You shall use the SHAMAN System and the Marks solely in connection with and exclusively for the promotion and conduct of a CBD American Shaman Business at the Store Site in accordance with the terms of this Agreement and with all instructions, rules, and procedures that may be prescribed by us from time to time with respect to this Agreement. The Marks shall be used solely in connection with the sale of, and only to identify, products and services designated by us. Nothing contained herein shall be construed to authorize or permit the use by you of the SHAMAN System and/or the Marks at any other location or for any other purpose. You agree not to use the CBD AMERICAN SHAMAN name or any derivation thereof as part of your corporate, limited liability company, partnership, or individual proprietor name.

## Article 4      RESERVATIONS OF RIGHTS

We and our Affiliates retain all rights with respect to SHAMAN stores, the Marks, the sale of similar or dissimilar products and services, and any other activities we deem appropriate whenever and wherever we desire, including, but not limited to:

A.      the right to provide, offer, sell, and to grant others the right to provide, offer, and sell goods and services that are identical or similar to and/or competitive with those provided at SHAMAN stores, whether identified by the Marks or other trademarks or service marks, through dissimilar channels of distribution (including grocery and convenience stores and the internet or similar electronic media) on any terms and conditions we deem appropriate;

B.      the right to establish and operate, and to grant others the right to establish and operate, businesses offering dissimilar products and services, under the Marks and on any terms and conditions we deem appropriate;

C.      the right to operate, and to grant others the right to operate, SHAMAN stores at sites located anywhere under any terms and conditions we deem appropriate and regardless of proximity to your Store;

D.      the right to operate and grant others the right to operate SHAMAN stores at "non-traditional sites" on any terms and conditions we deem appropriate. "Non-traditional sites" are sites that generate customer traffic flow and that are independent of the general customer traffic flow of the surrounding area, including military bases, shopping malls, airports, stadiums, major industrial or office complexes, hotels, school campuses, train stations, travel plazas, toll roads, casinos, hospitals, and sports or entertainment venues;

E.      the right to acquire the assets or ownership interests of one or more businesses providing products and services similar to those provided at SHAMAN stores, and franchising, licensing, or creating similar arrangements with respect to these businesses once acquired, wherever these businesses (or the franchisees or licensees of these businesses) are located or operating; and

F.      the right to be acquired (whether through acquisition of assets, ownership interests, or otherwise, regardless of the form of transaction), by a business providing products and services similar to those provided at SHAMAN stores, or by another business, even if such business operates, franchises, and/or licenses competitive businesses.

We are not required to pay you if we exercise any of the rights specified above.

You have no options, rights of first refusal, or similar rights to acquire additional Franchises.

Continuation of your franchise rights does not depend on your achieving a certain sales volume, market penetration, or other contingency.

We do not restrict you from soliciting or accepting orders from outside your Store, but you do not have the right to use other channels of distribution to make sales outside your Store.

You acknowledge and agree that the nature of the franchised business is such that complete uniformity is not always practical or desirable and that we may, at our sole discretion, vary certain terms of this Agreement and standards of operation of the franchise business to accommodate the peculiarities of a particular situation. You acknowledge that you have no recourse against us if other franchisees are granted allowances that you are not granted.

## Article 5      LEGAL ENTITY INFORMATION

You represent and warrant to us that you have the authority to execute, deliver, and perform your obligations under this Agreement and all related agreements and are duly organized or formed and validly existing in good standing under the laws of the state of your incorporation or formation.

A.      If you are a partnership, you shall deliver to us a copy of your current partnership agreement at the time you execute this Agreement. Thereafter, you shall deliver to us copies of all restated partnership agreements and any amendments to the partnership agreement marked to indicate changes since the date of the partnership agreement previously delivered to us.

B.      If you are a corporation, you shall deliver to us a copy of your Articles of Incorporation, and all amendments thereto, and a copy of your current Bylaws. Thereafter, you shall deliver to us copies of all subsequent amendments to your Articles of Incorporation and your Bylaws, marked to indicate changes since the date of the corporate documents previously delivered to us.

C.      If you are a limited liability company, you shall deliver to us a copy of your Articles of Organization and Operating Agreement and all amendments thereto. Thereafter, you shall deliver to us copies of all subsequent amendments to your Articles of Organization and your current Operating Agreement, marked to indicate changes since the date of the company documents previously delivered to us.

D.      Your organizational documents, operating agreement or partnership agreement, as applicable, will recite that this Agreement restricts the issuance and transfer of any Ownership Interests in you, and all certificates and other documents representing such Ownership Interests will bear a legend referring to this Agreement's restrictions.

E.      Each of your owners and their respective spouses (if any) (each a "Guarantor") will execute the "Guaranty and Assumption of Obligations" form attached hereto, undertaking personally to be bound, joint and severally, by all provisions of this Agreement and any ancillary agreements between you and us.

**Article 6      <u>TERMS OF FRANCHISE</u>**

A.      Initial Term
The initial term of this Agreement shall be for a period of five (5) years commencing on the Date of Execution as set forth on the last page hereof, unless sooner terminated as provided for in this Agreement.

B.      Options to Renew
Subject to the following conditions, you shall have the option to renew this Franchise for an indefinite number of five (5)-year periods.

1.      You must notify SHAMAN in writing of your intention to renew this Franchise not less than one (1) year, prior to the scheduled expiration date of this Agreement. The terms of your renewal Franchise shall be identical to the terms as set forth in SHAMAN's then-current form of Franchise Agreement being offered to new franchisees of the System at the time of the exercise of this option to renew, including, without limitation, any then-current royalty fee and marketing fee. You will be required to execute our then-current form of Franchise Agreement.

2.      You must pay us a renewal fee equal to twenty percent (20%) of the then-current franchise fee six (6) months prior to the commencement of the renewal Franchise. Your options to renew shall not be exercisable if, at the time of notice or renewal, you are in default under any provision of this Agreement or you or your Affiliates are in default under any other agreement between us or our Affiliates and you or your Affiliates, or if you or your Affiliates have not substantially complied with all other terms and conditions of such agreements during the previous terms thereof.

3.      Such right to renew is conditioned upon your right to renew the leasehold for the Store Site on terms acceptable to us or the leasing of a new store location, acceptable to us, prior to the renewal date.

4.      We may require you, at your cost, to remodel your SHAMAN store to conform to the then-current format and style of a SHAMAN store, as set forth in the OM or otherwise specified to you by us in writing. Such specifications may include the layout and design of the building, the exterior and interior decoration, the furniture and fixtures, the equipment, and the signage.

5.      Except to the extent limited or prohibited by applicable law, you (and each of your owners must execute a general release, in form and substance satisfactory to us, of any and all claims against us and our Affiliates, officers, directors, employees and agents; (Exhibit "I").

6.      You and your managers or employees as approved by us as the persons responsible for the operation of your business, may, upon notice by us, be required to complete, to our satisfaction, any training program being offered by us for renewing franchisees. Such renewal training program will be provided to the persons attending free of cost except for transportation costs, room and board, and other personal expenses.

## Article 7      <u>FRANCHISE FEE</u>

You will pay us a franchise fee of _____ Dollars ($_____) (the "Franchise Fee") which is fully earned and shall be due and payable in full upon the signing of this Agreement. *[Insert $10,000 or, if franchisee is an employee of Franchisor or one of its affiliates, the amount of the negotiated franchise fee.]*

If you fail to successfully complete the initial training program within ninety (90) days of the date that you sign this Agreement, this Agreement will be terminated, and you will not receive a return of any of the Franchise Fee that you paid.

If you fail to locate a suitable Store Site within 90 days of the date that you sign this Agreement, we may unilaterally terminate this Agreement without refund of franchise fee.

## Article 8      <u>NO EXCLUSIVE TERRITORY</u>

We offer no exclusive territories. We may establish additional SHAMAN stores at any location.

The Franchise is granted only for the operation of a SHAMAN store at the Store Site, and you may not relocate your Store Site without first obtaining our written consent.  You also may not open an additional SHAMAN store site without our prior written approval.

## Article 9      <u>OUR OBLIGATIONS</u>

A.      Operations Manual. We shall loan to you one (1) copy of the Proprietary Operations Manual (which may consist of one or more separate manuals and which may consist of audiotapes, videotapes, compact disks, computer software, other electronic media and/or written materials) for the operation of a SHAMAN store. The Manual contains mandatory and suggested specifications, standards and operating procedures prescribed from time to time by us, and information relative

to other obligations of you and to the operation of a SHAMAN store. The Manual contains confidential and proprietary information and Trade Secrets and remains our sole property. The Manual constitutes copywritten material of ours, and may not be loaned out, duplicated, or copied by you in whole or in part in any manner. You agree that the Manual's contents are confidential and that you will not disclose the Manual to any person other than your employees who need to know its contents. If you lose the Manual or the Manual is damaged or destroyed, you shall obtain a replacement copy at our applicable charge.

We will have the right to add to and otherwise modify the Manual from time to time, as we deem necessary, provided that no such addition or modification will alter your fundamental status and rights under this Agreement. You must always follow the directives of the Manual, as may be modified by us from time to time. Such compliance by you is necessary to protect the integrity and reputation of the SHAMAN System. In the event of a dispute over the contents of the Manual, the master copy maintained at our principal office shall be controlling.

You agree that System Standards (as defined herein) we prescribe in the Manual, or that we otherwise communicate to you in writing or another tangible form (for example, via Franchise extranet or Website), are part of this Agreement as if fully set forth within its text. All reference to this Agreement includes all System Standards as periodically modified.

B.      Approval of Store Site and Plans. We may approve your Store Site and Lease based on criteria provided by us as set forth in Article 10 of this Agreement.

C.      Development of Store Site. We will provide you criteria for the construction or remodeling plans of the Store Site as set forth in Article 11 of this Agreement.

D.      Fixtures and Equipment. We may provide a list of authorized suppliers from which you will purchase required items for the installation of fixtures and equipment for the Store Site as set forth in Article 12 of this Agreement.

E.      Products, Inventory, and Supplies. We will provide you lists of authorized products, inventory, and supplies that you will be required to purchase as set forth in Article 13 of this Agreement.

F.      Training and Pre-Opening Assistance. We will provide you with the initial training program concerning the operation of a SHAMAN store as set forth in Article 14 of this Agreement.

**Article 10      <u>LEASE OF STORE SITE</u>**

A.      Within ninety (90) days of your execution of this Agreement, you shall submit a proposed Lease for the Store Site with the landlord of the Store Site based upon the site criteria provided to you by us and on terms satisfactory to us. Such Lease shall be for a term at least equal to the term of this Agreement or, in the alternative, for a shorter term provided such Lease Agreement is renewable at your option for an additional term or terms that, together with the initial term, equal or exceed the term of this Agreement, unless waived in writing by us, we have thirty (30) days from receipt of the proposed Lease to approve or disapprove it and, if we do not respond within such 30-day period, the Lease will be considered disapproved. As a condition of our approval of the Lease, but not by way of limitation, we require that the Lease include a Lease Rider

substantially in the form attached as Exhibit "E", provided we may amend the Lease Rider from time to time to make it consistent with the form of lease rider attached to our then-current franchise disclosure document.

B.      In addition, to the extent that the landlord of the Store Site provides you any demographic information and/or statistics regarding the area within which the Store Site is located, you shall provide a copy of such information to us.

C.      If you fail to locate a satisfactory site for your SHAMAN store location within ninety (90) days of the signing of this Agreement, we have the right to unilaterally terminate this Agreement with refund of franchisee fee.

## Article 11      <u>DEVELOPMENT OF STORE SITE</u>

A.      Commencement of Development of the Store Site. Within sixty (60) days of the date you execute the Lease for the Store Site, you shall commence, at your sole expense, the construction or remodeling of your Store, all in accordance with our current requirements and specifications as provided for below in this Article 11 or as may be set forth in the Manual or as otherwise specified to you by us from time to time. If, under such Lease, you do not have the right to take immediate possession of the Store Site, we shall have the option, at our sole discretion, to extend such sixty (60)-day period to a period we deem appropriate.

B.      Layout and Specifications. You shall submit to us a complete set of final plans and specifications for approval by us prior to the commencement of the construction of the Store Site. You shall also provide us with cost estimates for the construction of your Store, and you shall not begin construction until we are satisfied that you have such construction funds available. We shall consult with you, to the extent we deem necessary, on the construction and equipping of your Store, but it shall be and remain your sole responsibility to diligently design, construct, equip, and otherwise ready and open your Store.

C.      Construction and Inspection. You shall use a bonded, licensed general contractor to perform construction work at the Store Site. We shall not be responsible for delays in the construction, equipping, or decoration of your Store or for any loss or damage to you or any third party resulting from the design or construction of your Store and we shall be indemnified by you as provided for in Article 29 herein. We shall have access to the Store Site while work is in progress and we may require such reasonable alterations or modification of the construction of your Store as we deem necessary. Your failure to pay the full cost of construction and commence operation of your business with due diligence shall be grounds for the termination of this Agreement. Failure by you to correct any unauthorized variance from the approved plans and specifications promptly may result in the termination of this Agreement. In addition, if your Store is, at any time, to be altered or remodeled, or additional decorations, fixtures, furniture, or equipment are to be installed or substituted, or signs are to be erected or altered, all such work shall be subject to our prior written approval and, when completed, shall conform to plans and specifications approved by us. We may, at our sole discretion, elect to do or cause such alterations, remodeling, or additional work otherwise to be done by you. If you do such additional work, we may inspect such work at any time to determine whether the work is being done in accordance with the plans and specifications previously approved by us.

D.      Additional Layout Plans. If you change the location of your Store Site at any time during the term of this Agreement or any extensions or renewals thereof, such new Store Site shall conform to the then-current layout and specifications for a SHAMAN store site as may be provided for in the Manual or otherwise specified in writing by us. You shall be solely responsible for all costs and expenses incurred in connection therewith. In addition, you shall, if requested by us, be required to refresh, upgrade or refurbish your Store Site in accordance with our requirements that may be established from time to time or to remodel the Store Site to conform to the then-current layout and specifications for a SHAMAN store site as may be provided for in the Manual or otherwise specified in writing by us.

E.      Permits and Licenses. Prior to the commencement of the operation of your SHAMAN store, you shall: procure all necessary licenses, permits, and approvals, including, without limitation, construction permits and licenses.

## Article 12      EQUIPMENT, FIXTURES, AND FURNITURE

A.      Use of Proper Equipment, Fixtures, and Furniture. We shall provide you with specifications for brands and types of any equipment (including motor vehicles) or fixtures, and you agree to equip and furnish your Store in accordance with our specifications. You shall purchase or lease equipment, fixtures, and furniture, meeting such specifications only from sources approved by us. If you propose to purchase or lease any item of equipment, fixtures, or furniture not approved by us as meeting our specifications, you shall first notify us in writing. We may require submission of sufficient specifications, photographs, drawings, and/or other information and samples to determine whether such item of equipment, furniture, and displays requested to be used in your Store meets our specifications. We shall advise you within ten (10) days of whether such item of equipment, fixture, or display meets our specifications and if we do not provide a written approval in such 10-day period, such item will be deemed to not meet our specifications.

B.      Signage. At your sole expense, you agree to erect, prominently display, and maintain advertising signs of such design, color, number, location, illumination, and size as we may reasonably require. All such signs or sign faces shall bear our Proprietary Marks. You further agree to obtain all necessary permits and to comply with all codes, regulations, or ordinances applicable to display of the required signage, all at your expense. The maintenance and repair of all signs shall be your sole responsibility and obligation. You shall not display any sign not approved by us. You must comply with our sign criteria, as more fully set forth in the Manual.

C.      Computer Software and Hardware.

1.      Computer System. We have the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, and hardware be used by you, including any point of sale system (the "Computer System"). We have the right to specify or require certain brands, types, makes, and/or models of communications, computer systems, and hardware to be used by you in operating your Store. We have developed a proprietary electronic point of sale software platform that you must use in operating your Store. At this time, the American Shaman point of sale software is made available to you at no additional cost, but we reserve the right to impose fees relating to the license, use or support of the point of sale software in the future.  A dedicated device is required to operate the software platform.  You must purchase

a computer that is compatible with such software platform.  Neither we nor any affiliate or third party has any obligation to provide ongoing maintenance, repairs, upgrades, or updates to the American Shaman point of sale software.

You must have a functioning email address so that we can send you notices and otherwise communicate with you by this method. We reserve the right to change the Computer System at any time. There are no contractual limitations on the frequency and cost of this obligation.  We need not reimburse you for any of these costs.

There is a monthly $200 technology fee to pay for the Computer System, software or other technological platforms. There are no other required fees for maintenance, updating, upgrading or support contracts for the point of sale or computer systems.

We will have the ability to access all information and financial data recorded by the Computer System for any purpose, including audit, sales verification and System development purposes. There are no contractual limitations on our right to access the information and data.  Sales, inventory, employee, and other proprietary information will be maintained on the Computer System upon implementation of the American Shaman point of sales system.

We have the right to modify our policies regarding both our and your use of internet websites as we deem necessary or appropriate for the best interests of the System. You acknowledge that we and/or our affiliates are the lawful, rightful and sole owner of the internet domain name www.cbdamericanshaman.com as well as any other internet domain names registered by us, and you unconditionally disclaim any ownership interest in such domain names and any similar Internet domain names. You may not register any Internet domain name in any class or category that contains words used in, or similar to any brand name, owned by us or our affiliates, or any abbreviation, acronym, phonetic variation or visual variation of those words.

2.      Required Software. We have the right, but not the obligation, to develop or designate: (a) computer software programs you must use in connection with any component of the Computer System (the "Required Software"), which you shall install at your expense; (b) updates, supplements, modifications, or enhancements to the Required Software, which you shall install at your expense; (c) the tangible media upon which you record data; and (d) the database file structure of the Computer System. You shall be responsible for the payment of all fees associated with the Required Software and Computer System.

3.      Compliance with Requirements. At our request, you shall purchase or lease, and thereafter maintain, the Computer System and, if applicable, the Required Software. You agree to pay all fees associated with the use of Required Software, which may be payable to us or our approved or designated suppliers. You expressly agree to strictly comply with our standards and specifications for all items associated with your Computer System and any Required Software, including any security software. You agree at your own expense, to keep your Computer System in good maintenance and repair and install such upgrades, additions, changes, modifications, substitutions, and/or replacements to your Computer System or Required Software as we direct from time to time in writing. You agree your compliance with this Article shall be at your sole cost and expense.

4.      Franchisor's Access. We may require that your Computer System be programmed to automatically transmit data and reports about the operation of your Store to us. We shall also have the right to, at any time without notice, electronically connect with your Computer System to monitor or retrieve data stored on the Computer System or for any other purpose we deem necessary. There are no contractual limitations on our right to access the information and data on your Computer System. You shall deliver to us all access codes, static internet protocol ("IP") addresses and other information to facilitate our access to the data described in this Article within thirty (30) days of opening your Store.

5.      Proprietary Software. We may now or in the future create or designate a proprietary software program, and we will retain a proprietary interest in all databases, lists, templates, programs and any other software components that have been created and/or customized by us using the Computer System and/or Required Software (the "Proprietary Software"). Proprietary Software may conduct, among other things, scheduling, accounting, inventory, and related activities. You must obtain the computer hardware necessary to implement the Proprietary Software into the store and comply with all specifications and standards prescribed by us regarding the Proprietary Software as provided in the Manual. This Proprietary Software will be our proprietary product, and the information collected therefrom will be deemed our confidential information. You agree to sign our then-current form of software license agreement for any Proprietary Software we may now or in the future create, pay any license fees associated with use of Proprietary Software, and upgrade the Proprietary Software as we designate.

6.      Computer Network. You are required to participate in any System-wide computer network, intranet system, or extranet system that we implement and you may be required by us to use such computer network, intranet system, or extranet system to, among other things: (a) submit your reports due under this Agreement to Franchisor online; (b)  view and print portions of the Manual, including any updates or modifications thereto; (c) download approved local advertising materials; (d) communicate with us and other System franchisees; and (e) to complete any initial or ongoing training. You agree to use the facilities of any such computer network, intranet system or extranet system in strict compliance with the standards, protocols, and restrictions that we included in the Manual, including those related to the encryption of confidential information and prohibitions against the transmission of libelous, derogatory or defamatory statements.

D.      Telephone. You must obtain a new telephone number and telephone listing at your expense, to be listed under the "CBD American Shaman" name and not under your corporate, partnership, or individual name, and to be used exclusively in connection with your operation of your Store. Upon the expiration, transfer or termination of this Agreement for any reason, you must terminate your use of such telephone number and listing and assign the same to our designee. You must answer the telephone in the manner we specify in the Manual.

Except as approved in advance in writing by us, you must not establish or maintain a separate website, splash page, profile or other presence on the Internet, or otherwise advertise on the Internet or any other public computer network in connection with your operation of the CBD American Shaman Business, including any profile on Facebook, MySpace, Twitter, LinkedIn, Plaxo, YouTube, Pinterest, Instagram, or any other social media and/or networking site. If such approval is granted by us, you must: (a) establish and operate such World Wide Web or Internet site in accordance with System standards and any other policies we designate in the Manual or

otherwise in writing from time to time; (b) utilize any templates that we provide to you to create and/or modify such site(s), and (c) make us an additional administrator on your social media programs.

## Article 13      PRODUCTS, SUPPLIES, AND MATERIALS

A.      We will provide to you initial and updated lists of approved items, and supplies (by brand name and/or by standards and specifications). We will make available, through authorized suppliers or otherwise, all items set forth in the updated lists. We have the sole right to change or modify the aforestated items and the suppliers thereof. The purchase prices may vary among the franchisees. We will provide to you specifications for the proper acquisition and preparation of the equipment, materials, and supplies, and you shall purchase the same from a supplier who has complied with our supplier approval guidelines.

B.      All necessary inventory products, supplies, and materials required in the operation of your Store will be supplied by designated sources to you and the prices may include a markup intended to make a profit for us or our Affiliate on those sales.

C.      If you propose to use in the operation of your SHAMAN store any product or supply not previously approved by us as conforming to our specifications and quality standards from a supplier not theretofore approved by us as a supplier to SHAMAN franchisees, you shall first notify us. Then you shall submit to us, upon request, sufficient specifications, photographs, and/or other information or samples for examination and/or testing and for a determination by us of whether such product, supply, and/or supplier meets our specifications and standards as set forth in the Manual or as set forth in writing by us from time to time, which determination shall be made and communicated to you within 30 days of receipt of the completed request and completion of the evaluation and testing; provided, however, if we do not respond within such 30-day period, such product, supply, and/or supplier will be deemed not approved. We shall also have the right to require that our representatives be permitted to inspect such supplier's facilities. We reserve the right, at our option, to re-inspect the facilities and products of any approved supplier and to revoke our approval upon the supplier's failure to continue to meet our criteria and specifications. As a condition for approval of any new supplier, you shall reimburse us for all costs and expenses incurred by us in connection with any such examination, testing, or inspection, including, but not limited to, travel and lodging expenses incurred where we deem it necessary to visit a proposed supplier's facilities.

D.      We shall not be liable for our failure to make available any products, materials, or supplies as provided for in this Article or any delay in connection with the delivery thereof where such failure or delay is caused by an act of nature, war conditions, governmental regulations or actions, embargo, fire, floods, strikes or other labor troubles, or, without limitation by reference, any other cause not directly under our control, including any act or omission of any third party.

## Article 14      TRAINING AND ASSISTANCE BY US

A.      Initial Training Program

        1.      We will provide to you an initial training program concerning the operation of your SHAMAN store, which consists of up to four (4) days of training (although the specific number

of days depends on our opinion of your experience and needs) to be conducted at a SHAMAN store site located in the Kansas City metro area or at a designated training facility, and at your Store Site prior to the commencement of the operation of your CBD AMERICAN SHAMAN Business. You, or if you are a legal entity, a person designated by you to assume primary responsibility for the management of your SHAMAN store (the "Operating Partner" or "General Manager"), shall attend, and must satisfactorily (at our sole determination) complete, the initial training program, which training program will be provided at no charge by us. You may also have one additional person, as chosen by you and approved by us, attend the initial training program at no charge to you, provided that the training of the additional person is at the same time as the training of your Operating Partner. We may require any other of your principal(s) or employee(s) to attend and satisfactorily (at our sole determination) complete the initial training program. We may charge a reasonable fee not to exceed $500.00 per person in the event you send more than two people to the training program or if any person is trained after the completion of the initial training program for you. You shall be responsible for any personal travel, lodging, meals, or other costs for yourself and other attendee(s) you send to the training program.

2.      You may make reasonable requests for training in addition to that specified above, and we shall, at our discretion, provide such training at your expense, including lodging, meals, and other related costs. We may charge a reasonable fee for such additional training if it is deemed appropriate.

3.      You shall complete and shall cause your employees to complete, to our satisfaction, such other training as we may reasonably require from time to time. However, it is understood that you shall make all decisions on hiring, firing, promoting and disciplining your employees. We are not responsible for your employment decisions. We are not responsible for training non-manager employees.

B.      Noncompletion of Training by You. If we determine, at our sole discretion, that you or your Operating Partner or General Manager (as applicable) is unable to satisfactorily complete the initial training program described above within 90 days of the date of signing this Agreement, we shall have the right to terminate this Agreement upon written notice to you, and we may keep the entire Franchise Fee paid by you to us in consideration for the time and effort we had put forth in training you and establishing your business operation and not as a penalty.

C.      Additional Training Requirements. From time to time, we may conduct additional training programs, conventions, and meetings, which you, or your General Manager, may attend at your own expense. These conventions (or Annual Meetings) include an attendance fee of up to $350 per person. Also, for any initial training for persons beyond the owner and the operating manager, there may be a fee of up to $500 per person in attendance. You must attend any programs that we have determined are mandatory. You will be responsible for all travel and living expenses associated with attendance at such training programs. If you or your General Manager fails to attend a program at which attendance is deemed mandatory by us, we may, without waiving any other rights, require you or your General Manager to attend and complete a make-up or alternative program at your sole cost and expense at a location determined by us.

D.      Continuing Assistance. We will provide continuing consultation and advice regarding business, financial, operational, technical, pricing, sales and advertising matters, type of products

and services offered, and operation of a SHAMAN store, as deemed appropriate by us. We will provide such assistance through inspections, meetings, telephone or e-mail consultations, onsite visits, and/or printed materials or other media, as deemed appropriate by us. We shall direct you from time to time concerning minimum prices for Products sold by you. Nothing contained herein shall be deemed a representation by us that the use of our minimum prices will optimize profits.

E.      Compliance with the System. You agree to fully comply with all mandatory specifications, standards, operating procedures, and rules we specify for the System ("System Standards") as in effect from time to time, including those relating to all of the following:

        1.      The dress, general appearance, and demeanor of your employees.

        2.      The hours during which the SHAMAN store will be attended and open.

        3.      All advertising and promotional programs.

        4.      The use and retention of standard forms.

        5.      The type, quantity, and variety of equipment (including motor vehicles) and the trademarked product lines (if any), copyrighted materials, and inventory items used.

        6.      The use of signs, posters, displays, and similar items.

        7.      The treatment of customers and the handling of customer complaints.

        8.      The procedures regarding the purchasing of items from us and/or our Affiliates.

        9.      The safety, maintenance, cleanliness, function, and appearance of your SHAMAN store and of its equipment (including motor vehicles), fixtures, furniture, decor, and signs used in the operation of your SHAMAN store and to update the Store Site upon our written request to, among other things, help establish uniformity among the franchise System.

        10.     Any other mandatory specifications, standards, operating procedures and techniques, and/or other rules prescribed from time to time by us in the Manual or otherwise communicated to you in writing.

        11.     We may set price guidelines for a Product. If we impose a minimum retail price for any Product, you shall charge no less for the Product than the price we impose.

F.      Opening. You shall not commence operation of your SHAMAN store until we certify in writing that the Store Site, you and your employees are to commence the operation.

**Article 15    <u>FEES TO US</u>**

You must purchase from our designated sources only all the Products that you are required to sell.

You must maintain at all times a reasonable level of inventory and supply of Products. You must allow a minimum of two (2) weeks from the time of placing an order for standard Products to be shipped and four (4) weeks for special order Products.

You understand and agree that we or our Affiliates are entitled to profit from your purchases from us or our Affiliates.

A.      Royalty.  As of the date of this Agreement, we do not require you to pay us a royalty fee, however we reserve the right to impose a royalty fee of up to 6% of Gross Sales. We will provide at least ninety (90) days' advanced notice of the imposition of any royalty fee.  If we implement a royalty fee, we will establish the timing, frequency and method of payment of such fee, and you agree to pay in accordance with our requirements.

B.      Marketing Fee. There is an $800.00 per month marketing fee (the "Marketing Fee"), payment, charged on a prorated basis, to be made on of the first four (4) Tuesdays of each month to us, provided we will not collect the Marketing Fee with respect to your Store's first 30 days of operation. We reserve the right to change and/or increase the Marketing Fee.  If we change the Marketing Fee to a fee based on a percentage of Gross Sales, we may not charge a Marketing Fee of more than the greater of $800.00 per month or 3½% of Gross Sales. We will provide at least ninety (90) days' advanced notice of any change of the Marketing Fee.

C.      Sales and Use Taxes. You must pay the amount of all sales taxes, use taxes, and similar taxes imposed upon or required to be collected or paid on account of goods or services furnished to you by us, whether such goods or services are furnished by sale, lease, or otherwise.

D.      Advances. You must pay us all amounts, if any, advanced by us or that we have paid, or for which we have become obligated on behalf of you at your request, including without limitation any payments made on trade accounts and taxes.

E.      Interest. You will pay us interest at a rate of the lesser of one and a half percent (1.5%) per month or the maximum rate permitted by law on any of the amounts set forth in this Agreement that are past due, which interest shall begin to accrue on the date when such amounts are first due and owing to us or as of the date that we make a payment on behalf of you, whichever is earlier.

F.      Late Payment Fee. If you fail to pay any amount owed within five (5) days of the due date, then, in addition to the payment due and the interest accruing thereon, you shall pay an amount that will equal ten percent (10%) of the amount due.

G.      Insufficient Funds. If the funds in your bank account are insufficient to cover any amounts due under this Agreement on the date such funds are due, in addition to the overdue amount and any interest due on such amount as described above, we have the right to immediately debit from your bank account an insufficient funds fee of $250 per occurrence, or a lesser amount as allowed under the state law where your franchise is located. Should any electronic funds transfer not be honored by your bank for any reason, you agree that you will be responsible for that payment and any service charge.

H.      Technology Fee. You will pay us a monthly fee of $200.00 which shall be payable to us, on a prorated basis,on the  first four (4) Tuesday's of each month, as a technology fee to pay for certain aspects of computer systems, software or any other technological platform that may be used or developed for the System ("Technology Fee"). We reserve the right to change the amount, scope, or manner of payment of the Technology Fee, including the party to whom payment is made, at any time upon providing 90 days' notice to you. We impose the Technology Fee to

reimburse us for certain expenses incurred in connection with the computer system, software or any other technological platform used by the System and do not impose the Technology Fee solely as an additional stream of revenue.

Notwithstanding anything provided herein to the contrary, you shall not have the right, under any circumstances, to offset or reduce, for any reason, any sum of money owed by you to us.

## Article 16        PAYMENTS OF FEES AND REPORTING REQUIREMENTS

A.        Payment. We may require that all payments, fees and other amounts due to us under this Agreement or any other agreement with us or any Affiliate will be paid by credit card or electronic funds transfer. We may, at our option on written notice, require that you pay all fees and purchases owed to us or our Affiliates by an approved credit card which you must keep active in good standing and on file with us or by means of an irrevocable line of credit.

B.        Sales Data.  You shall deliver to us any sales data requested by us in the form, manner, and frequency requested. Such data must include, without limitation: (a) daily sales reporting forms and accompanying point of sales data, which shall be received by us and (b) monthly state sales tax returns for the previous month's sales to be delivered to us concurrently with the monthly profit and loss statement described in this Article below.

**C.**        Financial Statements. If requested by us, no later than ten (10) calendar days following the end of each calendar month, you shall provide us with compiled financial statements, including a statement of profit and loss and a balance sheet reflecting the financial condition of your operation as of the last day of the preceding calendar month, prepared by your accountant. You also shall deliver to us within thirty (30) days of the end of each annual calendar period or, in the case of a corporation, limited liability company, or partnership, within thirty (30) days of the end of each annual fiscal period, "Year End" financial statements including a balance sheet and a statement of profit and loss for each such annual period prepared by your accountant, which  must be prepared according to the format provided by us using standard chart of accounts provided by us in the Operations Manual. If we have not received your financial statements timely as stated above three (3) times within a 12-month period, you agree that an audit will be performed at your expense.

## Article 17        RECORD KEEPING AND ACCOUNTING

A.        Use of Uniform System of Reporting and Accounting. Our uniform system of reporting, accounting, and record keeping, including our standardized forms, shall be used by you. This uniform system may be amended or supplemented from time to time by us.

B.        Records and Audits. You shall maintain and preserve accurate books, records, and tax returns, including related supporting material, such as point of sale data and invoices, for the operation of your SHAMAN store for at least three (3) years from the date such record is prepared. Such books, records, tax returns, and supporting material shall be made available by you for inspection, examination, or audit by us at all reasonable times and at such locations as may be designated by us from time to time.

C.        Backup of Information System. During any period of repair of the specified Computer System in the operation, all business records of yours shall be kept on forms and in accordance

with procedures as prescribed by us from time to time at our sole discretion. Notification of the replacement of the specified Computer System must be given immediately but, in any event, not more than twenty-four (24) hours from the time the specified Computer System is determined to be inoperative.

D.     Independent Access to Financial Information. We will be allowed unlimited computer access to your financial information regarding the business operation.

## Article 18        MARKETING AND ADVERTISING

A.     Our Obligations. We shall develop and conduct marketing, advertising, public relations, and promotional campaigns for the benefit of the Franchise System as we deem necessary at our sole discretion and we reserve the exclusive right to develop and conduct such advertising, sales, or marketing activities. In all phases of such advertising activities, including, without limitation, type, quantity, timing, placement, and choice of media or agency, our decision shall be final.

You shall not engage in any national or regional advertising activities directly, except in connection with the local implementation thereof as described herein, nor shall you erect or display any sign, material, or notice of any type, including on the "World Wide Web", of the operation of your SHAMAN store without our prior written consent. We shall have the right to unilaterally terminate or remove any unauthorized advertising material at your expense.

B.     Your Obligations. You will be obligated to participate in marketing and advertising programs established by us for the benefit of the System. Such advertising shall include local implementation of our national or regional advertising programs directly and through your local Advertising Cooperatives, as further set forth herein in Article 18 D.  In addition, you will be required to conduct local advertising, and spend up to a $750.00 amount each month (exclusive of the Marketing Fee or any other fees to us for marketing and exclusive of salaries or consulting fees paid to marketing personnel), which may include advertising published in local newspapers and aired on local television and radio broadcasting. You shall create and submit to us for our approval, at least 30 days prior to its implementation, a local advertising and marketing plan for each fiscal year. If we do not respond within such 30-day period, such local advertising and marketing plan will be deemed not approved. The plan must set forth your planned placements of local advertising during the next 12-month period. Advertising by you may be in any media you desire, provided that such advertising conforms to the standards and requirements of ours as set forth in the Manual or as otherwise designated by us. Such local advertising shall include you listing your operation in various social media platforms, the white pages and yellow pages of the authorized telephone company directories and publications distributed throughout your area. All such advertising shall be conducted in a dignified manner and conform to the standards and requirements prescribed by us from time to time and to the highest ethical standards of advertising.

C.     Advertising Approval. Unless provided to you by us, all local advertising, promotions, or other forms of publicity to be employed by you, which may include without limitation newspaper, television, radio, Internet, advertisements, signs, billboards, or any appearances by public figures, fliers, coupons, and promotional merchandise in the form of uniforms, caps, buttons, and similar items, shall be submitted to us for approval.  We have up to twenty (20) business days after receipt to approve or disapprove said advertising and, if we do not respond within such 20-business day

period, such advertising will be deemed not approved. No form of advertising, promotion, or publicity shall be employed without our prior written consent, which consent may be withheld by us at our sole discretion. Notwithstanding such prior written approval by us, we reserve the right to request that you resubmit to us any previously approved advertising or promotional material, at which time us may re-inspect such material and consent to its continued use or, in the alternative, withhold consent at our sole discretion.

You may not advertise your SHAMAN store in connection with any other business, except with our prior written approval, which approval may be withheld for any reason.

D.      Franchise Association/Advertising Cooperatives. The American Shaman Franchise Association is an entity that promotes collective marketing through joint buying power for each franchisee who make up the base of the Association members.  Each franchisee is required to participate in the Association at the minimum of paying the franchise membership fee which is used to purchase advertising and marketing for the franchisees as a whole but concentrating on regional good spending based on local needs, costs, and budgets.

In 2020 we established the American Shaman Franchise Association as a non-profit entity to serve as an advertising council or advertising cooperative (the "Association"). We reserve the right to create Advertising Co-Ops, each of which is an association of all franchisees whose SHAMAN stores are located within an Area of Dominant Influence ("ADI") (An ADI is a geographic market designation that defines a broadcast media market consisting of the cities, counties, or other defined area in which the home market stations receive a preponderance of viewing.). One function of any Advertising Co-Op is to establish a local advertising pool, of which the funds must be used for advertising of the SHAMAN store operations located in the ADI and for the mutual benefit of each Advertising Co-Op member. If an Advertising Co-Op is established in your ADI, you are required to join and participate in it and contribute to the pool in accordance with the rules and regulations of the Advertising Co-Op, as determined by its members. The members of the Co-Op will be responsible for administering the Co-Op. The Co-Op should operate from written governing documents, the rules of which are available for all members to review. Annual reports must be prepared by the Co-Op. which will be available for your review.

SHAMAN stores owned by us or our affiliates may participate, but are not be required, to pay an equal amount or on an equal percentage basis, as applicable, into the American Shaman Franchise Association.

The American Shaman Franchise Association is required to be participated in by each franchise at least to the minimum fee owed for each member franchise.  Other than the National Marketing Fund and the American Shaman Franchise Association, there currently are no other advertising funds in which you must participate according to the Franchise Agreement at this time, but we reserve the right to create ones, which you must participate in.

The Association Fund monies are not used to solicit new franchise sales.


E.      National Marketing Fund

1.      The Marketing Fees shall be placed in a separate bank account, commercial account, or savings account owned by us ("National Marketing Fund"). The National Marketing Fund will be administered by us, at our discretion. The National Marketing Fund proceeds may be used for researching, preparing, maintaining, administering, and directing advertising and promotional materials and public relations programs, including production of commercial print, radio, television, magazine, newspaper, Internet advertising, direct response literature, direct mailings, brochures, national and international franchise sales, collateral materials advertising, surveys of advertising effectiveness, and other advertising or public relations expenditures. We may reimburse ourselves from the National Marketing Fund for administrative costs, including the salaries of public relations personnel or persons administering the advertising services, independent audits, reasonable accounting, bookkeeping, reporting and legal expenses, taxes, repayment of loans, and all other reasonable direct or indirect expenses that we or our authorized representatives incur with the programs funded by the National Marketing Fund.  We may loan money to the National Marketing Fund on a periodic basis and charge a market interest rate in connection with such loan.

2.      Upon request from you, we will make available to you, no later than one hundred twenty (120) days after the end of each calendar year, an annual unaudited financial statement for the National Marketing Fund that shows how the National Marketing Fund proceeds have been spent in the prior year.

3.      All SHAMAN stores owned by us or our Affiliates will be required to pay on an equal basis into the National Marketing Fund.

4.      We do not guarantee that marketing expenditures from the National Marketing Fund will benefit you or any other franchisees directly or on a pro rata basis. We are not obligated to spend any amount on advertising in the geographic area where your Store Site is located.

5.      National Marketing Fees not spent in any fiscal year will be carried forward and spent in ensuing fiscal years.

6.      Marketing Expenditures from the National Marketing Fund will be up to the sole discretion of Franchisor in how to allocate amongst geographic areas where American Shaman facility sites are located.

7.      The National Marketing Fund is not used to solicit new franchise sales.

8.      National Marketing Fund monies not spent in any fiscal year will be carried forward for use in the ensuing fiscal years.  In addition, we reserve the right to loan money to the National Marketing Fund on a periodic basis and charge a market interest rate in connection with such loan. Monies in the National Marketing Fund may be used to repay such loans in future years as we determine.  You are not entitled to receive a periodic accounting for how National Marketing Fund monies are spent.

**Article 19**   **INSURANCE OBLIGATIONS**

A.      Overall Insurance Coverage Required. You shall procure, prior to opening, at your expense, an insurance policy or policies protecting you, us, and the officers, directors, partners, agents, and employees of both us and you, against any loss, liability, personal injury, death, property damage, or expense whatsoever arising from or occurring upon or in connection with operating your SHAMAN store.

B.      Qualified Insurance Carrier. All insurance policies required under this Agreement shall be written by an insurance company satisfactory to us with an A.M. Best BBB rating, naming us as an additional insured, in accordance with the standards and specifications set forth in the Manual or otherwise specified in writing, and shall include, at a minimum (except as additional coverage and higher policy limits may be specified from time to time by us), the limits set forth in the Manual for all of the following categories of required insurance, and any additional categories required by us, as set forth in the Manual:

        1.      Comprehensive general liability insurance including, but not limited to, Product Liability coverage and Personal Injury coverage.

        2.      Property damage liability insurance covering at a minimum the perils of fire and extended coverage and vandalism and business interruption.

        3.      Workers' Compensation and employer's liability insurance as prescribed by state law.

        4.      Motor vehicle coverage.

        5.      Such other insurance that may be required by the statutes or other laws of the state and/or any local governmental entities in which your Store Site is located and operated. All insurance policies must provide that they will not be cancelled or materially altered without at least thirty (30) days prior written notice to us.

C.      No Limitations on Coverage. Your obligations to obtain and maintain the foregoing insurance policies, in the policy limits set forth in the Manual, shall not be limited in any way by reason of any insurance that may be maintained by us; nor shall your performance of this obligation relieve you of liability under the indemnity provisions set forth in this Agreement. You may maintain such additional insurance as you may consider advisable.

D.      Evidence of Coverage. Upon obtaining the insurance required by this Agreement and on each policy renewal date thereafter, you shall promptly submit evidence of satisfactory insurance and proof of payment thereof to us, together with, upon request, copies of all policies and policy amendments and endorsements.

E.      We May Procure Insurance Coverage. Should you, for any reason, fail to procure or maintain the insurance required by this Agreement, as described from time to time by the Manual or as otherwise described in writing from us, you will be in breach of this Agreement. We shall then have the right and authority (but not the obligation) to procure such insurance and to charge

the cost thereof to you, which charges, together with a reasonable fee for our expenses in so acting, shall be payable by you immediately upon notice from us.

**Article 20**      **PROTECTION OF TRADEMARKS AND RELATED PROPRIETARY RIGHTS**

A.      Rights to the System and the Marks. Your rights to use the Marks and copyrights as granted in Article 2 herein are limited to their use in connection with the business operations of your SHAMAN store as described herein and as set forth in the Manual or as prescribed in writing by us from time to time.

You acknowledge our right, title, and interest in and to the Marks, together with the identification, schemes, standards, specifications, operating procedures, and other concepts embodied in the SHAMAN System. **Only we have the authority to allow a third party the right to use the Marks.** Except as expressly provided by this Agreement, you shall acquire no right, title, or interest therein, and any and all goodwill associated with the SHAMAN System and the Marks shall inure exclusively to our benefit. Upon the expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with your use of the SHAMAN System or the Marks.

You expressly acknowledge and agree that only we have and retain the rights, among others:

1.      To allow third parties the right to use or reproduce the Marks.

2.      To grant other licenses for the use of the Marks in addition to those already granted to existing franchisees and to you.

3.      To use the Marks in connection with selling products and providing services, except as we may license such rights on a non-exclusive basis.

4.      To develop and establish other systems and programs utilizing the same or similar Marks, or any other proprietary marks, and to grant franchises therein without providing you any rights therein.

5.      To use the Marks in connection with any type of electronic transmission, including but not limited to the use of the Marks on the Internet.

You acknowledge and agree that many items and the information included in the SHAMAN System constitute our Trade Secrets, which are revealed to you in confidence. You agree to adhere fully and strictly to all confidentiality of such information and to exercise the highest degree of diligence in safeguarding our Trade Secrets during and after the term of this Agreement. You shall divulge such material only to your employees and only to the extent necessary to permit the effective operation of your SHAMAN store. You agree that you will not, at any time during the term of this Agreement or at any time thereafter: (a) use or attempt to use any or all portions of the SHAMAN System or of the Marks or any name or mark similar to the Marks in connection with any other entity or business in which you have an interest; (b) disclose, duplicate, reveal, sell, or sublicense any or all portions of the SHAMAN System or of the Marks or seek to transfer any rights therein, except as authorized in this Agreement; or (c) directly or indirectly commit an act

of infringement or contest or aid in contesting the validity or ownership of the Marks or take any other action in derogation thereof.

You agree that, in the event you develop product, design, signage, or process that you wish to sell or use in your SHAMAN store, you will first receive written permission from us to sell or use such product or process and that the product or process shall inure to the benefit of us and become our property. As the owner of such property, we may introduce said product or implement said process throughout the System, and you will have no right to market or distribute said product or process outside of, or independently of, the SHAMAN System without written permission from us.

B.      Notice of Claim and Reimbursement. You shall give immediate written notice to us of any improper use of the Marks or any other trade name or service mark used by any third party that is confusingly like the Marks that comes to your attention or of any infringement or challenge to your use of the Marks. Upon receipt of written notification, we may, at our option, elect to undertake or not undertake and control the prosecution, defense, or settlement of any legal action in connection with such improper usage, infringement, or challenge. In connection therewith, you are required to assist us in carrying out such litigation. We will reimburse you for all actual damages (other than loss of income) and out-of-pocket expenses incurred by you in connection with any claim by any third party for infringement or unfair competition arising out of your use of the Marks; however, the foregoing obligations of ours to reimburse you will exist only if you have used the name or mark that is the subject of the controversy in strict accordance with the provisions of this Agreement and our rules, regulations, procedures, requirements, and instructions, have notified us of the challenge as set forth above, and have otherwise fully cooperated with us in the defense of any such action.

C.      Discontinued Use. In the event it becomes advisable at any time, at our sole discretion, to modify or discontinue the use of any one or more of our Marks or to use one or more additional or substitute marks, you agree to immediately comply with our instructions, including, without limitation, replacing sign faces and otherwise physically complying with this obligation. Our only obligation shall be to reimburse you for your out-of-pocket expenses actually incurred, including, but not limited to, letterhead and signs, in an amount not to exceed more than Two Hundred and Fifty Dollars ($250.00), which amount may be paid out of the National Marketing Fund.

D.      Notice. You agree to indicate the required trademark, service mark, or copyright notices in the form specified by us in connection with your use of our trademarked and copyrighted items.

**Article 21      <u>MODIFICATION OF THE SYSTEM</u>**

You recognize and agree that, from time to time hereafter, we may change or modify the System as presently described in the Manual, and as identified by Proprietary Marks, including the adoption and use of new or modified trade names, trademarks, service marks or copyrighted materials, new computer programs and systems, new types or brands of equipment and products, new inventory, or new equipment requirements or new techniques, and that you will accept, use, and display for the purpose of this Agreement any such changes in the System as if they were part of this Agreement at the time of execution hereof. You will make such expenditures as such changes or modifications in the System may reasonably require. You shall not change, modify, or alter in any way any material aspect of the System without our prior written consent.

**Article 22**      <u>**TERMINATION OF THE FRANCHISE**</u>

A.      Termination by You. If you are in full compliance with this Agreement and we materially breach this Agreement and fail to cure such breach within thirty (30) days after written notice specifying the breach is delivered by you to us, then you may terminate this Agreement and the Franchise, but you shall remain liable for all debts and amounts owing to us.

B.      Termination by Us - With Cure. You acknowledge that your strict performance of all the terms of this Agreement is necessary not only for our protection, but also for your protection, our other franchisees, and the System. You therefore acknowledge and agree that the strict and exact performance by you of each of the covenants and conditions contained in this Agreement is a condition precedent to the continuation of this Agreement.

        1.      If you (a) fail to pay any monies to us when due, (b) fail to file any reports with us when due, or (c) misuse or fail to follow our directions or guidelines concerning the Proprietary Marks, then we may terminate this Agreement if you fail to cure the breach within ten (10) days after written notice from us specifying the breach.

        2.      If you breach any other provision of this Agreement, except as stated below, then we may terminate this Agreement if you fail to cure the breach within thirty (30) days after written notice from us specifying the breach.

        3.      If you fail to properly set up your Shaman store. (See Article 11)

C.      Termination by Us -- Without Cure. You shall be deemed to be in breach, and we, at our option, may terminate this Agreement and all rights granted under it, without affording you any opportunity to cure the breach, effective immediately upon our notifying you in writing of such breach, if you or, as specifically stated below, your officers, directors, owners, or Guarantors do any of the following:

        1.      Make an assignment for the benefit of creditors or an admission of your inability to pay your obligations as they become due.

        2.      File a voluntary petition in bankruptcy or any pleading seeking any reorganization, arrangement, composition, adjustment, liquidation, dissolution, or similar release under any law or admitting or failing to contest the material allegations of any such pleading filed against you or are adjudicated bankrupt or insolvent, or a receiver is appointed for a substantial part of your assets or the operation of your SHAMAN store, or the claims of your creditors are abated or subject to moratorium under any laws.

        3.      Abandon, surrender, or transfer control of the operation of your SHAMAN store or fail to continuously and actively operate your SHAMAN store, for a period more than seventy-two (72) hours, unless precluded from doing so by an act of war, terrorism, act of God, civil disturbance, natural disaster, labor dispute, or other events beyond your reasonable control.

        4.      Fail or refuse on three or more occasions in any 12-month period to submit, when due, any financial statement, tax return, or schedule or to pay, when due, any fee or any other

payments or submit any required reports due to us or any other party related to this Franchise, even if all prior breaches were timely cured.

5.      Operate your SHAMAN store in a manner that violates any federal, state, or local law, rule, regulation, or ordinance.

6.      Make a material misrepresentation or omission on your application to own and operate the SHAMAN Franchise.

7.      You, or any of your owners, transfer (as defined in Article 25) any Interests in you or your CBD AMERICAN SHAMAN Business, without having our prior written consent, as set forth in Article 25.

8.      Disclose or divulge the contents of the Proprietary Manual or any Trade Secrets or other Confidential Information provided to you by SHAMAN or any of our Affiliates to any third party.

9.      Fail on three or more occasions in any twelve (12) month period during the term of this Agreement to substantially comply with any of the requirements imposed by the Manual, without regard to whether such failures were timely corrected.

10.     You, any owner, your Operating Partner, or your General Manager engage in any activity that has a material adverse effect on the System and/or the Proprietary Marks and/or engage in a business separate from the SHAMAN store.

11.     You, any owner, your Operating Partner, or your General Manager are convicted of a felony or plead nolo contendere to a felony.

12.     Fail to complete the initial training program, as specified in Article 14A above.

13.     Lose the right to occupy the Store Site due to a breach of the Lease or other occupancy agreement.

14.     You, or any officer, director, limited liability company member or manager, or partner of yours (as applicable), or the Operating Partner(s), becomes subject to United States Executive Order 13224 or The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "Patriot Act").

15.     Fail to locate a satisfactory site for your SHAMAN store location within ninety (90) days of the signing of this Agreement.

16.     A Guarantor revokes his, her or its guaranty of any or all of your obligations hereunder.

**Article 23      YOUR OBLIGATIONS UPON EXPIRATION OR TERMINATION OF THIS AGREEMENT**

Upon expiration or termination of this Agreement for any reason, the following provisions shall apply:

A.      You shall cease to operate the franchised business and shall not thereafter, directly or indirectly, represent to the public or hold yourself out as our franchisee.

B.      Immediately and permanently cease to use, by advertising or in any manner whatsoever, any equipment, materials, confidential methods, procedures, and techniques associated with the SHAMAN System or that display the Marks, or any other distinctive forms, slogans, signs, symbols, or devices associated with or belonging to us.

C.      You shall pay to us, or any of our affiliated companies, within ten (10) days after the effective date of termination or expiration of this Agreement, any fees; payments for inventory, equipment, or merchandise; or any other sums owed by you to us or our affiliated companies, which are then unpaid.

D.      You and your Affiliates shall immediately return to us all originals and copies of the Proprietary Manual, training aids, and any other materials that have been loaned or provided to you by us or any of our affiliated companies. You shall immediately return to us any other manuals, customer lists, records, files, instructions, correspondence and brochures, computer software, computer diskettes, and any and all other Confidential Information relating to the operation of your SHAMAN store in your or your Affiliates' possession, custody, or control and all copies thereof (all of which are acknowledged by you to be our sole property). Neither you nor your Affiliates will retain any copy or record of the foregoing, excepting only your copy of this Agreement, any correspondence between the parties hereto, and any other documents that you reasonably need for compliance with any provision of law.

E.      You will take such action that may be required to cancel all assumed names or equivalent registrations relating to your use of any Proprietary Marks and to notify the telephone company, Internet service provider, and listing agencies of the termination or expiration of your right to use any telephone number, e-mail addresses, or Internet domain names in any classified ad and any other directory listings associated with the Proprietary Marks or your SHAMAN store and to authorize the transfer of them to us.  (Exhibit "K")

You acknowledge that as between us and you, we have the sole rights to and interests in all telephone numbers, e-mail addresses, Internet domain names, and directory listings associated with any Proprietary Marks or SHAMAN store operations. You authorize us, and thereby appoint us, as your attorney in fact, to direct the telephone company, Internet service providers, and all listing agencies to transfer the numbers, addresses, and listings to us. Should you fail or refuse to do so, the telephone company, Internet service providers, and all listing agencies may accept such direction in this Agreement as conclusive evidence of our exclusive rights in such telephone numbers, e-mail addresses, domain names, and directory listings and our authority to direct their transfer.  (See Exhibit "K")

F.      No Confusion with Proprietary Marks. If you continue to operate or subsequently begin to operate any other business after termination or expiration of this Agreement, you shall not use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or in the promotion thereof, that is likely to cause confusion, mistake, or deception or that is likely to dilute our rights in and to the Proprietary Marks, and you further agree not to utilize any designation of origin or description or representation that falsely suggests or represents an association or connection with us or a former association or connection with us.

G.      We have the right, but not the duty, to be exercised by notice of intent to do so sent in writing by us within thirty (30) days after termination or expiration of this Agreement, to purchase any or all of the assets of your SHAMAN store, including inventory, equipment, supplies, signs, advertising materials, and items bearing our Proprietary Marks, at their fair market value (less the amount of any outstanding liens or encumbrances).

If the parties cannot agree on a fair market value within a reasonable time, an independent appraiser shall be designated by us, and the appraiser's determination shall be binding. No monetary amount shall be as attributable to any goodwill associated with your use of the Proprietary Marks or in connection with the operation of your SHAMAN store. If we elect to exercise our option to purchase as herein provided, we will have the right to set off all amounts due us or any companies affiliated with us from you, as well as the cost of the appraisal, if any, against any payment thereof.

H.      You shall immediately make such modifications or alterations to the premises of your SHAMAN store as may be necessary to distinguish the appearance of the premises from that of a SHAMAN store, and you shall make such specific additional changes to the premises as we may reasonably request for that purpose. In the event you fail or refuse to comply with this requirement, we shall have the right to enter upon the Store Site, without being guilty of trespassing or any other tort, for making or causing to be made such changes as may be required, at your expense, which expense you agree to pay upon demand.

I.      If you are the owner of a nonresidential building wherein your SHAMAN store is located, we shall have the opportunity of executing a lease agreement with you for a period of not more than 5 years, as we shall select, and the premises shall be leased to us at a fair market value and on other commercially reasonable terms, in each case, based on the type of property and the current market in the metropolitan area of your Store.

J.      If this Agreement is terminated prior to the end of the term by you other than pursuant to Article 22A or by us as a result of your breach of this Agreement.  Nothing contained in this agreement shall be deemed to limit any remedies available to us for any damages, other than lost recurring fees damages or liquidate damages, caused by or arising out of early termination.

K.      Termination for cause committed by Franchisee shall constitute grounds to implement a $50,000.00 termination fee against the franchisee entity, owners, and/or guarantors.

## Article 24      COVENANTS AND CONFIDENTIAL INFORMATION

A.      You Receive Confidential and Other Valuable Information. You specifically acknowledge that, pursuant to this Agreement, you will receive our training, confidential information and trade

secrets and valuable information regarding the promotional, operational, sales, and marketing methods and techniques of the SHAMAN System.

We possess (and will continue to develop and acquire) certain Confidential Information. We will disclose the Confidential Information to you in the training program, the Manual and in guidance furnished to you. You acknowledge that the Confidential Information is proprietary and/or involves our Trade Secrets and that you will not acquire any interest in the Confidential Information, other than the right to utilize it as we specify in the operation of the SHAMAN store during the term of this Agreement. You acknowledge and agree that the Confidential Information is disclosed to you only on the condition that you agree, and in fact do agree, that you:

      1.     will not use Confidential Information in any other business or capacity;

      2.     will keep each item deemed to be part of Confidential Information confidential, both during and after this Agreement's term;

      3.     will not make unauthorized copies of any Confidential Information disclosed via electronic medium or in written or other tangible form; and

      4.     will, except to the extent prohibited by applicable law, require and cause your owners and your General Manager to sign a separate non-compete and non-disclosure agreement in the form attached as Exhibit "D" and will deliver us a fully executed copy of each such agreement.

      5.     Confidential Information does not include information, knowledge, or know-how which you can demonstrate lawfully came to your attention before we provided it to you directly or indirectly; which, at the time we disclosed it to you, already had lawfully become generally known in the industry through publication or communication by others (without violating an obligation to us); or which, after we disclose it to you, lawfully becomes generally known in the industry through publication or communication by others (without violating an obligation to us). However, if we include any matter as Confidential Information, anyone who claims that it is not Confidential Information must prove that one of the exclusions provided in this paragraph is fulfilled.

      6.     All ideas, concepts, techniques, or materials relating to a SHAMAN store, whether protectable intellectual property and whether created by or for you or your owners or employees, must be promptly disclosed to us and will be deemed to be our sole and exclusive property, part of the Franchise System, and works made for hire for us. To the extent that any item does not qualify as a "work made for hire" for us, by this paragraph you assign ownership of that item, and all related rights to that item, to us and agree to take whatever action (including signing assignment or other documents) we request to evidence our ownership or to help us obtain intellectual property rights in the item.

B.     Covenant Not to Compete.

      1.     You covenant that during the term of this Agreement, none of you, your owners if you are a corporation, limited liability company, partnership or other business entity, the General Manager(s) or your Affiliates (each a "Restricted Party") will directly or indirectly (including

through any immediate family member) (a) own a direct or beneficial equity interest in a Competitive Business (as defined below), (b) engage or be financially involved in (including as a lender or guarantor), or otherwise perform services as a director, officer, manager, employee, consultant, representative, or agent for, a Competitive Business, or (c) grant franchises or licenses to others to operate a Competitive Business; except with our prior written consent, which consent may be withheld for any reason.

2.      You covenant that, except with our prior written consent, which consent may be withheld for any reason, for a continuous uninterrupted period of two (2) years following the expiration or termination of this Agreement for any reason, or the date on which you cease to conduct business under this Agreement, whichever is later (the "Post Term Restricted Period"), or, with respect to a Restricted Party other than you, for a continuous uninterrupted period of two (2) years following the termination of such Restricted Party's relationship or affiliation with you, neither you nor any Restricted Party will: (a) own a direct or beneficial equity interest in a Competitive Business having operations within a fifty (50) mile radius of any other SHAMAN store then in business, (b) engage or be financially involved in (including as a lender or guarantor), or otherwise perform services as a director, officer, manager, employee, consultant, representative, or agent for, a Competitive Business having operations within a fifty (50) mile radius of any other SHAMAN store then in business, or (c) grant franchises or licenses to others to operate a Competitive Business within a fifty (50) mile radius of any other SHAMAN store then in business; except with our prior written consent, which consent may be withheld for any reason. You agree that this 2-year, 50-mile restriction is reasonable and not overly burdensome to your ability to continue working in a retail environment, nor is it unreasonable to permit you to operate a CBD-product store outside of a 50-mile restriction.

3.      Competitive Business Defined. The term "Competitive Business" means any business enterprise that operates a business specializing in the sale of Industrial Hemp based products, or any other business that is the same as, or like, our operation, as it may evolve over time.

4.      The covenants in this Article 24B shall not restrict a Restricted Party from owning not more than five percent (5%) of the outstanding stock of a corporation, the stock of which is traded on a national securities exchange.

C.      Non-Solicitation of Customers.

1.      You acknowledge and agree that the names and addresses of the Franchise customers constitute our Trade Secrets, and that the sale or unauthorized use or disclosure of any of our Trade Secrets obtained by you during the term of the Franchise constitutes unfair competition.  You promise and agree not to engage in any unfair competition with us.

2.       You shall not, during the term of this Agreement or the Post Term Restricted Period, directly or indirectly, make known to any person, firm, corporation or other business entity, the names or addresses of any of the customers of the Franchise or any other information pertaining to them, or call on, solicit, take away, or attempt to call on, solicit, or take away any of the customers of the Franchise, either for your own benefit (except in the operation of your CBD

American Shaman Business in accordance with this Agreement) or for any other person, firm, corporation or other business entity.

D.      Non-Disclosure. You also agree that you will never, directly or indirectly during or after the term of this Agreement, divulge to or use for the benefit of any person or entity outside of the SHAMAN System, any information contained in our Proprietary Manual, any information related to marketing, or any other systems or methods of operation of our business or that of our franchisees. You agree not to do any act prejudicial or injurious to our goodwill or name. Information furnished to your employees shall be reasonably limited to that which directly relates to and assists in the proper performance of such employees' duties.

E.      Your Employees. All personnel performing managerial or supervisory functions, all personnel receiving special training and instruction, and all persons employed by you having access to any Confidential Information concerning the SHAMAN System shall execute an Employee Confidentiality Agreement, as set out in Exhibit "G" provided by us, pursuant to which such personnel shall agree not to disclose any of the Confidential Information concerning the SHAMAN System that may be disclosed to them or of which they learn or otherwise obtain during their involvement with you.

F.      Covenants Are Independent. The parties agree that each of the foregoing covenants shall be construed to be independent of any other covenant or provision of this Agreement. If all or any portion of the covenants in this Article 24 are held to be unenforceable or unreasonable by a court or agency having competent jurisdiction in any final decision to which we are a party, you expressly agree to be bound by any lesser covenant within the terms of such covenant that imposes the maximum duty permitted by law, as if the resultant covenant were separately stated in and made a part of this Article 24.

G.      Claims Are Not Defense to Covenants. You expressly agree that the existence of any claim you may have against us, whether arising from this Agreement, shall not constitute a defense to enforcement by us of the covenants of this Article.

You further agree that we shall be entitled to set off from any amount owed by us to you of any loss or damage to us resulting from your breach of this Article 24.

## Article 25      **TRANSFERABILITY OF INTEREST**

A.      Transfer by Us.  We may transfer this Agreement in whole or in part without your consent. Upon a transfer by us of all of our rights and obligations herein, we will have no further obligation under this Agreement, except for any accrued liabilities. You agree to execute any forms that we may reasonably request to effectuate any such transfer by us. In addition, we may delegate certain of our obligations and duties as described herein to a third party, who will assist us in the training, supervision, and/or administration of your Store Site.

B.      Transfer by You.

        1.      Conditions to Transfer.  We entered into this Agreement based on your qualifications and, if you are a business entity, those of your owners. Any direct or indirect transfer of an Interest requires our prior written consent. As used in this Article 25, "transfer" includes any

sale (except for the sale of merchandise and other products or services in the ordinary course of your Store operations), assignment, transfer, license, sublicense, sublease, collateral assignment, grant of a security, collateral or conditional interest, pledge, hypothecation, inter-vivos transfer or testamentary disposition, in each case, whether voluntary or involuntary.  Without limiting our right to consent or withhold consent to a proposed transfer, whether to an individual or a business entity, our consent to any transfer will be conditioned on the following: ( 1 ) the proposed transferee must meet our then-current  criteria for new franchisees entering the SHAMAN System, (2) you must satisfy all of your outstanding obligations to us and our Affiliates, (3) your Store and the Store Site must be in compliance with our then-current System Standards, (4) the proposed transferee and the transferee's General Manager must satisfactorily complete our training program, (5) the transferee (or the Franchisee, if an Ownership Interest is transferred) must execute our then-current form of Franchise Agreement (which will limit the term of the transferee's franchise to the unexpired portion of the term of this Agreement), Assignment of Telephone Numbers, Telephone Listings, and Internet Addresses, and other collateral agreements that we may then require, (6) concurrent with the execution of the then-current form of Franchise Agreement, each owner of an Ownership Interest in the transferee and such owner's spouse (if any), must execute a Guaranty and Assumption of Obligations, and each owner of an Ownership Interest in the transferee and the transferee's General Manager must execute a Non-Compete and Non-Disclosure Agreement in the form of Exhibit "D", (7) you and each of your owners must give us an unconditional, general release, in form and substance satisfactory to us, of all claims they may have against us or our Affiliates or our and our Affiliates' respective owners, officers, directors, employees and agents, and (8) you must have complied with any other conditions that we reasonably require from time to time as part of our transfer policies. You may not place in any communication media or any form of advertising, any information relating to the sale of the Franchise or the rights under this Agreement, without our prior written consent.

2.      Transfer Fee. Subject to Article 25B(5), in the event of a transfer of a direct or indirect Interest in you, you must pay to us a transfer fee in the amount of one-half (1/2) of our then-current franchise fee for a new Franchise. The transfer fee is nonrefundable.   You acknowledge that any transfer fee paid under this Agreement does not limit our right to charge a separate transfer fee under any other agreement between us and you.

3.      Involuntary Transfers.  In the event of your insolvency or the filing of any petition by or against you under any provisions of any bankruptcy or insolvency law, if your legal representative, successor, receiver or trustee desires to succeed to your interest in this Agreement or your Store, such person first must notify us, tender the Offer Notice provided for in Article 25B(5), and, if we do not exercise our Option, must apply for and obtain our consent to the transfer, pay the transfer fee, and satisfy the transfer conditions described in Article 25B(1).  You or the proposed transferee must also pay the attorneys' fees and costs that we incur in any bankruptcy or insolvency proceeding pertaining to you.

4.      Waiver of Interference Claims. You acknowledge that we have legitimate reasons to evaluate the qualifications of potential transferees and to analyze and critique the terms of their purchase contracts with you. You also acknowledge that our contact with potential transferees for the purpose of protecting our business interests will not constitute improper or unlawful conduct. You expressly authorize us to investigate any potential transferee's qualifications, to analyze and critique the proposed purchase terms with the transferee, to communicate candidly with the

transferee regarding the nature of your operation of your Store, and to withhold consent to economically questionable transactions. You waive any claim that action we take in relation to a proposed transfer to protect our business interests constitutes tortious interference with contractual or business relationships.

    5.    Special Transfers. If you are an individual who at any time advises us that you want to assign the Franchise to a business entity in which you will own all of the Ownership Interests, we will consent to the assignment and waive payment of the transfer fee upon our receipt of such documentation and information concerning the business entity and its direct and indirect owners as we may reasonably request. The required documentation will include, without limitation, (i) a certified list of the business entity's direct and indirect owners (designating the amount and percentage of Ownership Interests each person owns), (ii) a Guaranty and Assumption of Obligations signed by each such owner and their spouse (if any), and (iii) an express assumption by the business entity of your obligations under this Agreement.  You must reimburse us for any legal expenses incurred by us in connection with review or preparation of any documentation with respect to any such transfer.

    (a)    Option to Purchase.  If at any time (i) one or more of your owners (or the estate or representative of an individual owner) desires to dispose of direct or indirect Ownership Interests in you in one transaction or a series of related transactions, or (ii) you desire to dispose of Asset Interests (other than the disposal of inventory or supplies consumed in the ordinary course of business or the disposal of fixed assets used in the operation of your Store and being replaced in the ordinary course of business), you or such owner, as the case may be, will do as follows:

    (1)    Provide us with written notice of the desire to make such transfer at least 30 days before announcing that fact publicly or engaging the services of a broker or sales agent.

    (2)    If at any time you or any of your owners obtains an Offer, you or such owner, as applicable, will give us written notice that an Offer has been made (an "Offer Notice"), identifying the prospective purchaser by name and address, specifying the proposed purchase price and attaching a true and complete copy of the Offer.  At our option, delivery of such notice may not be deemed received until the proposed transferor has delivered to us an Asset Purchase Agreement or other similar agreement, signed by the proposed transferor and the proposed transferee, documenting in full the terms of the proposed sale.

    (3)    We will have the option (the "Option") to purchase the Interests at the price and on the conditions set forth in the Offer, except that we will not be obligated to pay any finder's or broker's fee, and if the Offer provides for payment of consideration other than cash, or if the Offer involves certain intangible benefits, we may elect to purchase the Interests by offering a reasonable cash substitute for the non-cash part of the Offer, including Ownership Interests in SHAMAN or our Affiliates.  Notwithstanding the foregoing, if we exercise the Option, we (i) will be entitled to receive representations and warranties from you and your owners, jointly and severally, that are customarily received by similar purchasers, (ii) will be permitted to not close if we are not satisfied with the results of our business, legal and financial due diligence, and (iii), with regard to a purchase

of Asset Interests, will not be required to purchase any assets unrelated to the operation of your Store, in which case the purchase price will be reduced by the fair market value of such assets, as reasonably determined by us.

(4)     The Option will be exercisable by us delivering to the proposed transferor (you or one or more of your owners, as applicable) within 45 days after receipt of the Offer Notice and all information regarding the proposed transferee requested by us in connection with our transfer approval process (the "Option Period"), a notice (i) stating that the Option is being exercised, and (ii) specifying the time, date and place at which such purchase and sale will take place, which date will be within 90 days after we deliver such notice. Notwithstanding the foregoing, the time for the purchase and sale may be delayed by us if such delay is required to obtain any licenses, permits or other approvals from any governmental authority, whether foreign, federal, state, provincial, municipal, local or other, to operate your Store in accordance with the SHAMAN System, and/or to consummate the sale to us if we are diligently pursuing such license, permit or other approval.

(5)     If the Option is not exercised, the proposed transferor (you or one or more of your owners, as applicable) may sell the Interests to the person that made the Offer, on conditions no more favorable to the third-party offeror than those set forth in the Offer, provided that we approve the proposed transferee in accordance with this Article 25 and provided further that such sale takes place within 90 days after the expiration of the Option Period. The 90-day limitation described in the preceding sentence will not apply if at the end of the 90-day period the only issue that prevents completion of the purchase and sale is the need to effect transfers of any applicable licenses and such licenses are being diligently pursued. In the event of such a delay, the purchase and sale will take place within seven days after those licenses have been transferred.

(6)     If the Option is not exercised, the proposed transferor (you or one or more of your owners, as applicable) will immediately notify us in writing of any change in the terms of an Offer.  For purposes of clarification, a change in the direct or indirect Ownership Interests of the proposed transferee will be deemed a material change in the terms of an Offer. Any material change in the terms of an Offer will cause it to be deemed a new Offer, conferring upon us a new Option. The Option Period with respect to the new Option will be deemed to commence on the day that we receive written notice of a material change in the terms of the original Offer. We will determine in our sole discretion whether a change in an Offer is material.

(b)     Transfer Upon Death or Disability.  Within twelve (12) months from the death or six (6) months after notice of Permanent Disability of Franchisee (if an individual) or any owner of Franchisee (if a business entity), notwithstanding any agreement to the contrary, the legal representative of the deceased or disabled individual must propose to us in writing to transfer the Interests of such individual to one or more transferees. Any such transfer must occur within twelve (12) months from such individual's death or six (6) months after notice of Permanent Disability and is subject to our prior written consent in accordance with this Article 25. Failure to complete an approved transfer of the affected Interests within the applicable time period will be a material breach of this Agreement.  During any transition period to an heir or successor-in-interest, your

Store and the CBD American Shaman Business still must be operated in accordance with the terms and conditions of this Agreement.  At any time prior to our approval of a transfer of the affected Interests, we may, at our sole discretion, install our personnel or representatives to operate your Store.  We shall be reimbursed by you for all of our out-of-pocket expenses, including, without limitation, the wages of such personnel or representatives.

**Article 26**     <u>**RELATIONSHIPS OF THE PARTIES**</u>

It is understood and agreed by the parties hereto that this Agreement does not establish a fiduciary relationship between them. In all matters pertaining to the operation of your SHAMAN store, you are and shall be an "Independent Contractor." No employee of yours shall be deemed an employee or agent of ours and nothing in this Agreement is intended to make either party a general or special agent, joint venture, partner or employee of the other for any purpose. Neither party hereto shall be liable for the debts or obligations of the other unless expressly assumed in writing.

You shall conspicuously identify yourself in all dealings with customers, suppliers, public officials and others as the owner of your business under a Franchise Agreement with us and shall place such other notices of independent ownership on such forms and other materials as we may require from time to time. You shall hire all employees of your SHAMAN store and you will be exclusively responsible for the terms of their employment, compensation, and proper training. You agree that we will not be responsible for your employment decisions.

You shall not employ any of the Marks in signing any contract applying for any license or permit or in a manner that may result in our liability for any of your indebtedness or obligations, nor may you use the Marks in any way not expressly authorized by us as expressly authorized by this Agreement, you shall make no express or implied agreement, warranties, guarantees or representations, or incur any debt, in the name of or on behalf of  us and we shall not be obligated by or be liable under any agreements or representations made by you.  Furthermore, we will not be obligated for any damages to any person or property directly or indirectly arising out of the operation of your SHAMAN store. We shall have no liability for any sales, use, occupation, excise, gross receipts, income, property or other taxes, whether levied upon you or your SHAMAN store in connection with the business conducted by you. You are responsible for paying these taxes and must reimburse us for any such taxes that we pay to any state taxing authority.

**Article 27**     <u>**WAIVER**</u>

No failure of ours to exercise any power reserved to it by this Agreement or to insist upon strict compliance by you with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of our right to demand exact compliance with any of the terms herein. Waiver by us of any particular default or breach by you shall not affect or impair our rights with respect to any subsequent default or breach of the same, similar, or different nature; nor shall any delay, forbearance, or omission of ours to exercise any power or right arising out of any breach or default by you of any of the terms, provisions, or covenants hereof affect or impair our right to exercise the same; nor shall such constitute a waiver by us of any succeeding breach by you of any terms, covenants, or conditions of this Agreement.

**Article 28**       **ENFORCEMENT BY US; GOVERNING LAW**

A.       Injunction. We shall be entitled to seek the entry of temporary and permanent injunctions and orders of specific performance in equity or at law enforcing the provisions of this Agreement relating to (1) your use of the Marks and System; (2) your preparation and distribution of products at your SHAMAN store; (3) the construction and equipping of your SHAMAN store; (4) your obligation upon termination or expiration of this Agreement; (5) a transfer of Interests in you or your assets, or in the Lease for the Store Site; (6) as necessary to prohibit any act or omission by you or your employees that would constitute a violation of any applicable law, ordinance, or regulation or that is dishonest or misleading to us and/or our other franchisees; (7) unfair competition claims; (8) questions relating to nondisclosure and unfair competition; or (9) matters regarding monies due us. Notwithstanding anything herein to the contrary, if we seek the entry of equitable relief as permitted by the foregoing, we may, at our option, bring any other claims that we may have against you arising out of or related to this Agreement as part of such action.  You consent to the exclusive jurisdiction and venue of such matters in the state and federal courts for Jackson County, Missouri, unless this provision of the Franchise Agreement is contrary to a specific statutory provision of any local, state, or federal authority that may affect this Agreement.

B.       Alternative Dispute Resolution. Except as provided in the preceding paragraph and this paragraph, any controversy or claim arising out of or related to this Agreement, or the breach thereof pertaining to the termination of the Franchise Agreement, giving of consents by us, or other questions arising under this Agreement not otherwise covered herein, either in contract or tort, shall be attempted to be resolved by the procedure set forth by the National Franchise Mediation Program upon the application of either party. The mediation proceeding shall be conducted in accordance with the rules set forth in the CPR Procedure for Resolution of Franchise Disputes or any successor thereto. Resolution by the appointed mediator who is mutually agreed upon by the parties shall not be binding upon us and you or enforceable in any court of competent jurisdiction. Unless otherwise determined by the mediator, the fees and expenses for such resolution shall be paid in equal proportions by the parties. The mediation proceeding shall take place in Kansas City, Missouri, or virtually via videoconferencing, if permissible by the mediator. In connection with any mediation preceding the provisions of the Missouri Supreme Court with respect to depositions and discovery (including any successor provisions thereto) are to be utilized in said proceedings. Any controversy or claim described above in this Article 28B that is not resolved by mediation within 60 days of submission to mediation by any party, must be resolved by mandatory arbitration in Kansas City, Missouri, or virtually via videoconferencing, if permissible by the arbitrator, by and in accordance with the rules of the American Arbitration Association for commercial disputes, or another arbitration service agreed to by us and you.  Arbitration will be before a single qualified and experienced independent arbitrator mutually and reasonably agreed on by the parties.  Arbitration will be conducted solely on an individual, not a class-wide, basis.  No award in arbitration involving us will have any effect of preclusion or collateral estoppel in any other adjudication or arbitration.

C.       Governing Law.  Subject to our rights under federal trademark laws, the parties' rights and obligations under this Agreement, and the relationship between the parties is governed by, and will be interpreted in accordance with, the laws (statutory and otherwise) of the State of Missouri (excluding any conflict of laws principles).

**Article 29**      __INDEMNIFICATION__

You agree to indemnify, defend, and hold harmless us, our Affiliates, and their respective shareholders, directors, officers, employees, agents, successors, and assignees (the "Indemnified Parties") against, and to reimburse any one or more of the Indemnified Parties for, all claims, obligations, and damages directly or indirectly arising out of your operation, the business you conduct under this Agreement, or your breach of this Agreement, including, without limitation, those alleged to be or found to have been caused by the Indemnified Party's negligence, unless (and then only to the extent that) the claims, obligations, or damages are determined to be caused solely by our gross negligence or willful misconduct in a final, un-appealable ruling issued by a court or arbitrator with competent jurisdiction.

For purposes of this indemnification, "claims" include all obligations, damages (actual, consequential, or otherwise), and costs that any Indemnified Party reasonably incurs in defending any claim against it, including, without limitation, reasonable accountants', arbitrators', attorneys', and expert witness fees, costs of investigation and proof of facts, court costs, travel and living expenses, and other expenses of litigation, arbitration, or alternative dispute resolution, regardless of whether litigation, arbitration, or alternative dispute resolution is commenced. Each Indemnified Party may defend any claim against it at their expense and agree to settlements or take any other remedial, corrective, or other actions.

THE FOREGOING INDEMNITIES ARE INTENDED TO BE ENFORCEABLE IN ACCORDANCE WITH THE EXPRESS TERMS AND SCOPE THEREOF NOTWITHSTANDING ANY EXPRESS NEGLIGENCE RULE, DOCTRINE RELATING TO INDEMNIFICATION FOR STRICT LIABILITY OR ANY SIMILAR DIRECTIVE THAT WOULD PROHIBIT OR OTHERWISE LIMIT INDEMNITIES BECAUSE OF THE NEGLIGENCE (WHETHER SOLE, CONCURRENT, ACTIVE OR PASSIVE) OR OTHER FAULT OR STRICT LIABILITY OF ANY INDEMNIFIED PARTY.

This indemnity will continue in full force and effect after and notwithstanding this Agreement's expiration or termination.

**Article 30**      __TAXES AND INDEBTEDNESS__

A.      You Must Pay Taxes Promptly.

        1.      You shall promptly pay, when due, all taxes levied or assessed, including, without limitation, payroll, unemployment, and sales taxes, and shall promptly pay, when due, all accounts and other indebtedness of any kind incurred in the conduct of your CBD American Shaman Business.

        2.      You shall pay us an amount equal to any sales tax, gross receipts tax, or similar tax imposed on us with respect to any payments to us required under this Agreement, unless the tax is credited against income tax otherwise payable by us.

B.      You Can Contest Tax Assessments. In the event of any bona fide dispute as to any liability for taxes assessed or other indebtedness, you may contest the validity or the amount of the tax or indebtedness in accordance with the proper procedures of the taxing authority or applicable law;

however, in no event shall you permit a tax sale or seizure by levy of execution or similar liens, writ or warrant, or attachment by a creditor to occur against the equipment used in your SHAMAN store operation or the premises of the Store Site or any improvements thereon.

**Article 31      NOTICES**

All notices, requests, demands, payments, consents and other communications hereunder shall be transmitted in writing and shall be deemed to have been duly given when delivered in person or when sent by regular, registered or certified United States mail, postage prepaid, return receipt requested, or when sent by email or facsimile for immediate transmittal, addressed as follows:

**FRANCHISOR:**
**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

2300 Main Street, Suite 165

Kansas City, Missouri 64108

Attention:  Marc Sayler


**FRANCHISEE:**

_____

_____

_____


Notices to you may also be given at the location of any SHAMAN store owned or operated by you or at your residence (if an individual) or at the residence of your owners. Notices, requests, demands, payments, consents and other communications hereunder will be deemed "delivered" when left in the custody of an adult agent, employee, or resident at a place of business or residence if given by personal delivery or courier, if given by certified mail, three (3) days after being deposited with the U.S. Postal Service with proper address and postage paid, and upon evidence of delivery if given by email or fax. A "read-receipt" received for an email delivery and a fax confirmation page from the sender's fax machine will be deemed evidence of delivery for notices sent by email or fax, as applicable. If any notice is undeliverable or refused at a proper address, then the notice is deemed delivered upon attempted delivery.

**Article 32      MISCELLANEOUS**

A.      **You May Not Withhold Payments Due Us.** You agree that you will not withhold payments of any fees or any other amounts of money owed to us for any reason on the grounds of alleged nonperformance by us of any obligation hereunder.

B.      **Rights of Parties Are Cumulative.** The rights of we and you hereunder are cumulative, and the exercise or enforcement by us or you of any right or remedy hereunder shall not preclude the exercise or enforcement by us or you of any other right or remedy hereunder that we or you have as set forth in the Manual, or written operational directives determined from the exercise or

enforcement by us or you of any other right or remedy hereunder that we or you are entitled by law or equity to enforce.

C.      Binding Effect. This Agreement is binding upon the parties hereto and their respective permitted assigns and successors in interest.

D.      Entire Agreement. This Agreement and Exhibits "A-1" through "M-2" represent the entire understanding between the parties and supersedes all other negotiations, agreements, representations, and covenants, oral or written.  Nothing in this or in any related agreement, however, is intended to disclaim the representations we made in the franchise disclosure document that we furnished to you. This Agreement may not be modified except by a written instrument signed by the parties hereto. You acknowledge and agree that we have made no promises or warranties to you concerning the profitability or likelihood of success of the franchised business other than as may be set forth herein, that you have been informed by us that there can be no guarantee of success in the franchised business, and that your business ability and aptitude are primary in determining your success. The parties intend this Agreement and Exhibits "A-1" through "M-2" to be the entire integration of all of their agreements of any nature but shall in no way affect your obligations to comply with our specifications as set forth in our Proprietary Manuals, or video or written operational directives determined from time to time. No other agreements, representations, promises, commitments, or the like, of any nature, exist between the parties, except as set forth or otherwise referenced herein.

E.      Construction. The headings of the several Articles and paragraphs hereof are for convenience only and do not define, limit, or construe the contents of those Articles or paragraphs. The singular usage includes the plural, and the masculine and neuter usages include the other and feminine, whenever consistent with the context in which the terms are used.

F.      Attorney Fees and Costs. We are entitled to recover all of our reasonable costs and expenses incurred in any action or arbitration arising out of, or related to, this Agreement (including an action to compel arbitration) in which we are the substantially prevailing party, including reasonable accounting, expert witnesses', attorneys', and arbitrators' fees, and costs of collecting monies owed, in addition to all other amounts and damages awarded.

G.      Modification. This Agreement may be modified only upon execution of a written agreement between the parties. You acknowledge that we may modify our standards and specifications and operating, marketing, and other policies and procedures set forth in the Proprietary Manual unilaterally under any conditions and to the extent in which we, at our sole discretion, deem necessary, and you shall be bound by such modifications.

H.      Varying Standards. We have the right, in our sole determination, to vary the franchise agreement and/or standards for any franchise, in each case, when compared to any franchise agreement to which you are a party or any franchise granted to you by us, whether based upon peculiarities of a particular site or circumstance, density of population, business potential, population or trade area, existing business practices, or any other condition that we deem to be of importance or otherwise desirable. You shall not have any right to complain about a variation in a franchise agreement, or from standard specifications and practices, granted to any other franchisee; and you shall not be entitled to require us to grant to you a like or similar variation.

I.      Waiver of Trial by Jury; Class Action Waiver. Both parties hereto waive trial by Jury in any action, proceeding, or counterclaim whether at law or in equity, brought by either of them. You waive, to the fullest extent permitted by law, any right to assert any claim against us on behalf of, or as a member of, a class.

J.      Delegation by Us. From time to time, we will have the right to delegate the performance of any portion or all of our obligations and duties under this Agreement to third parties, whether they are employees of ours or independent contractors that we have contracted with to provide such services. You agree in advance to any such delegation by us of any portion or all of our obligations and duties hereunder.

K.      Review of Agreement. You acknowledge that you had a copy of this Agreement in your possession for a period of time not less than fourteen (14) full calendar days, during which time you have had the opportunity to submit this Agreement for professional review and advice of your choosing prior to freely executing this Agreement.

L.      Limitation on Actions; Waiver of Certain Damages. Notwithstanding anything contained in this Agreement to the contrary, any and all claims and actions arising out of or relating to this Agreement, the relationship between you and us, or your operation of your Store shall be commenced within one (1) year from the occurrence of the facts giving rise to such claim or action. To the fullest extent permitted by law, you waive the right to or claim for any consequential, indirect, special, punitive or exemplary damages and will be limited to recovery of actual damages sustained in the event of any dispute between you and us.

M.      Invalidity. If any provision of this Agreement is held invalid by any tribunal in a final decision from which no appeal is or can be taken, such provision will be deemed modified to eliminate the invalid element and, as so modified, such provision will be deemed a part of this Agreement as though originally included. The remaining provisions of this Agreement will not be affected by such modification.

N.      Force Majeure. We will not be liable to you, nor will we be deemed to be in breach of this Agreement, if we exercise commercially reasonable efforts to perform our obligations as may be due to you hereunder, and our failure to perform our obligations results from: (1) transportation shortages; inadequate supply of labor, material, or energy; or voluntarily forfeiting the right to acquire or use any of the foregoing in order to accommodate or comply with the orders, requests, regulations, recommendations, or instruments of any federal, state, or municipal government or any department or agency thereof; (2) compliance with any law, ruling, order, regulation, requirement, or instruction of any federal, state, or municipal government or any department or agency thereof; (3) acts of God; or (4) fires, strikes, terrorism, embargos, war, or riot. Any delay resulting from any of these causes will extend performance by us accordingly or excuse performance by us in whole or in part, as may be necessary.

O.      Survival of Terms. Every provision of this Agreement that by its terms is intended to survive expiration and/or termination of this Agreement shall survive the expiration or termination of this Agreement for any reason.

P.      Cross-Default and Cross-Termination Provisions.

If this Agreement is terminated as the result of a default by you, we may, at our option, elect to terminate any or all other agreements between you and us. If any other agreement between you and us is terminated as a result of a default by you, we may, at our option, elect to terminate this Agreement. It is agreed that an incurable or uncured default under this Agreement or any other agreement between you and us will be grounds for termination of this Agreement and/or any and all agreements between you and us without additional notice or opportunity to cure.

A default by the Guarantor(s) of this Agreement or any other agreement of guaranty may be deemed a default of this Agreement.

**Article 33    SPECIAL REPRESENTATIONS**

If you are one or more individuals, or a business entity, each individual, corporate officer or director, limited liability company manager and member, acknowledges and agrees to all of the following:

**THAT YOU UNDERSTAND AND ACCEPT THE TERMS, CONDITIONS, AND COVENANTS CONTAINED HEREIN AS BEING REASONABLY NECESSARY TO ALLOW US TO MAINTAIN OUR HIGH STANDARDS OF SERVICE AND QUALITY AS WELL AS THE UNIFORMITY HEREOF FROM EACH OF THE SHAMAN FACILITIES AND TO PRESERVE THE GOODWILL OF THE MARKS.**

**THE SUCCESS OF THE BUSINESS VENTURE CONTEMPLATED HEREIN INVOLVES SUBSTANTIAL RISKS AND DEPENDS UPON YOUR ABILITY AS AN INDEPENDENT BUSINESSPERSON AND YOUR ACTIVE PARTICIPATION IN THE DAILY AFFAIRS OF THE BUSINESS.**

**NO ASSURANCE OR WARRANTY, EXPRESS OR IMPLIED, HAS BEEN GIVEN AS TO THE POTENTIAL SUCCESS OF SUCH BUSINESS VENTURE OR THE EARNINGS LIKELY TO BE ACHIEVED.**

**YOU ACKNOWLEDGE THAT YOU HAVE ENTERED INTO THIS AGREEMENT AFTER MAKING AN INDEPENDENT INVESTIGATION OF SHAMAN OPERATIONS AND NOT UPON ANY REPRESENTATION AS TO PROFITS WHICH YOU IN PARTICULAR MIGHT BE EXPECTED TO REALIZE, NOR HAS ANYONE MADE ANY OTHER REPRESENTATION IN PARTICULAR THAT MIGHT BE EXPECTED TO BE REALIZED, NOR HAS ANYONE MADE ANY OTHER REPRESENTATION, WHICH IS NOT EXPRESSLY SET FORTH HEREIN, TO INDUCE YOU TO ACCEPT THIS FRANCHISE AND EXECUTE THIS AGREEMENT.**

**NO STATEMENT, REPRESENTATION, OR OTHER ACT, EVENT, OR COMMUNICATION, EXCEPT AS SET FORTH IN THIS AGREEMENT AND IN ANY FDD SUPPLIED TO YOU, IS BINDING ON US IN CONNECTION WITH THE SUBJECT MATTER OF THIS AGREEMENT.**

**NEITHER YOU, NOR ANY OFFICER, DIRECTOR, LIMITED LIABILITY COMPANY MANAGER OR OWNER (AS APPLICABLE) IS SUBJECT TO UNITED STATES EXECUTIVE ORDER 13224 OR THE PATRIOT ACT. IF YOU, OR ANY OFFICER,**

**DIRECTOR, LIMITED LIABILITY COMPANY MANAGER OR OWNER OF YOURS (AS APPLICABLE), BECOMES SUBJECT TO UNITED STATES EXECUTIVE ORDER 13224 OR THE PATRIOT ACT, YOU SHALL NOTIFY US IMMEDIATELY THEREOF.**

You acknowledge and agree that our officers, directors, employees and agents act only in a representative and not in a personal capacity in their dealings with you and that you have not made any misrepresentations in obtaining this franchise.

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the date set forth below.

Date of Execution _____

**FRANCHISOR**
AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
A Nevada limited liability company

By: _____

_____(Title)

**FRANCHISEE**

_____

By:_____

_____(Title)

_____

_____(Title)

## GUARANTY AND ASSUMPTION OF OBLIGATIONS

**THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS** is given this _____ day of
_____,_____20___, by
_____
_____
_____
_____(the "Guarantor(s)").

In consideration of, and as an inducement to, the execution of that certain Franchise Agreement of even date herewith (the "Agreement") by **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** a Nevada limited liability company, ("SHAMAN", "we" or "us"), and _____, a company, corporation, or limited liability company ("Company"), each of the undersigned, being directly or indirectly beneficially interested in the business to be conducted by Company, hereby (a) personally and unconditionally guarantees to SHAMAN, and its successor and assigns, for the term of the Agreement and as provided in the Agreement that Company will punctually pay and perform each and every undertaking, agreement, and covenant set forth in the Agreement and (b) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities. Each Guarantor waives: (1) acceptance and notice of acceptance by SHAMAN of the foregoing undertakings; (2) notice of demand for payment of any indebtedness or nonperformance of any obligations guaranteed; (3) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations guaranteed; and (4) any right such Guarantor may have to require that an action be brought against Company or any other person as a condition of liability.

Each of the undersigned consents and agrees that: (1) the Guarantors' direct and immediate liability under this guaranty shall be joint and several; (2) they shall render any payment or performance required under the Agreement upon demand if Company fails or refuses punctually to do so; (3) such liability shall not be contingent or conditioned upon pursuit by SHAMAN of any remedies against Company or any other Guarantor; and (4) such liability shall not be diminished, relieved, or otherwise affected by any extension of time, credit, or other indulgence that SHAMAN may grant, including the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement.

Each Guarantor hereby consents and agrees that:

(1)    Guarantor's liability under this undertaking shall be direct, immediate, and independent of the liability of, and shall be joint and several with, Company and any other Guarantors;

(2)    Guarantor shall render any payment or performance required under the Franchise Agreement upon demand if Company fails or refuses punctually to do so;

(3)    This undertaking will continue unchanged by the occurrence of any bankruptcy with respect to Company or any assignee or successor of Company or by any abandonment of the Franchise Agreement by a trustee of Company's. Neither Guarantors' obligations to make payment or render

performance in accordance with the terms of this undertaking nor any remedy for the enforcement hereof shall be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Company or Company's estate in bankruptcy, or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the U.S. Bankruptcy Act or other statute or from the decision of any court or agency;

(4)     We may proceed against any one or more Guarantors and Company jointly and severally, or we may, at our option, proceed against any Guarantor, without having commenced any action or having obtained any judgment against Company or any other Guarantor. You hereby waive the defense of the statute of limitations in any action hereunder or for the collection of any indebtedness or the performance of any obligation hereby guaranteed; and

(5)     Guarantor(s) agrees to pay all reasonable attorneys' fees and all costs and other expenses incurred in any collection or attempted collection of amounts due pursuant to this undertaking or any negotiations relative to the obligations hereby guaranteed or in enforcing this undertaking against any Guarantor.

IN WITNESS WHEREOF, each of the undersigned has affixed his or her signature on the same day and year as the Agreement was executed.

**GUARANTOR SIGNATURE**                    **PERCENT OWNERSHIP**


_____            _____
Owner
_____
Spouse (if applicable)


_____            _____
Owner
_____
Spouse (if applicable)


_____            _____
Owner
_____
Spouse (if applicable)

EXHIBIT "D"

**NON-COMPETE AND NON-DISCLOSURE AGREEMENT**

This Non-Compete and Non-Disclosure Agreement is made, and entered into, between _____, a _____ ("Company") and a franchisee of AMERICAN SHAMAN FRANCHISE SYSTEM, LLC, ("Franchisor"), and _____ an individual residing at _____ ( "Company's Associate").

# RECITALS

WHEREAS, Franchisor has created and developed a system (hereinafter referred to as the ("SHAMAN System") for the establishment and operation of a retail establishment that offers certain "Industrial Hemp Derived" based products to the public (a "Store"); and

WHEREAS, Company and Franchisor have entered into a Franchise Agreement (the "Franchise Agreement") pursuant to which Franchisor has granted Company a license to use the SHAMAN System in connection with the operation of a Store; and

WHEREAS, Company and Company's Associate acknowledge that Franchisor and its affiliates are the owners of trade secrets and confidential information relating to the operation of the SHAMAN System; and

WHEREAS, Company's Associate further acknowledges that, as a part of his or her relationship with Company, Company's Associate will receive and be entrusted with certain Confidential Information; and

WHEREAS, in consideration of Company's Associate's relationship with Company, Company's Associate agrees to comply with the provisions of this Agreement. Company's Associate also agrees the restraints imposed by this Agreement are reasonable and necessary to protect Company's business, Franchisor and its affiliates, other franchisees of Franchisor, and the SHAMAN System.

NOW, THEREFORE, it is agreed as follows:

      1.    <u>Confidential Information.</u>

      (a)    Company's Associate and the Company acknowledge that the Confidential Information which is utilized in connection with the operation of Company's business is unique, exclusive property and a trade secret of the Franchisor or its affiliates. Company's Associate acknowledges that any unauthorized disclosure or use of the Confidential Information would be wrongful and would cause irreparable injury and harm to the Company, Franchisor and its affiliates, and Franchisor's other franchisees. Company's Associate further acknowledges that the Company, Franchisor and its affiliates, and Franchisor's other franchisees have expended a great amount of effort and money in obtaining and developing the Confidential Information and that the

Company, Franchisor and its affiliates, and other franchisees have taken numerous precautions to guard the secrecy of the Confidential Information, and that it would be very costly for competitors to acquire or duplicate the Confidential Information.

(b)     "Confidential Information" means all trade secrets, knowledge, know-how, standards, methods, techniques, formulae, formats, specifications, procedures, information, systems, sales and marketing techniques, and procedures related to (i) the establishment and operation of the SHAMAN System, (ii) design, manufacture, use or sale of products, or (iii) the development, operation or franchising of Stores, and includes, without limitation, any and all information contained in Franchisor's operations manual; all records pertaining to customers, suppliers, and other service providers of, and/or related in any way to, Company's business including, without limitation, all databases (whether in print, electronic or other form), all names, addresses, phone numbers, email addresses, customer purchase records, customer information, customer lists, manuals, promotional and marketing materials, marketing strategies; and any other data which Franchisor, one or more of Franchisor's affiliates or Company (each "Protected Party") designates as confidential.  Notwithstanding the foregoing, Confidential Information does not include information, knowledge, or know-how  which Company's Associate can demonstrate lawfully came to Company's Associate's attention before a Protected Party provided it to Company's Associate directly or indirectly; which, at the time a Protected Party disclosed it to Company's Associate, already had lawfully become generally known in the industry through publication or communication by others (without violating an obligation to a Protected Party); or which, after a Protected Party discloses it to Company's Associate, lawfully becomes generally known in the industry through publication or communication by others (without violating an obligation to a Protected Party).  If Company's Associate claims that any information is not Confidential Information subject to this Agreement, Company's Associate must prove that one of the exclusions provided in this paragraph is fulfilled.

2.     <u>Non-Disclosure of Confidential Information</u>. Company's Associate shall not, at any time, publish, disclose, divulge or in any manner communicate Confidential Information to any person, firm, corporation, association, partnership, or any other entity whatsoever, or use Confidential Information, directly or indirectly, for Company's Associate's benefit or for the benefit of any person, firm, corporation, association, partnership or other entity other than for the use of the Company.

3.     <u>Limitations on Competition</u>.  Company and Company's Associate acknowledge that the Confidential Information provides a competitive advantage and will be valuable to them in the operation of the Store. In consideration for the disclosure to Company's Associate of Confidential Information, and to protect the confidentiality and value of the Confidential Information, Company's Associate further agrees to the limitations on competition set forth below.

(a)     Company's Associate covenants that until the earlier of the termination or expiration of the Franchise Agreement or termination of the Company's Associate's relationship with Company (the "In Term Restricted Period"), Company's Associate will not directly or indirectly (including through any immediate family member) (a) own a direct or beneficial equity interest in a Competitive Business (as defined below), (b) engage or be financially involved in (including as a lender or guarantor), or otherwise perform services as a director, officer, manager, employee, consultant, representative, or agent for, a Competitive Business, or (c) grant franchises

or licenses to others to operate a Competitive Business; except with Company's and Franchisor's prior written consent, which consent may be withheld for any reason.

(b)     Company's Associate covenants that, except with Company's and Franchisor's prior written consent, which consent may be withheld for any reason, for a continuous uninterrupted period of two (2) years following the earlier of the expiration or termination of the Franchise Agreement for any reason, or termination of the Company's Associate's relationship with Company (the "Post Term Restricted Period"), Company's Associate will not directly or indirectly (including through any immediate family member): (a) own a direct or beneficial equity interest in a Competitive Business having operations within a fifty (50) mile radius of any Store then in business, (b) engage or be financially involved in (including as a lender or guarantor), or otherwise perform services as a director, officer, manager, employee, consultant, representative, or agent for, a Competitive Business having operations within a fifty (50) mile radius of any Store then in business, or (c) grant franchises or licenses to others to operate a Competitive Business within a fifty (50) mile radius of any Store then in business.

(c)     The term "Competitive Business" means any business enterprise that operates a business specializing in the sale of Industrial Hemp based products, or any other business that is the same as, or like, the operation of Company's Store, as it may evolve over time.

(d)     The covenants in this Section 3 shall not restrict Company's Associate from owning not more than five percent (5%) of the outstanding stock of a corporation, the stock of which is traded on a national securities exchange.

4.     Non-Solicitation of Customers.

A.     Company's Associate acknowledges and agrees that the names and addresses of Company's customers which Company's Associate has solicited constitutes Franchisor's trade secrets, and that the sale or unauthorized use or disclosure of any of such trade secrets obtained by Company's Associate during the term of Company's Associate's association with Company constitutes unfair competition.  Company's Associate promises and agrees not to engage in any unfair competition with Company or Franchisor.

B.     Company's Associate shall not, during the In Term Restricted Period or the Post Term Restricted Period, directly or indirectly, make known to any person, firm, corporation, or other business entity the names or addresses of any of Company's customers or any other information pertaining to them, or call on, solicit, take away, or attempt to call on, solicit, or take away any of Company's customers with whom Company's Associate became acquainted during the period of Company's Associate's association with Company, either for the individual benefit of Company's Associate or for any other person, firm, corporation or other business entity.

5.     Injunction. Company's Associate hereby acknowledges and agrees that in the event of any breach or threatened breach of this Agreement, the Company or any other Protected Party as an intended third party beneficiary shall be authorized and entitled to seek, from any court of competent jurisdiction, preliminary and permanent injunctive relief in addition to any other rights or remedies to which the Company or a Protected Party may be entitled. Company's Associate

agrees that a Protected Party may obtain such injunctive relief, without posting a bond or bonds totaling $500 or more, but upon due notice, and Company's Associate's sole remedy in the event of the entry of such injunctive relief shall be dissolution of such injunctive relief, if warranted, upon a hearing duly had; provided, however, that all claims for damages by reason of the wrongful issuance of any such injunction are hereby expressly waived by Company's Associate.

6.      Reasonableness of Restrictions. Company's Associate acknowledges and agrees that the restrictions set forth in this Agreement are reasonable and necessary for the protection of the Confidential Information and that any violation of this Agreement would cause substantial and irreparable injury to Company, to Franchisor and its affiliates, and to Franchisor's other franchisees. In any litigation concerning the entry of any requested injunction against Company's Associate, Company's Associate, for value, voluntarily waives such defenses as Company's Associate might otherwise have under the law of the jurisdiction in which the matter is being litigated relating to any claimed "prior breach" on the part of the Company; it being specifically understood and agreed between the parties that no action or lack of action on the part of the Company will entitle or permit the Company's Associate to disclose any such Confidential Information in any circumstances.

7.      Effect of Waiver.  The waiver by Company's Associate or the Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach thereof.

8.      Binding Effect; Intended Third Party Beneficiary.  This Agreement shall be binding upon and inure to the benefit of Company's Associate and the Company and their respective heirs, executors, representatives, successors, and assigns.  Franchisor and its affiliates are third party beneficiaries of this Agreement and shall be entitled to enforce the terms of this Agreement as if signatories hereto.

9.      Entire Agreement. This instrument contains the entire agreement of Company's Associate and the Company relating to the matters set forth herein. It may not be changed verbally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

10.      Governing Law. This instrument shall be governed by and construed under the laws of the state of Missouri.  Notwithstanding the foregoing, to the extent the laws of the state where the Company's Associate resides is legally determined to be applicable, then such other state's laws shall control.

11.      Jurisdiction and Venue. In the event of a breach or threatened breach by Company's Associate of this Agreement, Company's Associate hereby irrevocably submits to the jurisdiction of the state and federal courts for Jackson County, Missouri, and irrevocably agrees that venue for any action or proceeding shall be in the state and federal courts for Jackson County, Missouri. Both parties waive any objection to the jurisdiction of these courts or to venue in such courts. Notwithstanding the foregoing, to the extent the laws of the state where the Company's Associate resides are legally determined to prohibit the enforcement of the foregoing jurisdiction and venue provisions, then such other state's laws shall control.

12.     <u>Severability</u>. If any provision of this Agreement shall be held, declared, or pronounced void, voidable, invalid, unenforceable or inoperative for any reason, by any court of competent jurisdiction, government authority or otherwise, such holding, declaration or pronouncement shall not affect adversely any other provisions of this Agreement which shall otherwise remain in full force and effect.

ACCEPTED this _____ day of _____, 202_____.


COMPANY

_____


By: _____
_____**(Title)**


COMPANY'S ASSOCIATE


_____

## EXHIBIT "E"

## LEASE RIDER

This Lease Rider ("Rider") is entered into this _____ day of_____, 20____, by and between _____ ("Tenant") and _____ ("Landlord") and supplements and forms a part of the lease agreement (the "Lease") between Landlord and Tenant for the premises located at _____ (the "Premises"). In the event of a conflict between the provisions of the Lease and the provisions of this Rider, the provisions of this Rider will control.

1.      Landlord and Tenant acknowledge and agree that this Rider is entered into in connection with, and as a condition to, the grant of a franchise by American Shaman Franchise System, LLC, a Nevada limited liability company ("Franchisor"), to Tenant in accordance with the terms of a franchise agreement (the "Franchise Agreement"), granting Tenant the right to operate the Premises as a CBD American Shaman store (the "Store"). As such, Landlord and Tenant acknowledge and agree that Franchisor is an intended third-party beneficiary of this Rider with an independent right to enforce any and all of its terms.

2.      The Premises may be used, in addition to any other uses permitted under the Lease, for the operation of a retail store engaged in the sale of "Industrial Hemp Derived" based products and related products and services to the public.

3.      Subject to applicable zoning laws and restrictions of record, Landlord consents to Tenant's installation and use of such trademarks, service marks, signs, decor items, color schemes, and related components of the CBD American Shaman system as Franchisor may from time to time prescribe for the Store.

4.      Landlord agrees to furnish Franchisor with copies of all notices of default or alleged default and all notices of termination that it sends to Tenant pertaining to the Lease and the Premises at the same time it sends such notices to Tenant. Such notices will be sent to 2300 Main, Suite 165, Kansas City, MO 64108, Attn: President, or to such other address provided to Landlord in writing by Franchisor.

5.      Franchisor has the right to enter the Premises at any time and from time to time (i) to make any repairs, alterations, or removals of the CBD American Shaman trade dress or equipment Franchisor considers reasonably necessary to protect the CBD American Shaman system and marks, (ii) to cure any default under the Franchise Agreement or under the Lease, and (iii) to remove the distinctive elements of the CBD American Shaman trade dress upon the expiration or termination of the Franchise Agreement. Franchisor will repair, or reimburse Landlord for the reasonable cost to repair, any damage to the walls, floor, or ceiling of the Premises that results from Franchisor's removal of trade dress items and other property from the Premises.

6.      If Tenant has an obligation to continuously operate its business at the Premises, Tenant may cease operating for up to sixty (60) days, from time to time, to perform repairs, enhancements or renovations, as required by the Franchise Agreement.

7.      In the event of a default by Tenant under the Lease which entitles Landlord to terminate the Lease, Landlord will provide notice to Franchisor of such default and Landlord's intent to terminate the Lease ("Landlord's Notice"). Following receipt of Landlord's Notice, at Franchisor's option, Landlord agrees to enter into a new lease (the "New Lease") with Franchisor, as tenant, under the same terms as the Lease except that the term of such New Lease will be the remaining balance of the term of the Lease (as the same may have been extended). If Franchisor exercises such option, Franchisor will provide written notice of such election to Landlord within sixty (60) days after receipt of Landlord's Notice. During that sixty (60) day period, Landlord agrees that Franchisor may possess the Premises, to the exclusion of Tenant, in order to operate the Store, assess the Store's condition, and determine whether Franchisor desires to enter into the New Lease. Tenant acknowledges that Franchisor may possess the Premises in these circumstances and take whatever action is necessary, with or without Landlord's assistance, to enforce Tenant's compliance. Landlord agrees reasonably to cooperate and not to interfere with Franchisor's exercise of these rights. While Franchisor possesses the Premises for up to sixty (60) days, it will pay Landlord all pro-rated rent and other charges arising under the Lease during its possession. However, Franchisor will not be required to cure any monetary default of Tenant under the Lease before Franchisor takes possession or as a condition of signing a New Lease.

8.      Notwithstanding any provision in the Lease to the contrary, Tenant shall have the absolute right, whether or not Tenant is in default under the Lease, upon ten (10) days prior written notice to Landlord, to sublet, assign or otherwise transfer its interest in the Lease to Franchisor or Franchisor's affiliate, to any entity with which Franchisor may merge or consolidate, or to any person or entity which is an authorized franchisee of Franchisor (each, a "Permitted Assignee"), without Landlord's consent.  Landlord and Tenant acknowledge and agree that a Permitted Assignee will assume all of Tenant's obligations under the Lease arising as a result of events, acts or omissions occurring from and after the date of assignment, but a Permitted Assignee will not be required to cure any monetary default of Tenant under the Lease occurring prior to the effective date of the assignment to a Permitted Assignee. Landlord may pursue, or continue to pursue, a claim for damages under the Lease against Tenant, but will have no rights to terminate the lease or to disturb the quiet possession of the Premises by the Permitted Assignee.  Franchisor may also sublet, assign or otherwise transfer its interest in a New Lease to any Permitted Assignee without Landlord's consent.  Following an assignment or other transfer of interest in a Lease or New Lease, as applicable, contemplated under this Section 8, a Permitted Assignee also may sublet, assign or otherwise transfer its interest in the Lease or New Lease to another Permitted Assignee without the consent of Landlord.  There will be no fee or expense charged in connection with any transfer permitted under this Section 8.

9.      Except for an assignment or sublease to a Permitted Assignee as permitted under this Rider, Landlord will not consent to an assignment or subletting by Tenant unless and until Tenant provides Landlord with Franchisor's written consent thereto.

10.     Landlord hereby represents and warrants that it holds fee simple title to the Premises and has all requisite right, power and authority to lease the Premises to Tenant.  Landlord hereby agrees to obtain a non-disturbance agreement for the benefit of Tenant: a) from the holder of any mortgage/deed of trust as of the date of the Lease; and b) as a condition to Tenant's subordination to any mortgage/deed of trust granted after the date of the Lease.

11.     Landlord will not, without Tenant supplying Franchisor's prior written consent, modify in any material way the terms of the Lease or this Rider, including to change the permitted use of the Premises for anything other than a CBD American Shaman store.

12.     Landlord will not lease premises in the immediate vicinity of the Store to competing retail establishments that offer, "Industrial Hemp Derived" based products.

13.     The Lease may be terminated upon written notice from Tenant or Franchisor if the retail sale of "Industrial Hemp Products" to the public is declared illegal by a national, state, or local authority having jurisdiction over the Store and/or Premises.

14.     Landlord acknowledges that Franchisor is not a party to the Lease and will have no liability or responsibility under the Lease unless and until the Lease is assigned to, and assumed by, Franchisor in accordance with the terms of this Rider.

**IN WITNESS WHEREOF**, the parties have executed this Rider of the date first above written.

| **LANDLORD**: | **TENANT**: |
|---|---|
| _____, a _____ | _____, a _____ |
| By:_____ | By:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |

**EXHIBIT "F"**
**MULTI UNIT DEVELOPMENT AGREEMENT**

THIS MULTI UNIT DEVELOPMENT AGREEMENT (the "Agreement") is made and entered into this _____ day of _____, 20_____, (the "Effective Date") by and between AMERICAN SHAMAN FRANCHISE SYSTEM, LLC, a Nevada limited liability company, hereinafter referred to as "FRANCHISOR", and _____, a _____ hereinafter referred to as "DEVELOPER". For ease of reference, FRANCHISOR may also be referred to as "SHAMAN," "we," or "us" in this Agreement, and DEVELOPER may also be referred to as "you" or "your" throughout this Agreement.

## Section 1     **RECITALS**

WHEREAS, WE are the owner and operator of certain proprietary and other property rights and interests in and to the CBD American Shaman name and service mark and such other trademarks, trade names, service marks, logotypes, insignias (collectively, the "Marks"), trade dress, systems, trade secrets and designs used in connection with the development, operation and maintenance of a retail establishment that offers certain "hemp derived" based products to the public operating under the name of "CBD AMERICAN SHAMAN" (the "System"); and such other products as WE may authorize from time to time; and

WHEREAS, we desire to expand and develop the System, and we seek sophisticated and efficient persons or entities who will develop CBD AMERICAN SHAMAN stores ("SHAMAN Stores"); and

WHEREAS, you desire to build and operate a multiple number of SHAMAN Stores and we desire to grant to you the non-exclusive right to develop and open a certain number of said SHAMAN Stores in accordance with the terms and upon the conditions contained in this Agreement.

NOW, THEREFORE, THE PARTIES IN CONSIDERATION OF THE MUTUAL UNDERTAKINGS AND COMMITMENTS SET FORTH HEREIN, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, AGREE AS FOLLOWS:

## Section 2     **GRANT OF DEVELOPMENT RIGHTS**

Commencing on the Effective Date and ending on the first anniversary of the Effective Date (the "Term"), we hereby grant you, and you hereby accept, the non-exclusive right to develop multiple SHAMAN Stores, subject to and in compliance with the terms of this Agreement.

This Agreement is not a franchise agreement, and you shall have no right to use in any manner the Marks or the System by virtue hereof except pursuant to and in compliance with an effective franchise agreement between you and us for the operation of a SHAMAN Store (each a "Franchise Agreement").

**Section 3**      **YOUR OBLIGATION**

You hereby agree to construct, equip, open and thereafter continue to operate one (1) SHAMAN Store.  You must notify us of your intent to develop and open each additional SHAMAN Store at which time you shall be provided with our current franchise disclosure document. You must obtain our written approval prior to the signing of each additional Franchise Agreement for an additional SHAMAN Store.  The then current Franchise Agreement for each SHAMAN Store shall be signed by the parties separately and independently of the others, which shall take place within fourteen (14) days of the receipt of notice of approval by US of the Lease (as defined below) for a SHAMAN Store or, if later, on the date on which we have complied with any applicable franchise disclosure laws.

**Section 4**      **PAYMENTS BY YOU**

A.      Multiple Franchise Fee.  Development rights are granted in blocks of five (5).  Under this Agreement, you will pay us $10,000 per SHAMAN Store for the first four (4) out of every five (5) SHAMAN Stores for which you are granted development rights, and we waive the initial franchise fee for the fifth SHAMAN Store in each block of five (5) (each a "Bonus Store").   Accordingly, you shall pay us the sum of _____ as your fee (the "Multiple Franchise Fee") for the right to develop and open _____ (__) SHAMAN Stores under this Agreement.  **[Insert a multiple of five and a fee of $10,000 per store for the first four in each block of five.  For example, if Developer has the right to develop five SHAMAN Stores, the Multiple Franchise Fee is $40,000 and if Developer has the right to develop ten SHAMAN Stores, the Multiple Franchise Fee is $80,000.]**

B.      Payment of Fee.  The Multiple Franchise Fee shall be paid to us at the time of the signing of this Agreement. Within fourteen (14) days from the date that you sign a Lease for a SHAMAN Store or on the date on which we have complied with any applicable franchise disclosure laws, if later, (a) you and we will sign our then current Franchise Agreement for such SHAMAN Store (the "New Franchise Agreement"), (b) we will apply a prorate portion of the Multiple Franchise Fee to the franchise fee to be paid for such SHAMAN Store under the New Franchise Agreement, and (c) you will pay to us an amount equal to the balance of the franchise fee, if any, to be paid under the New Franchise Agreement for such SHAMAN Store.

The Multiple Franchise Fee is consideration for this Agreement and is fully earned by US upon execution of this Agreement and is non-refundable, notwithstanding any provision to the contrary contained in this Agreement or any Franchise Agreement between you and us.

**Section 5**      **DEVELOPMENT SCHEDULE; EXTENSION; TERMINATION**

A.      Development Schedule.  You have the right to develop the number of SHAMAN Stores set forth in Section 4.A above and complete construction and commence operations of such SHAMAN Stores during the Term.  If you do not develop and commence operations of all such SHAMAN Stores pursuant to this Agreement on or before the first anniversary of the Effective Date, then notwithstanding any extension of the Term that we may grant to you hereunder, any

rights granted to you under this Agreement to develop and open a Bonus Store will automatically terminate on the first anniversary of the Effective Date.

B.      Extension.  Subject to Section 5.A, if you are unable to develop and commence operations of all SHAMAN Stores for which you paid a Multiple Franchise Fee and are granted the right to develop under this Agreement prior to expiration of the Term, you may apply for one (but only one) 45-day extension of the Term (a "Term Extension"). To apply for a Term Extension, you must request it in writing not later than 15 days before the expiration of the Term. We will grant the Term Extension if, in our reasonable judgment, you have made a good faith effort to develop and open such SHAMAN Stores under this Agreement but have experienced delays beyond your reasonable control.  If you are unable to open and commence operations of any one SHAMAN Store for which you have been granted the right to develop under this Agreement prior to expiration of the Term, you may apply for one 45-day extension of the Term with respect to such SHAMAN Store (a "Store-Specific Term Extension"). A Store-Specific Term Extension may run subsequent to any Term Extension we may have granted to you. To obtain a Store-Specific Term Extension, you must request it in writing not later than 15 days before the expiration of the Term (as extended by a Term Extension, if applicable).  You may only apply for one Store-Specific Term Extension. Neither a Term Extension nor a Store-Specific Term Extension will be granted with respect to, or apply to, a Bonus Store.

C.      Termination.  We have the right to immediately terminate this Agreement upon written notice to you (a) subject to us granting you an extension pursuant to Section 5.B, if you fail to complete the construction and commence operations of the number of SHAMAN Stores indicated in Section 5.A within the time period indicated in Section 5.A, (b) if you are in material breach of a Franchise Agreement beyond any applicable cure period, or (c) upon your transfer or assignment or attempted transfer or assignment of this Agreement in violation of the terms hereof.  If we terminate this Agreement in accordance with its terms prior to the end of the Term or if you fail to complete the construction and commence operations of the number of SHAMAN Stores indicated in Section 5.A before expiration of the Term (subject to any extension that we may grant to you under Section 5.B), we are entitled to retain all funds received from you, including the Multiple Franchise Fee.

**Section 6        <u>SITE APPROVAL; LEASE</u>**

The site for any SHAMAN Store to be developed by you under this Agreement is subject to our site approval process. Without limiting the foregoing, you shall submit each proposed lease for a SHAMAN Store to be developed under this Agreement (each a "Lease") to us for our review. Such Lease shall be for a term at least equal to the term of the New Franchise Agreement to be signed for such SHAMAN Store or, in the alternative, for a shorter term provided such Lease is renewable at your option for an additional term or terms that, together with the initial term, equal or exceed the term of the New Franchise Agreement.  We have thirty (30) days from receipt of the proposed Lease to approve or disapprove it and, if we do not respond within such 30-day period, the Lease will be considered disapproved. As a condition of our approval of the Lease, but not by way of limitation, we may require that the Lease include a lease rider substantially in such form as may be included in our then current franchise disclosure document.

**Section 7**      <u>**ASSIGNMENT AND TRANSFER**</u>

A.      Assignment by Us.  WE have the absolute right to sell or assign this Agreement, or any of our rights and privileges hereunder, and to delegate any or all of our duties hereunder, to any other person, firm, limited liability company or corporation in our sole discretion and without your prior consent; provided that, in respect to any assignment resulting in the subsequent performance by our assignee of our functions, the assignee shall expressly assume and agree to perform such obligations.

B.      No Assignment by You.  You may not assign or transfer this Agreement, voluntarily or involuntarily, in whole or in any part, by operation of law or otherwise, without our prior written consent, which will be granted, withheld or conditioned in our sole discretion.

C.      No Encumbrance.  You shall not in any event have the right to pledge, encumber, hypothecate or otherwise give any third party a security interest in this Agreement in any manner whatsoever without our express prior written permission, which permission may be withheld for any reason whatsoever in our sole subjective judgment.

D.      Rights Not Granted.  Notwithstanding any provision to the contrary under this Agreement, it is understood and agreed that this Agreement does not grant you any right to the use of the Marks or to use any of our trade secret and/or confidential information, as defined below. Further, it is understood and agreed that this Agreement does not grant you any right to any copyright or patent which we now own or may hereinafter own.  Rights to the Marks, trade secrets (and/or confidential information), copyrights, or patents are granted only under the individual Franchise Agreements to be executed by us and you or your assigns.

**Section 8**      <u>**GENERAL CONDITIONS AND PROVISIONS**</u>

A.      Relationship of You to Us.  It is agreed that you have no authority to create or assume in our name or on behalf of us, any obligation, express or implied, or to act or purport to act as agent or representative on behalf of us for any purpose whatsoever.  Neither we nor you are the employer, employee, agent, partner or co-venturer of or with the other, each being independent.  You agree that you will not hold yourself out as the agent, employee, partner or co-venturer of us.  All employees hired by or working for you shall be your employees and shall not, for any purpose, be deemed our employees or subject to our control.

B.      Waiver and Delay.  No waiver by us of any breach or series of breaches or defaults in performance by you, and no failure, refusal or neglect of us to exercise any right, power or option given to it hereunder or under any franchise agreement between us and you, whether entered into before, after or contemporaneously with the execution hereof, or to insist upon strict compliance with or performance of your obligations under this Agreement or any franchise agreement between us and you, shall constitute a waiver of the provisions of this Agreement with respect to any subsequent breach thereof or a waiver by us of our right at any time thereafter to require exact and strict compliance with the provision thereof.

C.      Survival of Covenants.  The covenants contained in this Agreement which, by their terms, require performance by the parties after the expiration or termination of this Agreement, shall be enforceable notwithstanding said expiration or other termination of this Agreement for any reason whatsoever.

D.      Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of our successors and assigns and shall be binding upon and inure to your benefit and your respective heirs, executors, administrators, successor and assigns, subject to the prohibitions against assignment contained herein.

E.      Joint and Several Liability.  If you consist of more than one person or entity, or a combination thereof, the obligations and liabilities of each such person or entity to us are joint and several.

F.      Applicable Law; Jury Trial Waiver; Class Action Waiver

        (1)     This Agreement takes effect upon its acceptance and execution by us in the State of Missouri and shall be interpreted and construed under the laws thereof, which laws shall prevail in the event of any conflict of law.

        (2)     You acknowledge that any action sought to be brought by either party, shall be brought in the state or federal courts located in Jackson County, Missouri, and the parties do hereby waive all questions of personal jurisdiction or venue for the purposes of carrying out this provision.

        (3)     No right or remedy conferred upon or reserved to us or you by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

        (4)     Nothing herein contained shall bar our right to obtain injunctive relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary injunctions.

        (5)     Both parties hereto waive trial by jury in any action, proceeding, or counterclaim whether at law or in equity, brought by either of them. You waive, to the fullest extent permitted by law, any right to assert any claim against us on behalf of, or as a member of, a class.

G.      Entire Agreement.  This Agreement contains all of the terms and conditions agreed upon by the parties hereto concerning the subject matter hereof. No other agreements concerning the subject matter hereof, written or oral, shall be deemed to exist or to bind any of the parties hereto and all prior agreements, understandings and representations, are merged herein and superseded hereby. You represent that there are no contemporaneous agreements or understandings between the parties relating to the subject matter of this Agreement that are not contained herein.  No officer or employee or agent of ours has any authority to make any representation or promise not contained in this Agreement and you agree that you have executed this Agreement without reliance upon any such representation or promise.  This Agreement cannot be modified or changed except by written instrument signed by you and us.

H.      Titles for Convenience.  Article and paragraph titles used in this Agreement are for convenience only and shall not be deemed to affect the meaning or construction of any of the terms, provisions, covenants, or conditions of this Agreement.

I.      Gender.  All terms used in any one number or gender shall extend to mean and include any other number and gender as the facts, context, or sense of this Agreement or any article or paragraph hereof may require.

J.      Severability.  Nothing contained in this Agreement shall be construed as requiring the commission of any act contrary to law.  Whenever there is any conflict between any provisions of this Agreement and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event the provisions of this Agreement thus affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law.  In the event that any part, article, paragraph, sentence or clause of this Agreement shall be held to be indefinite, invalid or otherwise unenforceable, the indefinite, invalid or unenforceable provision shall be deemed deleted, and the remaining part of this Agreement shall continue in full force and effect.

K.      Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

L.      Attorney's Fees.  We will be entitled to recover our reasonable attorneys' fees and court or arbitration costs in any action or proceeding arising under, out of, in connection with, or in relation to this Agreement in which we are the substantially prevailing party.

M.      Notices.  All notices, requests, demands, payments, consents and other communications hereunder shall be transmitted in writing and shall be deemed to have been duly given when delivered in person or when sent by regular, registered or certified United States mail, postage prepaid, return receipt requested, or when sent by email or facsimile for immediate transmittal, addressed as follows:

**FRANCHISOR:**
**AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

_____

_____

Attention: _____


**DEVELOPER:**

_____

_____

_____

Notices to you may also be given at the location of any SHAMAN store owned or operated by you or at your residence (if an individual) or at the residence of your principal shareholder(s), partner(s), or member(s) (if a business entity). Notices, requests, demands, payments, consents and other communications hereunder will be deemed "delivered" when left in the custody of an adult agent, employee, or resident at a place of business or residence if given by personal delivery or courier, if given by certified mail, three (3) days after being deposited with the U.S. Postal Service with proper address and postage paid, and upon evidence of delivery if given by email or fax. A "read-receipt" received for an email delivery and a fax confirmation page from the sender's fax machine will be deemed evidence of delivery for notices sent by email or fax, as applicable. If any notice is undeliverable or refused at a proper address, then the notice is deemed delivered upon attempted delivery.

9.     **ACKNOWLEDGMENT**

A.     General.  You, on behalf of yourself and your shareholders, members and partners, as applicable, jointly and severally acknowledge that you have carefully read this Agreement and all other related documents to be executed concurrently or in conjunction with the execution hereof, that you have had the opportunity to obtain the advice of counsel in connection with entering into this Agreement, that you understand the nature of this Agreement, and that you intend to comply herewith and be bound hereby.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the first date set forth above.

Accepted on this _____day of _____, 20_____.

FRANCHISOR:
AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
a Nevada limited liability company
By_____
           President

DEVELOPER:

_____
Name of DEVELOPER

By_____
_____

EXHIBIT "G"

**EMPLOYEE CONFIDENTIALITY AGREEMENT**

This Confidentiality Agreement ("Agreement") is made and entered into the _____ day of_____, 20____, by and between _____, a _____ ("Company") and a franchisee of AMERICAN SHAMAN FRANCHISE SYSTEM, LLC ("Franchisor"), and _____ an individual residing at _____ ("Employee").

RECITALS

A.      The Company is engaged in the operation and maintenance of a retail establishment that offers certain "Industrial Hemp" based products to the public ("the business").

B.      In its capacity as a franchisee of Franchisor, the Company has access to the methods for establishing, operating and promoting the business by the use of a distinctive business format, plans, methods, data, processes, supply systems, marketing systems, formulas, techniques, designs, layouts, operating procedures, trademarks, and information and know-how, which has been provided to employee by the association as an Employee of the Company.

C.      Employee desires to be employed by the Company and in Employee's capacity with the Company will become privileged as to certain Confidential Information (as defined below).

D.      Employee and Company have reached an understanding with regard to non-disclosure by Employee of Confidential Information. Employee agrees to the terms of this Agreement as partial consideration for the Company's willingness to employ Employee.

**NOW THEREFORE,** in consideration of the foregoing, the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Employee and the Company, intending legally to be bound, agree as follows:

1.      <u>Confidential Information</u>.

        (a)      Employee and the Company acknowledge that the Confidential Information which is utilized in connection with the operation of the business is unique, exclusive property and a trade secret of the Franchisor or its affiliates. Employee acknowledges that any unauthorized disclosure or use of the Confidential Information would be wrongful and would cause irreparable injury and harm to the Company, Franchisor and its affiliates, and Franchisor's other franchisees. Employee further acknowledges that the Company, Franchisor and its affiliates, and Franchisor's other franchisees have expended a great amount of effort and money in obtaining and developing the Confidential Information and that the Company, Franchisor and its affiliates and other franchisees have taken numerous precautions to guard the secrecy of the Confidential Information, and that it would be very costly for competitors to acquire or duplicate the Confidential Information.

        (b)      "Confidential Information" means all trade secrets, knowledge, know-how, standards, methods, techniques, formulae, formats, specifications, procedures, information,

systems, sales and marketing techniques, and procedures related to (i) the establishment and operation of the CBD AMERICAN SHAMAN franchise system (the "System"), (ii) design, manufacture, use or sale of products, or (iii) the development, operation or franchising of CBD AMERICAN SHAMAN stores (each a "Store"), and includes, without limitation, any and all information contained in the Franchisor's operations manual; any records pertaining to customers, suppliers, and other service providers of, and/or related in any way to, the business, including, without limitation, all databases (whether in print, electronic or other form), all names, addresses, phone numbers, email addresses, customer purchase records, customer information, customer lists, manuals, promotional and marketing materials, marketing strategies; and any other data which Franchisor, one or more of its affiliates, or the Company (each a "Protected Party") designates as confidential.   Notwithstanding the foregoing, Confidential Information does not include information, knowledge, or know-how  which Employee can demonstrate lawfully came to Employee's attention before a Protected Party provided it to Employee directly or indirectly; which, at the time the Protected Party disclosed it to Employee, already had lawfully become generally known in the industry through publication or communication by others (without violating an obligation to a Protected Party); or which, after a Protected Party discloses it to Employee, lawfully becomes generally known in the industry through publication or communication by others (without violating an obligation to a Protected Party).  If Employee claims that any information is not Confidential Information subject to this Agreement, Employee must prove that one of the exclusions provided in this paragraph is fulfilled.

2.     <u>Non-Disclosure of Confidential Information</u>. Employee shall not, at any time, publish, disclose, divulge or in any manner communicate Confidential Information to any person, firm, corporation, association, partnership, or any other entity whatsoever, or use Confidential Information, directly or indirectly, for Employee's benefit or for the benefit of any person, firm, corporation, association, partnership or other entity other than for the use of the Company.

3.     <u>Injunction</u>. Employee hereby acknowledges and agrees that in the event of any breach or threatened breach of this Agreement, the Company or any other Protected Party as an intended third party beneficiary shall be authorized and entitled to seek, from any court of competent jurisdiction, preliminary and permanent injunctive relief in addition to any other rights or remedies to which the Company or a Protected Party may be entitled. Employee agrees that a Protected Party may obtain such injunctive relief, without posting a bond or bonds totaling $500 or more, but upon due notice, and Employee's sole remedy in the event of the entry of such injunctive relief shall be dissolution of such injunctive relief, if warranted, upon a hearing duly had; provided, however, that all claims for damages by reason of the wrongful issuance of any such injunction are hereby expressly waived by Employee.

4.     <u>Reasonableness of Restrictions</u>. Employee acknowledges and agrees that the restrictions set forth in this Agreement are reasonable and necessary for the protection of the Confidential Information and that any violation of this Agreement would cause substantial and irreparable injury to Company, to Franchisor and its affiliates, and to Franchisor's other franchisees. In any litigation concerning the entry of any requested injunction against Employee, Employee, for value, voluntarily waives such defenses as Employee might otherwise have under the law of the jurisdiction in which the matter is being litigated relating to any claimed "prior  breach" on the part of the Company; it being specifically understood and agreed between the parties that no action or lack of action on the part of the Company will entitle or permit the Employee to disclose any such Confidential Information in any circumstances.

5.      Effect of Waiver.  The waiver by Employee or the Company of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach thereof.

6.      Binding Effect; Intended Third Party Beneficiary.  This Agreement shall be binding upon and inure to the benefit of Employee and the Company and their respective heirs, executors, representatives, successors, and assigns.  Franchisor and its affiliates are intended third party beneficiaries of this Agreement and shall be entitled to enforce the terms of this Agreement as if signatories hereto.

7.      Entire Agreement. This instrument contains the entire agreement of Employee and the Company relating to the matters set forth herein. It may not be changed verbally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension, or discharge is sought.

8.      Governing Law. This instrument shall be governed by and construed under the laws of the state of Missouri.  Notwithstanding the foregoing, to the extent the laws of the state where Employee resides is legally determined to be applicable, then such other state's laws shall control.

9.      Jurisdiction and Venue. In the event of a breach or threatened breach by Employee of this Agreement, Employee hereby irrevocably submits to the jurisdiction of the state and federal courts for Jackson County, Missouri, and irrevocably agrees that venue for any action or proceeding shall be in the state and federal courts for Jackson County, Missouri. Both parties waive any objection to the jurisdiction of these courts or to venue in such courts. Notwithstanding the foregoing, to the extent the laws of the state where the Employee resides are legally determined to prohibit the enforcement of the foregoing jurisdiction and venue provisions, then such other state's laws shall control.

10.     Severability. If any provision of this Agreement shall be held, declared, or pronounced void, voidable, invalid, unenforceable or inoperative for any reason, by any court of competent jurisdiction, government authority or otherwise, such holding, declaration or pronouncement shall not affect adversely any other provisions of this Agreement which shall otherwise remain in full force and effect.

[Remainder of page intentionally left blank.]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the first date set forth above.

Accepted on this _____day of _____, 20_____.

FRANCHISEE:

By_____

EMPLOYEE:

_____
Name of EMPLOYEE

By_____

**EXHIBIT "H"**
**OPERATIONS RESOURCES**

**TABULAR TABLE OF CONTENTS TO OPERATIONS MANUAL**

US Hemp Laws, Pre-opening Marketing, Online Presence, Social Media, Advertising and Marketing, Compliance, Operations, Point of Sale Instruction. CBD Information, Products Information, Selling Products, and Miscellaneous.

**REFER TO ONLINE RESOURCE CENTER FOR MORE INFORMATION**

**EXHIBIT "I"**

**RELEASE**

This Release is made as of _____ (Effective Date of renewal Franchise Agreement) between _____, a [corporation/limited    liability    company/partnership/proprietorship] ("Franchisee"), those individuals or companies listed as "Principals" on the signature page hereof and AMERICAN SHAMAN FRANCHISE SYSTEM, LLC ("Franchisor").

R E C I T A L S

A.      Franchisee and Franchisor are party to a certain AMERICAN SHAMAN FRANCHISE AGREEMENT, dated _____ ("current Franchise Agreement"), for operation by Franchisee of a CBD AMERICAN SHAMAN STORE located at _____ (the "Store");

B.      Franchisee desires to renew the Franchise Agreement or has requested Franchisor's consent to the proposed transfer or assignment of the Franchise Agreement, Franchisee's business assets, or more than a 49% ownership interest in Franchisee (a "Transfer");

D.      Among the requirements and conditions for renewal or Transfer, as applicable, set forth in the current Franchise Agreement is the provision that Franchisee, its owners and partners, or stockholders or members (if Franchisee is a partnership, corporation or limited liability company), hereinafter "Releasors," execute a general release of any and all claims against Franchisor and its affiliates, officers, directors, employees, and agents, hereinafter "Releasees."

THEREFORE, in consideration of Franchisor's willingness to execute a Franchise Agreement to renew Franchisee's rights and obligations relating to the operation of the Store, or to consent to the Transfer, as applicable:

1.      Releasors hereby release Releasees (including Franchisor) from any and all obligations, claims, liabilities, causes of action and demands of any nature with respect to any acts taken or omissions occurring prior to the date hereof (collectively, "Claims"), including, without limitation, any and all Claims arising out of or in any way connected with or based on:

(a)      any representations alleged to have been made by Franchisor or any Releasee in connection with the negotiation and inducement to Franchisee's execution of the current Franchise Agreement or any renewal Franchise Agreement between Franchisee and Franchisor;

(b)      Franchisor's administration and performance under the current Franchise Agreement;

(c)      any financial obligation claimed to be owed by Franchisor or any Releasee to Franchisee or any Releasor under the current Franchise Agreement or any other

agreement between Franchisor or any Releasee on the one hand and Franchisee or any Releasor on the other; or

(d)    any action or conduct related to the franchise relationship created by the current Franchise Agreement, whether now known or hereafter discovered, fixed or contingent, and whether previously made or communicated to the other.

2.    Nothing herein to the contrary, or any other writing or statement alleged to have been orally made by Franchisor or any Releasee to the contrary, shall release any claim of Franchisor against Franchisee, any Releasor, or any Guarantor, under the current Franchise Agreement.

3.    Notwithstanding the effectiveness of this Release, nothing herein shall in any way diminish, impair, or release any of the obligations of Franchisee or Franchisor under any renewal Franchise Agreement (if any) being made concurrently herewith.

IN WITNESS WHEREOF, Releasors have, through Franchisee's duly authorized officers and/or managers (or if Franchisee is a proprietorship or partnership, through the individual or partners thereof) and, individually, executed this Release to bind each of them the day and year first above written.

"RELEASORS"

_____: FRANCHISEE

_____

By:

Title:

"PRINCIPALS"

_____

_____

_____

_____

**EXHIBIT "J"**

**STATE-SPECIFIC ADDENDA**

With regard to the states listed below, the following state-specific addenda are provided in this Exhibit J: Addendum to the Franchise Disclosure Document, Amendment to the Franchise Agreement, and Amendment to the Multi Unit Development Agreement:

- California
- Hawaii
- Illinois
- Indiana
- Maryland
- Michigan
- Minnesota
- New York
- North Dakota
- Rhode Island
- South Dakota
- Washington
- Wisconsin

**ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF CALIFORNIA**

In recognition of the requirements of the California Franchise Investment Law (§§ 31000 through 31516), the California Administrative Code (Title 10, Chapter 3, subchapter 2.6, §§ 310.00 through 310.505) and the California Business and Professions Code (§§ 20000 through 20043), the Franchise Disclosure Document of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of California shall be amended as follows:

1. SECTION 31125 OF THE CALIFORNIA CORPORATIONS CODE REQUIRES US TO GIVE YOU A DISCLOSURE DOCUMENT, IN A FORM CONTAINING THE INFORMATION THAT THE COMMISSIONER MAY BY RULE OR ORDER REQUIRE, BEFORE A SOLICITATION OF A PROPOSED MATERIAL MODIFICATION OF AN EXISTING FRANCHISE.

2. THE CALIFORNIA FRANCHISE INVESTMENT LAW REQUIRES THAT A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE BE DELIVERED TOGETHER WITH THE FRANCHISE DISCLOSURE DOCUMENT."

1. See the cover page of the disclosure document for our URL address. OUR WEBSITE HAS NOT BEEN REVIEWED OR APPROVED BY THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT. ANY COMPLAINTS CONCERNING THE CONTENTS OF THIS WEBSITE MAY BE DIRECTED TO THE CALIFORNIA DEPARTMENT OF BUSINESS OVERSIGHT AT WWW.DBO.CA.GOV.

2. The Franchise Agreement does not contain a provision for liquidated damages. Under California Civil Code, § 1671, certain liquidated damages provisions are unenforceable.

3. California Business and Professions Code (§§ 20000 through 20043) provides rights to you concerning termination, transfer and non-renewal of the Franchise Agreement and Multi Unit Development Agreement. If the Franchise Agreement or Multi Unit Development Agreement contain provisions that are inconsistent with the law, the law will control.

4. The Franchise Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. § 101 *et seq*.).

5. The Franchise Agreement contains a covenant not to compete that extends beyond the termination of the franchise. These provisions may not be enforceable under California law.

6. The Franchise Agreement and Multi Unit Development Agreement require application of the laws of the state of Missouri. These provisions may not be enforceable under California Law.

7. The Franchise Agreement and Multi Unit Development Agreement require disputes to be resolved in Kansas City, Missouri, and franchisees consent to the exclusive jurisdiction and venue of the state and federal courts in Jackson County, Missouri. Franchisees are encouraged to consult private legal counsel to determine the applicability of California and

federal laws (such as Business and Professions Code, § 20040.5, Code of Civil Procedure, § 1281, and the Federal Arbitration Act) to any provisions of an agreement restricting venue to a forum outside the state of California.

8.  You must sign a general release of claims if you renew or transfer your franchise. California Corporations Code, § 31512, voids a waiver of your rights under the Franchise Investment Law (California Corporations Code, §§ 31000 through 31516).  Business and Professions Code, § 20010, voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code, §§ 20000 through 20043).

9.  Neither we nor any person listed in Item 2 is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C. A. § 78a *et seq*., suspending or expelling such parties from membership in such association or exchange.

10. In California, local county health departments inspect restaurants and other retail food facilities to ensure compliance with safe food handling practices and adequacy of kitchen facilities. We do not prepare foods in our retail stores but we do sell pre-packaged food items.


**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF CALIFORNIA LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC. READ THIS ADDENDUM CAREFULLY.**


[Remainder of page intentionally left blank]

## AMENDMENT TO FRANCHISE AGREEMENT
## FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
## REQUIRED BY THE STATE OF CALIFORNIA

In recognition of the requirements of the California Franchise Investment Law (§§ 31000 through 31516), the California Administrative Code (Title 10, Chapter 3, subchapter 2.6, §§ 310.00 through 310.505) and the California Business and Professions Code (§§ 20000 through 20043), the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of California as follows:

1. The Franchise Agreement requires you to sign a general release of claims if you renew or transfer your franchise. California Corporations Code, § 31512, voids a waiver of your rights under the Franchise Investment Law (California Corporations Code, §§ 31000 through 31516). Business and Professions Code, § 20010, voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code, §§ 20000 through 20043).

2. California Business and Professions Code (§§ 20000 through 20043) provides rights to you concerning termination, transfer and non-renewal of the Franchise Agreement. If the Franchise Agreement contains a provision that is inconsistent with the law, the law will control.

3. You must sign a general release of claims if you renew or transfer your franchise. California Corporations Code, § 31512, voids a waiver of your rights under the Franchise Investment Law (California Corporations Code, §§ 31000 through 31516). Business and Professions Code, § 20010, voids a waiver of your rights under the Franchise Relations Act (Business and Professions Code, §§ 20000 through 20043).

4. The Franchise Agreement contains a covenant not to compete that extends beyond the termination of the franchise. These provisions may not be enforceable under California law.

5. The Franchise Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. § 101 *et seq.*).

6. The Franchise Agreement does not contain a provision for liquidated damages. Under California Civil Code, § 1671, certain liquidated damages provisions are unenforceable.

7. The Franchise Agreement requires application of the laws of the state of Missouri. These provisions may not be enforceable under California Law.

8. The Franchise Agreement requires mediation and arbitration to take place in Kansas City, Missouri, and franchisees consent to the exclusive jurisdiction and venue of the state and federal courts in Jackson County, Missouri. Franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code, § 20040.5, Code of Civil Procedure, § 1281, and the Federal Arbitration Act) to any provisions of an agreement restricting venue to a forum outside the state of California.

9. Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect.  To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

10. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.


[Signature page follows; remainder of page left intentionally blank]

      **IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**              **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title:  _____


**FRANCHISEE:**              _____

By:_____

Name: _____

Title:  _____


California Effective Date: _____

**AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT
FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
REQUIRED BY THE STATE OF CALIFORNIA**

In recognition of the requirements of the California Franchise Investment Law (§§ 31000 through 31516), the California Administrative Code (Title 10, Chapter 3, subchapter 2.6, §§ 310.00 through 310.505) and the California Business and Professions Code (§§ 20000 through 20043), the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of California as follows:

1. California Business and Professions Code (§§ 20000 through 20043) provides rights to you concerning termination, transfer and non-renewal of the Multi Unit Development Agreement. If the Multi Unit Development Agreement contains a provision that is inconsistent with the law, the law will control.

2. The Multi Unit Development Agreement requires application of the laws of the state of Missouri. These provisions may not be enforceable under California Law.

3. The Multi Unit Development Agreement requires any action to be brought in state or federal court in Jackson County, Missouri. Franchisees are encouraged to consult private legal counsel to determine the applicability of California and federal laws (such as Business and Professions Code, § 20040.5, Code of Civil Procedure, § 1281, and the Federal Arbitration Act) to any provisions of an agreement restricting venue to a forum outside the state of California.

4. Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

5. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signature page follows; remainder of page left intentionally blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

FRANCHISOR:                          **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title:  _____


**FRANCHISEE:**                          _____

By:_____

Name: _____

Title:  _____

California Effective Date: _____

**ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF HAWAII**

In recognition of the requirements of the Hawaii Franchise Investment Law, §§ 482E-1 through 482E-12 and the Hawaii Regulations, §§ 16-37-1 through 16-37-8, the Franchise Disclosure Document of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Hawaii shall be amended as follows:

1.  THESE FRANCHISES WILL BE/HAVE BEEN FILED UNDER THE FRANCHISE INVESTMENT LAW OF THE STATE OF HAWAII.  FILING DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE DIRECTOR OF COMMERCE AND CONSUMER AFFAIRS OR A FINDING BY THE DIRECTOR OF COMMERCE AND CONSUMER AFFAIRS THAT THE INFORMATION PROVIDED IS TRUE, COMPLETE AND NOT MISLEADING.

2.  THE FRANCHISE INVESTMENT LAW MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WITHOUT FIRST PROVIDING TO THE FRANCHISEE OR SUB-FRANCHISOR, AT LEAST SEVEN DAYS PRIOR TO THE EXECUTION BY THE FRANCHISEE OF ANY BINDING FRANCHISE OR OTHER AGREEMENT, OR AT LEAST SEVEN DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION BY THE FRANCHISEE, OR SUB-FRANCHISOR, WHICHEVER OCCURS FIRST, A COPY OF THE FRANCHISE DISCLOSURE DOCUMENT, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE SALE OF THE FRANCHISE.

3.  THIS FRANCHISE DISCLOSURE DOCUMENT CONTAINS A SUMMARY ONLY OF CERTAIN MATERIAL PROVISIONS OF THE FRANCHISE AGREEMENT AND MULTI UNIT DEVELOPMENT AGREEMENT.  THE CONTRACT OR AGREEMENT SHOULD BE REFERRED TO FOR A STATEMENT OF ALL RIGHTS, CONDITIONS, RESTRICTIONS AND OBLIGATIONS OF BOTH THE FRANCHISOR AND FRANCHISEE.

4.  REGISTERED AGENT IN THE STATE AUTHORIZED TO RECEIVE SERVICE OF PROCESS: COMMISSIONER OF SECURITIES, 335 MERCHANT STREET, ROOM 203, HONOLULU, HI 96813.

5.  Registration of this Franchise with any state does not mean that the state recommends it or has verified the information in this Franchise Disclosure Document.  If you learn that anything in this Franchise Disclosure Document is untrue, contact the Federal Trade Commission and the Director of Commerce and Consumer Affairs, 1010 Richards Street, Honolulu, Hawaii 96810.

6.  Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Hawaii Franchise Investment Law and any rules and regulations promulgated thereunder are met independently without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF HAWAII LAW**
**THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN**
**SHAMAN FRANCHISE SYSTEM, LLC.  READ THIS ADDENDUM CAREFULLY.**

## AMENDMENT TO FRANCHISE AGREEMENT
## FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
## REQUIRED BY THE STATE OF HAWAII

In recognition of the requirements of the Hawaii Franchise Investment Law, §§ 482E-1 through 482E-12 and the Hawaii Regulations, §§ 16-37-1 through 16-37-8, the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Hawaii as follows:

1. If the Franchise Agreement expires (without renewal) or is terminated by Franchisor, according to its provisions or by Franchisee without cause, then Franchisor shall purchase from Franchisee, for fair market value, any inventory, supplies, equipment and furnishings purchased from Franchisor or a supplier designated by Franchisor, excluding any personal materials which have no value to Franchisor.  Franchisor has the right to set off against and reduce the purchase price by all amounts owed by Franchisee to Franchisor or any of its affiliates and the cost of removing, transporting and disposing of Franchisee's inventory, supplies, equipment and furnishings.

2. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Hawaii Franchise Investment Law and the regulations promulgated thereunder are independently met without reference to this Amendment.  This Amendment shall have no force or effect if such jurisdictional requirements are not met.

3. Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect.  To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

4. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signature page follows; remainder of page left intentionally blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**            **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By: _____

Name: _____

Title: _____


**FRANCHISEE:**            _____

By: _____

Name: _____

Title: _____

Hawaii Effective Date: _____

**AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT
FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
REQUIRED BY THE STATE OF HAWAII**

In recognition of the requirements of the Hawaii Franchise Investment Law, §§ 482E-1 through 482E-12 and the Hawaii Regulations, §§ 16-37-1 through 16-37-8, the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**, for use in the State of Hawaii as follows:

1. If the Multi Unit Development Agreement expires (without renewal) or is terminated by Franchisor, according to its provisions or by Franchisee without cause, then Franchisor shall purchase from Franchisee, for fair market value, any inventory, supplies, equipment and furnishings purchased from Franchisor or a supplier designated by Franchisor, excluding any personal materials which have no value to Franchisor.  Franchisor has the right to set off against and reduce the purchase price by all amounts owed by Franchisee to Franchisor or any of its affiliates and the cost of removing, transporting and disposing of Franchisee's inventory, supplies, equipment and furnishings.

2. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Hawaii Franchise Investment Law and the regulations promulgated thereunder are independently met without reference to this Amendment.  This Amendment shall have no force or effect if such jurisdictional requirements are not met.

3. Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect.  To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

4. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signature page follows; remainder of page left intentionally blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**                      **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By: _____

Name: _____

Title: _____


**FRANCHISEE:**                      _____

By: _____

Name: _____

Title: _____

Hawaii Effective Date: _____

**ADDENDUM TO THE FRANCHISE DISCLOSURE DOCUMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF ILLINOIS**

In recognition of the requirements of the Illinois Franchise Disclosure Act of 1987, §§ 705/1 through 705/44 (the "Act"), the Franchise Disclosure Document for **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Illinois shall be amended to include the following:

Item 17 additional disclosures

1. Section 705/4 of the Act provides that any provision of the Franchise Agreement or Multi Unit Development Agreement that designates venue outside of Illinois is void with respect to any cause of action that is otherwise enforceable in Illinois; however, the Agreement may provide for arbitration in a forum outside of Illinois.

2. Illinois law shall apply to and govern any claim between the parties under the Franchise Agreement and Multi Unit Development Agreement that alleges violation of the Act.

3. The conditions under which your franchise can be terminated and your rights upon renewal may be affected by the Act, 815 ILCS 705/19 and 705/20.

4. Any release of claims or acknowledgements of fact contained in the Franchise Agreement that would negate or remove from judicial review any statement, misrepresentation, or action that would violate the Act, or a rule or order under the Act shall be void with respect to claims under the Act or any other law of the state of Illinois.

5. Any condition, stipulation, or provision in the Franchise Agreement or Multi Unit Development Agreement purporting to require you to waive compliance with any provision of the Act or any other law of the state of Illinois is void. The Act, however, shall not prevent any person from entering into a settlement agreement or executing a general release regarding a potential or actual lawsuit filed under any of the provisions of the Act, nor shall it prevent the arbitration of any claim pursuant to the provisions of Federal Arbitration Act (U.S.C. Title 9).

Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF ILLINOIS LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC. READ THIS ADDENDUM CAREFULLY.**

**AMENDMENT TO THE FRANCHISE AGREEMENT
FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
REQUIRED BY THE STATE OF ILLINOIS**

In recognition of the requirements of the Illinois Franchise Disclosure Act of 1987, §§ 705/1 through 705/44 (the "Act"), the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Illinois as follows:

1. Sections 705/19 and 705/20 of the Act provide rights to you concerning nonrenewal and termination of the Franchise Agreement. To the extent the Franchise Agreement contains provision(s) regarding nonrenewal or termination that are inconsistent with the Act, the provision(s) of the Act shall apply instead of the contrary provisions of the Franchise Agreement.

2. Any release of claims or acknowledgements of fact contained in the Franchise Agreement that would negate or remove from judicial review any statement, misrepresentation, or action that would violate the Act, or a rule or order under the Act shall be void with respect to claims under the Act or any other law of the state of Illinois.

3. Provision(s) in the Franchise Agreement requiring litigation to be conducted in a forum other than the state of Illinois are void. Any actions arising under the Franchise Agreement or otherwise as a result of the relationship between you and us may be commenced in the state or federal court of general jurisdiction in Illinois, and you irrevocably submit to the jurisdiction of those courts and waive any objection you may have to the jurisdiction or venue in those courts.

4. To the extent that provision(s) of the Franchise Agreement requiring a jury trial waiver are in conflict with the Act, the Act shall control.

5. Any condition, stipulation, or provision in the Franchise Agreement purporting to require you to waive compliance with any provision of the Act or any other law of the state of Illinois is void. The Act, however, shall not prevent any person from entering into a settlement agreement or executing a general release regarding a potential or actual lawsuit filed under any of the provisions of the Act, nor shall it prevent the arbitration of any claim pursuant to the provisions of Federal Arbitration Act (U.S.C. Title 9).

6. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

7. Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

8. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signatures next page]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**                    **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____


**FRANCHISEE:**                    _____

By:_____

Name: _____

Title: _____

Illinois Effective Date: _____

### AMENDMENT TO THE MULTI UNIT DEVELOPMENT AGREEMENT
### FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
### REQUIRED BY THE STATE OF ILLINOIS

In recognition of the requirements of the Illinois Franchise Disclosure Act of 1987, §§ 705/1 through 705/44 (the "Act"), the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Illinois as follows:

1. Sections 705/19 and 705/20 of the Act provide rights to you concerning nonrenewal and termination of the Multi Unit Development Agreement.  To the extent the Multi Unit Development Agreement contains provision(s) regarding nonrenewal or termination that are inconsistent with the Act, the provision(s) of the Act shall apply instead of the contrary provisions of the Multi Unit Development Agreement.

2. Provision(s) in the Multi Unit Development Agreement requiring litigation to be conducted in a forum other than the state of Illinois are void.  Any actions arising under the Multi Unit Development Agreement or otherwise as a result of the relationship between you and us may be commenced in the state or federal court of general jurisdiction in Illinois, and you irrevocably submit to the jurisdiction of those courts and waive any objection you may have to the jurisdiction or venue in those courts.

3. To the extent that provision(s) of the Multi Unit Development Agreement requiring a jury trial waiver are in conflict with the Act, the Act shall control.

4. Any condition, stipulation, or provision in the Multi Unit Development Agreement purporting to require you to waive compliance with any provision of the Act or any other law of the state of Illinois is void.  The Act, however, shall not prevent any person from entering into a settlement agreement or executing a general release regarding a potential or actual lawsuit filed under any of the provisions of the Act, nor shall it prevent the arbitration of any claim pursuant to the provisions of Federal Arbitration Act (U.S.C. Title 9).

5. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment.  This Amendment shall have no force or effect if such jurisdictional requirements are not met.

6. Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect.  To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

7. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signatures next page]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**              **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____


**FRANCHISEE:**              _____

By:_____

Name: _____

Title: _____

Illinois Effective Date: _____

### ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT
### FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
### REQUIRED BY THE STATE OF INDIANA

In recognition of the requirements of the Indiana Franchise Act, Title 23 Article 2 Indiana Code (§§ 23-2-2.5-1 through 23-2-2.5-51), and the Indiana Deceptive Franchise Practices Act, Indiana Code (§§ 23-2-2.7-1 through 23-2-2.7-7), the Franchise Disclosure Document of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**, for use in the State of Indiana shall be amended as follows:

1. The following language shall be included on the Cover Page:

   "Indiana Registered Agent:
   Indiana Secretary of State
   201 State House
   Indianapolis, Indiana 46204

2. On the State Cover Page, the sentence in the first paragraph that begins with "Registration of a franchise…." shall be deleted in its entirety and replaced with the following:

   Registration of this Franchise with a state does not mean that the state recommends, or it has verified the information in this Franchise Disclosure Document.  If you learn that anything in this Franchise Disclosure Document is untrue, contact the Federal Trade Commission and the Indiana Secretary of State, 201 State House, Indianapolis, Indiana 46204, which administers and enforces the Indiana Franchise Disclosure Act.

   REGISTRATION WITH THE INDIANA SECURITIES COMMISSIONER DOES NOT CONSTITUTE APPROVAL, RECOMMENDATION OR ENDORSEMENT BY THE COMMISSIONER."

3. Item 1, under the heading entitled "THE FRANCHISOR AND ANY PARENTS, PREDECESSORS AND AFFILIATES," shall be supplemented with the addition of the following language:

   "Exhibit M-1 contains a list of the names, addresses, and phone numbers of all of the franchises that operate franchises located in Indiana."

4. Item 3, under the heading entitled "LITIGATION," shall be amended by deleting the paragraph in its entirety and substituting the following in lieu thereof:

   "Neither Franchisor, nor any person identified in Item 3 above, has been convicted of a felony, pleaded nolo contendere to a felony charge or been held liable in a civil action by final judgment.

   Neither Franchisor, nor any person identified in Item 3 above, has during the past five years reorganized due to insolvency or been adjudicated as bankrupt.

   Neither Franchisor, nor any person identified in Item 3 above, has any administrative, criminal or material civil action pending against them alleging a violation of a franchise antitrust or securities law, unfair or deceptive practices, or comparable allegations.

> Neither Franchisor, nor any person identified in Item 3 above, is subject to any currently effective injunctive or restrictive order or decree relating to the Franchise or under a federal or state franchise, securities, antitrust, trade regulation or trade practice law resulting from a concluded or pending action or proceeding brought by any individual, a public agency or a department thereof."

5. Additional Item 17 Disclosures:

   a. The Choice of Forum should not be considered a waiver of any right conferred upon any party by the Indiana Franchise Act or the Indiana Deceptive Franchise Practices Act.

   b. The Choice of Law should not be considered a waiver of any right conferred upon any party by the Indiana Franchise Act or the Indiana Deceptive Franchise Practices Act.

6. The State Franchise Administrator in Indiana is:

   Indiana Securities Commissioner
   Securities Division
   302 West Washington Street, Room E111
   Indianapolis, IN  46204

7. The Agent for Service of Process in Indiana is:

   Indiana Secretary of State
   201 State House
   Indianapolis, IN  46204

8. Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Indiana Franchise Act and the Indiana Deceptive Franchise Practices Act, and the regulations promulgated thereunder are independently met without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF INDIANA LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC.  READ THIS ADDENDUM CAREFULLY.**

**AMENDMENT TO FRANCHISE AGREEMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF INDIANA**

In recognition of the requirements of the Indiana Franchise Act, Title 23 Article 2 Indiana Code (§§ 23-2-2.5-1 through 23-2-2.5-51), and the Indiana Deceptive Franchise Practices Act, Indiana Code (§§ 23-2-2.7-1 through 23-2-2.7-7) (collectively, the "Act"), the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Indiana as follows:

1.  Article 28, under the heading "ENFORCEMENT BY US" shall be supplemented by the addition of the following language:

    "Nothing in this Agreement shall be deemed to constitute a waiver of compliance with any provision of the Indiana Franchises Law or the Indiana Deceptive Franchise Practices Act."

2.  Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

3.  Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

4.  Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signatures next page; remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**              **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____


**FRANCHISEE:**              _____

By:_____

Name: _____

Title: _____

Indiana Effective Date: _____

**AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF INDIANA**

In recognition of the requirements of the Indiana Franchise Act, Title 23 Article 2 Indiana Code (§§ 23-2-2.5-1 through 23-2-2.5-51), and the Indiana Deceptive Franchise Practices Act, Indiana Code (§§ 23-2-2.7-1 through 23-2-2.7-7) (collectively, the "Act"), the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Indiana as follows:

1. Nothing in this Agreement shall be deemed to constitute a waiver of compliance with any provision of the Act.

2. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

3. Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

4. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signatures next page; remainder of page intentionally left blank]

   **IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**      **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____

**FRANCHISEE:**      _____

By:_____

Name: _____

Title: _____

Indiana Effective Date: _____

## ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT
## FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
## REQUIRED BY THE STATE OF MARYLAND

In recognition of the requirements of the Maryland Franchise Registration and Disclosure Act, the Franchise Disclosure Document of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**, for use in the State of Maryland shall be amended as follows:

1.  Additional Item 17 Disclosures.  The following statements are added to Item 17:

    a.  The provision for termination upon bankruptcy may not be enforceable under federal bankruptcy law.

    b.  You may bring suit in the State of Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

    c.  The general release required as a condition of renewal, sale and/or assignment shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

    d.  Any claims arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise."

2.  Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Maryland Franchise Law and any rules and regulations promulgated thereunder are met independently without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF MARYLAND LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC.  READ THIS ADDENDUM CAREFULLY.**

**FRANCHISOR:**                    **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title:_____

Date:_____

**FRANCHISEE:**          _____

By:_____

Name: _____

Title: _____

Date:_____

**AMENDMENT TO FRANCHISE AGREEMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF MARYLAND**

In recognition of the requirements of the Maryland Franchise Registration and Disclosure Law (Md. Code Ann. §§ 14-201 to 14-233) and the regulations promulgated thereunder, the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Maryland as follows:

1. Any provision(s) of the Franchise Agreement requiring franchisees to assent to a release, estoppel or waiver of liability are not intended to nor shall they act as a release estoppel or waiver of any liability uncured under the Maryland Franchise Registration and Disclosure Law.

2. Franchisees may bring suit in the State of Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law. Any claim arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

3. The Franchise Agreement provides for termination upon bankruptcy. These provisions may not be enforceable under federal bankruptcy law.

4. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

5. Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

6. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signatures next page; remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**              **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____


**FRANCHISEE:**              _____

By:_____

Name: _____

Title: _____


Maryland Effective Date: _____

**AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF MARYLAND**

In recognition of the requirements of the Maryland Franchise Registration and Disclosure Law (Md. Code Ann. §§ 14-201 to 14-233) (the "Act") and the regulations promulgated thereunder, the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Maryland as follows:

1. Franchisees may bring suit in the State of Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.  Any claim arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

2. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

3. Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect.  To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

4. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signatures next page; remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**                    **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____


**FRANCHISEE:**                    _____

By:_____

Name: _____

Title: _____

Maryland Effective Date: _____

**ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT
FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
REQUIRED BY THE STATE OF MICHIGAN**

(The Michigan Franchise Disclosure Document Addendum immediately follows the FDD cover page as required by Michigan law)

**AMENDMENT TO FRANCHISE AGREEMENT
FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
REQUIRED BY THE STATE OF MICHIGAN**

In recognition of the requirements of the Michigan Franchise Investment Law, Chapter 445, §§ 445.1501 through 445.1546 (the "Act") and the regulations promulgated thereunder, the parties set forth below agree to enter into this Amendment to the Franchise Agreement (the "Amendment") to amend the Franchise Agreement of the **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Michigan as follows:

1. Franchisee and its Principals shall execute a general release, in a form satisfactory to Franchisor, of any and all claims which either Franchisee or its Principals may have against Franchisor, its affiliates, and their respective shareholders, past and present officers, directors, agents, and employees, excluding only such claims as the Franchisee or its Principals may have under Michigan Franchise Investment Law.

2. The choice of forum provision(s) should not be considered a waiver of any right conferred upon either party by the Michigan Franchise Investment Law.

3. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

4. Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

5. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signatures next page; remainder of page intentionally left blank]

      **IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**                  **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

                                 By:_____

                                 Name: _____

                                 Title:  _____


**FRANCHISEE:**                _____

                                 By:_____

                                 Name: _____

                                 Title:  _____

Michigan Effective Date: _____

**AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF MICHIGAN**

In recognition of the requirements of the Michigan Franchise Investment Law, Chapter 445, §§ 445.1501 through 445.1546 (the "Act") and the regulations promulgated thereunder, the parties set forth below agree to enter into this Amendment to the Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of the **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Michigan as follows:

6. The choice of forum provision(s) should not be considered a waiver of any right conferred upon either party by the Michigan Franchise Investment Law.

7. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

8. Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

9. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signatures next page; remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**                **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____


**FRANCHISEE:**                _____

By:_____

Name: _____

Title: _____

Michigan Effective Date: _____

# ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT
# FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
# REQUIRED BY THE STATE OF MINNESOTA

In recognition of the requirements of the Minnesota Franchise Act, §§ 80C.01-80C.22, and the Minnesota Rule 2860.4400J, the Franchise Disclosure Document of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Minnesota shall be amended as follows:

State Cover Page and Item 17, Additional Disclosures:

    a.  This Franchise has been registered under the Minnesota Franchise Act. Registration does not constitute approval, recommendation or endorsement by the Commissioner of Commerce of Minnesota or a finding by the Commissioner that the information provided in this disclosure documents true, complete and not misleading.

    b.  The Minnesota Franchise Act makes it unlawful to offer or sell any franchise in this state which is subject to registration without first providing to the franchisee, at least 14 calendar days prior to the execution by the franchisee of any binding franchise or other agreement, or at least 14 calendar days prior to the payment of any consideration, by the franchisee, whichever occurs first, a copy of this Franchise Disclosure Document, together with a copy of all proposed agreements relating to the franchise.  The franchisee must also receive a Franchise Agreement containing all material terms at least 7 calendar days prior to the signing of the Franchise Agreement.

    c.  Minn. Stat. Sec. 80C.21 and Minn Rule 2860.4400J prohibit us from requiring litigation to be conducted outside Minnesota, requiring waiver of a jury trial or requiring the franchisee to consent to liquidated damages, termination penalties or judgment notes. In addition, nothing in the Disclosure Document shall abrogate or reduce any of your rights as provided for in Minn. Stat. Sec. 80C, or your rights to any procedure, forum or remedies provided for by the laws of the jurisdiction.

       Franchisee cannot consent to the Franchisor obtaining injunctive relief. The Franchisor may seek injunctive relief. A court will determine if a bond is required.

2. Additional Item 6 Disclosure:

NSF checks are governed by Minn. Stat. 604.113, which puts a cap of $30 on service charges.

3. Additional Item 13 Disclosures:

The Minnesota Department of Commerce requires that a franchisor indemnify Minnesota Franchisees against liability to third parties resulting from claims by third parties that the franchisee's use of the franchisor's trademark infringes upon the trademark rights of the third party. The franchisor does not indemnify against the consequences of a franchisee's use of a franchisor's trademark except in accordance with the requirements of the franchise agreement, and as the condition to an indemnification, the franchisee must provide notice to the franchisor of any such claim immediately and tender the defense of the claim to the franchisor. If the franchisor accepts tender of defense, the franchisor has the right to

manage the defense of the claim, including the right to compromise, settle or otherwise resolve the claim, or to determine whether to appeal a final determination of the claim.

4. Additional Item 17 Disclosures:

    a.  Any condition, stipulation or provision, including any choice of law provision, purporting to bind any person who, at the time of acquiring a franchise is a resident of the State of Minnesota or in the case of a partnership or corporation, organized or incorporated under the laws of the State of Minnesota, or purporting to bind a person acquiring any franchise to be operated in the State of Minnesota to waive compliance or which has the effect of waiving compliance with any provision of the Minnesota Franchise Law is void.

    b.  Minnesota law provides franchisees with certain termination and non-renewal rights. We will comply with Minnesota Statutes § 80C.14, subdivisions 3, 4 and 5, which require, except in certain specified cases, that you be given 90 days' notice of termination (with 60 days' notice to cure) and 180 days' notice for non-renewal of the Franchise Agreement, and that consent to the transfer of the franchise will not be unreasonably withheld.

    c.  Minnesota Rule 2860.4400D prohibits a franchisor from requiring a franchisee to assent to a general release, assignment, novation, or waiver that would relieve any person from liability imposed by Minnesota Statute §§80C.01 – 80C.22.

5. Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Minnesota Franchise Act and any rules and regulations promulgated thereunder are met independently without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF MINNESOTA LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC.  READ THIS ADDENDUM CAREFULLY.**

[Remainder of page intentionally left blank]

**AMENDMENT TO FRANCHISE AGREEMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF MINNESOTA**

In recognition of the requirements of the Minnesota Franchise Act, §§ 80C.01-80C.22, and the Minnesota Rule 2860.4400J (collectively, the "Act"), the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** in the State of Minnesota as follows:

1. The Franchise Agreement contains a provision providing for a general release as a condition of transfer of the franchise. Such release shall exclude claims arising under the Minnesota Franchise Act.

2. Minnesota law requires Franchisor to protect Franchisee's right to use the trademarks, service marks, trade names, logotypes or other commercial symbols or indemnify Franchisee for any loss, costs or expenses arising out of any claim, suit or demand regarding the use of the name.

3. Minnesota law provides franchisees with certain termination and non-renewal rights. Minnesota Statutes § 80C.14, subdivisions 3, 4 and 5 require, except in certain specified cases, that a Franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice of non-renewal of the Franchise Agreement.

4. The following is added to Article 28 of the Franchise Agreement:

    "No condition, stipulations, or provisions in the Franchise Agreement can abrogate or reduce any rights you have under the Minnesota Franchises Law, including (if applicable) the right to submit matters to the jurisdiction of the courts of Minnesota and the right to any forum or remedies provided for by the laws of the jurisdiction. Minnesota Statutes Section 80C.21 and Minnesota Rule 2860.4400J may prohibit us from requiring litigation to be conducted outside Minnesota, from requiring waiver of a jury trial, and from requiring you to pay liquidated damages."

10. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

11. Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

12. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signatures next page]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**                    **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title:  _____


**FRANCHISEE:**                    _____

By:_____

Name: _____

Title:  _____

Minnesota Effective Date: _____

**AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF MINNESOTA**

In recognition of the requirements of the Minnesota Franchise Act, §§ 80C.01-80C.22, and the Minnesota Rule 2860.4400J (collectively, the "Act"), the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** in the State of Minnesota as follows:

1. Minnesota law requires Franchisor to protect Franchisee's right to use the trademarks, service marks, trade names, logotypes or other commercial symbols or indemnify Franchisee for any loss, costs or expenses arising out of any claim, suit or demand regarding the use of the name.

2. Minnesota law provides franchisees with certain termination and non-renewal rights. Minnesota Statutes § 80C.14, subdivisions 3, 4 and 5 require, except in certain specified cases, that a Franchisee be given 90 days' notice of termination (with 60 days to cure) and 180 days' notice of non-renewal of the Multi Unit Development Agreement.

3. No condition, stipulations, or provisions in the Multi Unit Development Agreement can abrogate or reduce any rights you have under the Minnesota Franchise Law, including (if applicable) the right to submit matters to the jurisdiction of the courts of Minnesota and the right to any forum or remedies provided for by the laws of the jurisdiction. Minnesota Statutes Section 80C.21 and Minnesota Rule 2860.4400J may prohibit us from requiring litigation to be conducted outside Minnesota, from requiring waiver of a jury trial, and from requiring you to pay liquidated damages.

4. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

5. Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

6. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signatures next page; remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**                    **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By: _____

Name: _____

Title: _____


**FRANCHISEE:**                    _____

By: _____

Name: _____

Title: _____

Minnesota Effective Date: _____

### ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT
### FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
### REQUIRED BY THE STATE OF NEW YORK

In recognition of the requirements of the New York General Business Law, Article 33, §§ 680 through 695 and the regulations promulgated thereunder, the Franchise Disclosure Document of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of New York shall be amended as follows:

1. The following information is added to the cover page of the Franchise Disclosure Document:

   **INFORMATION COMPARING FRANCHISORS IS AVAILABLE. CALL THE STATE ADMINISTRATORS LISTED IN EXHIBIT A OR YOUR PUBLIC LIBRARY FOR SERVICES OR INFORMATION. REGISTRATION OF THIS FRANCHISE BY NEW YORK STATE DOES NOT MEAN THAT NEW YORK STATE RECOMMENDS IT OR HAS VERIFIED THE INFORMATION IN THIS FRANCHISE DISCLOSURE DOCUMENT. IF YOU LEARN THAT ANYTHING IN THIS FRANCHISE DISCLOSURE DOCUMENT IS UNTRUE, CONTACT THE FEDERAL TRADE COMMISSION AND THE APPROPRIATE STATE OR PROVINCIAL AUTHORITY. THE FRANCHISOR MAY, IF IT CHOOSES, NEGOTIATE WITH YOU ABOUT ITEMS COVERED IN THE FRANCHISE DISCLOSURE DOCUMENT. HOWEVER, THE FRANCHISOR CANNOT USE THE NEGOTIATING PROCESS TO PREVAIL UPON A PROSPECTIVE FRANCHISEE TO ACCEPT TERMS WHICH ARE LESS FAVORABLE THAN THOSE SET FORTH IN THIS FRANCHISE DISCLOSURE DOCUMENT.**

2. The following is to be added at the end of Item 3:

   Except as provided above, with regard to the franchisor, its predecessor, a person identified in Item 2, or an affiliate offering franchises under the franchisor's principal trademark:

   A. No such party has an administrative, criminal or civil action pending against that person alleging: a felony, a violation of a franchise, antitrust or securities law, fraud, embezzlement, fraudulent conversion, misappropriation of property, unfair or deceptive practices, or comparable civil or misdemeanor allegations.

   B. No such party has pending actions, other than routine litigation incidental to the business, which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

   C. No such party has been convicted of a felony or pleaded nolo contendere to a felony charge or, within the 10-year period immediately preceding the application for registration, has been convicted of or pleaded nolo contendere to a misdemeanor charge or has been the subject of a civil action alleging: violation of a franchise, antifraud, or securities law; fraud; embezzlement; fraudulent conversion or misappropriation of property; or unfair or deceptive practices or comparable allegations.

D. No such party is subject to a currently effective injunctive or restrictive order or decree relating to the franchise, or under a Federal, State, or Canadian franchise, securities, antitrust, trade regulation or trade practice law, resulting from a concluded or pending action or proceeding brought by a public agency; or is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities and Exchange Act of 1934, suspending or expelling such person from membership in such association or exchange; or is subject to a currently effective injunctive or restrictive order relating to any other business activity as a result of an action brought by a public agency or department, including, without limitation, actions affecting a license as a real estate broker or sales agent.

3. Additional Item 17 Disclosures.

The following is added to the end of the "Summary" sections of Item 17(c), titled "**Requirements for franchisee to renew or extend**," and Item 17(m), entitled "**Conditions for franchisor approval of transfer**":

However, to the extent required by applicable law, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force; it being the intent of this proviso that the non-waiver provisions of General Business Law Sections 687(4) and 687(5) be satisfied.

In addition, the following statements are added to Item 17:

a. You may terminate upon any grounds available under the New York General Business Law.

b. The provision for termination upon bankruptcy may not be enforceable under federal bankruptcy law (11 U.S.C.A. Sec. 101 et seq.).

c. No assignment shall be made by us except to an assignee who, in our good faith judgment, is willing and able to assume our obligations under our agreement with you.

d. The Choice of Forum provision is not a waiver of any right conferred upon you by the General Business Law of the State of New York, Article 33.

e. The Choice of Law provision is not a waiver of any right conferred upon you by the General Business Law of the State of New York, Article 33.

f. You must sign a general release when you renew or transfer your Franchise. These provisions may not be enforceable under New York law.

4. Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the New York General Business Law and any rules and regulations promulgated thereunder are met independently without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF NEW YORK LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC. READ THIS ADDENDUM CAREFULLY.**

**AMENDMENT TO FRANCHISE AGREEMENT
FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
REQUIRED BY THE STATE OF NEW YORK**

In recognition of the requirements of the New York General Business Law, Article 33, Sections 680 through 695 (the "Act") and the regulations promulgated thereunder, the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of New York as follows:

1. The following language shall be added to the end of Article 9.A:

    "The changes to the Operations Manual contemplated by this Section shall not impose an unreasonable economic burden on Franchisee or unreasonably increase Franchisee's obligations under this Agreement."

2. The following language shall be added to the beginning of Article 22.A:

    "Franchisee may terminate this Agreement under any grounds available under the New York General Business Law."

3. The following language shall be added to the end of Article 25.A:

    "However, no assignment shall be made by Franchisor except to an assignee who, in the good faith judgment of Franchisor, is willing and able to assume Franchisor's obligations under this Agreement."

4. The following language shall be added to the end of Article 28:

    "This provision is not a waiver of any right conferred upon Franchisee by the General Business Law of the State of New York, Article 33."

5. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

6. Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

7. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signatures next page; remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**               **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____


**FRANCHISEE:**               _____

By:_____

Name: _____

Title: _____


New York Effective Date: _____

**AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF NEW YORK**

In recognition of the requirements of the New York General Business Law, Article 33, Sections 680 through 695 (the "Act") and the regulations promulgated thereunder, the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of New York as follows:

1.  Franchisee may terminate this Agreement under any grounds available under the New York General Business Law."

2.  The following language shall be added to the end of Section 7:

    "However, no assignment shall be made by Franchisor except to an assignee who, in the good faith judgment of Franchisor, is willing and able to assume Franchisor's obligations under this Agreement."

3.  The enforcement provisions in the Multi Unit Development Agreement are not a waiver of any right conferred upon Franchisee by the General Business Law of the State of New York, Article 33.

4.  Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

5.  Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

6.  Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signatures next page; remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**                  **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____

**FRANCHISEE:**             _____

By:_____

Name: _____

Title: _____

New York Effective Date: _____

**ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT
FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
REQUIRED BY THE STATE OF NORTH DAKOTA**

In recognition of the requirements of the North Dakota Franchise Investment Law, §§ 51-19-01 through 51-19-17, and the regulations promulgated thereunder, the Uniform Franchise Disclosure Document of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**, for use in the State of North Dakota shall be amended as follows:

1. On the State Cover Page, the sentence in the first paragraph that begins with "Registration of a franchise…." shall be deleted in its entirety and replaced with the following:

    "Registration of this Franchise by a state does not mean that the state recommends it or has verified the information in this Franchise Disclosure Document.  If you learn that anything in this Franchise Disclosure Document is untrue, contact the Federal Trade Commission and the North Dakota Securities Department, 600 East Boulevard, Fifth Floor, Bismarck, North Dakota 58505, which administers and enforces the franchise laws in North Dakota."

2. Additional Item 17 Disclosures.  The following statements are added to Item 17:

    a. Any provision requiring franchisees to consent to the jurisdiction of courts outside North Dakota or to consent to the application of laws of a state other than North Dakota may be unenforceable under North Dakota law. Any mediation or arbitration will be held at a site agreeable to all parties. If the laws of a state other than North Dakota govern, to the extent such law conflicts with North Dakota law, North Dakota law will control.

    b. Any general release the franchisee is required to assent to as a condition of renewal is not intended to nor shall it act as a release, estoppel or waiver of any liability franchisor may have incurred under the North Dakota Franchise Investment Law.

    c. Covenants not to compete during the term of and upon termination or expiration of the franchise agreement are enforceable only under certain conditions according to North Dakota law. If the Franchise Agreement contains a covenant not to compete that is inconsistent with North Dakota law, the covenant may be unenforceable.

    d. If the Franchise Agreement includes a waiver of exemplary and punitive damages it may not be enforceable under North Dakota law.

    e. If the Franchise Agreement stipulates that the franchisee shall pay all costs and expenses incurred by Franchisor in enforcing the agreement, for North Dakota franchisees, the prevailing party is entitled to recover all costs and expenses, including attorneys' fees.

    f. Any requirement in the Franchise Agreement requiring the Franchisee to consent to a waiver of trial by jury may not be enforceable under North Dakota law.

    g. Any requirement in the Franchise Agreement or the Disclosure Document requiring the Franchisee to consent to the jurisdiction of courts outside the State of North Dakota may not be enforceable under North Dakota law.

     h.  For any requirement of the Franchisee to consent to a limitation of claims within one year in the Franchise Agreement, to the extent it conflicts with North Dakota law, North Dakota law will apply.

     i.  The Franchise Disclosure Document and Franchise Agreement may require the Franchisee to consent to termination or liquidated damages. This requirement may not be enforceable under North Dakota law.

3.  Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the North Dakota Franchise Investment Law and any rules and regulations promulgated thereunder are met independently without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF NORTH DAKOTA LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC.  READ THIS ADDENDUM CAREFULLY.**

## AMENDMENT TO THE FRANCHISE AGREEMENT
## FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
## REQUIRED BY THE STATE OF NORTH DAKOTA

In recognition of the requirements of the North Dakota Franchise Investment Law, §§ 51-19-01 through 51-19-17 (the "Act"), and the regulations promulgated thereunder, the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of North Dakota as follows:

1. Article 19 shall be supplemented by the addition of the following sentence at the end of the section:

   "Covenants not to compete such as those mentioned above are generally considered unenforceable in the state of North Dakota."

2. Article 23.J, shall be supplemented by the addition of the following language:

   "Under North Dakota law, certain liquidated damages clauses are unenforceable." Any litigation would be subject to this limitation.

3. The first sentence of Article 32.I regarding "Waiver of Trial by Jury" shall be deleted.

4. The first sentence of Article 32.L shall be deleted in its entirety and replaced with the following:

   "Notwithstanding anything contained in this Agreement to the contrary, any and all claims and actions arising out of or relating to this Agreement, the relationship between you and us, or your operation of your Store shall be governed by the statute of limitations under North Dakota Law."

5. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

6. Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

7. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signatures next page]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**           **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____

**FRANCHISEE:**       _____

By:_____

Name: _____

Title: _____

North Dakota Effective Date: _____

## AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT
## FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
## REQUIRED BY THE STATE OF NORTH DAKOTA

In recognition of the requirements of the North Dakota Franchise Investment Law, §§ 51-19-01 through 51-19-17 (the "Act") and the regulations promulgated thereunder, the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of North Dakota as follows:

1. The first sentence of Section 8.F(5) regarding "Jury Trial Waiver" shall be deleted.
2. Notwithstanding anything contained in this Agreement to the contrary, any and all claims and actions arising out of or relating to this Agreement, the relationship between you and us, or your operation of your Store shall be governed by the statute of limitations under North Dakota Law.

3. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment.

4. Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect.  To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

5. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signatures next page; remainder of page intentionally left blank]

      **IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**                **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____


**FRANCHISEE:**                _____

By:_____

Name: _____

Title: _____

North Dakota Effective Date: _____

**ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF RHODE ISLAND**

In recognition of the requirements of the Rhode Island Franchise Investment Act, §§ 19-28.1-1 through 19-28.1-34 (the "Act"), the Franchise Disclosure Document of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**, for use in the state of Rhode Island shall be amended as follows:

1. On the State Cover Page, the sentence in the first paragraph that begins with "Registration of a franchise…." shall be deleted in its entirety and replaced with the following:

   "Registration of this Franchise with any state does not mean that the state recommends it or has verified the information in this Franchise Disclosure Document. If you learn that anything in this Franchise Disclosure Document is untrue, contact the Federal Trade Commission and the Franchise Administrator for the State of Rhode Island Department of Business Regulation-Securities Division, 1511 Pontiac Avenue, Building 69-1, Cranston, Rhode Island 02920."

2. On the State Cover Page, the Risk Factor regarding governing law is supplemented with the following language:

   "SECTION 19-28.1-14 OF THE RHODE ISLAND FRANCHISE INVESTMENT ACT PROVIDES THAT 'A PROVISION IN A FRANCHISE AGREEMENT RESTRICTING JURISDICTION OR VENUE TO A FORUM OUTSIDE THIS STATE OR REQUIRING THE APPLICATION OF THE LAWS OF ANOTHER STATE IS VOID WITH RESPECT TO A CLAIM OTHERWISE ENFORCEABLE UNDER THIS ACT.'"

3. Additional Item 17 Disclosure. The following statement is added to Item 17:

   "Section 19-28.1-14 of the Rhode Island Franchise Investment Act provides that 'a provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act.'"

4. Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Act and any rules and regulations promulgated thereunder are met independently without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF RHODE ISLAND LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC.  READ THIS ADDENDUM CAREFULLY.**

**AMENDMENT TO FRANCHISE AGREEMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF RHODE ISLAND**

In recognition of the requirements of the Rhode Island Franchise Investment Act, §§ 19-28.1-1 through 19-28.1-34 (the "Act"), the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Rhode Island as follows:

1. Article 28 under the heading "ENFORCEMENT BY US" shall be supplemented by the addition of the following sentence at the end of Section 28:

   "Section 19-28, 1-14 of the Rhode Island Franchise Investment Act provides that 'a provision in a Franchise Agreement restricting jurisdiction or venue to a form outside of this state or requiring application of the laws of another state is void with respect to a claim otherwise enforceable under this Act.'"

2. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

3. Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

4. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signatures next page; remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**                    **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____

**FRANCHISEE:**                    _____

By:_____

Name: _____

Title: _____

Rhode Island Effective Date: _____

**AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF RHODE ISLAND**

In recognition of the requirements of the Rhode Island Franchise Investment Act, §§ 19-28.1-1 through 19-28.1-34 (the "Act"), the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Rhode Island as follows:

1. Section 19-28, 1-14 of the Rhode Island Franchise Investment Act provides that 'a provision in a franchise agreement (including this Multi-Unit Development Agreement) restricting jurisdiction or venue to a form outside of this state or requiring application of the laws of another state is void with respect to a claim otherwise enforceable under this Act.'"

2. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment.  This Amendment shall have no force or effect if such jurisdictional requirements are not met.

3. Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect.  To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

4. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signatures next page; remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**                    **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____

**FRANCHISEE:**                    _____

By:_____

Name: _____

Title: _____

Rhode Island Effective Date: _____

**ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF SOUTH DAKOTA**

In recognition of the requirements of the South Dakota Franchise Investment Law, §§ 37-5B-1 through 37-5B-53 (the "Act"), and the policies of the Director of the Securities Division, the Franchise Disclosure Document for **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of South Dakota shall be amended as follows:

1. Item 3, "LITIGATION" shall be amended by the addition of the following paragraphs:

   a. Neither Franchisor, nor any person identified in Item 3 above, has during the ten-year period preceding the date of this Franchise Disclosure Document, been convicted of a felony, or pleaded nolo contendere to any other felony charge, been convicted of a misdemeanor or pleaded guilty to a misdemeanor charge, reached a settlement in a civil action, been held liable in a civil action by final judgment, or been the subject of any material complaint or legal proceeding, where such felony, misdemeanor, civil action, complaint, or other legal proceeding involved the violation of any franchise law, fraud, embezzlement, fraudulent conversion, restraint of trade, unfair or deceptive practices, misappropriation of property, or comparable allegations.

   b. Neither Franchisor, nor any person identified in Item 3 above, has any material arbitration proceeding pending, or has, during the ten-year period immediately preceding the date of this Franchise Disclosure Document, been a party to concluded material arbitration proceedings.

   c. Neither Franchisor, nor any person identified in Item 3 above, is subject to any currently effective order or ruling of the federal trade commission.

2. Additional Item 17 Disclosures. The following statements shall be added to Item 17:

   a. To the extent that Franchisor has the right to terminate the Franchise Agreement or Multi Unit Development Agreement based on failure of Franchisee to meet performance and/or quality standards or in response to another breach of the Multi-Unit Development Agreement or Franchise Agreement, South Dakota law provides that Franchisor must provide a 30 day written notice with an opportunity to cure such default prior to termination.

   b. Covenants not to compete upon termination or expiration of the Franchise Agreement are generally unenforceable in the State of South Dakota, except in certain instances as provided by law.

   c. Any provision in the Franchise Disclosure Document, Franchise Agreement or Multi-Unit Development Agreement restricting jurisdiction or venue to a forum outside of South Dakota or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under the South Dakota Franchise Act.

   d. The law regarding franchise registration, employment, covenants not to compete, and other matters of local concern shall be governed by the laws of the State of South Dakota.

3. Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Act and any rules and regulations promulgated thereunder are met independently without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF SOUTH DAKOTA LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC.  READ THIS ADDENDUM CAREFULLY.**

[Remainder of page intentionally left blank]

## AMENDMENT TO FRANCHISE AGREEMENT
## FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
## REQUIRED BY THE STATE OF SOUTH DAKOTA

In recognition of the requirements of the South Dakota Franchise Investment Law, §§ 37-5B-1 through 37-5B-53, the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**, for use in the State of South Dakota as follows:

1. Covenants not to compete upon termination or expiration of this Agreement are generally unenforceable in the State of South Dakota, except in certain instances provided by law.

2. Upon any breach of this Agreement by Franchisee, or the failure of Franchisee to meet the performance and quality standards established by Franchisor, Franchisor may terminate this Agreement only by giving written notice of termination stating the nature of such default to Franchisee at least thirty (30) days prior to the effective date of termination; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to Franchisor's satisfaction, and by promptly providing proof thereof to Franchisor within the thirty-day period. If any such default is not cured within the thirty-day period, this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of the thirty (30) day period.

3. Any provision that provides that the parties' waive their right to claim punitive, exemplary, incidental, indirect, special or consequential damages or any provision that provides that parties waive their right to a jury trial may not be enforceable under South Dakota law.

4. The law regarding franchise registration, employment, covenants not to compete, and other matters of local concern shall be governed by the laws of the State of South Dakota. Any provision in this Agreement restricting jurisdiction or venue to a forum outside of South Dakota or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under the South Dakota Franchise Act.

5. Nothing in this Agreement shall be deemed to constitute a waiver of compliance with any provision of the South Dakota Franchises for Brand-Name Goods and Services Act.

6. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

7. Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

8. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signatures next page]

       **IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**             **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

                              By:_____

                              Name: _____

                              Title: _____

**FRANCHISEE:**             _____

                              By:_____

                              Name: _____

                              Title: _____

South Dakota Effective Date: _____

**AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF SOUTH DAKOTA**

In recognition of the requirements of the South Dakota Franchise Investment Law, §§ 37-5B-1 through 37-5B-53 (the "Act"), the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of AMERICAN SHAMAN FRANCHISE SYSTEM, LLC, for use in the State of South Dakota as follows:

1.  Upon any breach of this Agreement by Franchisee, or the failure of Franchisee to meet the performance and quality standards established by Franchisor, Franchisor may terminate this Agreement only by giving written notice of termination stating the nature of such default to Franchisee at least thirty (30) days prior to the effective date of termination; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to Franchisor's satisfaction, and by promptly providing proof thereof to Franchisor within the thirty-day period.  If any such default is not cured within the thirty-day period, this Agreement shall terminate without further notice to Franchisee effective immediately upon the expiration of the thirty (30) day period.

2.  Any provision that provides that the parties' waive their right to claim punitive, exemplary, incidental, indirect, special or consequential damages or any provision that provides that parties waive their right to a jury trial may not be enforceable under South Dakota law.

3.  The law regarding franchise registration, employment, covenants not to compete, and other matters of local concern shall be governed by the laws of the State of South Dakota.  Any provision in this Agreement restricting jurisdiction or venue to a forum outside of South Dakota or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under the South Dakota Franchise Act.

4.  Nothing in this Agreement shall be deemed to constitute a waiver of compliance with any provision of the South Dakota Franchises for Brand-Name Goods and Services Act.

5.  Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment.  This Amendment shall have no force or effect if such jurisdictional requirements are not met.

6.  Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect.  To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

7.  Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signatures next page]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**                         **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____

**FRANCHISEE:**                         _____

By:_____

Name: _____

Title: _____

South Dakota Effective Date: _____

**ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT**
**FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**
**REQUIRED BY THE STATE OF WASHINGTON**

In recognition of the requirements of the Washington Franchise Investment Protection Act, §§ RCW 19.100.010 to RCW 19.100.941, and the Regulations Issued by the Securities Division, Department of Financial Institutions and according to the Washington Franchise Investment Protection Act, WAC 460-80-100 to WAC 460-82-200 (collectively, the "Act"), the Franchise Disclosure Document of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**, for use in the State of Washington shall be amended as follows:

1. On the State Cover Page, the sentence in the first paragraph that begins with "Registration of a franchise…." shall be deleted in its entirety and replaced with the following:

   "Registration of this Franchise with any state does not mean that the state recommends it or has verified the information in this Franchise Disclosure Document.  If you learn that anything in this Franchise Disclosure Document is untrue, contact the Federal Trade Commission and the Washington State Department of Financial Institutions, Securities Division, Post Office Box 9033, Olympia, Washington 98507-9033."

2. Additional Item 17 Disclosures.  The following statements shall be added to Item 17:

   a. Under Washington law, transfer fees are collectable only to the extent that they reflect Franchisor's reasonable estimated or actual costs in effecting a transfer.

   b. The general release does not include a release of your claims under the Washington Franchise Investment Protection Act, or any rule thereunder except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel. Provisions such as those which unreasonably restrict or limit the statute of limitations period for claims under the Act, or rights or remedies under the Act such as a right to a jury, may not be enforceable.

   c. \

   d. The choice of forum provision may not be enforceable under Washington law.

   e. The choice of law provision may not be enforceable under Washington law.

   f. In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW shall prevail.

   g. To the extent not inconsistent with applicable law, the Franchise Agreement and the offer and sale of a Franchise are governed by the laws of the state of Washington.

   h. If any of the provisions in the Franchise Disclosure Document or Multi Unit Development Agreement are inconsistent with the relationship provisions of RCW 19.100.180 or other requirements of the Washington Franchise Investment Protection Act, the provisions of the Act will supercede and prevail over the inconsistent provisions of the Franchise Disclosure Document and Franchise Agreement with regard to any Franchise sold in Washington, including the areas of termination and renewal of your franchise. There may also be court decisions which

may supercede the Franchise Agreement in your relationship with the Franchisor including the areas of termination and release.

i.   In any arbitration or mediation involving a Franchise purchased in Washington, the arbitration or mediation site shall be either in the state of Washington, or in a place mutually agreed upon at the time of the arbitration or mediation, or as determined by the arbitrator or mediation."Pursuant to RCW 49.62.020, a noncompetition covenant is void and unenforceable against an employee, including an employee of a franchise, unless the employee's earnings from the parting seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation). In addition, a noncompetition covenant is void and unenforceable against an independent contractor of a franchise under RCW 49.62.030 unless the independent contractor's earnings from the party seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the Franchise Agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington.

j.   RCW 49.62.060 prohibits a franchisor from restricting, restraining, or prohibiting a franchise from (i) soliciting or hiring any employee of a franchise of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in the Franchise Agreement or elsewhere are void and unenforceable in Washington.

k.   Transfer fees are collectable to the extent that they reflect the franchisor's reasonable estimated or actual costs in effecting a transfer.

4.   Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Act and any rules and regulations promulgated thereunder are met independently without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF WASHINGTON LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC. READ THIS ADDENDUM CAREFULLY.**

[Remainder of page intentionally left blank]

## AMENDMENT TO FRANCHISE AGREEMENT
## FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
## REQUIRED BY THE STATE OF WASHINGTON

In recognition of the requirements of the Washington Franchise Investment Protection Act, §§ RCW 19.100.010 to RCW 19.100.941, and the Regulations Issued by the Securities Division, Department of Financial Institutions according to the Washington Franchise Investment Protection Act, WAC 460-80-100 to WAC 460-82-200 (collectively, the "Act"), the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Washington as follows:

1.  The following language shall be added to the end of Article 25.B.2:

    "Provided however, under Washington law, transfer fees are collectable only to the extent that they reflect Franchisor's reasonably estimated or actual costs in effecting a transfer."

2.  The following language shall be added to the end of Article 25.B.1(7):

    "Provided however, the general release will not include a release of your claims under the Washington Franchise Investment Protection Act, except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel"

3.  The following language shall be added to the end of Article 6.B.6:

    "Provided however, the general release will not include a release of your claims under the Washington Franchise Investment Protection Act, except when executed pursuant to a negotiated settlement after the agreement is in effect and where the parties are represented by independent counsel."

4.  The following language shall be added at the end of Article 28:

    "This provision may not be enforceable under Washington law.  In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW shall prevail, , including the areas of termination and renewal of your franchise. There may also be court decisions which may supercede the Franchise Agreement in your relationship with the Franchisor including the areas of termination and release, including the areas of termination and renewal of your franchise There may also be court decisions which may supercede the Franchise Agreement in your relationship with the Franchisor including the areas of termination and release."

5.  The following language shall be added at the end of Article 24.B.:

    5.      Pursuant to RCW 49.62.020, any noncompetition covenant as set forth above is void and unenforceable against an employee, including an employee of a franchise, unless the employee's earnings from the parting seeking enforcement, when annualized, exceed $100,000 per year (an amount that will be adjusted annually for inflation). In addition, any noncompetition covenant as set forth above is void and unenforceable against an independent contractor of a franchise under RCW 49.62.030 unless the independent contractor's earnings from the party

seeking enforcement, when annualized, exceed $250,000 per year (an amount that will be adjusted annually for inflation). As a result, any provisions contained in the Franchise Agreement or elsewhere that conflict with these limitations are void and unenforceable in Washington.

6.   The following language shall be added at the end of Article 24.C.:

3.     Pursuant to RCW 49.62.060 any non-solicitation provision set forth above in this Article 24 C shall be limited to the extent it constitutes a prohibition on a franchisor from restricting, restraining, or prohibiting a franchise from (i) soliciting or hiring any employee of a franchise of the same franchisor or (ii) soliciting or hiring any employee of the franchisor. As a result, any such provisions contained in this Franchise Agreement or elsewhere are void and unenforceable in Washington.

7.   Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment.  This Amendment shall have no force or effect if such jurisdictional requirements are not met.

8.   Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect.  To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

9.   Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

[Signatures next page]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**                          **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____


**FRANCHISEE:**                          _____

By:_____

Name: _____

Title: _____

Washington Effective Date: _____

**AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT
FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
REQUIRED BY THE STATE OF WASHINGTON**

In recognition of the requirements of the Washington Franchise Investment Protection Act, §§ RCW 19.100.010 to RCW 19.100.941, and the Regulations Issued by the Securities Division, Department of Financial Institutions according to the Washington Franchise Investment Protection Act, WAC 460-80-100 to WAC 460-82-200 (collectively, the "Act"), the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Washington as follows:

1. Under Washington law, transfer fees are collectable only to the extent that they reflect Franchisor's reasonably estimated or actual costs in effecting a transfer.

2. The enforcement provisions in the Multi Unit Development Agreement may not be enforceable under Washington law.  In the event of a conflict of laws, the provisions of the Washington Franchise Investment Protection Act, Chapter 19.100 RCW shall prevail.

3. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment.  This Amendment shall have no force or effect if such jurisdictional requirements are not met.

4. Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect.  To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

5. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signatures next page; remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**                     **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____


**FRANCHISEE:**                     _____

By:_____

Name: _____

Title: _____

Washington Effective Date: _____

## ADDENDUM TO FRANCHISE DISCLOSURE DOCUMENT
## FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
## REQUIRED BY THE STATE OF WISCONSIN

In recognition of the requirements of the Wisconsin Franchise Investment Law, Wis. Stat. §§ 553.01 to 553.78 and the Wisconsin Fair Dealership Law, Wis. Stat. §§ 135.01-135.07 (collectively, the "Act"), the Franchise Disclosure Document of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Wisconsin shall be amended as follows:

1.  On the State Cover Page, the sentence in the first paragraph that begins with "Registration of a franchise…." shall be deleted in its entirety and replaced with the following:

    "Registration of this Franchise with a state does not mean that the state recommends, or it has verified the information in this Franchise Disclosure Document. If you learn that anything in this Franchise Disclosure Document is untrue, contact the Federal Trade Commission and the Commissioner of Securities, Madison, Wisconsin 53701."

2.  Additional Item 17 Disclosures. The following statements shall be added to Item 17:

    a.  To the extent that the provisions regarding renewal described in this Franchise Disclosure Document are inconsistent with the requirements of the Wisconsin Fair Dealership Law, § 135.04, (which, among other things, currently grants you the right, in most circumstances, to 90 days prior written notice of non-renewal and 60 days within which to remedy any claimed deficiencies), the renewal provisions will be superseded by the Wisconsin Fair Dealership Law.

    b.  To the extent that the provisions regarding termination described in this Franchise Disclosure Document are inconsistent with the requirements of the Wisconsin Fair Dealership Law, § 135.04, (which, among other things, currently grants you the right, in most circumstances, to 90 days prior written notice of termination and 60 days within which to remedy any claimed deficiencies), the termination provisions will be superseded by the Wisconsin Fair Dealership Law.

    c.  For Wisconsin franchisees, Ch. 135. Stats., the Wisconsin Fair Dealership law, supercedes any provisions of the Franchise Agreement or a related contract which is inconsistent with the law.

    d.  The choice of forum provision may not be enforceable under Wisconsin law.

    e.  No provision of the Franchise Agreement or Multi Unit Development Agreement will constitute a waiver of compliance with any provision of the Wisconsin Franchise Investment Law or Wisconsin Fair Dealership Law."

3.  Each provision of this Addendum shall be effective only to the extent, with respect to such provision, that the jurisdictional requirements of the Act and any rules and regulations promulgated thereunder are met independently without reference to this Addendum.

**THIS ADDENDUM ADDRESSES CERTAIN PROVISIONS OF WISCONSIN LAW THAT AMEND THE FRANCHISE DISCLOSURE DOCUMENT OF AMERICAN SHAMAN FRANCHISE SYSTEM, LLC. READ THIS ADDENDUM CAREFULLY.**

## AMENDMENT TO FRANCHISE AGREEMENT
## FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
## REQUIRED BY THE STATE OF WISCONSIN

In recognition of the requirements of the Wisconsin Franchise Investment Law, Wis. Stat. §§ 553.01 to 553.78 and the Wisconsin Fair Dealership Law, Wis. Stat. §§ 135.01-135.07 (collectively, the "Act"), the parties set forth below agree to enter into this Amendment to Franchise Agreement (the "Amendment") to amend the Franchise Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Wisconsin as follows:

1.  To the extent that the provisions in the Franchise Agreement regarding renewal are inconsistent with the requirements of the Wisconsin Fair Dealership Law, § 135.04, (which, among other things, currently grants you the right, in most circumstances, to 90 days prior written notice of non-renewal and 60 days within which to remedy any claimed deficiencies), the renewal provisions will be superseded by the Wisconsin Fair Dealership Law.

2.  To the extent that the provisions in the Franchise Agreement regarding termination are inconsistent with the requirements of the Wisconsin Fair Dealership Law, § 135.04, (which, among other things, currently grants you the right, in most circumstances, to 90 days prior written notice of non-renewal and 60 days within which to remedy any claimed deficiencies), the termination provisions will be superseded by the Wisconsin Fair Dealership Law.

3.  The following language shall be added at the end of Article 28:

    "This provision may not be enforceable under Wisconsin law. No provision of this Agreement will constitute a waiver of compliance with any provision of the Wisconsin Franchise Investment Law or Wisconsin Fair Dealership Law."

6.  Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

7.  Except as expressly modified by this Amendment, the Franchise Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Franchise Agreement, the terms of this Amendment shall govern.

8.  Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Franchise Agreement.

    [Signatures next page; remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, the parties have executed this Amendment to Franchise Agreement as of the dates written below.

**FRANCHISOR:**              **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By:_____

Name: _____

Title: _____

**FRANCHISEE:**             _____

By:_____

Name: _____

Title: _____

Wisconsin Effective Date: _____

**AMENDMENT TO MULTI UNIT DEVELOPMENT AGREEMENT
FOR AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
REQUIRED BY THE STATE OF WISCONSIN**

In recognition of the requirements of the Wisconsin Franchise Investment Law, Wis. Stat. §§ 553.01 to 553.78 and the Wisconsin Fair Dealership Law, Wis. Stat. §§ 135.01-135.07 (collectively, the "Act"), the parties set forth below agree to enter into this Amendment to Multi Unit Development Agreement (the "Amendment") to amend the Multi Unit Development Agreement of **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC,** for use in the State of Wisconsin as follows:

4. To the extent that the provisions in the Multi Unit Development Agreement regarding renewal are inconsistent with the requirements of the Wisconsin Fair Dealership Law, § 135.04, (which, among other things, currently grants you the right, in most circumstances, to 90 days prior written notice of non-renewal and 60 days within which to remedy any claimed deficiencies), the renewal provisions will be superseded by the Wisconsin Fair Dealership Law.

5. To the extent that the provisions in the Multi Unit Development Agreement regarding termination are inconsistent with the requirements of the Wisconsin Fair Dealership Law, § 135.04, (which, among other things, currently grants you the right, in most circumstances, to 90 days prior written notice of non-renewal and 60 days within which to remedy any claimed deficiencies), the termination provisions will be superseded by the Wisconsin Fair Dealership Law.

6. The enforcement provisions in the Multi Unit Development Agreement may not be enforceable under Wisconsin law. No provision of this Agreement will constitute a waiver of compliance with any provision of the Wisconsin Franchise Investment Law or Wisconsin Fair Dealership Law."

9. Each provision of this Amendment shall be effective only to the extent, with respect to such provision, that the jurisdiction requirements of the Act and the regulations promulgated thereunder are independently met without reference to this Amendment. This Amendment shall have no force or effect if such jurisdictional requirements are not met.

10. Except as expressly modified by this Amendment, the Multi Unit Development Agreement remains unmodified and in full force and effect. To the extent this Amendment shall be deemed inconsistent with any terms or conditions of the Multi Unit Development Agreement, the terms of this Amendment shall govern.

11. Any capitalized terms that are not defined in this Amendment shall have the meaning given them in the Multi Unit Development Agreement.

[Signatures next page; remainder of page intentionally left blank]

      **IN WITNESS WHEREOF**, the parties have executed this Amendment to Multi Unit Development Agreement as of the dates written below.

**FRANCHISOR:**           **AMERICAN SHAMAN FRANCHISE SYSTEM, LLC**

By: _____

Name: _____

Title: _____


**FRANCHISEE:**           _____

By: _____

Name: _____

Title: _____

Wisconsin Effective Date: _____

## EXHIBIT "K"

## ASSIGNMENT OF TELEPHONE NUMBERS, TELEPHONE LISTINGS,
## AND INTERNET ADDRESSES

This Assignment is made, and entered into, between AMERICAN SHAMAN FRANCHISE SYSTEM, LLC, a Nevada limited liability company, hereinafter referred to as "Franchisor", "we" or "us" and by _____, a _____ and a franchisee of Franchisor, hereinafter referred to as "you" or "your".

RECITALS:

WHEREAS, we and you have entered into a Franchise Agreement, dated _____ (incorporated herein by reference as though set forth in full herein); and

WHEREAS, it is the desire of and in the best interests of the SHAMAN System that in the event of the termination or ending of the franchise relationship between the parties, that the telephone numbers, listings and internet address, used by you be retained and continue to be identified as a SHAMAN System property per the Franchise Agreement between us and you for the operation of a SHAMAN store at _____ (the "Franchise Agreement").

NOW THEREFORE, in consideration for entering in the aforestated Franchise Agreement, you hereby agree to assign to us (1) those certain telephone numbers and regular, classified or other telephone directory listings (collectively, the "Addresses; Numbers and Listings") and (2) those certain website addresses ("URLs") associated with the SHAMAN System trade and service marks and used from time to time in connection with the operation of the your business arising out of the Franchise Agreement. This Assignment is for collateral purposes only and, except as specified herein, we shall have no liability or obligation of any kind whatsoever arising from or in connection with this Assignment, unless we shall notify the telephone company and the listing agencies with which you have placed telephone directory listings (all such entities are collectively referred to herein as "Telephone Company") and your Internet Service Provider ("ISP") to effectuate the assignment pursuant to the terms hereof.

Upon termination or expiration of the Franchise Agreement (without renewal or extension), we shall have the right and are hereby empowered to effectuate the assignment of the addresses, numbers and listings and the URLs, and, in such event, you shall have no further right, title or interest in the addresses, numbers and listings and the URLs, and shall remain liable to the Telephone Company and the ISP for all past due fees owing to the Telephone Company and the ISP on or before the effective date of the assignment hereunder.

You agree and acknowledge that as between us and you, upon termination or expiration of the Franchise Agreement, we shall have the sole right to an interest in the addresses, numbers and listings and the URLs, and you appoint us as your true and lawful attorney-in-fact to direct the Telephone Company and the ISP to assign the same to us, and execute such documents and take such actions as may be necessary to effectuate the assignment. Upon such event, you shall immediately notify the Telephone Company and the ISP to assign the addresses, numbers and listings and the URLs to us. If you fail to promptly direct the Telephone Company and the ISP to assign the addresses, numbers and listings and the URLs to us, we shall direct the Telephone Company and the ISP to effectuate the

assignment contemplated hereunder to us. The parties agree that the Telephone Company and the ISP may accept our written direction, the Franchise Agreement or this Assignment as conclusive proof of our exclusive rights in and to the addresses, numbers and listings and the URLs upon such termination or expiration and that such assignment shall be made automatically and effective immediately upon Telephone Company's and ISP's receipt of such notice from us or you. The parties further agree that if the Telephone Company or the ISP requires that the parties execute the Telephone Company's or the ISP's assignment forms or other documentation at the time of termination or expiration of the Franchise Agreement, our execution of such forms or documentation on behalf of you shall effectuate your consent and agreement to the assignment. The parties agree that at any time after the date hereof they will perform such acts and execute and deliver such documents as may be necessary to assist in or accomplish the assignment described herein upon termination or expiration of the Franchise Agreement.

Agreed to this _____ day of _____, 202___.
(ASSIGNOR)

_____

By: _____   Title: _____

**EXHIBIT "L"**

**AUTHORIZATION FOR ELECTRONIC FUNDS TRANSFER**

AMERICAN SHAMAN FRANCHISE SYSTEM, LLC
2405 Southwest Blvd.
Kansas City, MO 64108
Phone: 855-427-7386

The undersigned does hereby authorize AMERICAN SHAMAN FRANCHISE SYSTEM, LLC (the "Company"), to initiate Electronic Funds Transfer charges to the institution and account (indicated below) for payment of_____ pursuant to the Franchise Agreement dated _____ by the undersigned to the Company.

Financial Institution Name: _____
Account Number: _____
Branch Name: _____
Address: _____
City: _____
State: _____
Zip: _____

.
AMERICAN SHAMAN FRANCHISE SYSTEM, LLC


By: _____

Title: _____

Effective Date: _____


Please attach a voided blank check for verification purposes. {VOIDED CHECK]

**EXHIBIT "M-1"**

**LIST OF ACTIVE FRANCHISEES IN SYSTEM**

| Location Address | City | State | Zip | Store Phone | Owner Last Name | Owner First Name |
|---|---|---|---|---|---|---|
| 365 The Bridge St, Suite 105 | Madison | AL | 35758 | 256-325-1601 | Bowers | Juliana |
| 8490 Hwy 72 W. Suite 160 | Huntsville | AL | 35806 | 256-715-1271 | Bowers | Juliana |
| 1471 7th St S | Clanton | AL | 35045 | 205-258-5018 | Moore | Joseph |
| 509 W. Spring St. #225 | Fayetteville | AR | 72701 | 479-387-5484 | Bousman | Loudy |
| 1700 Rogers Ave. Suite A | Fort Smith | AR | 72901 | 479-763-1680 | Connor | Paige |
| 7022 W. Sunset Ave.  Suite 2 | Springdale | AR | 72762 | 479-334-6000 | Gallea | Bill |
| 4500 W. Walnut St. Ste. 9 | Rogers | AR | 72756 | 479-372-6552 | Gallea | Bill |
| 908 E Rolling Hills Dr. Ste. F | Fayetteville | AR | 72703 | 479-387-0022 | Parker | Allison |
| 2695 Patterson Rd.  #6A | Grand Junction | CO | 81506 | 970-200-4050 | Arballo | Luis |
| 1901 Kipling St.  Suite A | Lakewood | CO | 80215 | 720-402-0784 | Kenawell | Wade |
| 9878 W. Belleview Ave. | Littleton | CO | 80123 | 720-866-9833 | Kenawell | Wade |
| 11651 W 64th Ave #E2 | Arvada | CO | 80003 | 720-328-6216 | Sheils | Bridget |
| 6695 Wadsworth Blvd. Ste. C | Arvada | CO | 80003 | 720-583-2793 | Sheils | Bridget |
| 3915 E 120th Ave Ste. A | Thornton | CO | 80233 | 720-476-7123 | Martinez | Nikolas |
| 5137 W 120th Ave | Broomfield | CO | 80020 | 720-353-3538 | St. Peter | Patrick |
| 352 Route 2 | Preston | CT | 06365 | 860-892-1407 | Hunter | Scott |
| 361 Boston Post Rd. | North Windham | CT | 06256 | 860-465-9894 | Zaprianov | Vess |
| 3640 Kirkwood Hwy. 101-103 | Wilmington | DE | 19808 | 302-999-9348 | Dent | Michelle |
| 18979 Costal Hwy Suite 103 | Rehoboth Beach | DE | 19971 | 302-259-0987 | Whittle | Jay |
| 7208 Central Ave | St Petersburg | FL | 33707 | 727-256-2584 | Holt | Jennifer |
| 35222 US Hwy 19 N | Palm Harbor | FL | 35320 | 661-472-5332 | Neret | Michel |
| 4715 Gulf Blvd. | St. Pete Beach | FL | 33706 | 727-755-8585 | Burke | Joseph |
| 1024 Hwy A1A Ste 146 | Satellite Beach | FL | 32937 | 321-622-8875 | Sharqawi | Abe |
| 1060 S. Ponce De Leon Blvd. | St. Augustine | FL | 32084 | 904-342-2365 | Sharqawi | Abe |
| 14286 Beach Blvd. #26 | Jacksonville | FL | 32224 | 904-503-2187 | Sharqawi | Abe |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1871 Wells Rd. Ste 100 | Orange Park | FL | 32073 | 904-375-2573 | Sharqawi | Abe |
| 3020 Lake Washington Rd. | Melbourne | FL | 32934 | 321-610-4275 | Sharqawi | Abe |
| 9889 San Jose Blvd. Suite 6 | Jacksonville | FL | 32257 | 904-503-2187 | Sharqawi | Abe |
| 13806 Little Rd | Hudson | FL | 32667 | 727-378-4348 | Lakhani | Salim |
| 515 S Chiekasaw Trail | Orlando | FL | 32825 | 321-626-8620 | Rodgers | Raymond |
| 7777 N. Wickham Rd. Suite 14 | Melbourne | FL | 32940 | 321-600-4112 | Shorr | William |
| 2076 Badlands Dr. | Brandon | FL | 33511 | 813-653-3223 | Burke | Joseph |
| 1100 Cornerstone Blvd. Suite 1002 | Daytona Beach | FL | 32117 | 386-281-5115 | Wilson | Marvalyn |
| 200 Tanger Outlets Blvd. | Pooler | GA | 31322 | 972-210-7082 | Wilson | Marvalyn |
| 1706 Hwy 138 SE Ste J | Conyers | GA | 30013 | 770-648-6732 | Garrett | Thaddeus |
| 6201 Veterans Pkwy Suite E | Columbus | GA | 31909 | 706-507-5622 | Webb | David |
| 5350 United Dr | Smyrna | GA | 30082 | 770-989-1147 | Hunter | Jeanine |
| 3150 Highlands Pkwy SE Suite 107 | Smyrna | GA | 30082 | 770-672-7292 | Dent | Antoine |
| 5188 McGinnis Ferry Rd. | Alpharetta | GA | 30005 | 678-691-4473 | Keck | Stacy |
| 3330 Cobb Pkwy NW #312 | Acworth | GA | 30101 | 770-285-3010 | Allen | Laura |
| 4875 Floyd Rd SW #101 | Mableton | GA | 30126 | 678-556-5995 | Allen | Curtis |
| 5715 Buford Hwy #201 | Doraville | GA | 30340 | 678-404-5009 | Bearden | Thomas |
| 9999 Hwy 92, #150 | Woodstock | GA | 30188 | 833-645-4673 | Blakeney | Kristian |
| 3845 N Druid Hills Rd. NE #203 | Decatur | GA | 30033 | 678-331-5433 | Dunne | Deniz |
| 911 Duluth Hwy B-5 | Lawrenceville | GA | 30043 | 678-331-5386 | Dunne | Deniz |
| 3595 Canton Rd | Marietta | GA | 30066 | 770-485-5410 | Glenn | Denise |
| 1750 Powder Springs Rd Ste. 540 | Marietta | GA | 30064 | 678-577-1411 | Pritchett | Amy |
| 3463 Lawrenceville-Suwanee Rd Ste 114 | Suwanee | GA | 30024 | 678-288-9011 | Tate | Daaliyah |
| 161 South Harbor Dr | Noblesville | IN | 46062 | 317-214-7923 | Edge | Taurese |
| 482 E. Carmel Dr. | Carmel | IN | 46032 | 317-795-2942 | Spina | Greg |
| 912 E. Westfield Blvd. | Indianapolis | IN | 46220 | 463-221-2829 | Spina | Greg |

| 202 E. Iron Ave. | Salina | KS | 67401 | 785-404-1343 | Berndt | Dennis |
|---|---|---|---|---|---|---|
| 16551 West 151st St | Olathe | KS | 66062 | 913-490-3195 | Burke | Michael |
| 6027 B Metcalf Ave. | Mission | KS | 66202 | 913-217-7123 | Carnes | Brandon |
| 1843 Village West Pkwy Suite C-124 | Kansas City | KS | 66111 | 913-499-7355 | Davis | Jennifer |
| 151 S. 18th St. Ste. U | Kansas City | KS | 66102 | 913-439-4318 | Fernandez | Omar |
| 608 Tulip Dr. Ste. G | Bonner Springs | KS | 66012 | 913-745-6667 | Fisher | Marikay |
| 704 N 11th Street | Manhattan | KS | 66502 | 785-477-5176 | Ince | Donald |
| 118 W. Peoria St. | Paola | KS | 66071 | 913-271-3120 | Johnston | Linda |
| 8043 State Ave. | Kansas City | KS | 66112 | 913-228-6000 | Murray | Elizabeth |
| 2214 E. Kansas Ave. Ste. 8 | Garden City | KS | 67846 | 620-288-1541 | Nolde | Bryce |
| 1819 E. Santa Fe St. | Gardner | KS | 66030 | 913-271-3120 | Sanders | Stephen |
| 2607 SW 21st St. | Topeka | KS | 66604 | 785-430-5262 | Todack | Jason |
| 7777 E. 21st N. Street, Suite 120 | Wichita | KS | 67206 | 316-941-5999 | Ware | Mary |
| 200 N. Baltimore Ave. #900 | Derby | KS | 67037 | 316-440-3371 | Zimmerman | Jeff |
| 1530 W. 6th St. Ste. C | Lawrence | KS | 66044 | 785-424-7500 | Zoeller | Heather |
| 3615 Nicholasville Rd. Ste. F/604 | Lexington | KY | 40503 | 859-971-5350 | Norris | Michael |
| 1812 W Pinhook Rd, Suite 203 | Lafayette | LA | 70508 | 337-345-5353 | Gossen | Lisa |
| 3471 Nelson Rd. | Lake Charles | LA | 70605 | 337-564-6191 | Honeycutt-Daigle | Marla |
| 190 Haverhill St | Methuen | MA | 01844 | 978-688-6806 | El Essawi | Khaled |
| 1690 Main St Suite D | Weymouth | MA | 02190 | 781-340-0034 | Mango | Anesti |
| 1201 Fall River Ave.  Ste. 1 | Seakonk | MA | 02771 | 508-557-1587 | Miley | Lesley |
| 18 Elm St. | Gorham | ME | 04038 | 207-222-0067 | Werts | Wayne |
| 10 Camden Ct. NE #1C | Camdenton | MO | 65020 | 573-317-9131 | Anderson | Jan |
| 701 S. Broadway St. | Oak Grove | MO | 64075 | 816-625-1127 | Brodzinski | Marnie |
| 1402 SW Eagles Pkwy | Grain Valley | MO | 64029 | 816-726-4615 | Keesee | Karen |
| 5650 Telegraph Road, Suite 5 | St Louis | MO | 63129 | 314-293-9817 | Kulik | Matthew |

| | | | | | | |
|---|---|---|---|---|---|---|
| 211 Salt Lick Rd. | St. Peters | MO | 63376 | 636-387-1711 | Nolen | Anthony |
| 1400 Forum Blvd. Suite 40 | Columbia | MO | 65203 | 573-355-5572 | Beard | Matthew |
| 1005 Middlebrook Dr. Suite C | Liberty | MO | 64068 | 913-249-7794 | Kalaiwaa | Francis |
| 468 Old Smizer Mill Rd. | Fenton | MO | 63026 | 314-701-7272 | Mebruer | Christine |
| 3520 SW Market Street | Lees Summit | MO | 64082 | 816-537-3233 | Ontiveros | Zachery |
| 3702 W. Truman Blvd. #200 | Jefferson City | MO | 65109 | 573-616-2524 | Pingleton | Charlie |
| 1412 S MO-7, Ste G | Blue Springs | MO | 64014 | 816-295-1921 | Stewart | Sal |
| 1415 W 39th St. | Kansas City | MO | 64111 | 816-541-3144 | Waters | Misty |
| 13125 State Line Rd. | Kansas City | MO | 64145 | 816-437-8261 | Wilkinson | Sharon |
| 937 Grand Ave. | Billings | MT | 59102 | 406-371-5191 | Leonard | Garreth |
| 827 9th St. S. | Great Falls | MT | 59405 | 406-315-3131 | Hendricks | Carey |
| 2891 S. 168th St. | Omaha | NE | 68130 | 402-885-8727 | Carbonell | Garrett |
| 15514 Spaulding Plaza Ste 105 | Omaha | NE | 68116 | 531-213-2256 | Queen | Jeff |
| 1600 Normandy Ct. #102 | Lincoln | NE | 68516 | 402-840-0393 | Schroeder | Lance |
| 233 N. 48th St. Ste. I | Lincoln | NE | 68504 | 402-817-2697 | Schroeder | Lance |
| 4721 S. 96th St. | Omaha | NE | 68127 | 402-932-2144 | Carbonell | Garrett |
| 1001 Farnam Street #100 | Omaha | NE | 68102 | 402-359-1248 | Gollobit | Paul |
| 3909 Twin Creek Dr. #104 | Bellevue | NE | 68123 | 402-933-7841 | Queen | Jeff |
| 5115 Leavenworth Street | Omaha | NE | 68106 | 402-359-1454 | Queen | Jonathon |
| 719 N. 120th St. | Omaha | NE | 68154 | 402-933-7822 | Queen | Jeff |
| 2834 Old Fair Rd | Grand Island | NE | 68803 | 308-675-1241 | Scellin | Brad |
| 2662 Cornhusker Hwy. Ste. 7C | Lincoln | NE | 68521 | 531-500-3672 | Schroeder | Lance |
| 1300 E. Plumb Ln. #B2 | Reno | NV | 89502 | 775-470-7421 | Bowen | Lori |
| 4850 W Flamingo Rd. Ste. 44 | Las Vegas | NV | 89103 | 725-735-5984 | Joson | Evelyn |
| 10410 S. Decatur Blvd. Ste. 102 | Las Vegas | NV | 89141 | 702-333-4392 | Spivak | Shawn |
| 5135 S. Fort Apache Rd. #105 | Las Vegas | NV | 89148 | 702-507-1594 | Spivak | Shawn |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3870 E. Flamingo Rd. Ste. A8 | Las Vegas | NV | 89121 | 702-444-4015 | Tyson | Karla |
| 276B E Lake Mead Pkwy | Henderson | NV | 89015 | 702-665-5300 | Vo | Kevin |
| 3338 S McCarran Blvd | Reno | NV | 89502 | 775-376-8232 | Eyre | Lee |
| 9850 S Maryland Pkwy Ste 16 | Las Vegas | NV | 89183 | 702-201-1962 | Vo | Kevin |
| 136 N Stephanie St Suite 120 | Henderson | NV | 89074 | 702-463-1132 | Vo | Kevin |
| 7175 W. Lake Mead Blvd. Ste. B - 150 | Las Vegas | NV | 89128 | 702-463-1888 | Scott | Jeff |
| 6870 S. Rainbow Blvd.  Ste. 111 | Las Vegas | NV | 89118 | 702-754-0524 | Co | Orlie |
| 7920 W. Tropical Pkwy.  Ste. 120 | Las Vegas | NV | 89149 | 702-463-3994 | Clarke | Sidney |
| 236 N. Broadway, Unit E | Salem | NH | 03079 | 603-898-7800 | Browne | Melissa |
| 270 Armherst St. | Nashua | NH | 03060 | 603-402-3293 | Gragg | Joshua |
| 44 Nashua Rd. #15 | Londonderry | NH | 03053 | 603-552-3836 | Gragg | Joshua |
| 1106 Union Ave. Unit #2 | Laconia | NH | 03246 | 603-528-7999 | Nieves | Miguel |
| 23 Plaistow Rd Suite 6 | Plaistow | NH | 03865 | 603- 947-2743 | Rheaume | Krystal |
| 150 Market Place Blvd Suite 5 | Rochester | NH | 03867 | 603-403-4229 | Capece | Joseph |
| 927 E Bender St. | Hobbs | NM | 88240 | 575-659-8615 | Tate | Bradley |
| 6629 Pearl Road | Parma Heights | OH | 44130 | 440-345-5059 | Tursi | Dale |
| 9391 Mentor Ave | Mentor | OH | 44060 | 440-290-0940 | Ely | Michael |
| 1781 Pearl Rd | Brunswick | OH | 44212 | 330-741-3627 | Patris | Vasilios |
| 1955 Niles Cortland Rd NE Suite 2 | Warren | OH | 44484 | 234-806-4433 | Schultz | Robert |
| 9402 N. May, #D | Oklahoma City | OK | 73120 | 405-753-9456 | Danuser | Matthew |
| 1306 N. Elm Pl. | Broken Arrow | OK | 74012 | 918-806-2089 | Doss | Jason |
| 11045 S. Memorial Dr. | Tulsa | OK | 74133 | 918-721-0866 | Green | Jared |
| 11230 North Garnett Road, Suite C | Owasso | OK | 74055 | 918-844-5911 | Haley | Adam |
| 5505 S Mingo Rd Suite A | Tulsa | OK | 74146 | 918-933-8327 | Haley | Adam |
| 22428 E. 71st St. South Ste. B | Broken Arrow | OK | 74014 | 918-279-6045 | Hefley | Amy |
| 4726 S.E. Hawthorne Blvd. | Portland | OR | 97215 | 971-678-7384 | Langston | John |

| Address | City | State | Zip | Phone | Last Name | First Name |
|---|---|---|---|---|---|---|
| 11633 SW Beaverton Hillsdale Hwy | Beaverton | OR | 97005 | 702-292-0181 | Consiglio | Jenna |
| 315 SW Montgomery St Suite 330 | Portland | OR | 97201 | 702-292-0181 | Nawrocki | Anthony |
| 1111 NE Broadway St. | Portland | OR | 97232 | 702-808-4189 | Nawrocki | Anthony |
| 38 N. 2nd St. | Newport | PA | 17071 | 717-204-7538 | Campbell | Amanda |
| 7727 Glenlivet Dr W, Suite D | Fogelsville | PA | 18051 | 484-656-7771 | Frey | Crystal |
| 506 3rd Ave | Duncansville | PA | 16635 | 814-696-4223 | Bryan | Thomas |
| 222 E Main Street #021 | Collegeville | PA | 19426 | 484-540-9220 | Ronan | William |
| 2250 Linglestown Rd. | Harrisburg | PA | 17110 | 717-510-6686 | Reisinger | Michael |
| 2355 Oregon Pike, Ste 105 | Lancaster | PA | 17601 | 717-874-5146 | Reisinger | Michael |
| 404 E. High St. #300 | Carlisle | PA | 17012 | 717-254-6643 | Reisinger | Michael |
| 5224 Simpson Ferry Rd. | Mechanicsburg | PA | 17050 | 717-620-8532 | Reisinger | Michael |
| 1104 Carlisle Rd. | Camp Hill | PA | 17011 | 717-577-3697 | Whittle | Jay |
| 2480 E. Market St. | York | PA | 17402 | 717-577-3703 | Whittle | Jay |
| 266 E. Main St. | Oak Ridge | TN | 37830 | 423-326-9730 | Brown | Jeff |
| 330 E Main Street | Chattanooga | TN | 37408 | 423-541-5193 | McIntyre | Melanie |
| 770 S. Jefferson Ave. Ste. B | Cookeville | TN | 38501 | 931-559-3604 | Unterstein | Paul |
| 1082 Hunters Crossing | Alcoa | TN | 37701 | 865-392-1011 | Fox | Mary Beth |
| 150 Lovell Rd. Ste. 102 | Knoxville | TN | 37934 | 865-392-1011 | Fox | Mary Beth |
| 313 W.Main St. | Hendersonville | TN | 37075 | 615-757-3778 | LaMot | Alisha |
| 925 Gallatin Ave. #103 | Nashville | TN | 37206 | 615-920-5595 | LaMot | Alisha |
| 3250 Memorial Blvd.  Suite B | Murfreesboro | TN | 37129 | 629-201-5971 | Wrinkle | Jennifer |
| 5756 Tennessee HWY 153 Suite 104 | Hixson | TN | 37343 | 423-541-6800 | McIntyre | Melanie |
| 2558 Memorial Blvd Suite C | Springfield | TN | 37172 | 615-667-4973 | McIntyre | Melanie |
| 5024 Hunter Road #110 | Ooltewah | TN | 37363 | 423-800-0223 | Millikan | Julie |
| 7050 FM 1960 E | Atascocita | TX | 77346 | 346-345-2937 | Abdelghani | Munay |
| 24811 Katy Freeway Suite 400 | Katy | TX | 77494 | 832-437-7712 | Adams | Brian |

| 21327 North Freeway Ste. C | Spring | TX | 77388 | 832-616-3076 | Adams | Brian |
| 702 W. Interstate 20 #104 | Arlington | TX | 76017 | 682-276-6881 | Akin | Clay |
| 3020 Legacy Dr. ste 290 | Plano | TX | 75023 | 972-459-7695 | Ali | Asif |
| 21149 SH 249 | Houston | TX | 77070 | 281-547-8800 | Anderson | Victor |
| 3400 S. Broadway Ave. #206 | Tyler | TX | 75703 | 903-630-5814 | Anderson | Morris |
| 5250 FM 2920, Ste. B1 | Spring | TX | 77388 | 832-585-1984 | Anzola | David |
| 1550 S. Custer Rd. #400 | McKinney | TX | 75070 | 214-592-8441 | Arden | Wendy |
| 28485 Tomball Pkwy. | Tomball | TX | 77375 | 832-843-6712 | Asberry | Stephanie |
| 3525 Longmire Rd | College Station | TX | 77845 | 979-450-7996 | Augsburger | Kimberly |
| 650 William D Fitch Pkwy  Ste. 300 | College Station | TX | 77845 | 979-485-2498 | Augsburger | Kimberly |
| 807 S. Central Expessway  Ste.160 | Anna | TX | 75409 | 972-514-5026 | Bardroff | Mary |
| 5480 FM 423 Ste. 500 | Frisco | TX | 75034 | 469-200-5636 | Benge | Tieri |
| 3415 Williams Dr. Ste 105 | Georgetown | TX | 78628 | 512-864-1848 | Blankenship | Celeste |
| 279 N. Interstate 35 E. Ste. A | DeSoto | TX | 75115 | 469-297-5854 | Boyo | Nailah |
| 6302 Frankford Ave. Suite 2 | Lubbock | TX | 79424 | 806-993-1029 | Brown | Beth |
| 709 N FM 1187 | Aledo | TX | 76008 | 817-782-9993 | Brown-Ibrahim | Angie |
| 6103 Wesley St.  Ste. G | Greenville | TX | 75402 | 903-494-5011 | Byrd | Charles |
| 516 N. Shary Rd. Ste. D | Mission | TX | 78572 | 956-997-0007 | Cantu | Rodolfo |
| 850 S Loop 336 W #200 | Conroe | TX | 77304 | 936-494-1599 | Carlisle | Pamela |
| 1215 Sam Houston Ave. Suite B | Huntsville | TX | 77340 | 936-439-4669 | Carlisle | Pamela |
| 328 W. Jefferson | Dallas | TX | 75208 | 774-332-8437 | Carruthers | Todd |
| 9324 Clifford St. Ste. 106 | Ft. Worth | TX | 76108 | 817-901-3363 | Chanthavong | Solo |
| 6412 Rufe Snow Drive | North Richland Hills | TX | 76148 | 469-297-5854 | Chanthavong | Solo |
| 1235 Clear Lake City Blvd. | Houston | TX | 77062 | 346-230-7097 | Chapman | Robert |
| 139 Gulf Freeway S | League City | TX | 77573 | 832-632-2327 | Chapman | Robert |
| 4237 N. Dixie | Odessa | TX | 79762 | 432-653-1760 | Clemence Jr. | Floyd |

| 4619 Ft. Crockett Blvd., Suite B | Galveston | TX | 77551 | 409-497-2164 | Dandridge | Ryan |
| 8350 N. Fry Rd. | Cypress | TX | 77433 | 281-304-2295 | Delce | Alfred |
| 1241 W. 11th St. | Houston | TX | 77008 | 346-330-9904 | DeStefano | Nick |
| 3408 82nd St. | Lubbock | TX | 79423 | 806-317-1866 | Diaz | Jennifer |
| 808 W Dickinson Blvd. Suite A | Fort Stockton | TX | 79735 | 432-299-0255 | Dilbeck | Kelly |
| 2001 Cross Timbers Road #103 | Flower Mound | TX | 75028 | 214-876-2921 | Edwards | Viviana |
| 642 Uptown Blvd. Ste. 200 | Cedar Hill | TX | 75104 | 469-454-6953 | Eyre | Lee |
| 9231 W. Parmer Lane  Ste. 102 | Austin | TX | 78717 | 512-369-3913 | Finn | Alexander |
| 549 W. McDermott Dr. | Allen | TX | 75013 | 214-785-7224 | Flood | Dan |
| 1224 N Hwy 377 Ste. 203 | Roanoke | TX | 76262 | 682-237-7502 | Fluker | Derick |
| 8745 Gary Burns Dr. #136 | Frisco | TX | 75034 | 469-888-4141 | Franklin | Alvin |
| 11300 Katy Freeway ste 300-A | Houston | TX | 77043 | 832-421-2978 | Gaytan | Maria |
| 11242 FM 1960 Rd W. #108 | Houston | TX | 77065 | 281-469-7620 | Gonzales | Tommy |
| 17445 Spring Cypress Rd. Ste. F | Cypress | TX | 77429 | 832-334-5922 | Gonzales | Tommy |
| 9150 S. Main Street  Ste. B3 | Houston | TX | 77025 | 832-659-0262 | Goode | Panthia |
| 303 W Northwest Hwy. Suite C | Grapevine | TX | 76051 | 817-722-6100 | Griffin | Lance |
| 8845 Memorial Blvd. #200 | Port Arthur | TX | 77640 | 409-237-4093 | Harrell | John |
| 3801 George Bush Turnpike  Ste. 130 | Plano | TX | 75075 | 972-905-5096 | Hubbard | Laura |
| 2406 B F Terry Blvd Ste 400 | Rosenburg | TX | 77471 | 832-600-8433 | Ikeh | Ugochukwu |
| 626 E US Hwy 67 | Duncanville | TX | 75137 | 855-696-7223 | Issokson | Michael |
| 3515 Sycamore School Rd. #110 | Fort Worth | TX | 76133 | 682-499-6126 | Jackson | Ellis |
| 6440 N. MacArthur Blvd. Ste. 120 | Irving | TX | 75039 | 469-206-3159 | James | Chris |
| 908 Audelia Rd. #100 | Richardson | TX | 75081 | 805-624-1529 | James | Chris |
| 1000 E. Main St.  Ste. 201 | Midlothian | TX | 76065 | 214-817-8662 | James | Chris |
| 1410 W Fairmont pkwy | Laporte | TX | 77571 | 281-402-5086 | Jimenez III | Albert |
| 15612 FM 529 Rd. | Houston | TX | 77095 | 832-906-6547 | Johnson | Rachelle |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2303 Ranch Rd. 620 S  Ste. 120 | Lakeway | TX | 78734 | 512-977-0400 | Johnson | Bradley |
| 1301 FM 407 Ste. #104 | Lewisville | TX | 75077 | 972-685-2414 | Jordan | Dusty |
| 7650 I-35 E. Ste. 136 | Corinth | TX | 76210 | 940-498-2949 | Jordan | Dusty |
| 2544 E. Abram St. Ste. 102 | Arlington | TX | 76010 | 817-200-6122 | Khalfan | Rahim |
| 3611 Greenville Ave. | Dallas | TX | 75206 | 469-499-7947 | Khalfan | Rahim |
| 11635 Harry Hines Blvd. Suite A | Dallas | TX | 75229 | 469-461-1555 | Khoja | Moiz |
| 1420 FM 1960 Bypass #106 | Humble | TX | 77338 | 281-725-6030 | Kitchen | Kenneth |
| 814 Honea Egypt Rd.  #104 | Magnolia | TX | 77354 | 281-642-7741 | Kitchen | Kenneth |
| 205 East Nasa Parkway #205 | Webster | TX | 77598 | 281-254-5592 | Krachinski | Sheabrie |
| 6925 Cypresswood Dr. Suite B | Spring | TX | 77379 | 832-932-5100 | Krachinski | Sheabrie |
| 426 FM 548 #120 | Forney | TX | 75126 | 972-357-7965 | Kunwar | Deepak |
| 1901 W. William Cannon Dr. #109 | Austin | TX | 78745 | 512-520-8027 | Lamb | Julian |
| 1127 N I-27 | Plainview | TX | 79072 | 806-213-0040 | Lanham | Kimberly |
| 4171 Dowlen Rd. #B2 | Beaumont | TX | 77706 | 409-333-1317 | Latil | Tara |
| 5636 N. Tarrant Pkwy. #104 | Fort Worth | TX | 76244 | 817-678-6588 | LeClaire | Robert |
| 403 Hwy 6  Ste. A-1 | Sugarland | TX | 77478 | 281-201-8958 | Lewis | Florence |
| 2131 N. Collins St. #401 | Arlington | TX | 76001 | 972-694-6401 | Lierz | Randy |
| 1250 NW Hwy  Ste. 1250H | Garland | TX | 75041 | 469-466-9600 | Lister | Julie |
| 5904 S. Cooper St.  Ste. 134 | Arlington | TX | 76017 | 682-777-4399 | Maloney | Lesley |
| 601 TrentonRd | McAllen | TX | 78504 | 956-627-0226 | Manasiya | Anita |
| 201 B HWY 332 W, Ste 1100 | Lake Jackson | TX | 77566 | (979) 266-9158 | Manasiya | Anita |
| 5100 W Sublett Rd.  Ste. 110 | Arlington | TX | 76001 | 817-516-5114 | Manohar | Steve |
| 305 E. FM Rd. 544 Ste. 909 | Murphy | TX | 75094 | 469-209-9680 | Marabella | Liza |
| 4145 Beltline Rd #214 | Addison | TX | 75001 | 469-209-9680 | Marabella | Liza |
| 12315 Westheimer Rd. Ste. E | Houston | TX | 77077 | 281-809-8115 | Maroun | Malak |
| 17404 NW Freeway | Jersey Village | TX | 77040 | 281-406-8839 | Martinez | Ryan |

| | | | | | | |
|---|---|---|---|---|---|---|
| 10242 E Northwest Hwy | Dallas | TX | 75238 | 972-685-5233 | Mavrikos | Mark |
| 1867 N. Plano Rd. | Richardson | TX | 75081 | 469-730-2133 | Mavrikos | Mark |
| 2023 W. McDermott Dr. Ste. 230 | Allen | TX | 75013 | 469-202-4707 | McReynolds Jr. | Bryan |
| 115 N. Rusk Ave. | Denison | TX | 75020 | 903-416-9211 | Melton | Phillip |
| 18006 Park Row Drive Ste. 300 | Houston | TX | 77084 | 281-206-7181 | Merrick | Carthon |
| 230 N. Denton Tap Rd. Ste. 113 | Coppell | TX | 75019 | 972-393-0913 | Mester | Joann |
| 100 Country Club Rd. Ste. 100 | Argyle | TX | 76226 | 940-464-2400 | Munoz | Jerry |
| 6390 Dezavala Rd. Ste. 102 | San Antonio | TX | 78249 | 210-476-5191 | Navarro | Patrick |
| 9402 Hwy 6 Ste. 350 | Missouri City | TX | 77459 | 281-972-9289 | Neret | Michael |
| 7939 Katy Frwy | Houston | TX | 77024 | 832-804-8970 | Nguyen | Richard |
| 6190 LBJ Freeway #600 | Dallas | TX | 75240 | 469-941-4141 | Nwaorgu | Prince |
| 12650 N. Beach St. Ste. 112 | Ft. Worth | TX | 76244 | 817-562-3000 | Osborne | Sheila |
| 480 W. Southlake Blvd. | Southlake | TX | 76092 | 817-900-6060 | Patel | Samit |
| 700 E. Whitestone Blvd. #103 | Cedar Park | TX | 78613 | 512-456-7609 | Patel | Vaishali |
| 2225 W. Park Row Drive | Arlington | TX | 76013 | 940-938-7043 | Patel | Dutt |
| 6010 S. Western St. Ste. 200 | Amarillo | TX | 79110 | 806-401-3200 | Patel | Vibha |
| 594 W. I-20 Ste. 235 | Grand Prairie | TX | 75052 | 214-263-3371 | Pettigrew | Latisha |
| 2520 E. Broadway St. | Pearland | TX | 77581 | 832-230-5353 | Ramirez | Luis |
| 1401 S. Hwy 287 Ste. 101 | Decatur | TX | 76234 | 940-539-9612 | Rendon | Loretta |
| 2314 Greencrest Blvd | Rockwall | TX | 75087 | 469-769-1990 | Routt II | Greg |
| 1502 W. University Dr. Ste. 113 | McKinney | TX | 75069 | 214-856-3223 | Rygalski | Heather |
| 23856 US 59 N | Kingwood | TX | 77339 | 281-623-5203 | Santos | Aundrea |
| 9203 Hiwy 6 S. #100 | Houston | TX | 77083 | 346-342-1165 | Schaub | Carla |
| 930 FM 1960-D | Houston | TX | 77073 | 832-286-4498 | Scott | Terri |
| 2324 Marketplace Dr Ste 110 | Waco | TX | 76711 | 254 424-9042 | Sepulveda | Jose |
| 200 E. Pecan St. #4 | Pflugerville | TX | 78660 | 512-305-3150 | Smith | Barrett |

| | | | | | | |
|---|---|---|---|---|---|---|
| 730 W. Pipeline Rd. | Hurst | TX | 76053 | 817-494-3335 | Sorensen | Jason |
| 5321 Lakeview Pkwy | Rowlett | TX | 75088 | 469-969-0333 | Sorrells | Wendy |
| 7330 Gaston Ave.  Ste. 102 | Dallas | TX | 75214 | 214-434-1727 | Spokes | Doug |
| 8315 Burnet Rd. Ste. C | Austin | TX | 78757 | 512-796-8190 | Sterling | Michael |
| 721 S 4th St | Waco | TX | 76706 | 254-300-5496 | Tamporello | Anne |
| 2038 W University Dr. | Denton | TX | 76201 | 817-479-8698 | Thaten | Linda |
| 602 W. Interstate 30 | Royse City | TX | 75189 | 469-723-5150 | Thomas | Condae |
| 2408 Southeast Green Oaks Blvd. | Arlington | TX | 75068 | 972-704-3420 | Thomas | Eric |
| 2700 El Dorado Pkwy. Ste. 203 | Little Elm | TX | 75068 | 972-704-3420 | Torosyan | Vilen |
| 2908 Garnett Ave. | Wichita Falls | TX | 76308 | 940-500-4490 | Tulagan | Emely |
| 5213 W. Lover's Ln. | Dallas | TX | 75209 | 214-613-2223 | Uglunts | Oleg |
| 500 W. Montgomery St. Ste. A | Willis | TX | 77378 | 936-218-5467 | Veronie | Carla |
| 2009 W. Hebron Pkwy. #104 | Carrollton | TX | 75010 | 469-263-0056 | Vue | Bee |
| 2900 NASA Parkway, Ste 280 | Seabrook | TX | 77586 | 281-532-6518 | Wallace | Sandra |
| 31007 I-10 W. #108 | Boerne | TX | 78006 | 830-368-5020 | Wolfenbarger | Jimmy |
| 3201 Bee Caves Road | Austin | TX | 78746 | 512-551-2911 | Womac | Timothy |
| 55 E. 1600 N. | North Logan | UT | 84321 | 435-752-5611 | Chesley | Ryan |
| 2836 South 5600 West #9 | West Valley City | UT | 84128 | 801-930-9684 | Mamales | Mark |
| 1787 W 7000 S | West Jordan | UT | 84084 | 385-296-1174 | Peterson | Alan |
| 1012 N Market Place Dr. | Spanish Fork | UT | 84660 | 801-806-4777 | Staheli | Michael |
| 1973 W. Sunset Blvd. Unit J | St. George | UT | 84770 | 435-628-9522 | Eyre | Lee |
| 256 E 12300 S Suite C | Draper | UT | 84020 | 801-572-8270 | Lavery | Ormond |
| 4874 S Highland Dr | Holladay | UT | 84117 | 385-900-8954 | Johancsik | Dawn |
| 2736 E Red Cliffs Dr, #2 | St. George | UT | 84790 | 435-627-1404 | Gentry | Adam |
| 603 S. Main St. #1 | Cedar City | UT | 84720 | 435-708-1411 | Gentry | Adam |
| 225696 Rib Mountain Dr | Wausau | WI | 54401 | 715-870-2137 | Burkhart | Tara |

| 305 Main St. | Racine | WI | 53403 | 262-256-2623 | Camacho | Javier |
| 805 River Road | Wisconsin Dells | WI | 53965 | 608-253-0713 | Griepentrog | Nathan |
| 17550 W. Bluemound Rd. #200 | Brookfield | WI | 53045 | 269-599-8020 | Islas | Andrea |
| N56 W 14108 Silver Spring Dr. Suite 111 | Menomonee Falls | WI | 53051 | 262-505-5695 | Johnson | Jennifer |
| 10236 W. National Ave. | West Allis | WI | 53227 | 414-988-4126 | Landry | Brad |
| 7249 S. 76th St. | Franklin | WI | 53132 | 414-235-8767 | Perszyk | Robert |
| 127 N Main St. | River Falls | WI | 54022 | 715-620-7316 | Ryan | Lisa |
| 2814 New Pinery Rd. | Portage | WI | 53901 | 608-683-2055 | Griepentrog | Nathan |
| 555 S. Midvale Blvd. #113 | Madison | WI | 53711 | 608-230-6153 | Griepentrog | Eric |
| 2416 W. Mason St. #101B | Green Bay | WI | 54304 | 920-544-4048 | Immel | Aubrey |
| 201 Helen Walton St. Ste. 6 | Tomah | WI | 54660 | 608-567-2014 | Pfaff | Sara |
| 2687 Windsor St. | Sun Prairie | WI | 53590 | 608-318-5112 | Pietrick | Sara |
| 17325 W Capitol Dr. | Brookfield | WI | 53045 | 262-439-9691 | Tonkin | Ben |
| 1921 Silvernail Rd #102 | Pewaukee | WI | 53072 | 262-239-4728 | Walsh | Matthew |
| 157 Collins Rd | Jefferson | WI | 53549 | 920-541-3414 | Nash | Christopher |

## EXHIBIT "M-2"

## LIST OF FORMER OR INACTIVE FRANCHISEES IN SYSTEM

Names, address, and phone numbers of franchisees of AMERICAN SHAMAN FRANCHISE SYSTEM, LLC, who had an outlet terminated, cancelled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under a Franchise Agreement during the most recently completed fiscal year, or who have not communicated with us within ten (10) weeks of the issuance date of this disclosure document.  If you buy this franchise, your contact information may be disclosed to other buyers when you leave the franchise system.

\

| Owner Last Name | Owner First Name | Location Address | City | State | Zip | Store Phone |
|---|---|---|---|---|---|---|
| Kasem | Elias | 9550 W. Van Buren St. #20 | Tolleson | AZ | 85353 | 602-458-9978 |
| Pugh | Ronnie | 104 E. Main St. | Russellville | AR | 72801 | 479-219-5289 |
| Carnes | Brandon | 3008 Manatee Ave W | Bradenton | FL | 34205 | 941-245-1214 |
| Jensen | Lisa | 103 South US Hwy 1 | Jupiter | FL | 33477 | 561-694-7600 |
| Carnes | Brandon | 1986 Osceola Pkwy | Kissimmee | FL | 34743 | 407-201-2347 |
| Emerson | Cariann | 880 A1A North Suite 24 | Ponte Vedra | FL | 32082 | 904-395-4000 |
| Carnes | Brandon | 3908b S. Tamiami Trail | Sarasota | FL | 34231 | 941-812-2534 |
| Hess | Gene | 2514 S. Florida Ave. | Lakeland | FL | 33803 | 863-937-3335 |
| Holt | Jennifer | 6844 Park Blvd. N | Pinellas Park | FL | 33781 | 727-256-2584 |
| Rogers | Justin | 6703 14th St. W. US Hwy. 41, Unit #105 | Bradenton | FL | 34207 | 941-739-6913 |
| Schantz | Ryan | 1311 Lyons Rd | Coconut Creek | FL | 33063 | 954-366-6574 |
| Gonzalez | Angel | 620 Barnes Blvd | Rockledge | FL | 32955 | 321-806-4416 |
| Brashear | Wade | 2483 Cedarcrest Rd.  #209 | Ackworth | GA | 30101 | 785-249-8689 |
| Brashear | Wade | 5575 Wendy Bagwell Pkwy. | Hiram | GA | 30141 | 770-693-0203 |
| Clark | Steven | 3421-5 Cypress Mill Road | Brunswick | GA | 31520 | 912-342-7234 |

| Chesley | Ryan | 10378 W. Fairview Ave. | Boise | ID | 83704 | 208-506-7826 |
|---------|------|------------------------|-------|-----|-------|--------------|
| Call | Pam | 1615 N Calumet Ave #200 | Valparaiso | IN | 46383 | 217-707-5220 |
| Call | Pam | 5145 E 81st Ave | Merrillville | IN | 46410 | 219-940-3202 |
| Hastings | Heather | 729 N. Green St. #500 | Brownsburg | IN | 46112 | 317-286-7222 |
| Robinson | TaSheila | 1733 E 37th Ave | Hobart | IN | 46342 | 219-973-2985 |
| Lyza | Maria | 879 Joliet St | Dyer | IN | 46311 | 219-227-8101 |
| Ahern | Steven | 2700 2nd Ave. Suite 1 | Council Bluffs | IA | 51501 | 712-328-1344 |
| Greenwood | Erica | 1255 S Tyler Rd. Ste. D | Wichita | KS | 67209 | 316-927-2707 |
| Nason | Melissa | 108 E 7th St. | Junction City | KS | 66441 | 785-223-0660 |
| Johnson | Beth | 1117 Commercial St. | Emporia | KS | 66502 | 620-208-8510 |
| Ottley | Trevor | 2013 Vine St. | Hays | KS | 67601 | 785-261-0890 |
| Reyes | Chris | 13436 Metcalf Ave. | Overland Park | KS | 66213 | 913-258-3940 |
| Shepherd | Walker | 1835 NW Topeka Blvd. Ste 201 | Topeka | KS | 66608 | 785-350-2250 |
| Underwood | Todd | 121 Express Ln. Ste. D | Lansing | KS | 66043 | 931-559-3604 |
| Ware | Mary | 1136 N. Bitting Ave. | Wichita | KS | 67203 | 316-558-5898 |
| Zimmerman | Jeff | 2570 S. Broadway St. #104 | Wichita | KS | 67216 | 316-201-4186 |
| LaMot | Alisha | 130 Walton Ave. Unit C | Bowling Green | KY | 42104 | 270-495-5730 |
| Lindsey | Scott | 624 N. 3rd St. Ste. 100 | Bardstown | KY | 40004 | 503-331-6005 |
| Lindsey | Scott | 970 Breckenridge Ln. Ste. 101 | Louisville | KY | 40702 | 502-409-5615 |
| Tribell | Russell | 325 N. 12th St. | Middlesboro | KY | 40965 | 606-896-8048 |
| Allgaier | Devin | 347 Clarkson Rd. | Ellisville | MO | 63011 | 636-220-7118 |
| King | Kristen | 100 E. 6th St, Ste. 6 | Kearney | MO | 64060 | 816-745-7977 |
| Jensen | Lisa | 80 W County Center | St. Louis | MO | 63131 | 314-944-6669 |
| Thompson | Jeffrey | 104 N Commercial St. | Branson | MO | 65616 | 417-334-5335 |
| Freidel | Mark | 4347 NE Chouteau Trfwy. | Kansas City | MO | 64117 | 816-832-8719 |
| Tomc | Kevin | 1303 Platte Falls Rd. Ste. C | Platte City | MO | 64079 | 816-858-6039 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Underwood | Todd | 3518 NE Vivion Rd. | Kansas City | MO | 64119 | 816-599-6010 |
| Scellin | Brad | 228 W. 42nd St. | Kearney | NE | 68845 | 308-455-1486 |
| Van Wyhe | Jeremy | 701 S. 25th St. | Norfolk | NE | 68701 | 712-253-0380 |
| Clarke | Sidney | 3000 W Ann Rd, Suite 102 | Las Vegas | NV | 89031 | 702-463-2118 |
| Clarke | Sidney | 355 W. Mesquite Blvd. Ste. C70 | Mesquite | NV | 89027 | 702-849-0547 |
| Batchelder-Nelson | Jennifer | 7 Colby Court ste 150 | Bedford | NH | 03110 | 603-339-8154 |
| Daigle | Jennifer | 416 Daniel Webster Hwy | Merrimack | NH | 03054 | 603-377-7764 |
| Gragg | Joshua | 1111 S. Willow St. | Manchester | NH | 03103 | 603-232-2006 |
| Cooper | Amanda | 14050 South Peoria Ave, #104 | Bixby | OK | 74008 | 918-209-4959 |
| Dietrich | Jonathon | 115 W. Blue Starr Dr. | Claremore | OK | 74017 | |
| Hefley | Kathleen | 110 E. Dewey Ave. | Sapulpa | OK | 74066 | 918-216-1109 |
| Holldorf | Dan | 2813 W. University Blvd. | Durant | OK | 74701 | 580-634-2530 |
| James | Peter | 801 E 6th St. | Okmulgee | OK | 74447 | 918-304-2090 |
| Johnson | Ranae | 8016 S. Memorial Dr. | Tulsa | OK | 74133 | 918-994-7194 |
| Maddox-Tilley | Kelly | 118 S. College St. | Cordell | OK | 73632 | 405-825-3257 |
| Moss | John | 12126 W. Reno Ave. | Yukon | OK | 73099 | 405-204-5306 |
| Sullivan | Keith | 140 S. Midwest Blvd. Ste D | Midwest City | OK | 73110 | 405-739-0859 |
| Wilson | Matthew | 2334 SE Washington Blvd. Ste. 1 | Bartlesville | OK | 74006 | 918-333-5319 |
| Jensen | Lisa | 9 E. 3rd St. | Bethlehem | PA | 18015 | 610-601-2411 |
| Haskell | Katherine | 35 S. Willowdale Dr. #310 | Lancaster | PA | 17602 | 717-740-5062 |
| Reisinger | Michael | 63 Erford Rd. | Camp Hill | PA | 17011 | 717-412-4825 |
| Jensen | Lisa | 288 Thayer St. | Providence | RI | 02906 | 401-414-4595 |
| Graham | Lawrence | 116 Granite St Suite 10-A | Westerly | RI | 02891 | 401-315-0323 |
| Hermance | John | 4409 Chapman Hwy. Suite Y | Knoxville | TN | 37920 | 865-200-4964 |
| HySmith | Dena | 699 Parkway Ste. 4 | Sevierville | TN | 37862 | 865-286-4230 |

| Inmon | Kristin | 455 Hwy 321 N Unit D | Lenoir City | TN | 37771 | 865-816-3476 |
|---|---|---|---|---|---|---|
| Vaughn | Joshua | 3026 Tazewell Pike | Knoxville | TN | 37818 | 865-200-8344 |
| Wyrick | Tom | 5911 Kingston Pike | Kingston | TN | 37919 | 865-444-2937 |
| Wyrick | Thomas | 7549 Barnett Wy. | Powell | TN | 37849 | 865-859-0223 |
| Holt | Bonnie | 119 Nashville Hwy Ste. 121 | Columbia | TN | 38401 | 615-481-3601 |
| Ottley | Trevor | 105a N. Maple St. | Murfreesboro | TN | 37130 | 615-203-5666 |
| Hysmith | Dena | 9450 S Northshore Dr | Knoxville | TN | 37922 | 865-507-4790 |
| Taylor | Catherine | 148 N. Belvedere Dr.  #148 | Gallatin | TN | 37066 | 615-461-8225 |
| Ayala | Mario | 6463A Westheimer Road | Houston | TX | 77057 | 713-485-4616 |
| Benge | Tieri | 26744 E University Dr. | Little Elm | TX | 76227 | 469-481-6139 |
| Bennett | Amanda | 4112 34th Street | Lubbock | TX | 75006 | 806-317-1664 |
| Broussard | Thomas | 303 W. Gray St. Ste. B | Houston | TX | 77019 | 713-529-2892 |
| Cadwell | Bene | 8701 S Spring Cypress Rd. Ste. E | Spring | TX | 77375 | 832-761-5940 |
| Connell | Joseph | 18720 Stone Oak Pkwy. #121 | San Antonio | TX | 78258 | 210-332-5266 |
| Cook | Connie | 401 N Hwy 77  Ste 11-A | Waxahachie | TX | 75165 | 214-980-1415 |
| De Pass | Andrew | 1135 Crabb River Rd. | Richmond | TX | 77469 | 713-581-4614 |
| Dever | Kimberly | 13837 Cypress N Houston Rd. | Cypress | TX | 77429 | 281-653-9565 |
| Diaz | Jennifer | 602 Donald Preston Dr Ste 107 | Wolfforth | TX | 79382 | 806-407-3600 |
| Dietrich | Gene | 13450 Research Blvd. Suite 100 | Austin | TX | 78750 | 512-645-0510 |
| Dollens | Kevin | 4741 S. Hwy 6 S | Missouri City | TX | 77459 | 281-969-5677 |
| Edge | Robert | 9793 Culebra Rd #102 | San Antonio | TX | 78251 | 210-474-0025 |
| Egbajie | Oshie | 12620 Woodforest Blvd.  Ste. 450 | Houston | TX | 77015 | 713-485-6045 |
| Fogleman | Jason | 1108 N. Loop 336 W  Ste. U | Conroe | TX | 77301 | 936-242-6997 |
| Gabriel | Vincent | 4535 Fredericksburg Rd., #117 | San Antonio | TX | 78201 | 210-439-1458 |
| Halili | Orion | 3020 Marina Bay Dr. Ste. C | League City | TX | 77573 | 281-549-6098 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Ikeh | Ugochukwu | 2201 Thompson Rd. #107 | Richmond | TX | 77469 | 832-451-6504 |
| Jones | Randy | 1001 N. Sam Rayburn Frwy | Sherman | TX | 75090 | 903-328-5575 |
| Krachinski | Sheabrie | 3759 FM 1488 Suite 450 | The Woodlands | TX | 77382 | 936-267-0105 |
| Kunwar | Deepak | 4271 Interstate 35 N. Frontage Rd. | Lacy Lakeview | TX | 76705 | 254-732-2887 |
| Manasiya | Anita | 3803 Houston Hwy Suite 500 | Victoria | TX | 77901 | 361-220-7746 |
| Mersberger | Greg | 721 Keller Pkwy #105 | Keller | TX | 76248 | 682-593-7566 |
| Milner | Travis | 20323 FM 529 Rd.  Ste. 170 | Cypress | TX | 77433 | 832-427-1166 |
| Mitchell | Michael | 2305 Ave F NW #850 | Childress | TX | 79201 | 940-938-7043 |
| Nolde | Bryce | 5425 S Padre Island Dr. Ste. 104 | Corpus Christi | TX | 78411 | 361-414-9192 |
| Pena | Dante | 1760 Mall Circle Drive | Ft. Worth | TX | 76116 | 817-720-6205 |
| Schaub | Carla | 3001 S. Central Expy #104 | McKinney | TX | 75070 | 214-548-5734 |
| Shakurjamal | Ahmad | 5202 Bissonnett St.  Suite A | Bellaire | TX | 77401 | 346-980-8767 |
| Smith | LaToya | 11130 Gulf Freeway Ste. 700 | Houston | TX | 77034 | 346-227-8687 |
| Smith | Sam | 7909 W. Grand Pkwy. | Richmond | TX | 77407 | 832-585-1984 |
| Smith | Barrett | 3116 Manor Rd. | Austin | TX | 78723 | 512-551-3070 |
| Thaten | Linda | 262 S I-35E | Denton | TX | 76205 | 940-514-0520 |
| Thaten | Linda | 3613 Shire Blvd.  Ste. 150 | Richardson | TX | 75082 | 832-585-1984 |
| Wilson | Marvalyn | 15853 N. Freeway Ste. 550 | Ft. Worth | TX | 76177 | 682-502-4850 |
| Wolfenbarger | Jimmy | 5407 4th St. Suite E | Lubbock | TX | 79416 | 806-701-4852 |
| McKellar | Connie | 10468 S Redwood Rd. | South Jordan | UT | 84095 | 801-446-8971 |
| McKellar | Connie | 1141 West State St. #6B | Hurricane | UT | 84737 | 435-627-3650 |
| McKellar | Connie | 7355 S. 900 E. #1 | Midvale | UT | 84047 | 801-878-4495 |
| Peterson | Alan | 164 S Main St | Richfield | UT | 84701 | 485-896-2900 |
| Pendergast | MaryLou | 159 Pearl St. | Essex Junction | VT | 05452 | 802-876-7110 |

| Kennedy | Mindi | 2324 18th St. Ste. D | Kenosha | WI | 53140 | 262-764-1037 |
|---|---|---|---|---|---|---|
| Lang | Ashley | 1060 S. Koeller St. | Oshkosh | WI | 54902 | 920-385-7547 |
| Burkhart | James | 1180 Meridian Dr. | Plover | WI | 54467 | 715-295-0688 |
| Hromatka | Andrew | 3110 Tower Ave. Ste. 1B | Superior | WI | 54880 | 715-718-5500 |
| Pfaff | Sara | 2928 Market Place #164 | Onalaska | WI | 54650 | 608-881-6565 |
| Lang | Ashley | 6075 Gemini Dr. #101 | Madison | WI | 53718 | 608-283-9191 |
| Griepentrog | Nathan | 637 S. Main St. | DeForest | WI | 53532 | 608-888-0391 |

**EXHIBIT "N-1"**

**RECEIPT**

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If American Shaman Franchise System, LLC, offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, American Shaman Franchise System, LLC, or an affiliate in connection with the proposed franchise sale. New York law requires a franchisor to provide the Franchise Disclosure Document at the earlier of the first personal meeting or ten (10) business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

If American Shaman Franchise System, LLC, does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and your state agency.

The name and information regarding the seller of franchises is as follows:

> Marc Sayler, Vice President
> marc@cbdamericanshaman.com
> www.cbdamericanshaman.com
> 855-427-2233  ext 115

The date of the issuance of the Disclosure Document is April 30, 2021.

I received a disclosure document dated _____ that included the following Exhibits:

| | |
|---|---|
| Exhibit A-1 | Agent for Service of Process |
| Exhibit A-2 | List of State Agencies |
| Exhibit B | Financial Statements |
| Exhibit C | Franchise Agreement |
| Exhibit D | Non-Compete and Non-Disclosure Agreement |
| Exhibit E | Lease Rider |
| Exhibit F | Multi Unit Development Agreement |
| Exhibit G | Employee Confidentiality Agreement |
| Exhibit H | Operations Manual Table of Contents |
| Exhibit I | Release |
| Exhibit J | State-Specific Addenda |
| Exhibit K | Assignment of Telephone Numbers, Telephone Listings, and Internet Addresses |
| Exhibit L | Authorization for Electronic Funds Transfer |
| Exhibit M-1 | List of Active Franchisees in System |
| Exhibit M-2 | List of Former or Inactive Franchisees That Have Left System |
| Exhibit N-1 | Receipt |
| Exhibit N-2 | Receipt |

FRANCHISEE


_____          _____
Signature                                                         Date


_____
Print Name

Your Copy – Sign and keep for your records

**EXHIBIT "N-2"**

**RECEIPT**

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If American Shaman Franchise System, LLC, offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, American Shaman Franchise System, LLC, or an affiliate in connection with the proposed franchise sale. New York law requires a franchisor to provide the Franchise Disclosure Document at the earlier of the first personal meeting or ten (10) business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

If American Shaman Franchise System, LLC, does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, D.C. 20580 and your state agency.

The name and information regarding the seller of franchises is as follows:

> Marc Sayler, Vice President
> marc@cbdamericanshaman.com
> www.cbdamericanshaman.com
> 855-427-2233  ext 115

The date of the issuance of the Disclosure Document is April 30, 2021.

I received a disclosure document dated _____ that included the following Exhibits:

| | |
|---|---|
| Exhibit A-1 | Agent for Service of Process |
| Exhibit A-2 | List of State Agencies |
| Exhibit B | Financial Statements |
| Exhibit C | Franchise Agreement |
| Exhibit D | Non-Compete and Non-Disclosure Agreement |
| Exhibit E | Lease Rider |
| Exhibit F | Multi Unit Development Agreement |
| Exhibit G | Employee Confidentiality Agreement |
| Exhibit H | Operations Manual Table of Contents |
| Exhibit I | Release |
| Exhibit J | State-Specific Addenda |
| Exhibit K | Assignment of Telephone Numbers, Telephone Listings, and Internet Addresses |
| Exhibit L | Authorization for Electronic Funds Transfer |
| Exhibit M-1 | List of Active Franchisees in System |
| Exhibit M-2 | List of Former or Inactive Franchisees That Have Left System |
| Exhibit N-1 | Receipt |
| Exhibit N-2 | Receipt |

FRANCHISEE


_____            _____
Signature                                                          Date

_____
Print Name

Franchisor's Copy - Sign, Detach and Return to American Shaman Franchise System, LLC

FDD No. _____