UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THOMAS O'NEAL,

    Plaintiff,

v.                                           Case No. 8:20-cv-936-KKM-AAS

AMERICAN SHAMAN FRANCHISE SYSTEM,
LLC; CBD AMERICAN SHAMAN,
LLC; SHAMAN BOTANICALS, LLC;
SVS ENTERPRISES, LLC; STEPHEN
VINCENT SANDERS II; BRANDON CARNES;
and FRANCIS KALAIWAA,

    Defendants.
_____/

## ORDER

Plaintiff Thomas O'Neal moves to determine the applicability of the crime-fraud exception to communications and work-product produced by Defendants American Shaman Franchise System, LLC (Shaman Franchise), CBD American Shaman, LLC (American Shaman), Shaman Botanicals, LLC, SVS Enterprises, LLC, Stephen Vincent Sanders II, and Francis Kalaiwaa's (collectively, the Shaman Defendants) and their attorneys. (Doc. 258). The Shaman Defendants respond in opposition (Doc. 265) and Mr. O'Neal replies (Doc. 280).

1

I.  **BACKGROUND**

   **A. Underlying Facts**[1]

On August 29, 2018, Mr. O'Neal contracted with Shaman Franchise to operate a retail establishment to sell hemp derived CBD products in the Florida market. (Doc. 6, ¶¶ 14, 17–18; Doc. 6, Ex. 1). Shaman Franchise is an affiliate of American Shaman, which sells franchises for retail establishments that sell the CBD products. (Doc. 6, ¶ 14). Under the contract, Mr. O'Neal agreed to manage one or more Florida stores that American Shaman planned to open, but American Shaman would cover the initial costs to open the store and classify the stores as company-owned. (*Id.* at ¶ 18). Under the contract, Mr. O'Neal would work or staff his first company-owned store for sixty hours per week and would receive $1,200.00 per week as a non-recoverable draw against commissions.[2] (*Id.* at ¶ 19; Doc. 6, Ex. 1). The contract also provided Mr. O'Neal with the right to open a second company-owned store. (Doc. 6, Ex. 1).

Mr. O'Neal found a retail location in Tampa, and American Shaman executed a lease in October 2018. (Doc. 6, ¶ 20). In November 2018, Mr. O'Neal

---

[1] This report pulls the facts from Mr. O'Neal's amended complaint in the prior action. *See* (Doc. 6).

[2] Under the contract, Mr. O'Neal would also own 30% of the business and 30% of the store's net profits, which he would receive monthly. (Doc. 6, ¶ 19; Doc. 6, Ex. 1).

met Joe Griffith, who was supposed to help build out the Tampa store, but Mr. O'Neal instead did much of the initial prep work because Mr. Griffith, who managed several American Shaman stores in the area, was working in Orlando. (*Id.* at ¶¶ 21–22). Despite being informed by the president of Shaman Franchise that Mr. Griffith would have the Tampa store ready to open on December 7, 2018, Mr. O'Neal returned to Tampa on December 5, 2018, after attending required sales training, to find the store not ready to be open. (*Id.* at ¶¶ 23–24). Mr. O'Neal worked diligently to prepare the store to open and began selling products on December 14, 2018. (*Id.* at ¶ 26).

In January 2019, Mr. Griffith informed Mr. O'Neal that Mr. Carnes and Ms. Sigman would be visiting the Tampa store. (*Id.* at ¶ 27). Mr. Griffith also instructed Mr. O'Neal to travel to Manatee County for the grand opening of Mr. Carnes' and Ms. Sigman's store. (*Id.* at ¶ 28). After the Manatee County store opening, Mr. Griffith informed Mr. O'Neal that Mr. O'Neal works for Mr. Carnes and Ms. Sigman.[3] (*Id.* at ¶ 29). Mr. Carnes and Ms. Sigman then became increasingly involved in Mr. O'Neal's Tampa store. (*Id.* at ¶ 31). Part of that involvement included Mr. Carnes installing new surveillance, which intercepted and recorded audio, in the Tampa store. (*Id.* at ¶¶ 31–32). Because of potential legal liability for recording in the store without notices of

---

[3] Mr. Carnes and Ms. Sigman operate Florida Shaman Properties, LLC (Florida Shaman), which is an American Shaman franchisee. (Doc. 6, ¶ 14).

3

surveillance, Mr. O'Neal informed Mr. Griffith that he unplugged the security system. (*Id.* at ¶ 33). That same day, Mr. Griffith notified Mr. O'Neal that he was terminated. (*Id.* at ¶ 34).

**B. Procedural History**

In his amended complaint,[4] Mr. O'Neal sued Shaman Franchise for breach of contract. (Doc. 6, ¶¶ 35–38). Mr. O'Neal sued Florida Shaman, Mr. Carnes, and Ms. Sigman for tortious interference with a contract. (*Id.* at ¶¶ 39–44). Mr. O'Neal sued American Shaman and Shaman Botanicals for violating the Fair Labor Standards Act (FLSA) on minimum and overtime wages and under the Florida Private Whistleblower Act. (*Id.* at ¶¶ 45–47, 48–51, 53–58). Mr. O'Neal sued all the defendants for unjust enrichment. (*Id.* at ¶¶ 59–63). Shaman Franchise, American Shaman, and Shaman Botanicals answered and asserted affirmative defenses. (Docs. 19, 20, 21). Mr. O'Neal, Shaman Franchise, American Shaman, and Shaman Botanicals settled.[5] (Docs. 65, 72).

On May 1, 2020, Mr. O'Neal served Florida Shaman. (Doc. 22). Because

---

[4] Mr. O'Neal filed his initial complaint on April 22, 2020. (Doc. 1). On April 29, 2020, Mr. O'Neal filed an amended complaint, which was the operative complaint in the prior action. (Doc. 6).

[5] The settlement agreement between Shaman Franchise, American Shaman, Shaman Botanicals, LLC (collectively, the Settled LLC Defendants) and Mr. O'Neal in the legal action preceding Mr. O'Neal's current post-judgment efforts will hereafter be referred to as the "Prior Settlement Agreement."

4

Florida Shaman did not respond to Mr. O'Neal's amended complaint, Mr. O'Neal successfully moved for a Clerk's default against Florida Shaman. (Docs. 25, 26).

On September 7, 2020,[6] Mr. O'Neal served Mr. Carnes and Ms. Sigman. (Docs. 31, 32). After several attempts to personally serve Mr. Carnes and Ms. Sigman, Mr. O'Neal served Attorney Shawn Pickett as an agent for Mr. Carnes and Ms. Sigman based on Mr. O'Neal's process server's telephone conversation with Mr. Carnes. (*See* Doc. 39, Ex. 1). Attorney Pickett later claimed that he lacked the authority to accept service on behalf of Mr. Carnes and Ms. Sigman. (*See* Doc. 39). Thus, Mr. O'Neal moved the court to determine the validity of the service. (*See id.*). A February 26, 2021 order found the service on Mr. Carnes and Ms. Sigman through serving Attorney Pickett was valid. (Doc. 42). Mr. O'Neal then successfully moved for Clerk's default against Mr. Carnes and Ms. Sigman. (Docs. 43, 44, 49, 51).

Mr. O'Neal moved for default judgment against Mr. Carnes, Ms. Sigman, and Florida Shaman Properties, LLC. (Doc. 58).[7] A July 30, 2021 order granted

---

[6] Because of issues in serving Mr. Carnes and Ms. Sigman, Mr. O'Neal successfully moved for extensions to serve them. (*See* Docs. 23, 24, 28, 29).

[7] Before Mr. O'Neal moved for default judgment against Florida Shaman, Mr. Carnes, and Ms. Sigman, Shaman Franchise, American Shaman, and Shaman Botanicals moved to defer the entry of default judgment under the *Frow* doctrine. (Doc. 46). Shaman Franchise, American Shaman, and Shaman Botanicals also opposed Mr. O'Neal's motion for default judgment. (Doc. 61). Those parties settled.

5

Mr. O'Neal's motion for default judgment, awarding Mr. O'Neal $608,400 in damages. (Doc. 77). Post-judgment, Mr. O'Neal successfully moved for entry of a charging order, entry of writs of garnishment, and leave to file a supplemental complaint. (Docs. 93, 127, 146).

On July 11, 2022, the court granted the Shaman Defendants' motion for judgment on the pleadings and dismissed Mr. O'Neal's supplemental complaint. (Doc. 230). Mr. O'Neal now moves for "an order finding that the crime-fraud exception applies to [Mr. Carnes] and [the Shaman Defendants'] attorney-client and attorney work-product privileges." (Doc. 258, p. 1).

## II.   ANALYSIS

Mr. O'Neal requests a judicial order declaring the crime-fraud exception applies to communications between Mr. Carnes and the Shaman Defendants such that Mr. "Carnes and [the Shaman] Defendants are not entitled to the benefit of the privileges to conceal their fraudulent and criminal conspiracy." (Doc. 258, pp. 1–2). At present, it is not immediately clear what documents or communications Mr. O'Neal seeks to impose the crime-fraud exception upon. This court granted a stay of discovery in this postjudgment matter on January 20, 2022, pending the multiple dispositive motions filed at the time by both parties and in light of the "more than 1,100 requests for production" Mr. O'Neal represented he intended to serve upon the Shaman Defendants. (Doc. 158, p. 2). On March 10, 2022, this court extended that stay of discovery "pending the

6

entry of a case management order" because the multiple dispositive motions "coupled with the one-sided nature of existing discovery requests . . . present[ed] good cause and unusual circumstances justifying a stay of discovery." (Doc. 203, pp. 3–4). This court also recently denied Mr. O'Neal's attempt at a limited lift of the discovery stay. (Doc. 275).

Based on Mr. O'Neal's allegations of "fraudulent and criminal conspiracy," it appears Mr. O'Neal claims "overwhelming" evidence of criminal conduct necessitates a judicial order concluding all communications between Mr. Carnes and the Shaman defendants are not subject to protection from the attorney-client privilege and the attorney work-product privilege. (Doc. 258, p. 2).

This request must be denied for several reasons. At a base level, Mr. O'Neal's blanket request is "inextricably intertwined with the merits" of his fraudulent transfer claims against the Shaman Defendants. *JAWHBS LLC v. Arevalo*, Case No. 15-cv-24176, 2017 WL 11681023 at *3 (S.D. Fla. Feb. 24, 2017). Mr. O'Neal essentially requests the court "preemptively decide that [the Shaman Defendants'] actions in this case were fraudulent and/or criminal." *Id*.

However, as discussed in prior orders, the court's prior order granting the Shaman Defendants' motion for judgment on the pleadings now means Mr. O'Neal no longer has active postjudgment claims before the court. *See* (Doc. 273). The undersigned recently denied Mr. O'Neal's motion to amend (Doc. 273)

7

as well as a motion for reconsideration of the order denying Mr. O'Neal's motion to amend (Doc. 284). Any relevance Mr. O'Neal's allegations have on the outcome of the Shaman Defendants' counterclaims is therefore muted.

Further, complying with Mr. O'Neal's request would constitute an improper use of the crime-fraud exception. *See Id*. ("[t]he compelled disclosure of otherwise privileged communications cannot be undone, but the [Plaintiff's] problem of not having every piece of evidence they would like to have before trial or some other evidentiary hearing can be ameliorated"). Mr. O'Neal's motion appears to request a blanket waiver of attorney-client privilege and attorney work-product privilege as applied to Mr. Carnes and the Shaman Defendants. *See* (Doc. 258, pp. 1–2) (requesting the court "declare that [Mr.] Carnes and [the Shaman] Defendants are not entitled to the benefit of the privileges to conceal their fraudulent and criminal conspiracy").

As case law cited by Mr. O'Neal notes, "for the crime-fraud exception to apply, a court must find that the *specific document or testimony* that the court is ordering to be produced reflects work of the attorney that was performed in furtherance of the criminal or fraudulent activity or that was closely related to it." (Doc. 258, p. 19) (*citing Drummond Co., Inc. v. Conrad & Scherer*, 885 F.3d 1324, 1338 (11th Cir. 2018)). Tying requests to overturn attorney-client privilege on the basis of the crime-fraud exception to particular documents or testimony is necessary to preserve "the integrity of the adversary process by

8

allowing a lawyer to work "with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Drummond*, 885 F.3d at 1335 (*citing Hickman v. Taylor*, 329 U.S. 495, 510, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). That an inquiry into the crime-fraud exception "focuses on the client's conduct" is of little relevance given the breadth of relief Mr. O'Neal requests. (Doc. 280, p. 2).

Most prudently, Mr. O'Neal fails to establish a prima facie basis for granting any crime-fraud exception to the attorney-client privilege in this matter. Much of the allegations Mr. O'Neal raises in his motion to substantiate his claims of fraud are just that — allegations, unsupported beyond bare reference to public state financial disclosure documents and exhibits filed by both parties as part of this postjudgment action. The undersigned has previously concluded the Shaman Defendants "provided a plausible and legitimate explanation for the reacquisition of the Transferred Stores." (Doc. 215, p. 22). Nothing in Mr. O'Neal's motion presently rebuts that explanation sufficient to substantiate "a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice." *Drummond*, 885 F.3d at 1335 (*citing In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987)).

9

## III. CONCLUSION

For the aforementioned reasons, Mr. O'Neal's Motion to Determine the Applicability of the Crime-Fraud Exception (Doc. 258) is **DENIED**.

**ORDERED** in Tampa, Florida on February 22, 2023.

*Amanda Arnold Sansone*
AMANDA ARNOLD SANSONE
United States Magistrate Judge